Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                 TALLAHASSEE DIVISION

 3

 4   QUENNEL JACKSON,

 5          Plaintiff,
                                  CASE NO.:
 6   vs.                          4:25-cv-00218-AW-MAF

 7   GT TECHNOLOGIES, INC.,

 8          Defendant.
     _____/

 9

10   VIDEOTAPED
     DEPOSITION OF:      QUENNEL JACKSON
11

     TAKEN BY:           The Defendant
12

     DATE TAKEN:         Tuesday, January 13, 2025
13

     TIME:               10:04 a.m. - 7:55 p.m.
14

     PLACE:              Via Zoom Videoconference
15

     REPORTED BY:        Tonya H. Magee, Registered
16                       Professional Reporter and Notary
                         Public, State of Florida at Large

17

18

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:
 2
 3   EMANUEL KATAEV, ESQUIRE
     OF:   Sage Legal, LLC
 4         18211 Jamaica Avenue
           Jamaica, New York 11423
 5         (718) 412-2421
           emanuel@sagelegal.nyc
 6
           APPEARING VIA VIDEOCONFERENCE ON BEHALF OF THE
 7         PLAINTIFF
 8
     ELIZABETH T. JOZSI, ESQUIRE
 9   MOLLY ROCHFORD, ESQUIRE
     OF:   Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
10         100 North Tampa Street, Suite 3600
           Tampa, Florida 33602
11         (813) 289-6530
           elizabeth.jozsi@ogletree.com
12
           APPEARING VIA VIDEOCONFERENCE ON BEHALF OF THE
13         DEFENDANT
14
15
16
     ALSO PRESENT VIA VIDEOCONFERENCE:
17
     Erin Wade, GT Technologies HR manager
18   Alivia Cooney, paralegal for Mr. Kataev
     Bailey Finnestad, Video Specialist
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2   PROCEEDINGS......................................    5
 3   TESTIMONY OF QUENNEL JACKSON:
 4        Direct Examination by Ms. Jozsi...............    7
 5   CERTIFICATE OF OATH..............................  225
 6   CERTIFICATE OF REPORTER..........................  226
 7   READ AND SIGN NOTIFICATION LETTER................  227
 8   ERRATA SHEET.....................................  228
 9                       - - - - -
10                    E X H I B I T S
     DEFENDANT'S
11   EXHIBIT            DESCRIPTION                    PAGE
12   Exhibit 1  - GT Technologies Employment Application.  26
     Exhibit 2  - Job Description, Bates DEF 4 - 5.......  38
13   Exhibit 3  - Offer letter, Bates DEF 6 - 7.........  39
     Exhibit 4  - Jackson final paycheck, Bates DEF 8....  41
14   Exhibit 5  - Mandatory Flow of Work Order
                    Steps/Process, Bates DEF 9............  51
15   Exhibit 6  - TLH Maintenance Training Module, Daily
                    Work Instructions Bates DEF 10 - 24....  54
16   Exhibit 7  - TLH Maintenance Training Module, Mpro
                    CMMS, Bates DEF 25 - 109..............  56
17   Exhibit 8  - Signed Acknowledgement, Bates DEF 110..  64
     Exhibit 9  - GT Code of Business, Conduct, and
18                  Ethics, Bates DEF 111 - 141...........  65
     Exhibit 13 - Performance Warning Notice, Bates
19                  DEF 154...............................  85
     Exhibit 14 - Jackson rebuttal to HR, Bates DEF 155..  94
20   Exhibit 65 - Handwritten list of jobs, Bates
                    PLT 1025..............................  110
21   Exhibit 67 - Handwritten list of jobs, Bates
                    PLT 1027 - 1032.......................  110
22   Exhibit 70 - Handwritten list of jobs, Bates
                    PLT 1037 - 1044.......................  111
23   Exhibit 15 - CMMS Security Log for 8/19/23, Bates
                    DEF 156 and 157.......................  113
24   Exhibit 16 - Work Order 12353, Bates DEF 158 - 159..  116
     Exhibit 17 - Work Order 12355, Bates DEF 160........  124
25   Exhibit 18 - Work Order 12442, Bates DEF 161 - 162..  127
```

Page 4

```
 1                    INDEX CONTINUED
 2                  E X H I B I T S
    DEFENDANT'S
 3  EXHIBIT            DESCRIPTION                PAGE
 4  Exhibit 21 - Work Order 12445, Bates DEF 167 - 168.. 133
    Exhibit 29 - Composite of photographs, Bates
 5               DEF 194 - 199........................ 138
    Exhibit 28 - Termination Notice, Bates DEF
 6               181 - 182............................ 144
    Exhibit 30 - FCHR Employment Complaint of
 7               Discrimination, Bates DEF 183......... 178
    Exhibit 31 - FCHR findings, Bates DEF 187 - 189..... 181
 8  Exhibit 32 - FCHR Petition for Relief, Bates
                 DEF 190 - 193........................ 182
 9  Exhibit 36 - EEOC Charge of Discrimination, Bates
                 DEF 184 - 186........................ 184
10  Exhibit 59 - Handwritten notes with names, Bates
                 PLT 812.............................. 192
11  Exhibit 56 - Handwritten notes to FCHR, Bates
                 PLT 144 - 147........................ 195
12  Exhibit 58 - Respondent's Proposed Recommended Order
                 Bates P 761 - 806.................... 196
13  Exhibit 61 - Wholesale Battery Tire and Auto invoice
                 Bates P 941 - 942.................... 197
14  Exhibit 69 - Printout form OD blog, Bates PLT
                 1034-1036............................ 198
15  Exhibit 71 - Mortgage statements and Power
                 statements, Bates PLT 1076 - 1094...... 198
16  Exhibit 72 - Mortgage statements and Power
                 statements, Bates PLT 1096 - 1099...... 198
17  Exhibit 46 - Jackson COBRA, Bates DEF 777 - 790..... 211
    Exhibit 64 - 401(k) documents, Bates PLT
18               1021 - 1022.......................... 214
    Exhibit 45 - Jackson paychecks, Bates DEF 446 - 773. 216
19
                        - - - - -
20

             S T I P U L A T I O N S
21

          It is hereby agreed and so stipulated by and
22   between the parties hereto, through their respective
     counsel, that the reading and signing of the transcript
23   are expressly reserved by the Deponent.
24                      - - - - -
25
```

```
 1                    P R O C E E D I N G S

 2                        * * * * * * * * *

 3           THE VIDEOGRAPHER:  Good morning.  We are going

 4      on the record at 10:04 a.m., Eastern Time, on

 5      January 13, 2026.  Please note that this deposition

 6      is being conducted virtually.  Quality of recording

 7      depends on the quality of camera and Internet

 8      connection of participants.  What is seen from the

 9      witness and heard on screen is what will be

10      recorded.  Audio and video recording will continue

11      to take place unless all parties agree to go off

12      the record.

13           This is media unit one of the video-recorded

14      deposition of Quennel Jackson, taken by counsel for

15      defendant in the matter of Quennel Jackson versus

16      GT Technologies, Inc., filed in the United States

17      District Court, Northern District of Florida

18      Tallahassee Division.  The case number is

19      4:25-cv-00218-AW-MAF.

20           This deposition is being conducted remotely

21      using virtual technology.  My name is Bailey

22      Finnestad, representing Veritext Legal Solutions,

23      and I'm the videographer.  The court reporter is

24      Tonya Magee, from the firm Veritext Legal

25      Solutions.
```

```
 1        I'm not authorized to administer an oath.  I'm
 2    not related to any party in this action, nor am I
 3    financially interested in the outcome.  If there
 4    are any objections to proceeding, please state them
 5    at the time of your appearance.
 6        Counsel will now state their appearances and
 7    affiliations for the record, beginning with the
 8    noticing attorney.
 9        MS. JOZSI:  Excuse me.  Elizabeth Jozsi from
10    the law firm Ogletree Deakins.  I represent the
11    defendant, GT Technologies.  With me I also have an
12    associate from my office, Molly Rochford, and a
13    representative from GT Technologies, Erin Wade.
14    They will not be speaking during the deposition,
15    though.
16        MR. KATAEV:  And good morning everybody.  I am
17    Emanuel Kataev with Sage Legal, LLC, and Consumer
18    Attorneys, PLLC, for whom I serve as general
19    counsel and am counsel, too.  I represent the
20    plaintiff, Quennel Jackson, and with me is Alivia
21    Cooney, a paralegal at Sage Legal.
22        THE VIDEOGRAPHER:  Would the court reporter
23    please swear in the witness.
24        THE COURT REPORTER:  Raise your right hand,
25    please, sir.  Do you solemnly swear or affirm that
```

1       the testimony you will give in this cause will be

2       the truth, the whole truth, and nothing but the

3       truth?

4            THE DEPONENT:  That is correct.

5                        QUENNEL JACKSON,

6   having been first duly sworn, testified under oath as

7   follows:

8                    DIRECT EXAMINATION

9   BY MS. JOZSI:

10       Q.   Good morning, Mr. Jackson.  I know it's been a

11  while since we've seen each other, but as you know, my

12  name is Elizabeth Jozsi.  I represent GT Technologies in

13  this case.

14           Can you please state your full name and

15  address for the record.

16       A.   Yes.  My full name is Quennel Jackson and my

17  address is ██████████████████  ███████████████

18  ████████████  ████████  ████████████████.

19       Q.   We're here for your deposition.  You are the

20  plaintiff in the lawsuit you filed against GT

21  Technologies; is that correct?

22       A.   That is correct.

23       Q.   And we are conducting this deposition

24  remotely.  So just to start off, sir, are you alone in

25  the room right now?

1        A.    That is correct.

2        Q.   (BY MS. JOZSI)   Okay.   Is anybody having audio

3   issues?

4             MR. KATAEV:   No.

5             MS. JOZSI:   Some of the beginning of his

6        answers are being cut off for me.   I just want to

7        make sure the court reporter is okay with that.

8        Q.   (BY MS. JOZSI)   Okay.   So we are in this remote

9   deposition.   So you're alone.   This deposition will

10  proceed just like a normal deposition.   So if anybody

11  walks into the room today while you're in the

12  deposition, please just let me know.   And I am going to

13  ask that you not communicate with anyone during the

14  actual testimony part of your deposition today.

15             And I also am going to ask that you not look

16  at any documents, unless I show them to you.   If you do

17  have any documents in front of you, I'm going to ask

18  that you just identify them and -- either by Bates

19  number in this case or, you know, hold them up to the

20  camera or something like that.   But if you review any

21  other documents while you're actually testifying, let me

22  know.   Okay?

23       A.    (Nods head affirmatively.)

24       Q.    Okay.   Yes, sir.

25       A.    One second, I just remembered.   I need to turn

1    the -- the speaker volume off on my phone.

2         Q.    Okay.

3         A.    Yeah.

4         Q.    Go --

5         A.    So I won't have interruptions and all.

6         Q.    Okay.  No, I appreciate that.

7              MS. JOZSI:  Let's go off the record for one

8         second.

9              THE VIDEOGRAPHER:  We are going off the

10        record.  The time is 10:09.

11             (Recess from 10:09 a.m. to 10:10 a.m.)

12             THE VIDEOGRAPHER:  We are back on the record.

13        The time is 10:10.

14        Q.  (BY MS. JOZSI)  Okay.  All right.  Mr. Jackson,

15   I know some of the things I'll ask you today, I probably

16   already know the answer to, but I still have to ask

17   those -- those questions.

18             Have you had your deposition taken before?

19        A.    That is correct.

20        Q.    Okay.  Is -- I know that it was taken in the

21   DOAH case in 2024.  Other than that deposition, have you

22   had your deposition taken before?

23        A.    No.

24        Q.    I'm sorry, I didn't hear your answer.  What

25   was that?

1      A.    No, ma'am.

2      Q.    Okay.  Thank you.

3            And, again, I know we had the case before

4  Judge Early in DOAH.  Other than that case, have you

5  ever testified under oath any other capacity?

6      A.    No, ma'am.

7      Q.    All right.  So today I'm going to ask you some

8  questions.  You and I have been -- have done this

9  before.  So you -- you probably already know a lot of

10  what I will ask you and -- and how this is going to go,

11  but I just want to give you some preliminary

12  instructions before we dive into the substance.

13            As you know, the court reporter has placed you

14  under oath today.  And so everything that you say needs

15  to be the truth, subject to the penalties of perjury.

16  You are under oath for the entire deposition, even

17  though we've taken breaks and come back, and you'll stay

18  under oath until the deposition's concluded.  Do you

19  understand?

20      A.    That is correct.

21      Q.    And even though this is a less formal setting,

22  everything you say still has the same force and effect

23  as if we were in a courtroom and, again, subject to the

24  penalties of perjury for -- for lying.

25            We have a court reporter and a videographer

Page 11

```
 1    here today.  The court reporter is taking down
 2    everything that we say.  And so I just ask that we take
 3    turns when we speak, to the extent possible.  Sometimes
 4    it's harder when you're in a Zoom setting because, you
 5    know, we're not in the same room to pick up on some of
 6    those cues.  But I just ask that you let me finish
 7    asking the questions before you start answering the
 8    question and, likewise, I'll let you finish your answer
 9    before I ask you another question.  So that way the
10    court reporter can get everything that we're saying nice
11    and tidy, can get that written down.
12            Along those same lines, with a court reporter,
13    you need to verbally answer all the questions that I
14    ask.  So at some point if you nod your head, you know,
15    yes or no, I may say, "is that a yes or is that a no."
16    And I'm not trying to be rude or anything like that.  I
17    just want to make sure that we get a verbal answer
18    written down for the transcript.  And similarly, try to
19    avoid saying things like "uh-huh" or "un-huh," because
20    that doesn't translate very well.
21            If you don't understand any of the questions
22    that I ask today, please ask me to rephrase it, repeat
23    it, or clarify.  Okay?
24        A.   (Nods head affirmatively.)
25        Q.   If I ask a question and you answer, I'll
```

Page 12

 1    assume that you understood the question.

 2              If at any point today you realize you need to

 3    make a correction or that an answer you gave prior was

 4    incomplete or incorrect, we can certainly supplement or

 5    modify your response.  You just need to tell me.  Okay?

 6         A.   (Nods head affirmatively.)

 7         Q.   Okay.  This is a marathon.  It's not a sprint.

 8    So at any point today you need to take a break, please

 9    just feel free to ask for one of those.  We'll take a

10    lunch break at some point, but if you need to use the

11    restroom.  I know you've had back problems in the past,

12    if you need to stand up and stretch even while we're

13    doing the question and answer, as long as we can still

14    see you on the video, that's perfectly fine with me.

15              But if you need a longer break or, you know,

16    want to go make some coffee, whatever it may be, just --

17    all you need to do is ask.  The one thing I would

18    request is that if we're taking a break, you just answer

19    the question that is pending and then once you're done

20    answering the question, then we can take that break.

21              In addition to asking you questions today,

22    I'll be showing you some documents.  So because we're on

23    Zoom, I will be sharing my screen to look at those

24    documents.  If you want time to review whatever it is

25    that I put up on the screen -- you should have copies of

Page 13

1   everything.  You've seen most of these before.  But when

2   I put something up on the screen, if you need me to

3   scroll or zoom or go left or right, whatever it is, just

4   ask me to do that.

5           I premarked the exhibits today.  So I'm going

6   to refer to them by number and then also there's Bates

7   numbers at the bottom corner.  I will refer to them by

8   that as well.  I may not introduce all of the exhibits.

9   I may introduce them out of order, but at the end of the

10  day I will make sure that I go through the list of what

11  I've shown you and what I've admitted so that we're all

12  on the same page.

13          Your attorney gave you instructions before we

14  went on the record and most of that was about

15  objections.  So he may make objections from time to time

16  today.  Unless he instructs you not to answer a

17  question, you still have to make -- answer the question,

18  even if there is an objection.  Okay.

19          Do you have any questions about the

20  instructions that I gave you?

21      A.   No, ma'am.

22      Q.   Okay.  Can you think of any reason why you

23  cannot answer the questions that I'm going to ask you

24  today completely, accurately, and truthfully?

25      A.   No, ma'am.

1      Q.   Okay.  Have you taken any medication,

2  narcotics, or any alcohol that would impair your ability

3  to answer truthfully today?

4      A.   No, ma'am.

5      Q.   Do you have any medical or other condition

6  that affects your ability to participate fully today?

7      A.   No, ma'am.

8      Q.   What did you do to prepare for your

9  deposition?

10     A.   Pretty much just focused on from the last

11  deposition we had.

12     Q.   Okay.  And speaking of -- you know, this is a

13  unique case in that you've already had one deposition,

14  and so you and I -- I've asked a lot of these kinds of

15  questions before today.  Just to make sure we have a

16  complete record, I'm probably going to ask you some more

17  things that I asked you last time.  I'm just going to

18  ask that you fully answer the questions today as if that

19  last deposition didn't exist.

20          So, you know, you can refer to things -- you

21  can refer to the fact that that deposition existed, but

22  I still, as we go forward today, just need to make sure

23  that anything you're testifying to, that you're

24  testifying fully today.

25          Prior to today's deposition, did you meet with

1   your attorney?  And I don't want you to tell me anything

2   that you discussed.  I just want to know if you met with

3   your attorney in advance of the deposition.

4        A.   No, ma'am.

5        Q.   Okay.  Did you look at any documents before

6   today to prepare?

7        A.   No, ma'am.

8        Q.   All right.  Do you have any documents that you

9   brought with you to the deposition today?

10        A.   No, ma'am.

11        Q.   Okay.  All right.  You gave your address when

12   we started the deposition today as an address on Monroe

13   Street in Tallahassee.  Is that your residential

14   address?

15        A.   That's -- that's my main mailing address.

16        Q.   Mailing address.  Okay.

17             What is your current residential address?

18        A.   That address is ████████████  ████████,

19   ████████  ██████████████████  ██████.

20        Q.   Okay.  And how long have you lived at the

21   ████████  address?

22        A.   I've been here since 2018.

23        Q.   You mentioned the start of the deposition

24   today that you were currently in Bainbridge, Georgia.

25   Are you -- are you a resident or where are you

1    currently?

2        A.   At my residence.

3        Q.   Okay.  Is that a different residence than the

4    ██████████?

5        A.   Same.

6        Q.   So the address is Climax, Georgia, but you

7    refer to it as Bainbridge, I believe.  Is it the same?

8        A.   Yes.  What it is, it's the county.  So it's

9    all combined together.

10       Q.   Okay.  I understand.

11            All right.  And does anyone else live at that

12   residence with you?

13       A.   No, ma'am.

14       Q.   What is your current email address?

15       A.   That's lower case ████████████████.

16       Q.   And what about your phone number?

17       A.   That number is ████  ████████.

18       Q.   Thank you.

19            What is your date of birth?

20       A.   That is ████████.

21       Q.   And are you married?

22       A.   No, ma'am.

23       Q.   Have you ever been married?

24       A.   Yes.

25       Q.   And did that marriage end in divorce,

Page 17

1    separation, annulment?

2            MR. KATAEV:  Objection; compound.

3            You can answer.

4        Q.  (BY MS. JOZSI)  Do you need me to repeat the

5    question?

6        A.   I -- I heard someone say something.

7            MR. KATAEV:  I said objection; compound, but

8        you can answer.

9            THE DEPONENT:  Okay.

10       A.   It led into annulment.

11       Q.  (BY MS. JOZSI)  Okay.  Do you have any

12   dependents?

13       A.   No dependent.

14       Q.   And any children?

15       A.   Two children.

16       Q.   Are they adult children?

17       A.   That is correct.

18       Q.   And I'm going to ask a question just based on

19   the nature of this case, but Mr. Jackson, can you please

20   tell us, what is your race?

21       A.   My race is black and -- mixed with black and

22   Indian and also Columbian.

23       Q.   You said your race is black mixed with Indian

24   and Columbian.  Do you consider that your race or is

25   that your national origin?

1      A.    Well, it would be a mix of -- my national

2    origin would be black.

3      Q.    Okay.

4      A.    I also consider other.

5      Q.    Okay.  Are you a U.S. citizen?

6      A.    That is correct.

7      Q.    And were you born in the United States?

8      A.    Yes.

9      Q.    Okay.  Do you have a high school degree?

10     A.    Yes.

11     Q.    When did you graduate high school?

12     A.    That would be the year of 1993.

13     Q.    And what about post-secondary education, do

14   you have any post-secondary degrees?

15     A.    Yes.

16     Q.    Okay.  What degrees do you have and from which

17   institution?

18     A.    That would be industrial engineering and that

19   would come from a college.

20     Q.    Which college?

21     A.    The college of FSU and FAMU for engineering.

22     Q.    Was that a bachelor's degree?

23     A.    Associate's.

24     Q.    An associate's.

25           All right.  Do you have any other

Page 19

1    post-secondary education or were you -- strike that.

2           Do you have any other formal degrees?

3      A.    I have certificates --

4      Q.    Okay.

5      A.    -- lobbying associated certificates from the

6    United States.

7      Q.    Is that like a licensure or something that you

8    have to actually maintain?

9      A.    Once you -- once you pass the license, it

10   stays with you throughout your term and life.

11     Q.    Okay.  Any other -- other than the lobbying,

12   any other certifications or licensures or anything like

13   that?

14     A.    No, ma'am.

15     Q.    Did you serve in the military?

16     A.    Yes.

17     Q.    All right.  What branch?

18     A.    Special forces.

19     Q.    Okay.  And when was that?

20           MR. KATAEV:  -- service.

21           THE COURT REPORTER:  Did not come through.

22           MS. JOZSI:  I didn't hear anything.

23           MR. KATAEV:  I want to thank you for your

24      service.  I apologize.

25           THE DEPONENT:  Thank you.

Page 20

1        Q.   (BY MS. JOZSI)   Mr. Jackson, when were you in
2    the special forces?
3        A.    It was during the year 2000.
4        Q.    Okay.   Through -- through when, 2000 to when?
5        A.    I can't remember the actual ending date.
6        Q.    Okay.   And did you -- were you discharged from
7    the military?
8        A.    It was honorable.
9        Q.    Where were you stationed during your time in
10   the special forces?
11       A.    Fort Bragg.
12       Q.    Okay.   Any deployment?
13       A.    No, ma'am.
14       Q.    And you said honorable discharge.   I -- I know
15   you don't remember when, but can you approximate, was
16   it -- did you -- were you discharged within the last ten
17   years, 15 years, 20 years?   Is there any way you can
18   estimate how long it's been; if you know?
19       A.    No, ma'am.
20       Q.    All right.   Other than this lawsuit, have you
21   ever filed any -- strike that.
22            Have you ever been involved in any other
23   lawsuits?
24       A.    Yes, ma'am.
25       Q.    All right.   Can you describe the nature of

Page 21

1    those other suits?

2        A.    The lawsuit was involved with -- in driving a

3    limousine, transporting clients.  The officer directly

4    pulled over and -- and saw a black driver driving a

5    limousine.  So I was directed out of the car at that

6    time.

7            The officer checked the registration, looked

8    at everything and he said, there's no way in Florida an

9    individual of my character owned a limousine.  So he

10   suggested that he -- I falsified and made up documents

11   on paperwork as far as registration and insurance.  So

12   they impounded the car.  They took the clients out of

13   the vehicle and the passengers had to call their people.

14           So I had to go before the judge, Judge Cato,

15   and Judge Cato seen that all my paperwork and records

16   was correct.  There was nothing falsified.  He, in turn,

17   fired the -- the officer.  He de-promoted the chief of

18   police and he directed them to not ever stop and pull me

19   over.  And I was granted rewards for a lawsuit for the

20   behavior and the -- and the wrongful conduct of the

21   officer.

22       Q.    Where was this?  Is this in Georgia or in

23   Florida or somewhere else?

24       A.    This was in Georgia.

25       Q.    Do you recall when that lawsuit occurred?

```
                                                      Page 22
 1        A.    It was in the early '90s somewhere.   I
 2    couldn't actually give you the correct date.
 3        Q.    Okay.   But it's been more than 20 years at
 4    this point?
 5        A.    Correct.
 6        Q.    Okay.   Any other lawsuits that you've been
 7    involved in?
 8        A.    Just that one.
 9        Q.    Any -- I believe you previously testified also
10    about some property disputes in Georgia.   Did that
11    amount to a lawsuit?
12        A.    Property -- property, yes.   That -- that
13    property, it never -- it was put on hold --
14        Q.    Okay.
15        A.    -- due to an investigation with the State.
16        Q.    Okay.
17        A.    So that's still remaining at -- at the moment.
18        Q.    All right.   And I believe you also had a
19    workers' compensation case; is that correct?
20        A.    Yes.
21        Q.    And was that related to your employment with
22    GT Technologies?
23        A.    That is correct.
24        Q.    And that case settled, correct?
25        A.    Correct.
```

Page 23

1      Q.   Were you awarded any payment as a result of

2   that settlement?

3      A.   That is correct.

4      Q.   Do you recall how much you received?

5      A.   No, ma'am.

6      Q.   All right.  Have you ever been arrested?

7      A.   That is correct.

8      Q.   All right.  Can you tell me when you were

9   arrested and the nature of the alleged crime?

10          MR. KATAEV:  Objection; relevance on this line

11      of questioning, but you can answer.

12          THE DEPONENT:  I couldn't quite hear.

13          MR. KATAEV:  Objection; relevance on this line

14      of questioning, but you can answer.

15      A.   Okay.

16      Q.   (BY MS. JOZSI)  You can answer the question.

17      A.   Okay.  That was the year 2023.  Actually, two

18   months after being dismissed at -- from GT on September

19   the -- actually, it was on a Tuesday.  Prior to that, I

20   was falsely accused on that case and they had the

21   wrong -- wrong person at the time.  And so the ju -- the

22   judge rewarded it and threw it out and excused the case.

23      Q.   Just to clarify, you said you were falsely

24   accused.  So you were arrested based on like a false

25   identification?  Is that what you're saying?

Page 24

1        A.    Yeah, false accusation.

2        Q.    Okay.  And the case was dismissed?

3        A.    Correct.

4        Q.    Where was that case?

5        A.    That case was held in Bainbridge, Georgia.

6        Q.    All right.  And we're going to talk about your

7    charge of discrimination in this case.  Other than your

8    claims against GT Technologies -- and I may refer to the

9    company today as either GT Technologies, GT, or the

10   company.  I just want to make sure we all understand

11   we're talking about the same thing.

12            But other than your charge against GT, have

13   you ever filed any other charges of discrimination

14   against another employer?

15       A.    No, ma'am.

16       Q.    Before you started working for GT

17   Technologies, where did you work?

18       A.    Before GT Technologies, it was Jackson Cook.

19       Q.    What did you do at Jackson Cook?

20       A.    I was a welder and a fabricator.

21       Q.    And where was the location that you were

22   working for Jackson Cook?

23       A.    That location would be Tallahassee, Florida.

24       Q.    And how long did you work for Jackson Cook?

25       A.    I don't remember exact time frame.

1      Q.   Did you work for Jackson Cook immediately

2  prior to working for GT Technologies?

3      A.   Yes.

4      Q.   And why did you leave Jackson Cook?

5      A.   I left -- a friend of mine that went to GT

6  Technologies had -- gave me a call that I was working

7  side by side at Jackson Cook, and said that there was

8  a -- an opening and better pay and he would like to --

9  for me to come aboard.

10     Q.   Okay.  So you voluntarily left Jackson Cook to

11 take the opportunity at GT?

12     A.   That is correct.

13     Q.   Okay.  While you were at Jackson Cook, were

14 you -- were you ever disciplined?

15     A.   No, ma'am.

16     Q.   Any complaints of discrimination, harassment,

17 or retaliation at Jackson Cook?

18     A.   No, ma'am.

19     Q.   Before you worked at Jackson Cook, where did

20 you work?

21     A.   I worked on the railroad.

22     Q.   Okay.  Do you remember the company that you

23 worked for?

24     A.   It was Nor -- the train company is Norfolk.

25     Q.   All right.  I am going to share my screen to

Page 26

 1    just facilitate this a little bit better.  This is going

 2    to be Exhibit 1.

 3              (Exhibit No. 1 was marked for identification.)

 4        Q.  (BY MS. JOZSI)  Can you see my screen,

 5    Mr. Jackson?

 6              MR. KATAEV:  Yeah.

 7        A.  Yes.

 8        Q.  (BY MS. JOZSI)  Do you see the -- I want to

 9    make sure, because I have two screens.  I want to make

10    sure it's showing the right one.  You see GT

11    Technologies Employment Application?

12        A.  Yes.

13        Q.  Okay.  So this going to be Exhibit 1, which is

14    Bates 1 through 3.  And I'm going to scroll through and

15    let me know if you recognize this document.  Do you

16    recognize this one, sir?

17        A.  Can you scroll back down?

18        Q.  Yes, absolutely.  Tell me when you need me to

19    go down.

20        A.  Can you go down a little more?

21        Q.  (Complies.)

22        A.  Okay.

23        Q.  I'm at the end.  Do you recognize this

24    document?

25        A.  Correct.

Page 27

1      Q.    And it says here, job application for GT
2  Technologies; is that correct?
3      A.    Correct.
4      Q.    All right.  Is this your signature on what's
5  on Defendant's page 3, with a date of November 13, 2017?
6      A.    Correct.
7      Q.    All right.  I'm going to scroll back up.  This
8  is still Defendant's 3, where it says, "Business
9  experience, list most recent position first."  It lists
10  Jackson Cook, Siemens.  I don't know if this is Aneco
11  Fabrics and Fiber.  And is it, Herrell's Equipment?  Do
12  you see those?
13      A.    Correct.  That is correct.
14      Q.    You just mentioned Norfolk, a railroad
15  company.  That's not listed on here.  So when did you --
16  when was -- when did work for Norfolk?
17      A.    That would be before Jackson Cook.  So, right,
18  there's a gap between these -- these jobs because there
19  wasn't enough room on this application to list all the
20  jobs that I worked at.  Between Jackson Cook and -- and
21  Siemens Water Technology out of Thomasville.
22      Q.    Okay.  So the -- the railroad was in between
23  those.
24            And why did you leave Norfolk?
25      A.    Well, at the time they had to lay off due to

```
1    9/11.  So our manager mentioned to all the guys that if
2    you didn't have five years or more, you wouldn't be able
3    to stay with the company due to what happened.
4         Q.   So was it part of a reduction in force?  It
5    was a larger layoff?
6         A.   That is correct.
7         Q.   Okay.  So then that was Jackson Cook, then
8    Norfolk.  Then Siemens Water Technology, it says you
9    were a welder and fabricator and that you left because
10   of a layoff; is that correct?
11        A.   That is correct.
12        Q.   And it says that you worked there at Siemens
13   from November 2012 -- I'm sorry, from November -- from
14   June 2009 to November 2012.  So what did you do, because
15   then the next one is -- Aneco was -- you left in 1998.
16   So what did you do between 1998 and 2009?
17        A.   There was one more job that I worked -- well,
18   1998, during that time I was finishing up and that's
19   when I went in -- into the service --
20        Q.   Okay.
21        A.   -- during that time.
22        Q.   Okay.  And then when you left the service, is
23   that when you went to Siemens?
24        A.   Yes.
25        Q.   Okay.  I didn't -- did you answer?
```

1      A.    Yes.  I believe it was -- I believe there was

2   one other job that was in between Siemens that I did.

3   That was a -- I didn't have room to add it on, and then

4   I went out to -- I went to Siemens.  It was a

5   temporary -- it was a temp job that I did --

6      Q.    Okay.

7      A.    -- before Siemens.

8      Q.    Okay.  All right.  Any of these jobs that are

9   either listed here or not on your employment

10  application, you never filed any charges of

11  discrimination at any of those jobs, correct?

12     A.    Correct.

13     Q.    Okay.  We're going to talk about your

14  employment with GT in a minute.  I think you just

15  mentioned already that you -- your separation was

16  September 5, 2023, from GT; is that correct?

17     A.    That is correct.

18     Q.    Since your separation from GT Technologies,

19  have you been employed?

20     A.    I am looking for employment at the time and

21  applying for different jobs.

22     Q.    What do you mean, "at the time"?

23     A.    At the time of being unemployed, I would go to

24  the employment office and file for employment, and was

25  rejected from employment.

1    Q.   Okay.  Let me ask it a different way.  Since
2    leaving GT, have you gotten another job at all?
3    A.   No, ma'am.
4    Q.   No other jobs since GT?
5    A.   No, ma'am.
6    Q.   At your prior deposition, you said that you
7    were working for a GSS Services.  Are you no longer
8    working for GSS Services?
9    A.   That -- that service didn't start until the
10   following -- the following next year, the following
11   year.
12   Q.   Right.  So my question is:  Have you gotten a
13   job at all since you left GT Technologies or have you
14   been unemployed since September 5, 2023, to the present?
15        MR. KATAEV:  Objection; compound.
16        You can answer.
17   A.   Yes.  So there was a gap.
18   Q.  (BY MS. JOZSI)  Okay.
19   A.   There was a gap of unemployment from -- from
20   being dismissed from GT up until the time of being
21   reemployed.
22   Q.   And that's what I'm trying to get is -- that's
23   what I'm asking is when you did you -- when did you get
24   a new job?
25   A.   The new job started January of 2024.

Page 31

1      Q.   Is that with GSS Services?

2      A.   That is correct.

3      Q.   Are you still employed at GSS Services?

4      A.   That is correct.

5      Q.   And what role do you hold at GSS Services?

6      A.   I am a field industrial supervisor.

7      Q.   All right.  And where do you work for GSS

8   Services, like the location?

9      A.   That location would be in Bainbridge, Georgia.

10     Q.   And what is your pay or your salary like at

11  GSS Services?

12          MR. KATAEV:  Objection; vague.

13          You can answer.

14     Q.  (BY MS. JOZSI)  Do you need me to repeat the

15  question, Mr. Jackson?

16     A.   Yeah.  I heard something.  Someone said

17  something in the background.

18          MR. KATAEV:  I said, "Objection; vague," but

19      you can answer.

20          THE DEPONENT:  Oh, okay.

21     A.   I'm going to hold off on that one.

22     Q.  (BY MS. JOZSI)  You can't hold off on that.  I

23  need you to answer the question.  I can rephrase it, if

24  you don't understand, but I need you to answer the

25  question.

1      A.   Okay.  He said something about objection or
2  something.
3      Q.   Your attorney objected, but he -- that's to
4  preserve the record, but you still need to answer the
5  question.
6           MR. KATAEV:  Correct, please answer the
7      question.
8           THE DEPONENT:  Okay.
9      A.   And you said the salary amount?
10     Q.  (BY MS. JOZSI)  Yes.  I said, what is your pay
11 or your salary like in your -- your role at GSS
12 Services?
13     A.   I'm not -- not on a set salary.  I'm on an
14 hourly pay.
15     Q.   And what is your hourly rate?  What do you
16 receive for compensation?
17     A.   The hourly rate is 30 an hour.
18     Q.   And how many hours a week do you typically
19 work?
20     A.   Just a regular 40 hours.
21     Q.   Do you ever work overtime?
22     A.   During the summertime we do.  Summertimes, we
23 do work overtime.
24     Q.   And you said you're a field industrial
25 supervisor.  What -- can you describe for me your

1  general duties in that role?

2      A.   Yes.  My job will consist of also with sales

3  and it is to look over engineering drawings from other

4  companies, planning.  Also overseeing guys, make sure

5  they have their correct material, proper PPE if someone

6  is going out to perform the work.

7           Also, I create a safety analysis for the guys.

8  I'll have a meeting in the morning with them.  So that

9  way everybody will understand that they're to work safe

10  and properly on the job site.

11     Q.   Okay.  So are you -- your title has the word

12  "supervisor."  So I assume, but do you supervise other

13  individuals?

14     A.   That is correct.

15     Q.   How many individuals do you oversee?

16     A.   It is from five to eight people at a time.

17     Q.   All right.  Who is your supervisor?

18     A.   My supervisor is Craig Forrester.

19     Q.   Okay.  Since you've been at GSS Services since

20  January 2024, have you had any changes to your job title

21  or responsibilities, like promotions, transfers,

22  anything like that?

23     A.   Yes, I did.

24     Q.   Okay.  What kind of change did you have?

25     A.   They moved me up into the front office where I

Page 34

1  became a -- their number one sales -- sales associate
2  rep for the company.
3       Q.   Did that come with a pay increase?
4       A.   That came with commission.
5       Q.   Okay.  So you currently -- I'm sorry.  You
6  currently have your hourly rate, you said was $30 an
7  hour, but then you earn commissions on top of that; is
8  that correct?
9       A.   That is correct.
10      Q.   Okay.  Approximately how much do you earn in
11 commissions on, say, a monthly basis?
12      A.   Commissions, it normally -- it varies.  It --
13 it may be, like, as high as -- probably, like, $5,000.
14      Q.   A month?
15      A.   That is correct.
16      Q.   All right.  And do you receive any sort of
17 benefit -- other benefits at your job, like insurance or
18 401(k)s or anything?
19      A.   We do get insurance.  Not too much on 401(k)s.
20      Q.   But you have health insurance?
21      A.   Yes.
22      Q.   Have you had that health insurance -- strike
23 that.
24           Have you been eligible for that health
25 insurance since you started your employment with GSS

1    Services?

2        A.    That is correct.

3        Q.    And you just said that you're eligible.  Are

4    you enrolled in that health insurance through GSS

5    Services?

6        A.    Yes.

7        Q.    Are you receiving -- what kind of insurance

8    are you receiving?  Like, are you -- medical, vision,

9    dental, those kind of things?

10       A.    It's only -- it's only medical.

11       Q.    All right.  Have you had any disciplinary

12   issues at GSS Services?

13       A.    No, ma'am.

14       Q.    Any complaints of discrimination or

15   harassment, anything like that at GSS Services?

16       A.    No, ma'am.

17       Q.    Okay.  Other than GSS Services, you mentioned

18   that for a time period you were unemployed.  So was that

19   between September 5, 2023, and when you started at GSS

20   in January of 2024?

21       A.    Could you repeat that?

22       Q.    Yes, of course.  You previously testified that

23   you had a period -- a gap in employment where you were

24   unemployed.  Was -- I just want to make sure I know -- I

25   understand the time frame.  So was that between your

1    separation at GT on September 5, 2023, and when you

2    started at GSS in January of 2024?

3        A.    That is correct.

4        Q.    Okay.  And you said you filed for

5    unemployment, but you were denied?

6        A.    That is correct.

7        Q.    Were you given a reason for the denial?

8        A.    Could you repeat the question?

9        Q.    Sure.  When you were denied unemployment

10   compensation, were you given any reason for why you were

11   denied?

12       A.    No, ma'am.

13       Q.    Have you had any other sources of income, like

14   self-employment or anything like that, since your

15   separation from GT Technologies?

16       A.    No, ma'am.

17       Q.    Have you ever been self-employed or had any

18   other sort of side projects that you've worked on ever?

19       A.    Yes, years back.

20       Q.    I think you had previously testified at your

21   last deposition about a business that you had,

22   Q. Jackson Millright Welding & Fabrication.  Do you

23   still have that business?

24       A.    No, ma'am.

25       Q.    I'm sorry, was that a no?

Page 37

1      A.   Yes, it's -- it's no.

2      Q.   So no other sort of work-related income that

3   we haven't discussed?

4      A.   That's correct.

5      Q.   Let's talk about your employment with GT

6   Technologies.  When did your employment with GT begin?

7      A.   That was December -- of 2000 --

8           (Technical interruption, after which a

9   discussion was had off the record.)

10     A.   Yes, that would be December the 4th of 2017.

11     Q.  (BY MS. JOZSI)  Thank you.

12          And what role were you hired for?

13     A.   I was hired in the maintenance department.

14     Q.   Do you remember the -- the job title that you

15   had?

16     A.   Yes.  The job title was maintenance mechanic.

17     Q.   And can you tell me, generally, what your

18   duties were in that role?

19     A.   The job duties were to work, prepare as far as

20   fixing on the machines.  Also, do fabrication and

21   welding on different parts of the machines throughout

22   the plant.

23     Q.   You mentioned the plant.  Was that the

24   Tallahassee, Florida, location?

25     A.   That is correct.

1      Q.   I'm going to share my screen.

2           MS. JOZSI:  This is going to be Exhibit 2.

3      This is Defendant's 4 to 5.

4           (Exhibit No. 2 was marked for identification.)

5      Q.  (BY MS. JOZSI)  And let me know if you

6  recognize this document.  Just tell me when you're ready

7  for me to scroll.  Oh, forgot to share.

8      A.   Okay.  If you can scroll down.

9           MR. KATAEV:  Can you Zoom in so that it shows

10     us the page?  It's on the right-hand side it shows

11     the Bates.

12          MS. JOZSI:  Is that better?  Can you still see

13     it?

14          MR. KATAEV:  Yes.

15     Q.  (BY MS. JOZSI)  And that -- that's the bottom.

16     A.   Okay.

17     Q.   Do you recognize this document, Mr. Jackson?

18     A.   Yes.

19     Q.   All right.  Is that an accurate job

20  description for your role at GT Technologies?

21     A.   Yes.

22     Q.   Okay.  All right.  Do you recall approximately

23  how many maintenance technicians worked at GT during

24  your employment?

25     A.   During my time of employment, there was

1   numerous maintenance technicians that worked at the

2   time.

3        Q.   Let me ask it a different way.  So you weren't

4   the only maintenance technician that was working at GT

5   during your employment.  Is that -- would that be fair

6   to say?

7        A.   Correct.

8        Q.   And did you work on a shift schedule?

9        A.   Yes.  My -- my shift was primary day shift.

10       Q.   And were there other maintenance technicians

11  that worked the day shift with you?

12       A.   That is correct.

13       Q.   And then presumably, were there maintenance

14  technicians that worked the night shift?

15       A.   Yes.

16       Q.   Okay.  Do you remember who hired you when you

17  first started working for GT?

18       A.   Yes.

19       Q.   Do you recall your starting salary at GT

20  Technologies?

21       A.   I don't recall.

22            MS. JOZSI:  I'm going to share.  This is

23       Defendant's Exhibit 3.  This is Bates numbers

24       Defendants 6 to 7.

25            (Exhibit No. 3 was marked for identification.)

1      Q.   (BY MS. JOZSI)  Let me zoom in a little.  I'm

2    going to just scroll through the whole thing really

3    quickly and then I'll come back up just so you can see

4    the pages, and that's -- that's the end.  So I'll come

5    back to the top and let me know when you're ready for me

6    to scroll down.

7      A.   Okay.  Okay.

8      Q.   Are you ready for me to scroll?

9      A.   Okay.  I'm ready.  Okay.  I'm ready.  All

10   right.

11     Q.   Do you recognize this document, Mr. Jackson?

12     A.   Yes, I recognize it.

13     Q.   Okay.  And is this your offer letter for

14   employment with GT?

15     A.   Yes.

16     Q.   Is that your signature I'm showing you as

17   Defendant's 7?

18     A.   Yes.

19     Q.   Okay.  And then I'm going to scroll back up to

20   the first page.  It says here that you were being

21   offered the role of a maintenance technician to begin

22   December 4, 2017.  The rate was $19 an hour.  Is that

23   accurate?

24     A.   Yes.

25     Q.   All right.  Do you recall -- strike that.

Page 41

1           Did you ever receive a pay increase while you

2      were employed by GT Technologies?

3           A.   Yes.

4           Q.   Do you recall what your salary was at the time

5      of your separation?

6           A.   Salary was 24.

7                (Exhibit No. 4 was marked for identification.)

8           Q.   (BY MS. JOZSI)  I'm going to show you what's

9      been marked as Defendant's Exhibit 4 and this is Bates

10     stamped Defendant's 8.  Do you recognize this document?

11     I'll make it a little bigger.

12          A.   Yes, uh-huh.

13          Q.   Okay.  And I'll represent that this is the

14     final earning statement from your time with GT with a

15     pay date of 9/15/2023.  Do you see that?

16          A.   Yes.

17          Q.   Okay.  And it shows for your regular rate, the

18     rate was 24.58.  Does that sound accurate?

19          A.   Yes.

20          Q.   Okay.  And it also shows that your overtime

21     rate was 36.87.  Is that -- is that fair?

22          A.   Yes.

23          Q.   All right.  Who was your supervisor at GT

24     Technologies?

25          A.   Would that be from the starting date or the

1    last -- or the ending date?

2        Q.   Well, thank you.  That's a good point.

3             Did your supervisor change -- if your

4    supervisor changed at any point.  Let's start with when

5    you were first hired.  Who was your supervisor?

6        A.   That would be Jamie Sweeney and Dan May at the

7    time.

8        Q.   Okay.  Jamie Sweeney and Dan May.  And how

9    long were they your supervisor?

10       A.   I believe that was up to three years.

11       Q.   To three years.

12            All right.  And when that changed, then who

13   became your supervisor?

14       A.   That would be Curtis -- I can't really

15   pronounce his last name.  His first name was Curtis.

16       Q.   Was he your supervisor for the remainder of

17   your employment with GT or did that change again?

18       A.   That changed again.

19       Q.   Okay.  Then who became your supervisor after

20   Curtis?

21       A.   There was Dave Laverne became my supervisor,

22   from the engineering department.

23       Q.   Then -- and what was his job title?

24       A.   At the time, he was engineering manager

25   where -- they combined the maintenance department at the

Page 43

1    time until we were able to find a maintenance manager.

2         Q.    And then so does Dave -- did you have another

3    supervisor after Dave?

4         A.    After Dave, there was James White.

5         Q.    And what was James White's job title?

6         A.    He came in as a -- as a maintenance mechanic.

7    Later on he was filling in as a maintenance supervisor.

8         Q.    Do you recall approximately when that was when

9    he became maintenance supervisor?

10        A.    No, ma'am.

11        Q.    And at some point he was a -- because you said

12   he was a maintenance mechanic.  When he was a

13   maintenance mechanic, was he like a peer level for you?

14        A.    Yes.  He came in and I -- I trained him as a

15   maintenance mechanic.

16        Q.    Okay.

17        A.    And at the time he was awarded, as I say, a

18   fill-in supervisor, because at the time we was looking

19   for two candidates to fill in those positions.

20        Q.    And then at some point, though, he became your

21   supervisor?

22        A.    Yes, later on down the road.

23        Q.    Did you have any other supervisors?

24        A.    No, ma'am.

25        Q.    So the time of your separation on September 5,

1    2023, who was the supervisor?

2        A.    James White held his same position as -- it

3    changes as a full-time supervisor and then later on they

4    hired Jason Farrell [sic] as a maintenance manager.

5        Q.    At the time of your separation, who did you

6    consider to be your supervisor, your direct supervisor?

7        A.    Direct supervisor was Jason Farrell.

8        Q.    And when you are saying Jason Farrell, I

9    believe -- I want to make sure we're talking about the

10   same person.  Was that Jason Felger?

11       A.    Is it pronounced Felger?

12       Q.    Yeah, it's F-e-l-g-e-r.  I just want to make

13   sure it's the same person.

14       A.    Oh, yes.  I apologize for mispronouncing his

15   name.

16       Q.    That's okay.  I just want to make sure we're

17   on the record as the same person.

18             Okay.  Mr. White, what is his race?

19       A.    Mr. White is causation.

20       Q.    What about Mr. Felger, what is his race?

21       A.    His race is Caucasian.

22       Q.    You also earlier mentioned Dave.  Was that

23   Dave Laverne?

24       A.    That is correct.

25       Q.    Do you know what Dave's title was?

1      A.    At the end, his position he was moved up as

2   maintenance manager.  He was awarded -- he was awarded

3   as maintenance manager.

4      Q.    Okay.  At the time of your separation, Dave

5   was maintenance manager?

6      A.    He was the plant manager.

7      Q.    Okay.  And what is -- what is Dave's race?

8      A.    His race is Caucasian.

9      Q.    Okay.  All right.  Did you ever receive any

10   sort of formal training during your employment?

11      A.    Yes.

12      Q.    Can you describe what kind of training you

13   received during your employment?

14      A.    I received training in electrical and

15   electronics.

16      Q.    All right.  You mentioned earlier some your

17   job duties and the first thing you said was that you,

18   you know, worked and fixed machines and that you did

19   some fabrication on different machines.  So I just want

20   to get a general sense.  Can you describe how it is that

21   you would know what work to perform?  If you come in to

22   start your shift, how did you know what job tasks you

23   were required to do for that day?

24      A.    So when we get to our work area, we are given

25   out instructions and we're given out work orders on

1   certain machines that would be already planned for us to

2   work on.  We also have safety meetings in the morning.

3   So we'd be, at times, properly trained as far as working

4   with -- team up with maintenance men that has been there

5   for some time and we would learn on some machines

6   that -- during a breakdown, you may have an emergency on

7   a machine that breaks down, and learning and

8   understanding the concept of what breaks down and how to

9   perform that task as far as getting that machine back up

10  on the production line.

11      Q.   Okay.  You mentioned that you're given out

12  work orders.  So can you describe, how is it that you

13  know what work orders are your responsibility to work

14  on?

15      A.   Work orders would be assigned to us.  So

16  between supervisors or maintenance managers, their job

17  was to plan out the work orders that they see fit as far

18  as which direction that they want each of the

19  maintenance guys to go in as far as working.  So we

20  would have an area that we would be assigned in to do

21  daily PM of machines.  And once we complete those, we

22  turn them back in.

23      Q.   And just for the record, PM, is that

24  preventive maintenance?

25      A.   That is correct.

Page 47

1    Q.   Okay.  So you said you do your daily PM on the

2    machine.  Once you completed that, you turn it back in.

3    How do you turn it back in?

4    A.   For the longest -- for the seven years of

5    working, it was all done documented on paper.  And then

6    the following last year and a half, that changed over to

7    electronic device.

8    Q.   You say the last year and a half you worked at

9    GT, you used a -- like an electronic work order system;

10   is that correct?

11   A.   That is correct.

12   Q.   So let's talk about that paperwork.  When it

13   was on paper, what kind of paperwork did you have to

14   fill out for your work order?

15   A.   Well, there's a maintenance log, a daily

16   maintenance log that shows where we perform -- we would

17   write down what we perform from the beginning to finish.

18   And that log would show -- state what machines that we

19   worked on and then we make sure we document as far as

20   the date and time when that machine -- that work was

21   performed on that machine.

22   Q.   Okay.  And then you said at some point it

23   changed to the computer.  Do you recall approximately

24   when that change occurred?

25   A.   That change occurred when Jason was hired in

1    as the maintenance manager, correct.

2         Q.   All right.  And when you changed to the

3    computer system for the work orders, did you still have

4    to complete any kind of documentation on paper or was it

5    fully replaced by the computer system?

6         A.   At times we still had to use the paper.

7         Q.   The whole time or just like during the

8    transition?

9         A.   During the transition, because we were still

10   trying to work out the kinks with the computer system.

11   There was -- a lot of times we had trouble with

12   documents not loading up or slow coming into the

13   computer system and it would fault out sometimes.  So

14   there was still a lot of work, still working on the

15   computer system as far as getting it fully operational

16   to be able to accept anybody's work into it.

17        Q.   When did you stop using the paper documents

18   and just fully transition to the computer system?

19        A.   Never did.

20        Q.   Never did.  Okay.

21             Okay.  So you said that you were assigned

22   these work orders and tasks.  Were -- did you ever have

23   to create the work order yourself in the computer

24   system?

25        A.   Yes, there -- at times we'd have to create

Page 49

 1   work orders, besides the current work orders we get.

 2       Q.   Were there ever circumstances where you may

 3   create a work order but then not do work associated with

 4   that work order?

 5       A.   The only time we'd create a work order is when

 6   a machine goes down and the operator calls over the

 7   intercom.

 8       Q.   Okay.  If a machine were to go down five

 9   minutes before the end of your shift, would you -- would

10   that be a circumstance where you would create the work

11   order and it would be addressed by the night shift

12   folks?

13       A.   No.  That would be a work order -- at times we

14   would discuss with our supervisor and we would stay over

15   and complete that work order.  Even if it's five

16   minutes, we had -- we would stay over and complete that.

17   We wouldn't -- wouldn't allow that to go on to the

18   second shift.

19       Q.   Were there ever any work orders that were

20   performed -- that had work performed by multiple

21   maintenance technicians?

22       A.   Could -- could you kind of repeat that one?

23       Q.   Sure.  Was it possible that a work order would

24   be worked on by more than one maintenance technician?

25       A.   That is correct.

1      Q.   Okay.

2           THE VIDEOGRAPHER:  There is about five minutes

3      remaining on this media.

4           MS. JOZSI:  Okay.

5           MR. KATAEV:  Can we take a quick

6      off-the-record break when that happens?  I need to

7      discuss something with you.

8           MS. JOZSI:  Sure.  Why don't we -- why don't

9      we go off the record now and just take a quick

10     break so we can transition.  We can go off the

11     record.

12          THE VIDEOGRAPHER:  We are going off the

13     record.  This is the end of media one.  The time is

14     11:29.

15          (Recess from 11:29 a.m. to 11:31 a.m.)

16          THE VIDEOGRAPHER:  We are back on the record.

17     This is the beginning of media two.  The time is

18     11:31.

19     Q.  (BY MS. JOZSI)  Okay.  Before we went off the

20     record, we were discussing the work orders.

21     Mr. Jackson, you said that some of these would be

22     assigned to you.  So were there circumstances where

23     somebody else would create a work order and then you

24     would perform the work on that work order?

25     A.   Only if our supervisor at the time, James

1    White, if he creates a work order on a certain

2    assignment, then we would take over that work order and

3    perform it.

4        Q.   Okay.  Were there ever circumstances where a

5    work order may be created, but then nothing -- there's

6    no work performed associated with that work order?

7        A.   There are work orders that was created that a

8    supervisor may create, but there's no names on it.  So

9    if we finish our tasks and we see that -- within a

10   window of time that -- that we can pick up another work

11   order, the maintenance crew is allowed to pick up

12   further work orders and perform those jobs to help

13   reduce the -- the volume of work orders that's in the --

14   in the system.

15       Q.   So were there like -- was there like a queue

16   of unassigned work orders that you could pick up as you

17   finished your tasks?

18       A.   That is correct.

19       Q.   Okay.  All right.  Did you ever receive

20   training on how to enter the work orders into the

21   computer system or like what the process was supposed to

22   be for the workflow?

23       A.   Yes.

24            (Exhibit No. 5 was marked for identification.)

25       Q.  (BY MS. JOZSI)  I'm going to share what's been

1    marked as Defendant's Exhibit 5.  This is Bates No.

2    Defendant 9.  I will try to make it bigger, but it's

3    just a one-page PDF.  And let me know if you recognize

4    this document.

5        A.   Yes.  Okay.  Can you scroll down?

6        Q.   This is at the bottom there.  That's it.

7        A.   Okay.  Let me see.  The top part is correct

8    where it says 1 through 7, but it's a little different

9    on the bottom.

10       Q.   Okay.  How so?

11            I see you kind of looking.  Do you need me to

12   zoom or anything?

13       A.   Yeah, I was looking at it, but then I was

14   looking at the date that it was created.  I'm trying

15   to -- I'm thinking that one was created at a later date.

16       Q.   For the record, the date on here is 10/27/22.

17   Are you saying this is -- that you think this is created

18   after that date?

19       A.   Yeah, because we -- we had a class on that.

20   That was -- when it was actually being built in May, it

21   was a later date.

22       Q.   Let me ask it this way.  You previously said

23   for the last about year and a half, you used the

24   computer system.  Your separation from GT was

25   September 25, 2023.  So a year before that would have

1  been September 5, 2022, correct?

2      A.   You said separation in 2022 -- in '22?

3      Q.   Well, you said that you -- you said that you

4  used the computers for the last year to year and a half

5  of your employment, right?

6      A.   Correct, the year before.

7      Q.   Right.  So the year before your -- your

8  separation was in September of 2023.  So you had already

9  been using the computer for a year.  So you would have

10  started at minimum in September of 2022, right?

11          MR. KATAEV:  Objection to form.

12          You can answer.

13     A.   So where I'm getting confused is the time it's

14  actually being created and worked on, but it wasn't a

15  complete task yet because there was still modifications

16  and changes being done to the actual work scope.  And

17  during the time I was actually looking at it -- because

18  we had computer systems, but they were stationary

19  computer systems at the time where we were still using

20  the old method.  They was trying to convert the old

21  method over to the new method.

22     Q.   (BY MS. JOZSI)  Okay.  I understand that you

23  take issue with this date of 10/27/2022.  Other than

24  that date, though, does this describe generally the flow

25  of work orders, the steps and processes that you were

Page 54

1    expected to complete at GT Technologies?

2         A.    Yeah.    That didn't come until -- till, like,

3    the date somewhere first of December, around the first

4    of January.

5         Q.    Let me ask it a different way.    At the time

6    of -- towards the end of your employment -- so let's say

7    August to September of 2023 -- was this the process that

8    you were expected to -- to follow for your daily work

9    orders and -- and just the end-of-your-day work orders,

10   is this what you were expected to do at the end of your

11   employment?

12        A.    At the end of employment, yes, at the end.

13             (Exhibit No. 6 was marked for identification.)

14        Q.    (BY MS. JOZSI)    Okay.    Let's look at next

15   Exhibit 6.    This is Defendant's 10 through 24, and this

16   one is 15 pages.    So I'm just going to scroll through

17   first and then I'll let you look at it closer.    It is a

18   PowerPoint.    So I will scroll back again to the top.    It

19   says, "TLH Maintenance Training Module," and the date

20   8/11/2022, the author is J. Felger, and the title is

21   "Daily Work Instructions."

22             Do you see that?

23        A.    No.    It hasn't shown up on the screen.

24        Q.    Didn't show up on the screen.    Okay.    Hold on.

25             MR. KATAEV:    Yeah, you didn't share.

1          MS. JOZSI:  Okay.  Sorry about that.

2      Q.  (BY MS. JOZSI)  All right.  Let me show this

3  again.  This is Defendant's Exhibit 6 and it's

4  Defendant's 10 -- Defendant's 10 through 24.  And it

5  says at the top, "TLH Maintenance Training Module, Daily

6  Work Instructions."  The date is 8/11/2022, and the

7  author is J. Felger.

8          Do you see that?

9      A.  I see the part where it says, "TLH

10  Maintenance," and then in red, "Daily Work

11  Instructions," and there's a cutoff after that.

12      Q.  Do you see at the top the date 8/11/2022, and

13  author is J. Felger?  Are you able to see that on your

14  screen?

15      A.  Is that in the right-hand corner?

16      Q.  The top right corner, yes, sir.  Are you able

17  to see that?

18      A.  No, ma'am, because the -- the video screen is

19  in that corner.

20      Q.  Okay.  Here's what I'm going to suggest you

21  do, because I've got this document and another document.

22  They're actually quite lengthy and I know, Mr. Jackson,

23  you need to take the time to look at exhibits, which is

24  completely fair.  Why don't I do this:  I'm going to

25  email over to your counsel and if you --

1          MS. JOZSI:  You know, Emanuel, if you want, I

2      can also copy Mr. Jackson.  I have his email, but I

3      don't want to do that, necessarily.  But if it's

4      easier for everybody, I can.  I will email you what

5      I've marked as Exhibit 6 and 7 because they are

6      longer so that --

7      Q.  (BY MS. JOZSI)  Mr. Jackson, I'd like you to

8  take a look at them.  We can go ahead and break a little

9  bit early so that you can review them during lunch.

10  Because, again, the next one is quite long and I just

11  want to make sure that you see it and you're comfortable

12  with it before I start asking you questions.  Is that

13  fair?

14      A.   Oh, yes.  Yes, that's fine.  I appreciate

15  that.

16          MS. JOZSI:  Okay.  Emanuel, do you want me to

17      send it to you and you send it to Mr. Jackson or do

18      you want me to just send it to both of you at the

19      same time?

20          MR. KATAEV:  I have no objection to you

21      sending it to both at the same time.

22          MS. JOZSI:  So we'll do that.  I will email

23      you both 6 and 7 and then we can go ahead and go

24      off the record now.

25          (Exhibit No. 7 was marked for identification.)

Page 57

1          THE VIDEOGRAPHER:  We are going off the

2     record.  The time is 11:45.

3          (Luncheon recess from 11:45 a.m. to 1:02 p.m.)

4          THE VIDEOGRAPHER:  We are back on the record.

5     The time is 1:02.

6     Q.  (BY MS. JOZSI)  All right.  Before we took the

7     break, I emailed you, Mr. Jackson, two documents that I

8     want to turn our attention to.  Those were marked as

9     Defendant's Exhibits 6 and 7.  So we'll start with 6 and

10    I'll share my screen.  And for the record, Exhibit 6 is

11    Defendant's 10 through 24.  Did you have a chance to

12    review this document during the break?

13    A.   Yes.

14    Q.   I'm sorry, I didn't -- is that a yes?

15    A.   Yes.

16    Q.   Okay.  Do you recall receiving this training?

17    A.   Yes.

18    Q.   I'm sorry.  It cut off again on my end.  Was

19    that a yes?

20    A.   Yes.

21    Q.   Okay.  And then let's take a look at

22    Exhibit 7.  This is Defendant's 25 through 109.  Did you

23    have an opportunity to review this document?

24    A.   Was the screen supposed to change?

25    Q.   It did.  It's now turning to Exhibit 7, the

Page 58

1    Mpro CMMS document.

2         A.    Okay.   It just now pulled up.   I guess it's a

3    little slow on my end.   Yes.

4         Q.    Okay.   Do you recall receiving this training

5    while you were employed by GT?

6         A.    Yes.

7         Q.    Okay.   And it says here CMMS.   What does CMMS

8    stand for?

9         A.    I'm sorry.   I hadn't -- couldn't hardly

10   understand that last part.   It kind of went out a little

11   bit.

12        Q.    Sure.   It says CMMS.   What does CMMS stand

13   for?

14        A.    I can't remem -- quite recall that at the

15   moment.

16        Q.    All right.   I'll tell you.   Does it stand for

17   computerized maintenance management system?   Does that

18   sound right?

19        A.    Yeah, that sounds about right.

20        Q.    Okay.   And would the CMMS be the computer

21   system where you would enter the work orders that we

22   were discussing before lunch?

23        A.    That is correct.

24        Q.    Okay.   How often would you use this CMMS

25   system?

1    A.    We used the system after the training, doing

2    your multiple work orders, even though we still had some

3    glitches in the system with it and sometimes we'd have

4    to write down on paper as far as some of our work and

5    still turn it in that way until the system was fully

6    operational.

7    Q.    Was it the CMMS program where you would enter

8    in those work orders and document your work on a daily

9    basis?

10    A.    Yes.

11    Q.    What specifically -- what kind of information

12    would you put into the CMMS specifically?

13    A.    Well, specifically, as the CMMS describes the

14    type of work scope they ask for and required, we would

15    follow their instructions on it as far as entering

16    that -- the work that it set up for us, designed to put

17    in.

18    Q.    Okay.  Did you have a log-in and password that

19    you would use to get -- to access the CMMS?

20    A.    That is correct.

21    Q.    Was that log-in and password unique to you,

22    Quennel Jackson, or was it something that was a common

23    password for the whole shop?

24    A.    Each individual has their own.

25    Q.    Can you enter -- could you enter work into the

1  CMMS on behalf of someone else?

2      A.   It was open where it was like that until it

3  could be fixed by our maintenance manager.

4      Q.   What do you mean by that?

5      A.   The system was open to where anybody within

6  the plant can see what you work on or -- or see.  Only

7  within the maintenance department, anybody within the

8  maintenance department under that ID number or work

9  scope could actually enter and they can add to your work

10  order or make changes to it.  So it was where once you

11  make changes and once you submit it in real time, it can

12  be notated and then we can edit, those of that nature.

13      Q.   So I understand it was a platform -- it sounds

14  like, and correct me if I'm wrong, it was a platform

15  where more -- you know, multiple people could see what

16  was going on at any one time.  Is that fair to say?

17      A.   That is correct.

18      Q.   Now, you said that people could go in and

19  enter or add to your work order or change it.  If

20  somebody did that, though, would it show up with

21  their -- you know, a notation that it was entered in by

22  their user name to differentiate between what you had

23  put in and what somebody else had put in?

24      A.   That last part, I -- I didn't quite catch it.

25      Q.   Sure.  You were saying that somebody could go

1  in and add to your work order or, you know, make

2  changes.  If somebody did that, would it show up with

3  their user name to indicate that, you know, Elizabeth

4  Jozsi went in and made this note or made this change?

5  Would it show the person's name associated with that

6  edit?

7       A.   Okay.  It would show once that person types

8  their name in there and show that they add themselves in

9  there on maintenance they do.

10      Q.   Okay.  You said that you add your own user

11  name and password.  So if something was entered in under

12  your user name, does that mean that you were the person

13  that entered in that work or work order or notation?

14      A.   When I first create the work order and enter

15  it in, yes, and then the second person can come in and

16  add on.  It could be from a number of multiple

17  maintenance guys that can add on to that work order upon

18  that and start the same work based on what type of task

19  it is.

20      Q.   Would that additional work, though, show up as

21  being performed by Quennel Jackson or would it have

22  their name?

23      A.   I would be the main primary.

24      Q.   Did you ever enter work under another person's

25  name or user name?

Page 62

1      A.    Yes.

2      Q.    What was that?

3      A.    That is correct.

4      Q.    Okay.  Was that how you were trained under the

5   training that we had looked at a minute ago?

6      A.    That is correct.

7      Q.    So you were trained to enter in work under a

8   different person's user name?

9      A.    We would log in with that person.  We would

10  let that person know, if we were right beside each

11  other, that we would be working together on the same

12  work scope.  So we were both in on there once he creates

13  it and you add on upon it here.  And then once it's

14  submitted into the system, then you go in to start

15  performing the work.

16          And then once the work is performed, we go

17  back and reenter what was done.  Right now if work was

18  performed, it could be the same task, you write that

19  same task.  Or if you're on the other side machine and

20  do something a little different but it's the same

21  machine -- I mean the same number, then you would notate

22  on that same work order that y'all both performed that

23  work that day together and then you would close it out.

24     Q.    Okay.  So if you were performing work under a

25  work order -- let's say that you and I were both working

1   on the same work order, that work order should have both

2   of our names and show that both of us were working on

3   that particular work order.  Am I understanding you

4   correctly?

5       A.   That is correct.

6       Q.   Okay.  Thank you.

7            And the work order that you're entering into

8   the CMMS system, was there any expectation of what --

9   let me ask it different.  What was the expectation from

10  the company as far as entering that work into the

11  system?  When were you supposed to do that?

12      A.   Well, based on that expectation depends on if

13  the operator was to call, that machine's down and it

14  takes -- requires two people to work on it to get it up

15  in a timely manner, they will -- we will go and work and

16  do that together.  As far as time frame, what time,

17  when, it was just different times whenever an operator

18  may respond on the intercom and call in for a whistle

19  chaser, for maintenance to come through or the machine

20  is down.

21      Q.   Were you required to put in the work that you

22  were performing into the computer system like on a daily

23  basis?

24      A.   That is correct.

25      Q.   Okay.  All right.  I want to briefly touch on

1    some policies.  To your knowledge, during your

2    employment, did GT Technologies maintain employee

3    handbook for codes of conduct and things of that nature?

4              MR. KATAEV:  Objection; compound.

5              You can answer.

6        A.    Could you repeat that last part?

7        Q.  (BY MS. JOZSI)  Sure.  I'll break it apart.  To

8    your knowledge, did GT Technologies have any employee

9    handbooks?

10        A.    That is correct.

11        Q.    Okay.  What about like a code of conduct or

12    ethics, something like that?

13        A.    To my knowledge, in the beginning of being

14    hired, they had -- they had that.

15        Q.    Okay.  Do you remember seeing a code of

16    business, conduct, and ethics?

17        A.    I do recall seeing something in the beginning

18    of -- of hiring date.

19              (Exhibit No. 8 was marked for identification.)

20        Q.  (BY MS. JOZSI)  I'm going to show you what

21    we've marked as Exhibit 8, and this is Defendant's 110.

22    It's just one page.  It says, "GT Technologies Code of

23    Business, Conduct, and Ethics," and it's an

24    acknowledgment with signature.  Do you recognize this

25    document?

1      A.    I recognize it, but it was longer than that.

2      Q.    Right now this is just the acknowledgment

3  page.  I just want to know, is this -- is this your

4  signature marked as "Employee Signature"?

5      A.    Yes, it is.

6            (Exhibit No. 9 was marked for identification.)

7      Q.   (BY MS. JOZSI)  Okay.  And then I'm going to

8  show you Exhibit 9.  I think this is what you were

9  referring to.  This is the Defendant's 111 to 141, and

10  this is a longer document.  I'm just going to scroll

11  through it.  And I don't need you to -- you know, I

12  don't want you to -- you don't have to read the whole

13  thing.  I just want to know if you recall receiving a

14  copy of the code of business, code of conduct, and

15  ethics.  And this is that signature page, but it's a

16  blank version.

17            Do you recall seeing a code of business,

18  conduct, and ethics during your employment?

19      A.    Yes.

20      Q.    I'm going to turn to page 14 of this document.

21  That's not 14, apparently.  At least that page, anyhow.

22  I'm going to go -- oh, it's -- it's page 14 of the

23  thing.  Defendant's 127, in the middle here it says,

24  equal employment -- I'm sorry, "equal opportunity."  Do

25  you see that policy, sir?

Page 66

1      A.    Uh-huh.  Okay.  All right.  Are you still
2   there?
3      Q.    Yeah, I -- I was waiting.
4            Are you familiar with this policy?
5      A.    Yes, uh-huh.
6      Q.    Okay.  What was your understanding of your --
7   how to report any concerns that you may have while you
8   were employed by GT Technologies?
9      A.    Well, I was explained in this policy to -- if
10  I had any concerns or anything, it was discussed with --
11  with human resources and --
12     Q.    Okay.
13     A.    -- the -- and the maintenance -- or not -- I
14  mean and the plant manager.
15     Q.    Okay.  Were you aware of any other ways that
16  you could report any violations or concerns during your
17  employment?
18     A.    Yes.  There's -- there's other ways that you
19  could report any violations or any activity that's not
20  of good nature, and you start by with your supervisor
21  and then maintenance manager and then it goes from
22  maintenance manager to -- to HR and plant manager.
23     Q.    What about did the company have like an ethics
24  hotline or, you know, anonymous hotline phone number?
25     A.    There was a hotline number for -- for

Page 67

1    something that they had there due to dealing with

2    something that they had.

3        Q.    I'm on same exhibit.  It's Defendant's 128, if

4    you scroll -- if you see under the heading, "Reporting a

5    complaint," it says here, "You may also call the

6    toll-free GT Technologies code of business, conduct, and

7    ethics hotline," and it gives the phone number to

8    reports complaints anonymously.  Were you aware of that

9    hotline during your employment with GT Technologies?

10       A.    During the time of being there, I wasn't aware

11   of that hotline at that time until shown later on, at

12   the end, there was a hotline on -- on a bulletin board.

13       Q.    Okay.  You say, "at the end."  What do you

14   mean -- when did you first learn of that -- of GT's

15   hotline?

16       A.    That was mentioned to me at -- the same day

17   of -- of when I was being dismissed.

18       Q.    Who told you about it?

19       A.    That was a former employee that was there.

20       Q.    What's that former employee's name?

21       A.    I can't remember the lady's name.

22       Q.    Do you remember, like, what her job role or

23   title was?

24       A.    It's been too far gone -- long ago since I've

25   been there to remember.

Page 68

1          Q.   Was it someone in HR or, like, management?

2          A.   No.  It was -- it was a former employee that

3     worked on a -- worked out in the plant.

4          Q.   Okay.  And they told you about the hotline and

5     I think you said you saw it on the bulletin board; is

6     that correct?

7          A.   Yeah, as I was walking in and I had mentioned

8     to them about a few things.  They showed it to me and

9     said, well, they have that right there.  And they -- and

10    they showed me around the corner of that on the bulletin

11    board where they had it up, next to the cafeteria.

12         Q.   Okay.  Did you ever call the hotline to make

13    any reports or complaints?

14         A.   No.

15         Q.   Why not?

16         A.   I did not have any knowledge of it.

17         Q.   I thought you just said that you learned about

18    it, though, while you were still employed?

19              MR. KATAEV:  Objection; argumentative.

20              You can answer.

21         A.   That's at the end of -- of being dismissed.

22    By the time I found out, I was already being terminated.

23         Q.   (BY MS. JOZSI)  Okay.  Okay.  So you were

24    unaware -- I just want to make sure I understand.  You

25    were unaware of the existence of an employee hotline

1    until you were essentially -- the day you were on your

2    way out, after you were terminated?

3              MR. KATAEV:  Objection; asked and answered.

4              You can answer.

5        A.    Correct.

6        Q.    (BY MS. JOZSI)  Okay.  I understand.

7              All right.  Were you ever disciplined when you

8    were working at GT Technologies?

9              MR. KATAEV:  Objection to form.

10             You can answer.

11       A.    During my time there for the seven years

12   working there, the only time I was disciplined was

13   during the time once Mr. Jason Fergel was being

14   appointed as the maintenance manager, where there was a

15   disciplinary action written up for -- for a worker's

16   scope that was not performed.

17       Q.    (BY MS. JOZSI)  Okay.  Prior to receiving that

18   written discipline -- and we're going to take a look at

19   that in a minute, but prior to receiving that, did you

20   ever have any sort of disciplinary issues, whether they

21   were formal or informal, issued to you?

22       A.    Not to my knowledge.

23       Q.    Did your -- any of your supervisors ever give

24   you suggestions on ways that you could improve

25   performance?

Page 70

1      A.    One supervisor did.

2      Q.    Who was that?

3      A.    Curtis.

4      Q.    Okay.  Let's turn our attention to the

5   substance of what your complaint is about.  Tell me what

6   happened on August 19, 2023.  Walk me through that day.

7      A.    Okay.  Which date that was?

8      Q.    Saturday, August 19, 2023.

9      A.    Saturday, that's the date that -- at what --

10  what time on a Saturday?

11     Q.    Well, your complaint --

12     A.    Was it --

13     Q.    Well -- so, your complaint alleges that you

14  had worked over the weekend.  You were unable to upload

15  work orders into the system.  That was Saturday, the

16  19th.

17     A.    Okay.

18     Q.    Yeah.

19     A.    All right.

20     Q.    So I just want you to walk me through what

21  happened on that day.

22     A.    Okay.  So Saturday, that was a voluntary -- I

23  was asked to work on that Saturday afternoon on the

24  second shift, to help out on the second shift because

25  they had two maintenance guys that was going to be out.

Page 71

1    So me and Johnny Taylor were the two individuals that

2    were assigned to work on that Saturday evening shift.

3        Q.   Okay.  You said you were -- that you were

4    asked to help out.  So that was not your normal second

5    shift, the Saturday shift?

6        A.   That is correct.

7        Q.   And you mentioned another individual, Johnny

8    Taylor.  Is he another maintenance defendant -- or

9    maintenance technician?

10       A.   That is correct.

11       Q.   And what is Mr. Taylor's race?

12       A.   Mr. Taylor is Caucasian.

13       Q.   Okay.  So what about that day and that shift

14   was unusual?

15       A.   Me and Mr. Taylor, we decided to -- to work

16   together and our job was to work on the machines.  So

17   there were machines that -- at the time that required

18   two people to work on them.  So what we did is combine

19   both our names on the work order.  I created the work

20   order first and then Mr. Taylor entered his name up

21   under mine, and we typed in work as we -- starting out

22   as work we were performing on the same machine.

23           Then once we finished working on the machine,

24   we'd go back and then we entered the worker's scope,

25   what was done and performed, any parts or anything that

Page 72

1  we may have had to go back into the shop to get to the

2  place to put on the machine, and then we entered all

3  that.  Following the CMMS into the system, we had it set

4  up as far as the work scope needed to be entered in.

5  We'd done that together.

6       Q.   Okay.

7       A.   Once we entered the work in and we submitted

8  the work in, it went through and then 30 seconds, it

9  kicked out.  Our IT number had kicked out of the system,

10  and so we both discovered that.  We tried multiple

11  computers throughout the plant where we -- we tried the

12  main stationary computer and something like that.  Our

13  laptop didn't work.  We would try another computer to

14  enter it into it also.

15          So we had done that multiple times.  It kicked

16  back out, rejected as well.  So I told Mr. Taylor, I

17  discovered -- well, we're having a problem with the

18  system here again.  So I need to write down, you also

19  write down on your notes and write down the entire work,

20  what we've done and the number that we entered in.  So

21  that way we have our records.  So that way we can show

22  that we did the work and it doesn't look like we didn't

23  have the work performed.

24          So in real time, the computer database had

25  stored both our names in the system, even though it

1  kicked it out.  So it's still there within the main

2  computer system and database of GT Technologies.

3       Q.   You said it got kicked out in ten multiple

4  computers.  Were you logged in just as you or did you

5  try logging in under Mr. Taylor's log-in as well?

6       A.   First myself.

7       Q.   Okay.

8       A.   And then -- then Johnny did it hisself.  He

9  done the same thing for him.  Then we switched it around

10  where he created the work order and then I went up under

11  him and done the same thing.  So we decided to let me

12  create the work orders and then he'd just add up under

13  me and we'd just worked together throughout the whole

14  entire shift with both our names on the work orders.

15       Q.   So you were able to create a work order

16  successfully?

17       A.   Yes.

18       Q.   Okay.  But not able to enter the scope of work

19  and any of the details after that?  That's when it was

20  kicked back?

21       A.   No.  All -- all details was entered and it was

22  saved and it was submitted successfully, but then 30

23  seconds it kicked me back out.  It would show it in

24  itself, but then it undid itself.

25       Q.   Were you and Mr. Taylor the only two

1   maintenance technicians working that day?

2       A.   That is correct.

3       Q.   Are there any other -- strike that.

4            The other people not -- I'm not phrasing this

5   right.  Are the maintenance technicians the only ones

6   that you see on CMMS or do other people in the plant use

7   the computer system as well?

8       A.   Maintenance is pretty much the only -- we

9   mostly used it in there, CMMS.  It's set up for the

10  other departments to use it also.

11      Q.   Okay.

12      A.   They set the system up for everybody to have

13  access to be able to use it in each department as far as

14  putting it in.  They also were supposed to go through

15  certain trainings as well.  That was a -- a time frame

16  where they were successful where you could do that due

17  to people's and other operator's work ethics as far as

18  finding a time being able to come up with it.

19           That's something he was trying to set up to

20  make it easier on him where it would help out the entire

21  system for GT Technologies.

22      Q.   To your knowledge, did anybody else have

23  computer issues that Saturday?

24      A.   To my knowledge, we was the only two that was

25  on maintenance that was actually using the computers as

1    far as putting it in.

2        Q.    Okay.

3        A.    And there was no other issues that were seen

4    that anybody else had or mentioned over the intercom.

5        Q.    Do you remember how many work orders you

6    completed that Saturday?

7        A.    There were multiple work orders, but I

8    couldn't give you an exact number.

9        Q.    Okay.  On Saturday, when you were having these

10   computer issues, did you tell anybody at GT that you

11   were having trouble with the computer?

12       A.    Yes.  I called -- I called Jonathan.  Jonathan

13   is the computer technician.  I called him about the --

14   the computer system and see if he could look into it on

15   his end --

16       Q.    Okay.

17       A.    -- see why we was having issue -- trouble with

18   it, and he said he was checking into it and he'd get

19   back with us.  We explained to him what we were doing

20   and he said that was a good option doing it, to write it

21   down.  He said, still submit it in.  It would accept it,

22   but it may still keep kicking it out.  Just keep doing

23   that and that way -- and keep writing it down so that

24   way you keep a log of everything you're doing.

25              So what we did was still enter in every work

Page 76

1   order the same way like we normally do on that -- on our

2   laptop.  Submit everything in, submit to show the

3   complaint so that way it will save into the real-time

4   database.  And then later on, maybe once the computer

5   gets corrected, all the evidence will still show back

6   up.

7        Q.    You said that you were writing things down.

8   Did you have like a specific form that you were using?

9   Like, how were you tracking that?

10       A.    Yeah.  So I had a tablet that I wrote down the

11  actual work order numbers and wrote it out on each work

12  order, which I've been doing that for quite some time.

13  I've been doing that for over a year, wrote down

14  hundreds of work orders on the tablet.  So I'd just keep

15  a record just in case there was a major glitch or

16  something, a computer crash.  Our records, I'd still

17  have it on paper so that way when people go back in the

18  system, they were able to pull it back up.  It was

19  something good to have.

20            It was something that I used to do.  The rest

21  of the maintenance guys as well were doing the same

22  thing because during my seven years of working there, we

23  have had computer issues showing that documentation is

24  put in there and it wasn't there, and then later on it

25  showed up.  So that's what was being done.

1      Q.   And the work orders that you were compiling,
2  did you put the same level of detail on that list that
3  you would have entered into the computer?
4      A.   That is correct.
5      Q.   Okay.  Did the list -- and what you were
6  writing down, you mentioned that you had been doing
7  that.  Did you put like the full scope of work of
8  everything you did and the dates and the times, all of
9  that kind of detailed information?  Did you keep that in
10  that same list?
11     A.   The action date and time.  The dates I didn't
12  do --
13     Q.   Okay.
14     A.   -- because the numbers -- the numbers of that
15  work order were still being tied into the system.  So
16  with the limited space that I had on the tablet, I wrote
17  the main information I needed to keep.  In order to be
18  able to go back and type in to look it up, I put in -- I
19  put in that number.
20     Q.   Okay.  So Saturday you're there and you had
21  trouble entering things into the system.  Did you work
22  on Sunday?
23     A.   No, ma'am.
24     Q.   Did you come back to work then on Monday to
25  start your regular schedule?

Page 78

1      A.    Yes.

2      Q.    When you arrived to work on Monday, did you

3   tell anybody that you had experienced this computer

4   issue over the weekend?

5      A.    Yes, I did.

6      Q.    Who did you tell?

7      A.    I got back with Jonathan and then I also

8   mentioned it to Mr. James White.

9      Q.    Were you having a computer issue when you

10   returned to work on Monday?

11      A.    On Monday, the computer issue started

12   working -- started working fine when I started entering

13   a new work scope.

14      Q.    So by Monday the issue had resolved?

15      A.    That is correct.

16      Q.    When you mentioned this to James White about

17   this computer issue on -- on Saturday, what did

18   Mr. White tell you or what did he say?

19      A.    He would check into it.

20      Q.    So you said the computer was working fine on

21   Monday when you arrived.  So did you go back and enter

22   the Saturday work orders into the computer system?

23      A.    Yeah.  So all of my regular line of work

24   scope, I entered those back in to see if it would show

25   back up into the system.  So there was a double copy in

1    the system where I entered in it in there.

2        Q.    What do you mean?

3        A.    So when I reentered it into the system, the

4    same work order, it was supposed to pull up the work.

5    So I retyped the queue in to see if it would accept it.

6    It accepts the same work, but then when I typed in the

7    number again to show it, to pull it up, I still couldn't

8    see where me and Johnny Taylor had entered our work

9    scope in for that Saturday.

10       Q.    Okay.  So I guess the question is:  Did you

11   just enter all the work in for Saturday, because it

12   sounds -- it sounds like you couldn't always see the --

13   the scope of work that you entered on Saturday?  So did

14   you just go ahead and enter all that information into

15   the computer on Monday, when you got back to work?

16       A.    I entered some on Monday along with other work

17   orders.  When I have a -- a space time somewhere in

18   between I'm doing work and when I'm entering one work

19   order and finishing, then I would add one in from that

20   work that I had and then -- and then see if it would

21   submit and put on there Saturday's work scope.

22            And I would notate, showing that this is

23   Saturday's work scope that did not enter.  So that way

24   he would see it on the other side of his computer; so

25   that way he could kind of take it, match up by his

Page 80

1  computer and see if he could see where me and Johnny

2  Taylor had that those work orders there.

3      Q.   How long did it take you to enter the work

4  scope into work orders?

5      A.   It varies between -- somewhere between

6  three -- three minutes at the most.

7      Q.   Okay.  And so you said that you entered some

8  of the work orders on Monday along with other work

9  orders.  So presumably, you got new work orders when you

10 showed up on Monday that you were supposed to complete

11 that day.  So you entered some of Saturday's work on

12 Monday.

13         Did it -- did you enter -- did you enter all

14 of Saturday's work on Monday or did it take you a couple

15 days to get it into the system?

16     A.   It took -- it took another day to enter it in,

17 you know, because I had other work that I had to

18 perform.

19     Q.   Sure.  Okay.

20         All right.  So would it be fair to say that

21 you -- you entered the work orders from Saturday on

22 Monday and Tuesday, in between your normal scheduled

23 work?

24     A.   That is correct.

25     Q.   Do you recall about how many work orders you

Page 81

1  would get on any given day?

2      A.   On a given day, me working at a good, steady,

3  fast pace, maybe I'm multitasking a lot of things, I

4  would complete a good bit amount of work orders in a

5  decent time so that, you know, we'd have a good record

6  of maintenance logs that we're keeping up on what goes

7  down and -- and also as far as PM is why.

8      Q.   So I'm trying to get a feel for a number.

9  Like, is ten work orders in one given day, is that

10 normal or is that too high, too low?  Can you estimate

11 how many you'd do?

12     A.   Sometimes -- ten is like -- is like an

13 average.  Sometimes between -- maybe between 12, 14 with

14 an eight-hour work scope.  Sometimes if you work over an

15 extra two hours, so it'll start from ten and it'd just

16 escalate on up.

17     Q.   Okay.  All right.  So you mentioned that you

18 were entering -- you were doing your normal work duties

19 on Monday and Tuesday in addition to the work orders

20 that you were entering back in from Saturday.  Do you

21 recall doing any other specific work orders on that

22 Monday or Tuesday?

23     A.   There were other work orders that I was

24 working on, also there was a project that I was working

25 on and I was assigned and working on.  So between

1    work -- a few work orders and the project, which was a

2    big, long project, I was assigned on that project, I

3    would stay on that project and work on it as well.

4         Q.   Okay.

5         A.   As far as building -- building design, that

6    was my main thing I executed on, doing something for

7    machines so that way it gives better production.  So

8    between that Monday, there was a project that was

9    started prior, that following week, that started the

10   following week between -- on a Wednesday, Wednesday or

11   Tuesday of the -- of that last following week.

12        So I was assigned to stay on that project as

13   far as fabricating, coming up with the measurements,

14   engineering to figure out the different elevations and

15   things of that nature.  And if it was where it -- in the

16   work scope and I needed to be pulled off the work order,

17   I would do that, but then follow that back in to going

18   back to working on that project.

19        Q.   So a project could take several days because

20   you may be called away to do other orders, right?

21        A.   That is correct.

22        Q.   All right.  So you mentioned a performance

23   warning that you received, a written performance

24   warning.  So I want to talk about that.  What do you

25   recall about the events leading up to you getting that

Page 83

1    performance warning?

2        A.    As far as I know, it was a good day.    There

3    was no one having problems.    I was doing work.    I was

4    doing my normal, you know, job duties.    But as far as

5    the performance, when it came in, I was shocked to learn

6    that that came about, you know.

7        Q.    Let me ask this.    Do you recall speaking with

8    Jason Felger on that Tuesday, August 22, 2023?

9        A.    Yes.

10       Q.    And what do you remember about that

11   conversation?

12       A.    The conversation was -- in '23 was something

13   about not having enough work scope within seven hours

14   performed on --

15       Q.    Okay.

16       A.    -- that actual day of 2023.

17       Q.    Did you discuss with Jason that you had been

18   having issues with the CMMS on Saturday, during that

19   conversation?

20       A.    Yeah.    I mentioned to him about the system

21   having trouble, like, it was again and he needed, you

22   know, to check into it; that me and Johnny had trouble

23   with it and he said would check into it, you know.

24       Q.    Did you-all discuss how in CMMS it didn't show

25   that you had entered work orders for that day in the

1    system at that time?

2         A.    Yes.  He mentioned -- he said it doesn't show

3    in his system where it's entered, and so I wrote down on

4    my pad and showed him where I had those work orders, you

5    know, written down to -- to cover my back as well as

6    Johnny's, you know.

7         Q.    At the time you had a conversation with Jason

8    on Tuesday, so were those work orders entered into the

9    computer system?

10        A.    Not that day, it wasn't.

11        Q.    I'm sorry, what was that?

12        A.    Not -- not on Tuesday.

13        Q.    Okay.  Do you know if when you spoke with --

14   with Jason on Tuesday, if you had anything showing up

15   from a work-order perspective in CMMS as having been

16   accomplished that Tuesday?

17             (Technical interruption.)

18             THE VIDEOGRAPHER:  We are going off the

19        record.  The time is 1:57.

20             (Recess from 1:57 p.m. to 2:01 p.m.)

21             THE VIDEOGRAPHER:  We are back on the record.

22        This is the beginning of media three.  The time is

23        2:01.

24        Q.    (BY MS. JOZSI)  All right.  Mr. Jackson, before

25   we went off on -- off the record, I had asked you if you

1    were aware when you spoke to Jason on the 22nd, on

2    August the 22nd -- do you know if any work orders were

3    showing up in the computer system as having been entered

4    that day, August 22nd?

5         A.    As far as work orders that was entered on

6    Saturday that showed up on his end, is that what you

7    mean?

8         Q.    No, sir.  If he went into the computer for

9    August 22nd, that same day, that Tuesday, do you know if

10   there were any work orders showing up as you have -- as

11   completed for you that day, August 22nd?

12        A.    No.  We hadn't discussed anything or -- or

13   talked about that.

14        Q.    Okay.  All right.  Do you recall -- so -- so

15   you remember meeting with him on the 22nd.  I think you

16   said you spoke with him about the trouble you had with

17   the CMMS on Saturday.  Do you recall anything else you

18   discussed with Jason that Tuesday, the 22nd?

19        A.    Yeah.  That 22nd is when he -- he discussed

20   with me about the disciplinary he wrote up that morning.

21        Q.    He wrote up a discipline on August 22nd?

22        A.    Yeah.  It's on -- on the 22nd.

23              (Exhibit No. 13 was marked for

24   identification.)

25        Q.    (BY MS. JOZSI)  I'm going to show you what's

1  been marked as Exhibit 13.  This is Defendant's 154, and

2  I'm going to just scroll to the bottom so you can see.

3  It's one page.

4  All right.  Do you recognize this document, Mr. Jackson?

5       A.   Yes.

6       Q.   Is this the performance warning notice that we

7  were discussing a moment ago?

8       A.   That is correct.

9       Q.   All right.  And if you scroll to the bottom,

10  the date -- is the date down here -- it looks like it's

11  8/23/23; is that correct?

12       A.   Yes, that's the correct date that's wrote on

13  there.

14       Q.   Okay.  Are you saying you had this discussion

15  on the 22nd and not the 23rd?

16       A.   That is correct.

17       Q.   If I --

18       A.   If you scroll, it -- it shows the 22nd.

19       Q.   So it says date of occurrence 8/22/23, but

20  then the date that it says it was signed and discussed

21  was 8/23/23.  Is that right?

22       A.   Yeah.  So after we discussed it, a day later,

23  he took it up there to Erin, which was the next day.

24       Q.   Okay.  Okay.  So did you receive a copy of

25  this performance warning notice?

Page 87

```
 1        A.    Only copy I got is when you gave it to me when
 2    we had the deposition.
 3        Q.    Okay.  Here it says, "Employee signature,
 4    refused to sign."
 5              Do you see that?
 6        A.    Yes.
 7        Q.    So were you asked to sign this document during
 8    your employ there?
 9        A.    That is correct.
10        Q.    And -- and you refused to sign it?
11        A.    That is correct.
12        Q.    Why did you refuse to sign it?
13        A.    Refused to sign because when he presented it
14    to me, it was 9:45 in the morning.
15        Q.    Okay.
16        A.    So, again, I asked him, why would you write
17    a -- a notice for the same day, for seven hours of work
18    scope and -- and it's only 9:45 and the end of the shift
19    hasn't finished.  So it doesn't make sense, you know, to
20    call me in the morning to have this laying out and then
21    I'm still -- everybody's still working and it's not even
22    been five hours yet.
23        Q.    So is it your testimony that you -- that he
24    gave you this document on the 22nd?
25        A.    The 22nd.
```

Page 88

1      Q.   Okay.

2      A.   As it stated, because it was -- when I looked

3   at it on his desk and it had the 22nd on there written

4   out and I'm, like, I'm sorry, you know, I'm not -- I

5   can't do that.  I mean, I'm, like, look at what you're

6   you doing, you know, you're kind of getting ahead of

7   yourself.

8           So it -- it falls back to prior to -- to

9   statements and different things that was occurring

10  during the time I was working there.  As -- as it went

11  into it, as I mentioned when we had our last deposition

12  where Mr. White had mentioned about that they didn't

13  have to have -- the State of Florida didn't have to have

14  a minority in the work environment.

15          And then it starts registering in my mind by

16  me being the only minority in the maintenance

17  department, that I knew that there's -- they're going to

18  try to remove me to have just only -- just their people

19  in there since I was the only one that was left.  So --

20     Q.   Okay.

21     A.   -- and I --

22     Q.   I want to make sure that I'm understanding,

23  though.  So your testimony is that he showed you this

24  performance warning notice at 9:45 a.m., on August 22nd,

25  and it all -- was this all filled out at that time?

1      A.    Yes.

2      Q.    So it's signed 8/23/23.  Your testimony is

3   that this is signed the day after you got this document?

4      A.    Correct.  If you notice, the ink on that paper

5   is changed.

6      Q.    Okay.

7      A.    It's all written out with the same ink and

8   then later on they used a different ink, because you can

9   see -- I can see where -- where it's recut and paste and

10  redone.

11     Q.    Okay.  I want to make sure I understand what

12  your understanding is.  So tell me why you think you

13  received this performance notice warning.  What was the

14  discipline for?

15     A.    This was for the work scope that they said

16  that I hadn't performed on Saturday.  They waited for

17  that following Monday.  One way or the other, the way

18  how he mentioned it to me, it was still work that I

19  didn't do the actual Monday that still I wasn't

20  completed the whole entire shift.  So that's why I

21  mentioned to him, how can I sign this and the end of the

22  shift is not even here yet.  I said --

23     Q.    What --

24     A.    Huh?

25     Q.    Go ahead.  I'm sorry.

1      A.   I said, you know, I'll take a copy of it.  And

2  he refused to make a copy and give it to me.  He said

3  he'll -- he's going to run it -- he'll run it to Erin

4  and let her know I refused to sign it.

5      Q.   Okay.  Where on here does it mention the

6  Saturday or Monday work?

7      A.   On here it doesn't mention Saturday.  It

8  doesn't mention Monday, but it was discussed in the

9  office between us why he wrote it out.  So he didn't

10  state -- so he didn't notate it on here the reason --

11  which reason it was for, what day for the work scope

12  being performed.

13      Q.   Well, it says on here -- it says for the

14  description, it says, "seven hours to conduct one-hour

15  work scope," and then parentheses, "eight-hour shift not

16  captured in documentation."

17           Do you see that?

18      A.   Uh-huh.

19      Q.   And the date of occurrence at the top is for

20  8/22/23; is that right?

21      A.   That's correct.

22      Q.   So did you understand that the date that he's

23  talking about could be something other than 8/22/23?

24      A.   He's talking about that same day we actually

25  talked, 8/22/23, which was at the beginning of the

Page 91

1   shift.

2        Q.    Okay.  All right.  When you got this document,

3   this performance warning notice, did you and Jason go

4   look at the CMMS together to see what was in the

5   computer at that time?

6        A.    No.

7        Q.    Do you recall, did you clean two restrooms on

8   that day, on that Tuesday, the 22nd?

9        A.    You said Tuesday or -- or Monday?

10       Q.    On Tuesday, August 22nd, do you recall if you

11  cleaned two restrooms that day?

12       A.    There were two restrooms that was cleaned.  I

13  can't give you exactly the dates on when those was

14  cleaned.

15       Q.    Okay.  So after you received this

16  performance -- performance warning notice, what did you

17  do?

18       A.    Well, I tried to explain to him in a nice

19  manner, as always, you know, in -- in a helpful way and

20  I explained to him, Jason, this is -- this is not how we

21  handle a situation, you know, we're better than that.

22  We're a team.  You know, I complete the entire computer

23  system, wired it in, done everything you asked and I

24  don't understand why this comes about, you know, what --

25  what change to add to or what change brought this upon

1    you, you know.

2          And he hesitated for a while before he could

3    give a response and -- and after that he just said, just

4    go back to work and finish working on what you was

5    doing, just no more over -- overtime for right now that

6    you always like and, you know, just stay on the job

7    until you -- the task I tell you to do and keep working

8    that.  Because James had set me up on doing some stuff

9    and at first it was James telling me, do that and then

10   get back onto the project.

11         So that switched and changed and then he said,

12   if I don't tell you to do anything myself, then don't do

13   it.  And then I actually explained, I said, well, you

14   mentioned to me to do whatever James asked.  And he

15   said, I don't remember call -- saying that, but if he

16   asks, don't do anything else.  And I said, okay,

17   that's -- that's fine, you know.

18         So there was a miscommunication between the

19   two of them as far as who letting who know what who is

20   supposed to work on.  And I noticed he was confused on a

21   lot of things at that time that caused him not to

22   remember certain things that he was doing.

23         Q.   Okay.  Let me ask it this way.  Did you talk

24   to anybody -- when you got the performance warning

25   notice, did you go to and complain to anybody about it?

1       A.   No.  There was only one person -- there was

2    only two people that knew I had the performance, and

3    that was Jonathan.  He was there when -- because

4    Jonathan was in there when he was writing it and he told

5    me as soon as I got to the door, after I was called to

6    the office, he said, you're -- you're in trouble now

7    with Jason.  I said, for what reason, right.  He said, I

8    don't know why, but you shouldn't, you know.  I said,

9    okay, I want to see what's going on.

10           So me and Darrell Harris walked in there.  So,

11   yeah, we was walking up there, because we were fixing to

12   see about some other -- we were helping the AC guy on

13   the roof working on an assignment.  So Darrell Harris

14   was right there and he told Harris just go on.  So that

15   task -- he's the only one who also knew besides

16   Jonathan.

17       Q.   Okay.  So Jonathan and Darrell Harris knew

18   that you were receiving the performance warning notice.

19           Did you ever complain to anybody in HR about

20   the performance warning notice?

21       A.   I -- I complained to Erin Wade about the

22   performance warning notice.  Like I mentioned to her,

23   you know, for years I worked there, I never had a

24   performance warning.  I always did my job correctly and

25   done anything that GT asked me to do as far as inside

1    the plant and outside the plant.  Never had to question

2    authority or why I wouldn't do my job.  I always worked

3    extra hours.  I even worked off the clock, because I

4    think an employer would give me a job opportunity and in

5    return I show my appreciation for them giving me a form

6    of work, you know, and that's what I did.

7         Q.   Okay.  So you -- so you talked to Erin Wade.

8    Is Erin Wade in human resources?

9         A.   That is correct.

10        Q.   And did you talk to her in person or on the

11   phone or in email?  What was the method of communication

12   there?

13        A.   That's in person.

14        Q.   And you told me a little bit about what you

15   talked to Erin about.  Did you explain about the

16   computer issues that you had on that Saturday to Erin?

17        A.   Yes, I did.

18        Q.   And did Ms. Wade give you the opportunity to

19   submit some -- you know, a rebuttal or some sort of

20   response to the performance warning notice?

21        A.   That is correct.

22        Q.   And you submitted something in response,

23   correct?

24        A.   That is correct.

25             (Exhibit No. 14 was marked for

```
 1    identification.)
 2         Q.  (BY MS. JOZSI)  I'm going to show you, this is
 3    Exhibit 14 and this is Defendant's 155.  Do you
 4    recognize this document?  Let me zoom it out.
 5              MR. KATAEV:  Is this from plaintiff's
 6         production?  Elizabeth?
 7              MS. JOZSI:  Sorry, did you say something?
 8              MR. KATAEV:  Can you hear me?  Elizabeth, can
 9         you hear me?
10              MS. JOZSI:  I can now, yes.
11              MR. KATAEV:  I was just asking you, is this
12         plaintiff's production?
13              MS. JOZSI:  This one's Defendant's 155.
14              MR. KATAEV:  Okay.  I'm sorry.  Please,
15         proceed.
16              She asked if you recognize the document.
17         Please answer her question.
18         A.   Yes.
19         Q.  (BY MS. JOZSI)  And is that your handwriting?
20         A.   Yes.
21         Q.   And on the left side, is that your signature
22    at the bottom of that first page?
23         A.   Yes.
24         Q.   Is this the document that you provided to
25    human resources?
```

Page 96

1      A.    That is correct.

2      Q.    All right.  And on the left side -- so it

3    looks like this is a scanned document with two sheets of

4    paper.  On the left side is a letter or a note dated

5    August 25, 2023, and on the right side there's a list of

6    items and it's signed with your name on the bottom; is

7    that correct?

8      A.    That is correct.

9      Q.    All right.  So let's start on the left side.

10   There's a statement.  Why did you write this statement

11   to HR?

12     A.    I wrote this statement to protect my repu --

13   representation [sic] with the company.

14     Q.    All right.  In here you say, "This shows me

15   the maintenance supervisor is discriminating me of my

16   work ethics."

17           What -- so first of all, who are you referring

18   to here as the maintenance supervisor?

19     A.    That would be Jason Fergel.

20     Q.    Okay.  And what do you mean by this,

21   discriminating of -- discriminating of my work ethics,

22   what does that mean?

23     A.    Well, what Jason was saying is that -- that I

24   didn't produce the work that -- saying it was done, that

25   he said that I was falsifying documents.  There's no

1    work there showing that's submitted, that it was made

2    up.

3        Q.   Did he -- did he accuse you of falsifying

4    documents in the performance warning notice?

5        A.   He accused me of not having any documents of

6    writing these up and it being assigned to someone else,

7    he said.  So I --

8        Q.   Okay.  What specifically do you believe

9    Mr. Felger did to you that was discriminatory?

10       A.   I see -- what he done was -- I explained to

11   him about the work orders as being done and he had no

12   proof of showing that I had and his demeanor changed

13   towards me, you know, after I had done and performed

14   numerous work for him.  I was highly disappointed with

15   this -- with his actions and also with his attitude had

16   changed.

17            I was trying to figure out what caused or led

18   him -- and I know one other person that was working with

19   him on this situation that was really pushing the whole

20   issue, and that would start with James White.  So him

21   falling in behind him caused him to change his demeanor

22   as well towards me.

23       Q.   You said he was pushing the whole issue.  What

24   issue are you talking about?

25       A.   Well, James White pushing the whole issue as

1   far as wanting to remove me out of the maintenance

2   department due to of my character wasn't by work.  It's

3   just that I cross any I, dot any of the Ts and Is, but

4   it's just one thing that just quite didn't complete the

5   whole cycle and we pretty much know what that is.

6       Q.   I'm -- I'm sorry, but I need you to tell me

7   what it is that you think that you're talking about

8   here.

9       A.   Well, it's my -- it's my actual race, my being

10  who I am was an issue between the two.

11      Q.   Did Mr. White ever tell you that your race is

12  an issue?

13      A.   He told me in a way how he explained that it

14  be an issue, because he really didn't come out and say,

15  hey, you know, your color is the problem.  How he

16  explained it was you're -- you got everything going

17  right, I mean, you act like us, you think like us and

18  you talk like us.  You just -- just -- you just got one

19  problem, you just got one thing, you know, and he was

20  like that.  And I can read between the lines to know

21  what he was talking about.

22      Q.   When did he make that statement?

23      A.   It would be different days that he'd make that

24  statement around other guys, other maintenance guys.

25      Q.   Who?

1       A.    Around Terry Logan or -- or another guy that
2    was there also, his buddy.  What is his name?  He was
3    another maintenance guy that works with us, right beside
4    us.  I know his name.  It's at the tip of my tongue and
5    I can't get it out.
6       Q.    If you think about it, we can come back to
7    that, but I just want to circle back.  You're saying
8    that James White made statements about your race on
9    different occasions and around different individuals; is
10   that correct?
11      A.    That is correct.
12      Q.    Okay.  But here you're referencing -- you said
13   you were referencing Mr. Felger.  So what did Mr. Felger
14   do that you felt was discriminatory?
15      A.    Well, after him and Mr. White discussed
16   certain things and -- about the situation, Mr. White was
17   trying to find a way.  So the problem exists where he
18   would discuss with him as far as how and what needs to
19   be done and I would notice that, you know, the work
20   orders and stuff would change dramatically and then it
21   was where I'm being doubled up on certain work orders.
22          So Jason would say one thing, James White
23   would say one thing.  Jason would tell me to do what
24   James asked.  James would have me do different things
25   and then when I do it, it comes out and he would get

1  mad.  He said, I didn't tell you to do this.  I say,

2  well, you told me to do what James said.  And then he

3  said, no, I didn't tell you to do that.  He said, I'll

4  have to write you up for that.  I said, that doesn't

5  make sense.

6          I said, I'm doing -- I always do what you tell

7  me to do, but now you're switching it around.  And it's

8  like -- I said, all y'all set this up for me to look

9  inferior.  He was trying to find anything he could do

10 to -- to see if there's something wrong.  He'd give me a

11 write-up at some point.

12     Q.   But you weren't written up on any of those,

13 right?

14     A.   Right.  So when he didn't follow through, he

15 couldn't -- he'd get agitated because he was hoping that

16 my mind would be -- would slip to where I wouldn't

17 understand what was going on or be able to back myself

18 up on what he told me or remember anything so he can

19 catch me where I didn't remember and then he'd write me

20 up.  So I had to -- to pay attention constantly on what

21 was going on so I do remember so that way that wouldn't

22 happen.

23     Q.   Before saying this statement to HR, did you

24 ever complain to HR about these things that you were

25 just talking about?

Page 101

1      A.    Yes.  I -- I -- I spoke with HR and I spoke

2   with Dave Laverne, the plant manager.  And I talked to

3   him numerous times on what was going on, what Mr. White

4   was doing and all.  He said he would look into it and

5   everything and -- and I said, hey, you know, you know I

6   never had any trouble going on here, I always done --

7   and he said, yeah, you are always a great guy.  You're a

8   hard worker and you're always wanting to work overtime

9   all the time, you know.

10        You know -- you know, I would love right now

11   to work over.  I love working over.  I love my job

12   because I love working with machines.  So I always was

13   trying to find other ways to get ahead.  But when you --

14   when you're good at something that you're good at,

15   there's other people that's envy of you -- of you

16   working there and -- and they try -- it's just like

17   someone don't want you reaching your -- in what you're

18   trying to do.

19        It's just like in your profession, you're good

20   at what you're doing, but if someone there within your

21   firm would try to find a way to -- to -- to do something

22   to -- to mess you up, you know, for no reason, you know.

23   And that's what the case is here, you know.

24      Q.    So just to be clear, you submit this letter to

25   HR August 25, 2023.  Before submitting this letter to

1   HR, had you complained to HR about any of these things

2   that you believe were discriminatory at GT?

3       A.   After this letter was submitted, there was

4   different times that I went in and talked to her with

5   certain levels of things that wasn't right.

6       Q.   What are those times and -- and what -- tell

7   me about the times that you talked to HR before this.

8       A.   I can't remember exactly the times and dates.

9   I know there was a -- give or take, between three or

10  four days after this letter.  I spoke with her in

11  certain situations when I could find the time that was

12  right, when she wasn't busy and wasn't having any kind

13  of issues.  But then when it reached certain things --

14  right after -- let's see.

15           This was -- was signed and then a disciplinary

16  done and this one was done and this was done and then

17  there was a couple other things that was done after that

18  that we hadn't talked about, her about, and then I also

19  hadn't talked to the plant manager about, you know.

20      Q.   Right.  So -- but before this, had you talked

21  to anyone at HR about any of this stuff that you're

22  saying Jason and James were discussing or doing?

23      A.   No one else.

24      Q.   And so what was the context of that, those

25  conversations?

1      A.   Based on what was happening, for instance, as

2  far as this here and the work order and the behavior

3  that was going on.

4      Q.   So just to be clear, you in here say that

5  Jason's discriminating against you and that was based on

6  prior conversations that you -- between Jason and James.

7  And that's what you think -- you think the performance

8  warning notice was discriminatory --

9           MR. KATAEV:  Object --

10     Q.  (BY MS. JOZSI)  -- based on the prior

11  conversations?

12          MR. KATAEV:  Object to the form.

13          You can answer.

14     Q.  (BY MS. JOZSI)  I'm just -- let me -- let me

15  rephrase the question.  I'm trying to understand what it

16  is that you thought the prior -- the performance warning

17  notice, what about that document that they're issuing,

18  what was discriminatory?

19     A.   What was read to that is that we have -- not

20  only me, but we have maintenance guys that's in there

21  actually do the same work and -- and everything.  And a

22  lot of them at that time, like Bill and all -- you know,

23  all those guys that I worked with, you know, and

24  Jonathan, work on work orders and answer calls.  So at

25  the time there was a lot of gaps where these guys

1    would -- I'll be doing the most work on a lot of those

2    work orders and putting in a lot more work orders in the

3    computer database to show, but a lot of guys would sit

4    around and not do anything.  They would be on their

5    phone, playing games the whole time on a work shift.

6              And you see that and folks would come back

7    from -- the operators that need something fixed and

8    they'd go to Bill and Corey.  A lot of operators went to

9    Corey and watched them actually stand there and just do

10   that with respect to the maintenance.  So they would

11   point me out on those situations and said that I didn't

12   do one scope in a timely manner and I didn't do this,

13   then you have five guys that stand around every day that

14   don't report to no one, don't put in a timely on

15   anything.  Maybe there's four jobs they've done out of

16   their whole entire work scope during the day.  And then

17   some of them I know don't put no work in on Saturday,

18   too.  I know two --

19        Q.   Who was that?

20        A.   -- people that wasn't working.  I know that

21   for a fact.

22        Q.   How?

23        A.   And I can have someone pull that up out of the

24   computer base and show it and show the gap where that

25   work hadn't been performed during that time, when I was

Page 105

1    there actually performing it.

2        Q.    Do you know if those other individuals were

3    disciplined?

4        A.    Those individuals hadn't been disciplined.

5        Q.    How do you know that?

6        A.    Because I had spoken with them and talked with

7    them.

8        Q.    Who are these other employees that you're

9    referring to?

10       A.    These other employees worked second shift.

11   It's -- it's -- his name is -- he took my place as a

12   fabricator and a welder.  What is his name?  I don't

13   remember.  Give me a minute.  I forgot his name.

14            One of them is Bill, the other one is

15   electrical.  He's an electrician that was on the second

16   shift, that middle-of-the-day shift.  Lucas is his name.

17       Q.    Okay.

18       A.    The other guy is -- oh, what is his name?

19   Well, Johnny Taylor also.

20       Q.    Okay.

21       A.    There was -- I have to think a minute.  I have

22   to come back to that one.

23       Q.    Okay.  We can come back.

24            Okay.  So you're saying that there were other

25   employees that did not enter work orders and were not

1   disciplined and they were on the second shift, and that

2   was Bill Lucas and Johnny Taylor?  That's all you can

3   remember?

4        A.   Second shift and day shift.

5        Q.   And day shift.

6             All right.  Did you tell Erin about these

7   other employees?

8        A.   No.  I didn't mention to her anything about

9   those employees.

10       Q.   Okay.  This letter that you gave to HR on

11  August 25, 2023, is this the first time you complained

12  about discrimination on the basis of race?

13       A.   That is correct.

14       Q.   And you only mention race in here, correct?

15       A.   I don't see race in there.

16       Q.   I'm sorry.  What was that?  You cut off.

17       A.   You said -- you said that I mentioned race?

18       Q.   Right, you mention race, but you don't

19  mention -- like, national origin is not mentioned

20  anywhere in here, right?

21       A.   National origin, it's in there.

22       Q.   Where in here do you mention national origin?

23       A.   Where it shows -- it says black.

24       Q.   Okay.  So then you're saying that black is

25  your national origin?

Page 107

1       A.    Correct.

2       Q.    Okay.  Then at the end of this letter, you

3   say, "As stated below, here are the work orders listed

4   below that were completed."

5             And then here's this list on the second page;

6   is that right?

7       A.    Correct.

8       Q.    This list of orders, what -- what does this

9   list represent?

10      A.    This list represents the day that I worked

11  on -- on that Saturday of August with Johnny Taylor.

12      Q.    So this list of work orders, there's 12 work

13  orders listed.  Is it your testimony it would be 12 --

14  all 12 of these were worked on Saturday, the 19th of

15  August?

16      A.    Where the line I put on there, the 18th, work

17  orders performed on that.  And then the 21st, which is

18  that Monday, that was with the women's bathroom.  The --

19  the last two where the seat grinder was, that was also

20  worked on, on the 19th, too.  So I should enter that one

21  also again with the 19th -- as well as the 19th, because

22  it was re -- reentered again twice, reworked on.

23      Q.    Okay.  Let me take a step back.  So you had --

24  you mentioned that you had a tablet that you would write

25  down all the work orders that you completed and that

Page 108

1    practice had been going on several years, right?

2         A.    Right.

3         Q.    Is that where you got this list of work orders

4    from?

5         A.    Yes.

6         Q.    So how do you know which orders you worked on

7    any given day?

8         A.    So as I write on the tablet, each work order

9    goes down the line in that tablet as far as which work

10   orders that I had done.

11        Q.    Okay.

12        A.    So what I did was wrote down on that -- out of

13   that -- out of that tablet, the work orders that I had

14   performed for that day and then I notated on the side,

15   which it doesn't show on this tablet -- on the margin.

16   And I have it in a number sequence.  So I knew which one

17   that line was for that I worked on and the ones I worked

18   on previously prior to, weeks and weeks back.

19        Q.    You said that you have additional lists that

20   are not on here; is that right?

21        A.    That is correct.

22        Q.    Have you turned those over -- those notes,

23   have you turned those over to your attorney for this

24   case?

25        A.    Only the ones that I had sent over that we had

Page 109

1    in our last deposition.

2         Q.   Okay.  I'm unfamiliar with notes regarding

3    these work orders in this format.  So you're saying you

4    have this -- this document that has additional notes in

5    the margins?

6         A.   Yes.  It has numbers that's on the side that I

7    had written that show why I took it out of the -- took

8    it apart.

9         Q.   Okay.  So when you gave this list and the --

10   this line for the -- like I said, there's 12 work

11   orders.  There's six here on the top and then a line and

12   then six below.  Was that line there on -- originally,

13   when you gave the list to Erin?

14        A.   No, that line wasn't originally there --

15        Q.   Okay.

16        A.   -- when I gave it to her.  That line was put

17   in there later.

18        Q.   Okay.  And it says -- above the line it says,

19   "Sat. 8/19," and below it says, "Mon. 8/21."

20             Do you see that?

21        A.   Right.

22        Q.   Okay.  So does that mean you did the top six

23   on Saturday and the bottom six on Monday?

24        A.   Well, when -- when Erin and Jason went back

25   into the computer, when they discovered it, that's how

1   they discovered that it came through on their end.

2   That's the dates and she drew the line in, and this is

3   what she found on 8/19 and then separating it showing

4   that this is what she found showing on 8/21.

5       Q.   Did you tell Erin, I did these six on Saturday

6   and these six on Monday, or are you saying she came to

7   that conclusion herself?

8       A.   Well, that's the conclusion how they found it

9   and set it up.  And when I gave it to them, I just gave

10  them all -- all -- all the work orders as it was without

11  the line.

12      Q.   Okay.  And when you gave them the -- the --

13  all the work orders without the line, what is it that

14  you told her this list represented?

15      A.   That it represented work that I've done for --

16  for -- for that Saturday, me and Johnny Taylor worked

17  on.  And then also prior to the work that we said that

18  he did the -- the actual write-up for the two bath --

19  the bathrooms and stuff, that these are the ones that

20  were done that he said I didn't perform for the work

21  scope, that he said I didn't have for working on that

22  holiday as well for that -- for that write-up that I

23  didn't -- I had refused to sign.

24          (Exhibit Nos. 65 and 67, respectively, were

25  marked for identification.)

Page 111

1      Q.   (BY MS. JOZSI)   I'm going to share my screen.
2  All right.  This is Defendant's Exhibit 65.  This is
3  Plaintiff 1025.  Do you see this document?
4      A.   Uh-huh.
5      Q.   All right.  Then I'm going to show you now
6  Plaintiff -- I'm sorry, Exhibit 67.  This is Plaintiff's
7  1027 through 1032.  I do have a note here on Plaintiff's
8  1030.  This appears to be -- oh, I'm sorry, one more.
9  Exhibit 70 is Plaintiff's 1037 to 1044.
10          (Exhibit No. 70 was marked for
11  identification.)
12      Q.   (BY MS. JOZSI)  This, to me, looks like a
13  scanned copy of the -- the running list of work orders
14  that you referenced earlier.  Is that correct, these
15  three exhibits?
16      A.   That is correct.
17      Q.   You mentioned additional notes in the margin.
18  None of these appear to have that.  So, again, we'll go
19  back to 65 just to start.  They're broken up because
20  this is the manner in which we received them.  So this
21  one's just one page here.
22          Exhibit 67, let me go back up, again, to the
23  first page.  I'll just kind of scroll through.  This is
24  the only additional note I see that's on the scanned
25  copy.  It's on Defendant's -- I'm sorry, Plaintiff's

Page 112

1    1030.  And then we will go to Exhibit 70 and I'll scroll

2    through.  So, again, nothing else in the margins here.

3    So with that, I just want to make sure I understand what

4    it is that you're talking about where you had additional

5    notes.

6        A.    There's another page that should have been on

7    there that I have that I made a copy of all the numbers

8    and I put numbers and then it had the dates

9    additionally, kind of like what you call like an index

10   that you would have.  So I did that separate, going back

11   and doing it separate and writing those same numbers all

12   back down again, but then having notes that have the

13   actual dates on it.

14           It didn't have the time, but just the dates

15   when it was -- actually what day it was.  Like, if it

16   was that Monday and then I put a circle around it for

17   that and then go down to the next.  I thought I had

18   submitted that document.  There was only -- only three

19   pages to that.

20       Q.    Three pages?

21       A.    Yeah, just three pages, because I only did so

22   many of them and I didn't actually do the whole book

23   like that.  I thought I had it.

24       Q.    All right.  Well, we'll cir -- we'll circle

25   back to that, but just going back to the list that you

Page 113

1   provided Erin Wade.  Let me share that again.  This is

2   going back to Exhibit 14.

3           So when you gave Erin this list here without

4   the lines, I want to understand, you said that this is

5   the work that you performed on Saturday, Monday, and

6   Tuesday?

7       A.   This is the work I performed on -- on that

8   Saturday and -- and that Monday.

9       Q.   Okay.  All right.  So you said that you

10  couldn't enter your work orders on Saturday,

11  August 19th.  What about Monday, August 21st, you said

12  that you were able to get back into the computer system

13  that day?

14      A.   Yes, and I was able to enter some of the

15  maintenance logs, you know, into the system right along

16  with these work orders here.

17           (Exhibit No. 15 was marked for

18  identification.)

19      Q.  (BY MS. JOZSI)  Okay.  Let's take a look at

20  Exhibit 15.  This is Defendant's 156 and 157.  Do you

21  recognize this document?  And tell me when you want me

22  to scroll to the second page.

23      A.   There his name is, Pat -- Pat Fletcher.

24      Q.   That's the -- that's the other individual that

25  you mentioned in the classes?

1      A.   That's correct.

2      Q.   All right.  We'll come back to that in a

3   minute, but do you recognize this -- this document, what

4   this is?

5      A.   Okay.  This is Saturday's work scope.

6      Q.   Is this from the CMMS?

7      A.   Correct.  So is this isn't --

8      Q.   Okay.

9      A.   -- showing me -- is that correct, the

10  Saturday's work scope?

11     Q.   So I'm showing you a document, two pages, a

12  screenshot from the CMMS secured log for Saturday,

13  August 19, 2023.  On the left column where it says

14  "log-in," it says, "Q. Jackson."  Is that you?

15     A.   That's correct.

16     Q.   Okay.  And then the next column says, "date"

17  and column after that says, "time."  Do you see that on

18  the first page here for Q. Jackson?  There's one, two,

19  three, four, five, six entries.  It has your name and

20  the date of 8/19.  Do you see that?

21     A.   Uh-huh.

22     Q.   You see those six entries that says, "Q.

23  Jackson," on the first page?

24     A.   I don't know if it matches up with the -- with

25  the work order numbers that I entered in with Johnny

1    Taylor.

2        Q.    There's three work orders on the first page

3    that associate -- are associated with you.  I'll try to

4    high -- I don't know if I can highlight there or not.

5    There's 12353, 12354, and 12355.  Do you see that?

6        A.    Yep, I see all those that you highlighted.

7        Q.    Okay.  And then if we go to the second page,

8    your name appears.  There's another six entries on the

9    second page starting here.  We've got Q. Jackson 8/19,

10   and that's for work orders 12353, 12357, and 12358.  Do

11   you see that?

12       A.    Uh-huh.  And that's the work order numbers?

13       Q.    That is the identification for the work orders

14   as found in the CMMS security log here.

15             MR. KATAEV:  That's what you're representing

16        to him?

17             MS. JOZSI:  Yes.

18       Q.    (BY MS. JOZSI)  So looking at this, were you

19   able to enter data into the CMMS on 8/19/2023?

20       A.    Yes.  I was able to enter me and Johnny Taylor

21   into the system and she made it through and it went

22   through, and 30 seconds later it kicked us back out.

23       Q.    Okay.  We're going to look through -- I'm

24   going to come back to Exhibit 14.  There's 12 work

25   orders here we're going to look through.  For the sake

Page 116

1    of time I'm going to move kind of quickly through these,

2    just because there are some other things we've got to

3    cover and it's already 3 o'clock.  So we're going to

4    look at these work orders pretty quickly.

5                (Exhibit No. 16 was marked for

6    identification.)

7        Q.  (BY MS. JOZSI)  We'll look at Exhibit 16, and

8    this is Defendant's 158 to 159.  So the first page, I

9    will represent to you is the same -- another screenshot

10   from the CMMS and the second page of the work order is

11   going to be the act -- of the exhibit is going to be the

12   actual work order.  All right.  So the first one is work

13   order 12353.  Does the first page here show Q. Jackson

14   created this work order on 8/19?

15       A.   Wait.  No, I think the screen went back to the

16   regular work order one.

17                (Technical interruption.)

18                THE VIDEOGRAPHER:  May I take us off the

19        record?

20                MS. JOZSI:  Yes.

21                THE VIDEOGRAPHER:  We are going off the

22        record.  The time is 3:01.

23                (Recess from 3:01 p.m. to 3:09 p.m.)

24                THE VIDEOGRAPHER:  We are back on the record.

25        This is the beginning of media four.  The time is

1      3:09.

2      Q.  (BY MS. JOZSI)  Okay.  We're back on the

3  record.  I'm going to be showing you, Mr. Jackson,

4  some -- these are composite exhibits.  They are -- I

5  will represent to you that the first page is going to be

6  a screenshot from the C -- CMMS security log and the

7  second page is going to be an actual copy of the work

8  order itself.

9          I've got all 12 work orders from that list

10  that was on Exhibit 14 that you gave to -- to HR and

11  we're just going to run through them.  I'm just going to

12  go a little quickly, just for the sake of time, but --

13  so -- I'm going to refer -- and just for the record, I'm

14  going to go in the order in which they appeared here on

15  the list that you gave to HR.  Okay.

16          So Exhibit 16, this is Defendant's 158 to 159.

17  This is page 1 and then page 2 is the work order.

18  Page 1 of this exhibit, does it show -- at the top it

19  says, "Q. Jackson 8/19 created work order 12353."  Do

20  you see that?

21      A.   It's showing your name and it says it's --

22  it's not showing anything yet.

23      Q.   You can't see my screen?

24      A.   It's still in circular motion.

25          MS. JOZSI:  Does the exhibit show up for

Page 118

1    everybody else?

2        MR. KATAEV:  Yes, 16.

3        MS. JOZSI:  Yes.

4    Q.  (BY MS. JOZSI)  Let me -- I'm going to stop.

5    I'll try sharing it again, Mr. Jackson.  Let me see if

6    that helps.  Okay.  Can you see it now?

7    A.    It's still going -- it's saying y'all have

8    started screen sharing and it's going in circular motion

9    right now.  I think it's trying to upload.

10   Q.   Okay.

11   A.   Oh, there it is.  It -- it popped up, 16.

12   Q.   Okay.  All right.  So the first page, again,

13   from CMMS security log says, "Q. Jackson, 8/19/2023."

14   The identification says all for work order 12353, and

15   the first entry right here, it says work order number

16   12353 was created.

17        Do you see that?

18   A.   Yes, I see it.

19   Q.   Okay.  And it shows your name a bunch of times

20   with a bunch of entries, that it was edited, changes

21   were made, the parts history, labor history, so forth.

22   And then do you see down here it says P. Fletcher and

23   J. White and J. Felger, about halfway down the page?

24   A.   Right.

25   Q.   Okay.  And for P. Fletcher, J. White, and

1    J. Felger that's all with the date associated 8/21/2023.

2    Do you see that?

3         A.    Yes.

4         Q.    Okay.  Why would their names appear on this

5    work order?

6         A.    Yeah, that's interesting.  Well, what that

7    does, that shows that they actually went into the work

8    order.  They looked into -- so the work orders --

9    everybody's work order at the time was you go and enter

10   it, you look into it then close it back, then the

11   computer let's you know.  So Jason had developed a

12   system actually where the work orders where -- you know,

13   everybody can go in and enter anybody's work order.

14        When you go into your own and then you have to

15   have somebody else's permission to go in theirs, but

16   it's where anybody can go in and look as to what you've

17   done and the form and then -- and then exit back out.

18   As you can see, he went in there, Jason himself, he went

19   in and did some editing to there.  I'm not sure what all

20   changes he made and then he resubmitted back in.

21        Q.    Do you see here it says Pat Fletcher -- or

22   P. Fletcher, it says, made changes to part history and

23   labor history.  So does that mean Fletcher -- that

24   Patrick Fletcher did perform substantive work on this

25   work order?

1      A.    It seems like he went in there and did

2   something.   I don't know what would be done on the 21st

3   because the work was done on the 19th --

4      Q.    Okay.

5      A.    -- a Saturday.   So I'm trying to figure out

6   why they would go back in on a Saturday work scope

7   including James White here, he also went in here.

8      Q.    Okay.

9      A.    Yeah.

10      Q.    If you look at this, this is the work order

11   for that same log, right, 12353, and it says issued

12   8/19/2023, but completed 8/21/2023?   Do you see that?

13      A.    Uh-huh.

14      Q.    And it says, "assigned to Fletcher," and then

15   under the labor it says Pat Fletcher and James White,

16   right?

17      A.    Uh-huh.

18      Q.    And your name is nowhere on the actual work

19   order itself; is that correct?

20      A.    That is correct.

21      Q.    Why is that?

22      A.    It seems as though there -- there's some kind

23   of mixup in the system where the same work order is

24   being reissued out.   They're on a different -- a

25   different number, but using the same number from -- from

Page 121

1    the previous system.  So it seemed like they used the

2    same work order.  They had the same -- had another

3    problem with that same machine.

4              And it seems as though that -- instead of

5    creating another whole work order with that -- with a

6    different number, they're using the same number on that

7    same machine, performing that same work.  And it's

8    keeping it in the same log is what they're trying to do,

9    and then just resubmit it with that same number, then

10   resubmit it back in.  That's all I can see that's being

11   done as far as using him that same number again.

12        Q.   But --

13        A.   You see --

14        Q.   Go ahead.

15        A.   If you look into the system on their other

16   work orders, you might be seeing the same thing.  But we

17   have to actually look at other work orders that's in the

18   system that will follow along with multiple different

19   names of others performing the same thing.  If that's

20   the case, then that's what will be going on as far as

21   using that same number on -- on -- on that same machine,

22   but just different people using it on multiple different

23   days.

24              So then, again, you go back to -- as far as

25   their -- the computer system, you know, they're able

1    to -- to have access to do that.  So like I mentioned,

2    you would have to actually go back into the history to

3    see how many times on different -- different machines

4    it's been done like that just like it's --

5         Q.    Okay.

6              (Technical interruption.)

7              THE VIDEOGRAPHER:  We just lost the witness.

8         Take us off the record?

9              MS. JOZSI:  Yes.

10             THE VIDEOGRAPHER:  We are going off the

11        record.  The time is 3:18.

12             (Recess from 3:18 p.m. to 3:25 p.m.)

13             THE VIDEOGRAPHER:  We are back on the record.

14        The time is 3:25.

15        Q.  (BY MS. JOZSI)  Okay.  All right.  I'm going to

16   try to expedite this a little bit.  We've got 12 work

17   orders that you submitted.  Are you aware of whether GT

18   Technologies investigated those 12 work orders that you

19   submitted to HR?

20        A.    As far as the headquarters, you mean?

21        Q.    The -- the work orders that you submitted

22   to -- to -- on that list to Erin Jackson [sic], are you

23   aware of whether GT ever looked into those 12 work

24   orders that you submitted to her?

25        A.    Okay.  I'm trying to understand the question.

Page 123

1      Q.   Okay.

2      A.   You said -- you said GT.  So when you say GT,

3  my understanding is that would be the people that are

4  higher up in -- in headquarters or are we referring to

5  just Dave Laverne?

6      Q.   I'll clarify.  You gave Erin Wade a list of 12

7  work orders.  Do you know whether Erin Wade ever looked

8  into those 12 work orders that you provided the list to

9  her?

10     A.   Yes.

11     Q.   And do you recall seeing through the -- the

12  DOAH proceedings, do you recall seeing all 12 work

13  orders that she pulled in the course of her

14  investigation?

15     A.   No.

16     Q.   No?

17     A.   No.

18     Q.   Okay.  You don't remember us going through one

19  by one, looking at all those work orders and the

20  security logs associated with them?

21     A.   Now, when -- when you -- when you mentioned

22  investigation, what I recall is investigation is during

23  the time when I was still there.  That's -- that's what

24  I was recalling as investigation as far as she,

25  Jason Fergel, and Dave Laverne was trying to find those

1   work orders in the system.

2        Q.   Okay.   And thank -- let me clarify, then.   To

3   your knowledge, it sounds like you -- you're aware -- or

4   are you aware that Jason and Erin looked at all 12 work

5   orders on that list that you gave to them while you were

6   still employed with GT Technologies?

7        A.   Yes.   I believe I seen Erin Wade going to

8   Jason Fergel's office, sat down there in front of him

9   and asked him to try -- she tried to show -- look up

10  those work orders.

11       Q.   Okay.   And to your knowledge, did they

12  physically look at all 12 of those work orders along

13  with the accompanying CMMS data?

14       A.   I didn't get that opportunity to be present.

15       Q.   Okay.   Have you subsequently seen all 12 of

16  those work orders and the accompanying security data

17  since your separation?

18       A.   Yes.

19            (Exhibit No. 17 was marked for

20  identification.)

21       Q.   (BY MS. JOZSI)   I'm going to show -- I'm going

22  to show what has been marked as Exhibit 17.   This is

23  Defendant's 160.   Can you see my screen, Mr. Jackson?

24       A.   It's blank.   Let me see.   Okay.   It just came

25  up.

1      Q.   Okay.  So do you see there's one entry, it's

2   Q. Jackson, 8/19/23.  For identification, it's 12355,

3   and it just says work order was created.  Do you see

4   that?

5      A.   Uh-huh.  Yes, I see it.

6      Q.   Okay.  And there's nothing else, there's no

7   work order attached here.  There's no other entries on

8   the security log for that work order either; is that

9   correct?

10      A.   That's correct.

11      Q.   Okay.  Do you have any documentation to

12   support that you worked on this work order that you told

13   HR that you worked on?

14      A.   Yes.

15      Q.   I'm sorry.  Did you answer that?  I didn't

16   hear anything.

17      A.   Yes, I did.

18           MR. KATAEV:  I heard him answer yes as well.

19           MS. JOZSI:  He said yes.  Okay.  It's kind of

20      glitchy on my side.

21      Q.   (BY MS. JOZSI)  All right.  What documentation

22   do you possess that shows that you performed work on

23   this work order?

24      A.   I have it written down.  And also, that work

25   order should be able to be printed out and it should be

1    able to show the work actually being performed.

2         Q.    Okay.  If you see -- go ahead.

3         A.    Now, where you just highlighted and it just

4    only shows that part -- does your screen show the rest

5    of that screen, all the way down?

6         Q.    I will represent to you that this is the only

7    thing -- the only entry for that work order in the CMMS.

8              So my question is:  If that is the only

9    document -- or only entry for this work order in the

10   CMMS, I'm asking do you have anything else that shows

11   that there was actually work performed on that work

12   order?

13        A.    On this particular work order, there's work

14   that was performed on it and there's also other multiple

15   work orders following behind that one as well.

16        Q.    If the company records only show this one

17   entry and no work order and no -- nothing showing

18   completion, how is the company supposed to know whether

19   work was performed and entered on this work order?

20        A.    Well, the company would know because it's

21   recorded in real time when it was entered into the

22   computer database.  So it would show me and Johnny

23   Taylor's name on each work order saying we completed the

24   work and submitted it.  And once it's submitted, it's

25   submitted in real time, even though it kicked it back

Page 127

1  out, but it's saved into the entire network of the GT

2  Technologies' database.

3      Q.   Would you agree that this does not show

4  completion by you or Mr. Taylor or any other employee?

5      A.   Then that means that somebody has tampered

6  with the evidence that's there.

7      Q.   It's your testimony that if it was tampered

8  with, it would not show up in the system?

9      A.   It's in the system.  If it's there -- the

10 entire system is there, it's there, because an analyst

11 can go in and plug in and pull the entire database on

12 the entire network and they can pull that file and show

13 it's there.

14          In case that card's been pulled out of that

15 room and it's been changed over, that card should still

16 be there for the entire database of the date of --

17 everything was entered before that Saturday and it

18 should follow all the work that was performed weeks and

19 months prior to that.  So there we'll know for sure if

20 anything has been changed or not.

21          (Exhibit No. 18 was marked for

22 identification.)

23      Q.   (BY MS. JOZSI)  I'm going to show Exhibit 18.

24 This is Defendant's 161 to 162.  This is for work order

25 12442.  Do you see this?  Can you see that screen,

Page 128

1    Mr. Jackson?

2        A.   Uh-huh, I can see that screen.

3        Q.   Okay.  All right.  On here you see, again,

4    log-in, Q. Jackson, the date is 8/22/2023, and this is

5    for work order 12442.  It says it was created, edited,

6    edited.  There were some changes made and then later,

7    the second page, this is the actual work order.

8             On the actual work order, do you see at the

9    top it says issued 8/22/2023, completed 8/19/2023?  Do

10   you see that?

11       A.   Uh-huh.

12       Q.   Do you see the dates at the top there?

13       A.   Uh-huh.  So it's showing a work order issued

14   8/22, and it was completed on 8/19, which is -- was that

15   actual Saturday.

16       Q.   Okay.  So my question is:  How can a work

17   order be issued on Monday for completed in the past?

18       A.   So here's how it works, the time's where --

19   is -- when they issue a work order, they can put the

20   date above the time, which allows you enough time --

21   really state enough time to actually -- based on that

22   being the actual ending date that you have to have that

23   work order to have completed before the actual ending

24   date or it will go away blank.

25             So all work orders with the maintenance

Page 129

1  manager and -- and -- and supervisor, they were
2  issuing -- like I said, they'll allow you enough time
3  for you to get to them because they know at times that
4  we were working on other machines.  There's other work
5  that has to be performed, but they'll allow you enough
6  time, maybe two or three days ahead.  So that way it
7  don't fall into a redline that -- to where you'll have
8  to explain or -- the work order for why you couldn't get
9  to this work order and what was the reason why you
10 couldn't do it.  You have to explain, you know, what
11 caused, you know --
12      Q.    Sure.
13            So I understand that any issue, they give you
14 a couple days to complete it, but that makes sense that
15 if it was issued and then it's completed a couple days
16 later.  But in this case, it was issued on 8/22 and it
17 was completed two or three days before it was even
18 issued.  So how is that possible?  Can you -- I want --
19 I want you to explain that discrepancy in the date to
20 me.
21      A.    That means somebody went in and edited and
22 changed the date earlier.  So this work order here, this
23 is where a work order should have been done where me and
24 Johnny Taylor worked on -- on the Godzilla, which that
25 machine actually went down that night.  So there should

Page 130

1    be little notes on here where -- Johnny Taylor's name
2    was up under mine as well, notes that both performed the
3    work on this machine.
4            But like I mentioned earlier, the computer's
5    open.  Anybody can go into the computer and change and
6    move people's work orders around and change it.  I've
7    watched James White right there, too.  I had a work
8    order that I worked on.  He took that work from me and
9    gave it to Pat.  He said, okay, you're going to do this
10   here.  We got someone else on it.  I'm going to change
11   your name off.  I'm going to put Pat's name on here.
12   I'm going to let him continue letting you -- letting him
13   work on that work order.  I'm going to put you on this
14   work order.  So --
15        Q.   In -- in those circumstances, though, would
16   the security log still show the name of the -- the
17   person that is doing that work, though?
18        A.   It'll show the name of that person that he --
19   once he swap it around, it takes off and there will be
20   somebody else that's on it.  The computer was open where
21   anybody can change and swap people around off of work
22   orders.
23        Q.   But would it still show Q. Jackson, if you
24   were swapping users around, or wouldn't it show their --
25   would it show their user name?

1    A.    It'll show their user name and who else was

2    added on to it.

3    Q.    Okay.  And this work order, it says that it

4    was created and edited only by you, all on 8/22/2023,

5    and yet it says here issued was 8/22/2023, completed in

6    the past.  Do you see that?

7    A.    Yes, I see that.

8    Q.    Okay.  So is this one of those work orders

9    that you did on Saturday, but couldn't edit it into the

10   computer until a couple days later?

11   A.    It was here on Saturday.  It went through the

12   system and then 30 seconds later, it kicked back out.

13   Q.    But it doesn't show that on the security log,

14   right?  It just shows 8/22?

15   A.    Let's go back to the security log.

16   Q.    Well, this is the security log for that work

17   order, for 12 -- 12442, and it just shows 8/22/2023.

18   A.    Okay.  So it shows history that it was

19   entered.  So --

20   Q.    August 22; isn't that right?

21   A.    It should show 8/22 and it should show 8/19.

22   Q.    And it doesn't show 8/19, right?

23   A.    Right.  So the log -- we would need to go back

24   to 8/19 log and show the history on it with that same

25   work order number.

Page 132

1    Q.   I can go back to the 8/19 log, but this --
2    this work order does not appear on there.  I'll pull
3    that up so you can see.
4         And this is Exhibit 15 that we looked at.
5    It's the security log for 8/19.  You see your name and
6    it only shows 12353, 12354, 12355, and on the next page,
7    12353, 12357, and 12358.  So 12 -- 12442 does not appear
8    by you on the security log for 8/19; is that correct?
9    I'll scroll back up to the first page.
10   A.   And what that work order is doing here --
11   Q.   Here's the work order showing as 8/22/2023 in
12   the security log.  And if you look at the actual
13   security log, it says issued was 8/22/2023.
14   A.   Yeah, I seen that, but it shows over in the
15   corner where it's been edited.  So somebody went in and
16   edited it and changed it to a --
17   Q.   Where do you --
18   A.   -- to a different --
19   Q.   -- that it's edited?
20   A.   Just the one you took off the screen.
21   Q.   Right here?
22   A.   The other one is --
23   Q.   Oh, this --
24   A.   -- not showing --
25   Q.   -- this here?  Is this the one that you're

Page 133

1    referring to?

2         A.    Okay.   Now it showed up.   Let's see here.   See

3    where it says down here, 8/19, work order 1235 [sic],

4    okay, and it says work order -- there, it says was

5    edited on?

6         Q.    There's some where it says that it was edited.

7    Okay.

8         A.    Okay.   Yep, okay.   So that means somebody went

9    back in.   They go into my log and edit it.   The only

10   person that has access to do that and edit it is either

11   James White or Jason.   They can go back and edit change

12   things on there.

13        Q.    If they made the edits, wouldn't it say James

14   White or wouldn't it have their user name here as James

15   White or Jason Fergel?

16        A.    No, I don't -- it don't have to.   They can

17   just actually go in and log into your -- your file.

18        Q.    They can log in as you?

19        A.    Yeah, they can.

20        Q.    Okay.   All right.

21        A.    I -- I watched them actually do it.

22             (Exhibit No. 21 was marked for

23   identification.)

24        Q.    (BY MS. JOZSI)   Okay.   All right.   Again, for

25   the sake of time, I'm not going to go through all the

Page 134

1    work orders.  Let's look at another one, though.  Let's

2    look at Exhibit 21.  This is work order 12455 [sic].

3    This is Defendant's 167 to 168.  This was on your list

4    that you submitted to HR and here's the CMMS log at the

5    top.  Is your name on the CMMS log for order 12445?

6              MS. JOZSI:  We lost him again.

7              THE VIDEOGRAPHER:  Do you want me to take us

8         off?  Do you want me to take us off the record?

9              (Technical interruption and a discussion was

10   had off the record.)

11             THE VIDEOGRAPHER:  I can't spotlight him until

12        we go off the record, I'm sorry.

13        A.   Is that -- is that me or is that y'all.

14        Q.   (BY MS. JOZSI)  I mean, Mr. Jackson, can you

15   see and hear us?

16        A.   I can see the screen.  I can hear y'all.

17        Q.   Okay.  Your -- your camera is not showing.

18   There you go.

19        A.   Is it -- is it showing?

20        Q.   It is now.

21             THE VIDEOGRAPHER:  Can we go off the record?

22        I'm sorry, Counsel.  It's actually recording you

23        right now.

24             MS. JOZSI:  Yeah.

25             THE VIDEOGRAPHER:  We're going off the record.

Page 135

1        The time is 3:47.

2              (Recess from 3:47 p.m. to 3:54 p.m.)

3              THE VIDEOGRAPHER:  We are back on the record.

4        The time is 3:54.

5              MS. JOZSI:  Madam Court Reporter, can you

6        remind us of where we left off?

7              (Discussion off the record.)

8        Q.  (BY MS. JOZSI)  I'm going to share my screen.

9   This is Exhibit 21.  Can you see my screen, Mr. Jackson?

10       A.   Not yet.  All right.  It just appeared.

11       Q.   Okay.  All right.  This is work order 12445.

12  Does your name appear anywhere on the CMMS logs for this

13  work order?

14       A.   No.

15       Q.   Do you need me to zoom or anything?  Do you

16  see your name anywhere in here?

17       A.   Oh, I -- I had already responded.

18       Q.   Okay.  I didn't get that.  I'm sorry.  So what

19  was the answer?

20       A.   No, I didn't.

21       Q.   Okay.  And on the second page, this is the

22  actual work order.  I'll zoom in a little bit more.

23  Does your name appear anywhere on this section of the

24  work order?

25       A.   Are you still there?

1           MS. JOZSI:  He cut out again.

2       Q.  (BY MS. JOZSI)  I'm sorry, what was that?

3       A.   No, I was -- I see the work order, but I --

4   I -- I didn't hear no voice.

5       Q.   Okay.  Is your -- does your name appear

6   anywhere on this work order, because I -- I only see

7   Pat Fletcher under assigned to and labor.  So I wanted

8   to know if your name is on this work order anywhere?

9       A.   No, it isn't.

10      Q.   Can you answer the question?

11          MS. JOZSI:  I'm sorry.  He's cutting out on my

12      end.

13      A.   Yes, I did -- I had answered it.  It's not on

14   there.

15      Q.  (BY MS. JOZSI)  But this is one of the work

16   orders that you provided in your list to HR, correct?

17      A.   Correct.

18      Q.   But you didn't perform any work on this work

19   order; is that correct?

20      A.   I performed work on that work order, but it

21   has been -- it's been edited.

22      Q.   Okay.  Your name doesn't appear anywhere on

23   the security log-in.  So -- either, correct?

24      A.   Can you scroll down?  Okay.

25      Q.   This is the full -- this is all -- this is the

Page 137

1    entire security log for this work order.

2         A.    Right.  So if you notice on that work order,

3    it shows where it's been edited on that work order.  So

4    that was a change --

5         Q.    By Pat Fletcher, correct?

6         A.    Ma'am?

7         Q.    It says edited, but it's by P. -- everything

8    is by P. Fletcher, correct?

9         A.    Right.

10        Q.    For the sake of time, I'm not going to go

11   through all the work -- all 12 work orders.  Let's talk

12   about your -- your termination.  What day were you

13   terminated?

14        A.    That was September the 5th of 2023.

15        Q.    How were you informed that you were being

16   terminated?

17        A.    After I had spoke with Dave Laverne and Erin

18   Wade, after I had received the statue that was on my

19   desk I took a picture of and -- and then made a

20   statement by it, then I went back to my desk.  And I

21   actually asked them what could we do about resolving

22   this, you know, nicely or old-fashioned way so it won't

23   get out into the open for other employees to know.

24             I asked them if they could talk with our

25   maintenance sup -- our mainten -- our manner -- our

1    maintenance manager and -- and now our supervisor,

2    because at the time there wasn't no one around in the

3    office or the work area.  So I took it to HR and Dave --

4    Dave Laverne about it and discussed the issues and made

5    peace about the situation.

6            (Exhibit No. 29 was marked for

7    identification.)

8        Q.  (BY MS. JOZSI)  You referenced a statue.  I'm

9    going to share my screen.  This is Exhibit -- this is

10   Composite Exhibit 29.  I'm just going to share

11   Defendant's 198.  Can you see the photograph?  Let me

12   know when you can see it.

13       A.   Yes, I can see the statute.

14       Q.   Okay.  And this is a picture that you had

15   provided previously during the DOAH proceedings.  Is

16   this the statue that you are referring to?

17       A.   That is correct.

18       Q.   Okay.  And the statue, when did you first see

19   this statue?

20       A.   When me and Darrell Harris came back from

21   break.  We took break at 9:30, went to break and come

22   back at 9:45.  We noticed that the statue was on the

23   desk when I walked back.  I looked around and there was

24   nobody else around in the maintenance shop.  No one to

25   say -- tell to -- at the time noticed anybody had put it

Page 139

1   there.

2       Q.   Is this --

3       A.   So --

4       Q.   Is this your desk or do you share this desk

5   with somebody else?

6       A.   That is my desk.

7       Q.   I'm going to stop sharing my screen just

8   because I don't want to eat up more of your computer

9   bandwidth, but prior to -- you said when you and Darrell

10  came back from break, was this on September 5, 2023?

11      A.   That is correct.

12      Q.   Prior to coming back from break on

13  September 5, 2023, had you ever seen this statue in the

14  shop before?

15      A.   Yes, I did.

16      Q.   Where had you seen it before?

17      A.   This statue was placed on the backside of

18  Mr. Dennis's desk.  Mr. Dennis was one of the oldest

19  candidates that we had there that has retired and had

20  moved the statue there when he retired, on another empty

21  desk that was in the back.

22      Q.   Okay.  And can you describe the statue for the

23  record?

24      A.   The statue is described as -- it's a brown --

25  dark brown statue of a black man holding a noose in his

Page 140

1   arm with -- with a hat on his head.

2       Q.   So when you discovered the statue on your

3   desk, I think you said you took it to Erin and Dave.

4   Why did you do that?

5       A.   I took a picture of it to notate real time and

6   to secure myself on what was going on.  When I

7   discovered and seen what was on that statue, it made me

8   nervous due to the fact that they was already into the

9   investigation of trying to discover my work orders.  And

10  so I guess it got tense with the others that -- as I

11  had -- my work orders was correct and then someone got

12  upset and chose to -- to do that in return at some

13  point.

14          So to do the rightful thing to protect myself

15  to -- just in case somebody on the outside followed some

16  words and tried to do some harm to me at some point, I

17  felt that it was the right, necessary actions to take

18  to -- to at least know -- let HR and, you know, the

19  plant manager know what was going on as far as my

20  safety-wise working with these people.

21      Q.   What about -- what about the statue or the

22  placement of the statue made you feel unsafe?

23      A.   It made me feel unsafe because knowing the

24  history behind that, knowing the history behind --

25      Q.   Behind what?

Page 141

1          A.    That by having the noose around its neck,

2    knowing that black people have been hung before.  My

3    grandfather was one of them that was done that way,

4    which was a very sad situation.  And just a lot of

5    history behind that from decades, from the 1900s all the

6    way back to the 1800s.  And you wouldn't expect this

7    type of behavior to carry on over into the 21st Century.

8          Q.    So it's your testimony that there was a noose

9    around the neck of that statue that we just looked at?

10          A.    That is correct.

11          Q.    Did you show the statue to anybody -- you said

12    you took a picture of it.  Did you show the actual

13    statue to anybody that day?

14          A.    I showed the statue to Dave Laverne, to Erin

15    Wade.  I actually hold the statue up to all the cameras

16    as I walked towards the front office.  Those cameras

17    are -- are recorded.  There is actually live footage

18    that actually goes back to main headquarters of GT,

19    which is up north.

20               So I made sure that I showed the footage and

21    scrolled through a few cameras that I know that this is

22    what actually was on my desk, made sure I walked to

23    Dave's office with it, which the camera footage will

24    show.  I also walked to Erin's, which is HR, her office.

25    I also had the image presented in front of me as I

Page 142

1   walked to her office, showing that I walked to her

2   office with it.

3            Both people wasn't present at that time in

4   their office.  So I walked towards the back, which the

5   camera footage shows.  The main camera footage that

6   shows the overall view from the back of the office, all

7   the way back up towards the -- the plant manager's

8   office and walked through the door, holding the image up

9   so they can actually get a good picture of it.

10       Q.   Okay.

11       A.   And at that door, that camera sits right at

12   the door where me and Erin went in.  Dave Laverne was

13   actually standing there actually talking.  So the camera

14   caught all three of our voices actually talking as I

15   presented them the statue and I showed it to them.  I

16   said, look at this, this is what was on my desk, this is

17   proof.  I asked, what do y'all do about this; which way

18   can we handle this in a quietly or old-fashioned way?

19           Their response was, don't worry about it.

20   They're just joking, just take it and put it away and go

21   back to work like nothing happened.  I said, is that --

22   is that it?  And he said, yes.  And I said, okay.

23           So once I went back to my desk and I put it

24   away, I'd say 30 minutes after that I was called to room

25   conference B and I told them I was speaking on the phone

Page 143

1   and I'd be right there, which I did.  And I went to
2   conference room B and there on the left side of me when
3   I walked into the conference, Dave Laverne was sitting
4   towards the back, Erin was sitting towards the front in
5   front of Dave, and Jason Fergel was sitting on the
6   right-hand of them side across the table.
7           I stood there and asked them -- I stood there,
8   you know, when I walked in and he said that -- I thought
9   they was going to discuss that image that I had and we
10  was going to -- was going to sit down and talk about the
11  statue that I brought to them.  Instead, they went a
12  different route.
13          What was brought to me was -- I was told
14  that -- that they could not find the documents, that
15  they looked over the computer.  That they discovered
16  that it looks as I had falsified the documents with the
17  company and they said they was disappointed that they
18  couldn't find it in our computer system at the time and
19  that they would have to terminate me and separate me
20  from the company.
21      Q.   Okay.  And so the reason -- what was the
22  reason that you were told that you were being
23  terminated?
24      A.   I was told because that they could not find no
25  work orders in the system that I had performed.

Page 144

1           (Exhibit No. 28 was marked for
2    identification.)
3        Q.  (BY MS. JOZSI)  I'm going to share my screen.
4    This is Exhibit 28, Defendant's 181 to 182, and tell me
5    when you can see that.
6        A.   Can you zoom in a little more?
7        Q.   Did you say zoom in?
8        A.   Uh-huh.
9        Q.   And then tell me when you're ready to scroll
10   down.  Are you ready for me to scroll down yet?
11       A.   Uh-huh, yes.
12       Q.   Have you finished looking through this?
13       A.   Yes, I have.
14       Q.   It says, "Employee refused to sign."  Were you
15   presented with this termination notice at the time of
16   your termination?
17       A.   No, ma'am.  This is the wrong notice.  This is
18   something done after I left.  This -- this is not the
19   same paperwork that I -- that I received and I looked
20   at.
21       Q.   This is not the termination, the performance
22   warning notice for termination?
23       A.   No, ma'am.
24       Q.   What is the one that you looked at?  What did
25   it say?

Page 145

1    A.    It was written out.  It did not have -- where

2  it says the written notice of unacceptable work, none of

3  that was on there.  It was all handwritten out by Erin.

4    Q.    Okay.  It says here that, "After further

5  investigation of the 12 work orders, only three were

6  entered by Quennel on 8/22/23 for work performed by

7  8/19/23.  In addition, three other work orders were

8  created by other maintenance techs."

9         Do you see that?

10   A.    Yes.

11   Q.    And then it says, "Due to falsification of

12  these documents during the investigation, Quennel's

13  employment is being terminated effective immediately."

14        So is it your understanding that your

15  termination is for falsification of documents in the

16  course of an investigation?

17   A.    It was work orders that I had on that list

18  that they said I did not produce.

19   Q.    Okay.  So you've brought this lawsuit for

20  claims of discrimination based on race, color, and

21  national origin as well as retaliation; is that correct?

22   A.    That is correct.

23   Q.    All right.  So you mentioned briefly comments

24  from James White about your race.  Did anyone else ever

25  make any comments to you about your race?

1      A.    There were -- there was no one else made

2  comments other than just agreed with him, which is

3  pretty much Pat Fletcher, when he said -- made certain

4  statements on certain things.

5      Q.    What statements?

6      A.    Like the statement I mentioned earlier about a

7  black minority being in a work environment, that they

8  don't have to -- the State of Florida rules are they

9  don't have to have rights -- the rights to be where they

10  don't have to hire a minority and keep you.

11      Q.    Were you the only minority in the maintenance

12  department?

13      A.    At that time of the situation that was going

14  on, I was.  Three years prior to that, I wasn't.  There

15  were -- five years prior to that, there were other

16  minorities in there.  One of the oldest candidates that

17  was there was Ron Gowin, which is known as Rosco.  There

18  were several other candidates that was hired in and they

19  were fired.  Some were a week apart.  They had been

20  working there a week or two weeks or just a month and

21  then they were released.

22      Q.    Do you know why they were fired?

23      A.    Due to the fact that why different managers

24  hired and fired is because we had trouble with our

25  machines.  And I had to watch with my own eyes how

1   everything was working within the system.  So when the

2   engineers could not get the crimp right onto the machine

3   of the Volkswagen machines and actually get it right and

4   we had parts that wasn't showing up on the maintenance

5   log and one of our vendors called to ask to produce a

6   certain date, which was in March, that they had got bad

7   parts and they was -- they were spilling, the way it

8   was.

9           And I was asked by Dave Laverne to find the

10  maintenance on it because I was the only candidate that

11  was there that knew where all the maintenance log books

12  and stuff were stored throughout the plant.

13      Q.   Just for the sake of time, I'm going to try to

14  redirect this a little bit.  I just -- do you have -- do

15  you know specifically why other -- these other

16  individuals were fired?

17      A.   Well, to -- to cover up for maintenance of

18  when -- when -- when -- when the sealings weren't

19  working and couldn't produce the parts, then they would

20  use the maintenance guys as an alibi to -- to say that

21  they did bad performance and couldn't fix the machine

22  right to -- to get by to keep the contracts that they

23  needed.

24      Q.   Okay.  Anyone else make any comments to you --

25  besides James White and Pat Fletcher agreeing with

1  James, anyone else make any other comments to you about

2  your race?

3      A.    There would be other employees in the plant

4  and they would see how I was being mistreated and how

5  they were treating me, how I was doing stuff.  And a lot

6  of times I won't see it.  They'll do stuff behind me or

7  go behind the scene.  I'll have different -- other

8  employees will come and tell me, hey, they went behind

9  me and changed something or done something of that

10 nature.

11          So people knew my good nature and good talent

12 that I had as far as fixing the machines and kept

13 everything running.  They knew I was a very humble

14 person.  I did good, satisfactory work and they all

15 looked at for me and --

16     Q.    Who specifically saw this alleged

17 mistreatment?

18     A.    There were numerous employees in there that

19 would see it and they would -- and they would say

20 something to me about it and then they'd even say

21 something to James White about it, hey, you know, that's

22 not right, you know.

23     Q.    Okay.  My question is who?  And so if you

24 don't remember names, that's one thing, but I just

25 need -- I would like to know the names of the people

1    that you believe are witnesses to this alleged

2    mistreatment.

3         A.    I -- I don't remember names of those

4    individuals.

5         Q.    Okay.  Any other comments based on your race?

6         A.    No, other than what I had mentioned and -- and

7    the toy of a black man with a noose around his neck.

8         Q.    Okay.  What about any comments related to

9    color?

10        A.    The only thing that was said one time, and

11   they told me they was just joking about it, they said,

12   you got -- you got all the credentials, only if you --

13   how did they say that?  Some way I didn't understand it.

14   It was only if he was something.  Yeah, only if he was

15   slightly lighter on -- on -- on the color.

16        Q.    Who said that?

17        A.    That was coming from Mr. White.

18        Q.    When did he say that?

19        A.    That was -- it was in the middle of the week

20   and it was during a time we was working on a project and

21   I had did something real good and I had designed it and

22   it came out great and -- and they implied they didn't

23   like the way I did and I guess they -- you know, they

24   were just joking about it.  So I just let it went over.

25   I didn't -- I didn't retaliate or -- or show any sign.

Page 150

1    I just kept my composure and just kind of slightly

2    smiled and just went on.

3         Q.    Do you remember -- sorry.  Do you remember

4    approximately when?  I know you said this was in the

5    middle of the week when you were on a project.  Do you

6    remember the year or -- you know, in relation to your

7    termination when this comment was made?

8         A.    This comment was made in, like, the early part

9    of 2022.

10        Q.    Okay.

11        A.    Early in the year of '22.

12        Q.    Was anyone else around for that -- to hear

13   that comment from Mr. Wade [sic]?

14        A.    You said Mr. Wade?

15        Q.    White.

16        A.    Oh, White.  Mr. Fletcher and -- and -- what

17   is -- Mr. Logan that was around and there was -- I can't

18   think of the other gentleman's name.

19        Q.    Did you report that comment to anybody?

20        A.    No, I didn't report it.

21        Q.    Why not?

22        A.    Since he was a supervisor, I told him, you

23   know what, you know, I just kind of, you know, just

24   looked at him and just kind of just went on about my

25   business and kind of not feed into it and say that -- I

1  was just standing there, not stoop to that level and

2  just prayed about the situation and just moved forward.

3      Q.   Okay.  Any other comments about your color?

4      A.   No.

5      Q.   What about national origin, any comments about

6  your national origin?

7      A.   Well, they asked me my race and things of that

8  nature.

9      Q.   Who did?

10      A.   Mr. White and Pat, because I have a country

11  accent and I -- you know, you don't talk like -- what am

12  I trying to say?  You know, you don't talk like normal

13  black people talk.  You -- you got too much of, you

14  know, us in your system, you know.  And I'm like, okay,

15  and things of that nature, you know.  I said I was

16  raised in the country, you know, and the only time -- I

17  was raised around a lot of Caucasians, that's what I

18  grew up with, ate with these people and their families

19  and all.  That's -- I mean, I grew up on a farm.

20      Q.   Okay.  Did you tell anyone at GT Technologies

21  specifically what you identified your national origin to

22  be?

23      A.   Yes, I did, and I told them, you know, I was

24  black and then -- then I also told them that, you know,

25  I have a mixture in with some part Columbian as well.

Page 152

1  So I figured since I mentioned that, that would kind of

2  get them on the calm side of having a different origin

3  or nationality and they would back off a little with the

4  situation of being, you know, on the minority side, you

5  know.

6          So, you know -- you know, I'd try different

7  things.  When I see them come at me, I would -- I would

8  do different things.  I would buy stuff or buy food or

9  bring, you know, breakfast in the morning.  I would stop

10 at Hardee's and get everybody sausage and biscuits,

11 different stuff in the morning, you know, peanuts or

12 stuff like that just to get the maintenance guys' day

13 going and get them where they have a change of attitude

14 and they would, you know, move away from it.

15         So I prayed about the situation and God gave

16 me different ideas of different ways to try things to

17 see if that would change a person's mind and heart for

18 how they identify or look at me as far as -- and it

19 worked for a little while until that ran out, you

20 know --

21     Q.    Okay.

22     A.    -- and then they went right back to what they

23 was doing.

24     Q.    Did you ever discuss with Mr. Felger your

25 national origin?

Page 153

1      A.    I mentioned to him one time, we was all
2  sitting in -- in the office, sitting around.
3      Q.    What about Mr. White, did you discuss your
4  national origin with Mr. White?
5      A.    Yes, I did.
6      Q.    And what about with Ms. Wade?
7      A.    Ms. Wade knew my nationality as well everybody
8  else in the front office.
9      Q.    What about Dave Laverne?
10     A.    He knew also.
11     Q.    Have we discussed all the reasons why you feel
12  you were discriminated against based on your race,
13  color, and national origin?
14     A.    Okay.  Could you repeat that again?
15     Q.    Yes, sir.  Today have we discussed all the
16  things or the reasons that you believe you were
17  discriminated against based on your race, national
18  origin, and color?
19     A.    Yes, we pretty much discussed everything.
20     Q.    Okay.  And have we discussed the specific --
21  or -- strike that.
22          Who specifically do you feel discriminated
23  against you based on your race, color, or national
24  origin?
25     A.    Well, I pretty much feel everybody did due to

1   the fact of that and not -- and by, you know, the image,

2   you know, not following proper protocol on that.

3       Q.   By image, do you mean the statue?

4       A.   Correct.  It was a shocking situation how they

5   went about it.  And then what I seen the reaction, you

6   know, you can -- God gives us senses and we -- we can

7   discover and sense certain things.  And when he gives

8   you images in your mind and you can see things that you

9   don't think you could see and discover, his angels have

10  put it there.

11          And what I noticed, when it started from one

12  person, it just went to the next person had it on, then

13  the next person had it on, then the next person.  And

14  then at the very end, you notice there was a group of

15  four people all within -- within the same status of --

16  of what was going on knew -- they all knew what was

17  happening.

18      Q.   You said there -- you said there were four

19  people.  Who were those four people?

20      A.   Let's start with Jason -- I'm sorry, with

21  James, then Jason, Dave Laverne, and Erin.  They all

22  knew what went on, but I was shocked -- I was very

23  shocked that, you know, at our last hearing that we had

24  at court that day, that they said they never saw me

25  bring a statue to them and present it to them.

1    And that was very shocking at the day the

2  court reporter recorded -- recorded during the time when

3  they raised their hand under oath in front of

4  Judge Early and -- and I never thought that many years,

5  they would actually say such a thing that they never saw

6  it.  But, you know, real-time camera footage, voice

7  command shows it all there at the plant.  So they must

8  have forgot -- they must have forgot they were standing

9  up under the cameras at the time when it was being

10  recorded.

11    Q.    Okay.  Are there any individuals that you

12  believe were treated better than you because -- well,

13  let's start with race -- because they were not African

14  American?

15    A.    No.  We was treated equal.  Everybody got

16  treated fair, you know, as far as performing work.  I

17  would tell everybody in the plant, when you need

18  something.  I was the type of gentleman that would pat

19  somebody on their back and say, hey, great job, no

20  matter what their situation, what they were going

21  through or what they're going through at home.  A little

22  kindness goes a long ways when somebody needs it.

23    Q.    Okay.

24    A.    And --

25    Q.    Was there anybody that you believe was treated

Page 156

1    better than you because they were not black?

2         A.    I'm not sure.  If there was, I didn't notice

3    it.

4         Q.    What about --

5         A.    If they --

6         Q.    I'm sorry.  What about was there anybody that

7    you think was treated better than you because they were

8    not -- you've identified as mixed or half Columbian and

9    you think they were treated better than you because they

10   were of a different national origin?

11        A.    Not to my knowledge.

12        Q.    Okay.  Why is it that you believe that your

13   termination was based specifically on your race?

14        A.    So that goes to the image put on the desk and

15   then the -- then the remarks that was being said coming

16   from supervisors.  And then again, this goes back to the

17   company policy, that -- the policy that you have.  So

18   when you have a company policy and the company creates a

19   policy that the owner is supposed to protect and honor

20   their employees and that shows the behavior of the

21   company's higher ranks, core structure.

22        Q.    And just for the record, which policy are you

23   referring to?

24        A.    Well, this refers to the -- the same policy in

25   the beginning that you presented.

Page 157

1      Q.    The equal opportunity employer policy?

2      A.    Correct.

3            So this shows that the company didn't listen

4   to their own policy.  They broke their own policy.  They

5   failed their own policy accompanied by their actions,

6   the way how they react.  Their disciplinary actions

7   show.  And by that, you know, that's a process that they

8   didn't even look at.

9      Q.    How is it that you believe they were not

10  following their own policy?  Like, what specifically do

11  you believe is not them following their own policy?

12     A.    Well, by they hired in and they took the

13  positions that they asked for.

14     Q.    Who?

15     A.    Mr. White, Ms. Erin, Mr. Laverne, and

16  Mr. Fergel, Mr. Fletcher.

17           So they knew what the policies were.  They

18  knew how they were supposed to conduct themselves and

19  they knew that in their line of positions, they were

20  supposed to lead by example.  And by not leading by

21  example left a poor example in me.  A former employer

22  that -- that did great things for them showed lack of

23  appreciation for it.  It brought a bad name and approach

24  on the company itself.

25     Q.    And how -- walk me through your claim for

1  retaliation.  What specifically do you believe you were

2  retaliated for?

3      A.   Retaliation previous was based on the capture

4  of where it said falsifying documents.  Retaliation

5  comes where the other individual was separated.  Johnny

6  Taylor's name was not there present along with mine.

7      Q.   How is that retaliation?

8      A.   Well, it was only targeted on just me

9  individually.

10     Q.   Okay.  What -- but -- but why -- why do you

11 believe that you were targeted specifically?  What is

12 that based on?

13     A.   That's based on there were -- there were two

14 people on -- that was working that day and you find out

15 how they was able to -- well, actually, let me -- let

16 me -- let me rephrase that.  I was trying to find out --

17 I was able to produce the documents and the work orders

18 that I had later on going forward when they actually

19 said that I didn't have any documentation of work orders

20 at all during the time I was terminated.

21          So all of a sudden in these documents, the

22 work orders surprised me, come up out of nowhere and was

23 presented at the time of the hearing.  So, you know, I

24 would think that at some point someone there on their

25 side would apologize and say, hey, we're sorry, work

Page 159

1   orders finally came up.  It was a glitch or something in

2   the computer.  We couldn't find it at the time, but now

3   they're here.

4        Q.   Okay.  So is it your testimony that the work

5   orders magically appeared in the system after you were

6   separated?  Is that what you are trying to say?

7        A.   Yes.

8        Q.   And that was --

9             THE VIDEOGRAPHER:  Counsel, we have five

10        minutes remaining on this media.

11             MS. JOZSI:  Okay.  I'll -- I'll wrap up this

12        line of questioning.

13        Q.  (BY MS. JOZSI)  Your testimony that your work

14   orders appeared after your separation, I just want to

15   make sure I understand, is based on the fact that they

16   were presented as evidence at the DOAH hearing?

17        A.   They were presented.  I don't know who

18   presented these during a deposition, but the work orders

19   there with my name on it that said that I didn't have

20   any work orders at all.

21        Q.   Okay.  You understand that that's not what

22   Mr. Felger's write-up says, right?  It didn't say --

23   that wasn't what the investigation showed.  You

24   understand that?

25        A.   That -- that was part of the investigation,

Page 160

1    because you got two -- you got two sections on that

2    write-up where it shows at the bottom two of those work

3    orders -- 12 work orders that I produced, that's on

4    that -- that's on that termination as well.

5            Also, according to what you're saying to the

6    work orders that's above that, that's mentioned that

7    he's terminating -- he's writing up about not having

8    eight-hour, ten-hour work scope.  So, again, he falsely

9    wrote up that statement and I'm going to explain that to

10   you why, because there if you look, those work orders

11   are produced in a time frame where it shows that the

12   work was performed within that seven-hour work scope and

13   was completed with that time frame.

14           So if you look at the time of those work

15   orders, it'll show all the way through that day to the

16   end, that it was enough time that all that work was

17   performed including -- including the actual time I was

18   working on the project as well.  So that project is in

19   the midst of that time where he wrote -- where he wrote

20   that disciplinary action stating that there's no work --

21   there's no work within that seven-hour work scope.  You

22   have a window -- a window that shows that I'm working on

23   a project for the next five days.

24       Q.   Okay.  I think -- okay.  I think let's go

25   ahead and stop here so we can switch media.

Page 161

1          MS. JOZSI:  Off the record.

2          THE VIDEOGRAPHER:  We are going off the

3     record.  This is the end of media four and the time

4     is 4:46.

5          (Recess from 4:46 p.m. to 4:46 p.m.)

6          THE VIDEOGRAPHER:  We are back on the record.

7     This is the beginning of media five.  The time is

8     4:46.

9     Q.  (BY MS. JOZSI)  Okay.  Before we went off the

10    record, you were explaining that the work orders were in

11    the system.  And so -- I think you were explaining it,

12    that the work orders were showing up in the system, but

13    were you able -- did you get with Jason when you

14    received the performance -- the first performance

15    warning notice, did you see that all -- that your full

16    day of work was captured within the CMMS program?

17    A.   That is correct.

18    Q.   And -- and your understanding of the

19    termination is that the work order was -- that the work

20    orders were not in the system?  I -- I still don't quite

21    understand what you believe you were terminated for.

22    A.   It's not I believe.  It's an actual real

23    statement.  It's an actual real-time, real work ethic.

24    So what I'm trying to help you to understand is -- what

25    I'm trying to break down is with the termination that he

1    has, the first part on that termination, it shows that

2    in the time of work scope, there's no work orders that's

3    produced within that time, length of time.  Okay.

4          When he wrote that and did that on that date,

5    which was the 22nd, okay, work wasn't finished yet when

6    he done that.  That was done that morning when he wrote

7    that actual statement and wrote -- and wrote that --

8    that write-up.  Okay.  It hadn't even gotten to

9    lunchtime yet.  Okay.  He was in too big of a rush to go

10   ahead and write something up.  You know, he was in a

11   hurry, you know, and he had done got -- was drooling and

12   excited and he wants to -- he wants to write up --

13   between him and James White, they all come together to

14   come up with that.

15         All I knew, I was being set up prior to the

16   stuff that Mr. White was saying.  So we had done start

17   working together, doing all that.  All this is all

18   combined together and if it makes sense to you, it makes

19   sense.  You see a pattern how everything was started

20   from the very beginning and just worked its way as it

21   made -- as it got bigger and bigger, you know.

22         So, there again, those work orders were

23   produced and those work orders are there.  It's y'all's

24   position as well as mine and my attorney there as well.

25   So it shows that I done that work and performed it.

1  It's there in real time.  Okay.  And we also see where

2  some has been edited, okay, in real time.  Okay.

3           But, again, if y'all don't feel that it's

4  there, okay.  Like I said, you know, I can provide -- I

5  can provide the hours and go in there and pull the time

6  database and it will show everything that was done prior

7  to the very beginning when I put it in, prior to who

8  went in, and then by the changed format prior to who

9  came on and put it back into the system.  It will show

10  the whole entire status.

11       Q.   I'm going to show you Exhibit 16 again.  We

12  looked at this one already.  This is for work order

13  12353.  And tell -- and tell me when you can see my

14  screen, because I know there's a delay.  Are you able to

15  see my screen, Mr. Jackson?

16       A.   Yes, I can see your screen.

17       Q.   Okay.  So this is for work order 12353 and

18  it -- I'm going to the second page of the exhibit that

19  shows the actual work order.  I'm going to scroll all

20  the way to the bottom.  And it says a printed date and

21  time that says 8/25/2023, at 12:32:45 p.m., printed by

22  J. Felger.  Do you see that date?

23       A.   At the very bottom, right.

24       Q.   Okay.  You were still employed on 8/25/2023,

25  right?

Page 164

1          A.    Okay.  That work order, you said 8/20 -- you

2     said 8/25.  That was a different date on where his name

3     was.

4          Q.    No, sir.  This page -- it says this work order

5     was dated -- this work order was issued on 8/19 and was

6     completed on 8/21.  I'm sticking with the date that this

7     is printed off.  This was printed on 8/25/2023, and it

8     says printed by -- printed by Jason Felger.  Do you see

9     that?

10         A.    Okay.  That -- it just left, wherever it went.

11         Q.    You can't see the screen?

12         A.    Okay.  It just now popped back up just now.

13         Q.    Okay.  I'm just trying to understand --

14         A.    I -- I see something at the bottom down here.

15         Q.    Okay.  I'm trying to understand your testimony

16    that the documents did not exist and then they came

17    back.  So if you look at the bottom of this -- this work

18    order, this is printed off on 8/25/2023.  It's printed

19    by Jason Felger.  And I will represent to you, this was

20    printed in the course of the investigation into the 12

21    work orders that you provided for Ms. -- for Ms. Wade.

22              So I'm trying to understand when you say that

23    things disappeared and came back, you would agree that

24    this work order was printed off on 8/25/2023 -- or it

25    appears that it was printed on 8/25/2023, while you were

Page 165

1    still employed, before you --

2         A.    Yes.  So -- so I'm trying to help you, to be

3    able to say that if you -- if you -- if you notice,

4    again, it's showing printed 8/25 at that time, p.m.

5    Okay?

6         Q.    Yes, sir.

7         A.    So if he printed that and he had that printed,

8    then why was that not presented at the time of

9    termination when he said I didn't have any documentation

10   of -- of any work orders whatsoever?  So --

11        Q.    But that's what the termination says, though.

12   Let's look at the termination again.  That's Exhibit 28.

13   This is your termination form and it says that they --

14   they investigated 12 work orders that you provided and

15   only three were actually entered by you on 8/22/23 for

16   work performed on 8/19/23.  In addition, three work

17   orders were created by other maintenance techs.  It

18   doesn't say that you didn't do any work.  Do you see

19   that?

20        A.    I don't see that.  I'm still on the same -- it

21   says only three were here -- in there.  So which three

22   are they referring to?

23        Q.    Well, we can go back -- I can go back to the

24   list.  I mean, I -- I will do that on a break, but --

25   but I just want -- do you understand, though, that it's

1    not -- you were not terminated because you didn't

2    perform any work.  I want to make sure that we agree,

3    you understand that that is not the reason for

4    termination?

5            MR. KATAEV:  Objection; argumentative.

6            You can answer.

7        A.    Okay.

8        Q.  (BY MS. JOZSI)  I will share this again.  It

9    says the termination was due to falsification of

10   documents during the investigation.  Do you see that?

11       A.    It's still cycling.

12       Q.    Okay.

13       A.    Okay.  So, again, what this -- what this work

14   performance notice here, this termination letter, this

15   letter is totally different from the letter that was

16   presented to me at the table when I was in the

17   conference room.

18       Q.    Okay.

19       A.    So, you know, we got a real big mess here

20   going on because we're getting more stuff that's --

21   that's brought in that wasn't presented during the time

22   of my termination and -- and that's what I'm looking at.

23   I remember how everything was presented, but, you know,

24   I see more of them falsifying more stuff and changing

25   stuff around and I'm seeing, you know, stuff that they'd

1    add on paperwork where there's two different ink marks.

2        Q.    What else do you believe was falsified,

3    because you're making big references?  First you're

4    saying that this is not accurate, but what -- what is

5    not -- what else is not accurate?  What else is

6    falsified?

7            MR. KATAEV:  I'm sorry.  He didn't testifying

8        to the last question.  Let him finish.

9        A.    So documentation, their -- their -- if you

10   look on there when it was signed and dates and you see

11   where there's different ink and stuff's been changed.  I

12   can see where stuff that was presented to me at the time

13   of this whole thing, that was signed and done.  I

14   remember exactly how it was, even though he didn't give

15   me a copy of that so that way I can keep a match.

16            And then this letter here was nothing of this

17   nature written out whatsoever.  It didn't have none of

18   this writing, none of this rules involved, a

19   description, all this written out where it's showing

20   quality.  So this is after you came into the picture,

21   after I left.

22            So we have a real gap in between the time I

23   left on September the 5th of 2023, versus when these

24   documents were produced, and that was done by the time

25   when I filed through human relations and the EO -- EEOC.

Page 168

1    Okay.  So when they found out that I had filed, that's

2    when they start pulling together stuff, documents start

3    coming together, putting stuff, and they trying to do --

4    fix it the right way.

5            I see -- had I had a copy when I asked Erin to

6    give me at the day of separation, you would have seen

7    that letter and it would never match to what it is

8    today.  She snatched it from my hand and would not give

9    me a copy and she took it and crumbled it up right there

10   in my face and told me, don't worry about it, you just

11   go ahead and get out of here, you know, and that's what

12   I was told.  So this here -- this -- this how this is

13   written really don't really stand up because it was a

14   different letter.

15       Q.  (BY MS. JOZSI)  Okay.  So other than this

16   letter, what other documents specifically are you

17   claiming have been -- are you alleging have been

18   changed?  You've made big references, but I want to know

19   specifically which documents you are claiming have been

20   changed?

21       A.  Okay.  This -- this -- this document, the

22   document that Jason wrote.

23       Q.  Are you talking about the performance warning

24   notice?

25       A.  The warning.  The -- also --

                                              Page 169

1       Q.   Was it this one?  Hold on.  Exhibit 13, is

2   this the other one you're referring to?  Because I want

3   to be very clear on the record what you're alleging.

4       A.   Yes.  So with it being the date of 8/22, they

5   had the same day at the bottom.

6       Q.   So you're alleging that the termination form

7   and this performance warning notice dated 8/23/2023,

8   you're claiming those have been changed?

9       A.   That's correct, because I stood right there

10  and watched him when he filled it out and he wrote,

11  refused to sign, and he did it right there in front of

12  me.  And he said he was going to take it right up there

13  to Erin, and I watched him right there till I walked

14  out.  And he -- and he said, fine, this is it.  Now --

15  and he said, go back to your job and do your work and

16  I'll handle this with her and -- and we may talk

17  tomorrow and that was it.  But that date right there was

18  not on that paper when I walked out of that office.

19      Q.   Okay.  Any other documents that you're

20  claiming --

21      A.   And if you notice the ink, the ink in the

22  letter is darker, the slash in '23, okay, if you go

23  back, the slash again.  But if you notice, the last two

24  letters of the year '23 is the same matching of the rest

25  of the paper on there.  So you can see it's either

Page 170

1    been -- it was either Wite-Out, recopied, printed on

2    scanner, rescanned, and then turn around and rewritten

3    back in there on a new sheet of paper.

4        Q.    Are you handwriting expert or an expert on

5    falsification of documents?

6            MR. KATAEV:  Objection; compound,

7        argumentative.

8            You can answer.

9        A.    That I have witnessed this before in other

10   areas and I observed things during my time of training.

11       Q.   (BY MS. JOZSI)  This is your opinion?

12       A.    This is accuracy.

13       Q.    According to you?

14       A.    Correct.

15       Q.    All right.  Have we discussed all of the

16   things that you claim to be -- have been discriminatory

17   or retaliatory during your employment?

18       A.    I can't fully give you an answer on that.

19   There may be some more at that point, but at this time I

20   will have to think on that.  So that's a -- that's a --

21   that's a statement that has -- has to stay unanswered at

22   this time.

23       Q.    That's not how this works.  This is -- this is

24   your case that you've brought against your former

25   employer and I am entitled to know all of the things

Page 171

1    that you believe are discriminatory or retaliatory and
2    is the basis of your -- your lawsuit.  So if you want to
3    take a five-minute break, we can take a five-minute
4    break and you can think on it, but we can't just put a
5    pin in that and come back.  I'm entitled to know that.
6        A.   That's fine.  I just need to -- to think on it
7    and -- and see --
8        Q.   Okay.
9        A.   -- what's -- what's left out there that I have
10   not actually touched on.
11       Q.   Is there a document or something that you need
12   to refer to in order to -- to do so?
13       A.   I'm not sure.  I'll have to actually --
14   actually look -- actually think upon it.
15       Q.   Okay.  Why don't we do this.  It's 5:05.
16   Let's take a five-minute break and we'll come back at
17   5:10 and pick up on this.
18       A.   Okay.
19            THE VIDEOGRAPHER:  We are going off the
20       record.  The time is 5:05.
21            (Recess from 5:05 p.m. to 5:10 p.m.)
22            THE VIDEOGRAPHER:  We are back on the record.
23       The time is 5:10.
24       Q.   (BY MS. JOZSI)  Okay.  Before we went on break,
25   Mr. Jackson, I asked you if we've discussed everything.

```
 1    So just to -- I want to make sure that we've covered
 2    everything that you believe was discriminatory or
 3    retaliatory.  You've mentioned a comment by Mr. White.
 4    You've made -- you mentioned the statue you found on
 5    your desk and some other various comments related
 6    throughout your employment.  Is there anything else that
 7    you believe is discriminatory -- that was discriminatory
 8    or retaliatory during your employment?
 9         A.   Yes, I remember now.  Can y'all still hear me?
10              MR. KATAEV:  Yes.
11         Q.   (BY MS. JOZSI)  Yes, sir.
12         A.   Okay.  So after all that, also -- it took me a
13    minute.  I almost left it out, but prior to -- each
14    month I'll have my tools stolen out of my box as soon as
15    I would go to work on a machine and come back.  It got
16    bad to where I was missing all types of tools.
17    Wrenches, stuff that I bought, I purchased within three
18    or four days and it'll go missing.
19              They would take my desk -- at my desk, they
20    would take my chair and they would take it and hide it.
21    They would take it to -- and put it into another
22    department.  I had to walk to another department and go
23    look to find it and bring it back; that I was accused of
24    taking too much time going to get my desk -- to get my
25    chair.
```

Page 173

1          Just a lot of humi -- humiliation that I went
2     through and they would laugh about it.  All the guys in
3     the maintenance department would laugh and -- and they'd
4     just want to see me get upset.
5          Q.   You keep saying, "they."  Who are you
6     referring to when you say, "they"?
7          A.   Well, that's Pat Fletcher, James White,
8     Terry Logan.  What's the other guy's -- Lucas.  They
9     would stand around, but I would hear it and I'd be
10    asking them, you know, about my chair and stuff when
11    I -- when I get there.  As soon as I clock in and get to
12    my desk, it was gone.  That happened numerous times and
13    I'd just -- okay.  So --
14         Q.   Did you ever -- sorry, go ahead.
15         A.   I -- I was -- I was just going to say, last
16    time I had to weld a chain to it.  I had to buy a chain
17    to weld to the bottom of the chair and then wrap it
18    around the desk and put a lock around it.
19         Q.   Okay.
20         A.   Actually, I took my chair and I have my chair
21    here at home now out in my shed with that chain wrapped
22    around it with that pad on it I had.  And that's how bad
23    it got with me being there due to the fact when it's
24    getting close to the end of the last few months of me
25    being there at GT.

Page 174

1    Q.    So you say the -- the tools and the chair

2    would disappear.  That was within the last few months of

3    your employment?

4    A.    That is correct.

5    Q.    Did you ever report this to anybody?

6    A.    Yes.  I -- I told James and he goes, well --

7    the thing with him was he said, you need to keep up with

8    tools and let nobody steal them; it's just too bad

9    they -- they got them.  And he would laugh, you know,

10   right along with the rest of the employees in the

11   maintenance department that I mentioned.  And I would be

12   asking guys, if y'all see my tools, would you kindly

13   return them or just lay them on my desk if you see them.

14        Somebody had broke the lock off my -- off my

15   tool cart and went in there and got my tools out.

16   Mostly the expensive tools that I had bought to actually

17   perform the work on the machines that -- there were

18   certain tools that you had to have and needed, and I was

19   able to work overtime to -- to buy that certain tools in

20   order to help out in the maintenance department to

21   perform that task on certain machines.

22        And when I didn't have it, it made it

23   difficult for me to perform the work that I needed to

24   perform and had to go back and doing it longer because I

25   didn't have the actual tools to perform the job at a

Page 175

1    quicker pace.

2        Q.    Did you ever ask your supervisors to purchase

3    those tools to allow you to do the job faster?

4        A.    I asked and -- and they wouldn't purchase the

5    tools, but they would purchase tools for all the other

6    maintenance guys and I would stand there and watch them

7    when they purchased certain wrenches and tools for them.

8    And I would stand over there, you know, just quietly

9    and, you know, working and everybody get certain things.

10   And they were all, like, kids, you know, opening --

11   like, opening their gifts and all.

12            And I'd be the oddball just standing there,

13   you know, trying to figure out, you know, how I'm going

14   to have to work more overtime to replace them tools

15   to -- to keep them off my back.

16       Q.    Okay.  The chair thing, was there ever a time

17   that everyone's chairs were taken away from them?

18       A.    The chair thing later on down the road, it was

19   tooken from them because we had -- had got a couple

20   employees that would sit in the very back end, behind

21   the desk in one spot.  And operators will call and --

22   for a breakdown and they'll go back there -- either back

23   there and went to sleep or they're back there with the

24   ear buds -- ear buds in their ears and couldn't hear --

25   hear the calls on -- on the intercom.

1          And so when the maintenance manager had walked
2     around or come around and seen it and he decided to just
3     go ahead and remove the thing because there'd be
4     disciplinary action.  A couple guys wouldn't report
5     to -- when machines were down in -- in the maintenance
6     department.
7          Q.   Okay.  So it was everyone's chair, not just
8     your chair?
9          A.   That was prior to four -- four months down the
10    road.
11         Q.   Okay.
12         A.   But at the time, it was just my chair being
13    taken and hidden.  So I would have to stand up, couldn't
14    find the chair a lot of times and I had to stand up and
15    just do my work on the tablet or the computer.
16         Q.   Okay.
17         A.   Yeah.
18         Q.   All right.  Before we move on, is there
19    anything else that happened during your employment with
20    GT that you're alleging was discriminatory or
21    retaliatory that we have not discussed?
22         A.   Other than Patrick had took -- was given to me
23    an assignment by management.  It was an entire platform
24    that was in the back that we had a large shipment that
25    came in on a freight and -- and I had got a sign-off

1   signature that I could -- you know, I could actually

2   have it, but instead -- they knew I was going to get it

3   and bring the truck and trailer.  And that following

4   day, he went back and got a truck and trailer and took

5   it to his house.

6          And -- and he knew I had already had been --

7   that guy -- it was told that -- he was saying, first

8   come first serve, you know, I done got it now.  So he

9   was not bringing it back.  So that was a little

10  disappointment.  I wouldn't ever expect for him to do

11  that, but basically I had to put away emotional distress

12  and just -- just move on with it, you know.  And pretty

13  much after, I had worked by myself and just kind of

14  separate myself from them.

15      Q.   Okay.

16      A.   Other people seen what I was going through and

17  they knew at that time I wasn't happy.  They seen what

18  was going on and what was fixing to happen due to

19  what -- how the guy was mistreating me.

20          MS. JOZSI:  Okay.  I had previously said I had

21      a hard stop at 5:30.  I have arranged for someone

22      else to pick up my daughter from daycare.  So we

23      can continue on.

24      Q.   (BY MS. JOZSI)  I'm going to ask now about your

25  administrative charges.  So you filed a charge of

1    discrimination in this case, right?

2         A.   That's correct.

3              (Exhibit No. 30 was marked for

4    identification.)

5         Q.   (BY MS. JOZSI)  I'm going to share what is

6    marked as Exhibit 30.  This is Defendant's 183.  Let me

7    know when you can see the screen.  I can zoom in.  Let

8    me know if you recognize this document.

9         A.   Yes.  Okay.

10        Q.   Do you recognize this document, Mr. Jackson?

11        A.   Yes.

12        Q.   Okay.  Is this the charge of discrimination

13   that you filed with the Florida Commission on Human

14   Relations?

15        A.   That is correct.

16        Q.   And is that your signature down there at the

17   bottom?  Did you draft this document?

18        A.   I can't see it.

19        Q.   What was that?  Did you say you did draft this

20   document?

21        A.   You said draft?

22        Q.   Yes.  Did you prepare this -- did you prepare

23   this document?

24        A.   That is correct.

25        Q.   You list in the middle here -- and I'll make

1    it a little bit bigger.  It says, "Cause of

2    discrimination" -- yeah, "Cause of discrimination based

3    on," then it says, "check the boxes."  You've checked

4    race, sex, and retaliation.

5           Do you see that?  I will highlight it.  Right

6    in that area.  Do you see that?

7        A.   It's kind of blurry on my side.

8        Q.   It's a little blurry.  This is the way we got

9    it from the agency, unfortunately.  Do you see that

10   there's three boxes checked right here?  It says race,

11   sex, and retaliation.

12       A.   Yes, I see it.

13       Q.   And do you see national origin and color are

14   not checked here?

15       A.   Oh, in the corner.  Okay.

16       Q.   Do you see how color and national origin are

17   not checked, correct?

18       A.   I only see national origin.  You say it says

19   color?

20       Q.   So this right here next to "race," there's a

21   box that says "color."  And right underneath "race",

22   there's a box that says, "national origin."  And I'm

23   asking you if either box, color or national origin, are

24   either of those boxes checked?

25       A.   No, those two are not.

1      Q.   And if you look in the paragraph under
2  discrimination statement, it says, "The complainant
3  alleges discrimination on the basis and issues of race
4  black, retaliation, gender identity, sex male,
5  discharge, harassment, and intimidation."
6          Do you see that?
7      A.   No, I don't see -- I don't see that.
8      Q.   The first sentence in this discrimination
9  section, this statement.  Can you see the portion I've
10 highlighted in blue?
11     A.   I see where -- where you had it highlighted
12 where it says the race and color, sex and all that, that
13 little square box there.
14     Q.   Let me see if I can highlight it.  I'm
15 highlighting it in yellow.  I don't think I wanted to
16 highlight the second line, but there we go.  Do you see
17 the yellow highlighting now?
18     A.   No.  There's no yellow highlighting.
19     Q.   Okay.
20     A.   Okay.  It showed up in blue now.
21     Q.   Okay.  There's a lag, I think, on the screen.
22          Can you read in the discrimination, there's a
23 box -- a big box that says, "D, discrimination
24 statement," and there's two paragraphs in there and I'm
25 looking at the first line -- I'm sorry, the first

```
                                            Page 181
 1    sentence of the second paragraph.

 2         A.   Okay.  All right.

 3         Q.   Do you see that?

 4         A.   I see that second paragraph down here.  All

 5    right.

 6         Q.   Would you agree that the -- that national

 7    origin is not mentioned anywhere in that paragraph?

 8         A.   It only says black.  The race is black.

 9         Q.   Right.  Race is black, but national origin's

10    not mentioned, right?

11         A.   Right.

12         Q.   Okay.  Do you see that -- that the charge to

13    the Florida Commission and then the Florida Commission

14    issued a finding of no cause?

15              (Exhibit No. 31 was marked for

16    identification.)

17         Q.  (BY MS. JOZSI)  This is Exhibit 31, Defendant's

18    187 to 189.  Do you remember seeing this document.  It

19    hasn't come up yet.

20              THE VIDEOGRAPHER:  Mr. Jackson, it looks like

21         the room is really, really dark.  I'm not sure if

22         there's a light that can turn on for you.

23              THE DEPONENT:  (Complies.)

24              THE VIDEOGRAPHER:  Thank you.  Much better.

25         Q.  (BY MS. JOZSI)  Do you recall receiving this
```

Page 182

1   document?

2        A.   Yes.

3        Q.   Sorry, was that a yes?

4        A.   Yes.

5        Q.   And then when you received this document, what

6   did you do?  Did you file a petition for relief with

7   DOAH?

8        A.   Yes.

9        Q.   I'm having a hard time hearing.

10            MR. KATAEV:  I hear him clearly.  He said yes.

11            MS. JOZSI:  Okay.  Thank you.  I think it just

12       sometimes doesn't give the first -- when he has a

13       one-word answer, I have had a hard time hearing

14       him.

15            (Exhibit No. 32 was marked for

16   identification.)

17       Q.   (BY MS. JOZSI)  Okay.  This is marked as

18   Exhibit 32.  This is Defendant's 190 to 193.

19   Mr. Jackson, do you recognize this as the petition for

20   relief for the FCHR?  Do you recognize this document?

21   And let me know if you need me to scroll.

22       A.   Okay.  You can scroll.

23       Q.   I'm not asking you anything specific about it.

24   I just want to know if you recognize this document?

25       A.   Yes.

1      Q.   Was that a yes?  I'm sorry.  Okay.  All right.

2   I think there's something on my end, because it's also

3   freezing.  Okay.

4           MR. KATAEV:  He said yes.

5      Q.  (BY MS. JOZSI)  Okay.  And again, for the sake

6   of time, Mr. Jackson, we have been -- we've been

7   referring today we had an administrative proceeding

8   before DOAH, correct?

9      A.   Could you repeat that?

10     Q.   Yes, sir.  We -- we referred to it a few

11  times, but we already went through the administrative

12  proceeding before the Division of Administrative

13  Hearings and had a final on this case.  Do you remember

14  that?

15     A.   Yes.

16          (Technical interruption.)

17          THE VIDEOGRAPHER:  We just lost him.  Can I

18      take us off?

19          MS. JOZSI:  Looks like he dropped.

20          THE VIDEOGRAPHER:  We are going off the

21      record.  The time is 5:34.

22          (Recess from 5:34 p.m. to 5:40 p.m.)

23          THE VIDEOGRAPHER:  We are back on the record.

24      The time is 5:40.

25          MS. JOZSI:  All right.  I'm going to try to

1      speed through just the remaining exhibits so that

2      we can get everybody out of here.

3              (Exhibit No. 36 was marked for

4  identification.)

5      Q.  (BY MS. JOZSI)  I'm going to share my screen

6  again.  This is Exhibit 36, Mr. Jackson.  Let me know

7  when you can see my screen?  Are you able to see my

8  screen, Mr. Jackson?

9      A.   It's still cycling.

10     Q.   Still nothing?

11     A.   No, ma'am.

12          MR. KATAEV:  You can answer now?

13     A.   Okay.  We're up now.

14     Q.  (BY MS. JOZSI)  All right.  All right.  This is

15  Exhibit 36.  This is the charge of discrimination filed

16  with the EEOC.  Do you recognize this?

17     A.   Yes.

18     Q.   Do you see -- and I'll zoom in where it says,

19  "Discrimination based on," and it just says, "race"; is

20  that correct?

21     A.   Correct.

22     Q.   Are you there, Mr. Jackson?

23          MR. KATAEV:  He said correct.

24     Q.  (BY MS. JOZSI)  Is that yes?

25     A.   Yes.

1      Q.   All right.  And if you look in the narrative

2   section, there's two parts to it.  Is there any

3   reference to national origin anywhere here in your

4   charge of discrimination?

5      A.   You mean written in these blocks?

6      Q.   Yes, sir.

7      A.   The way how it is presented and put it in

8   there, they left it out.

9      Q.   All right.  So you filed the charge of

10  discrimination with the EEOC and you received a right to

11  sue letter; is that correct?

12     A.   That is correct.

13     Q.   And just for time, I'm not going to bother

14  showing that.

15          You filed a complaint in this lawsuit.  Have

16  we gone through everything that you believe you alleged

17  in your complaint that's relevant to the claims of

18  discrimination or retaliation today?

19          MR. KATAEV:  Objection; asked and answered.

20          You can answer.

21          (Technical interruption.)

22          THE VIDEOGRAPHER:  We lost the witness.  We

23      are going off the record.  The time is 5:44.

24          (Recess from 5:44 p.m. to 5:45 p.m.)

25          THE VIDEOGRAPHER:  We are back on the record.

Page 186

1      The time is 5:45.

2      Q. (BY MS. JOZSI) The question I last asked is:

3 Have we discussed everything that you believe is

4 relevant in your complaint related to discrimination and

5 retaliation today?

6           MR. KATAEV: Same objection.

7           You can answer.

8           THE DEPONENT: Objection?

9           MR. KATAEV: I said, "Same objection, you can

10     answer."

11      Q. (BY MS. JOZSI) You can answer.

12      A. Okay. Yes.

13      Q. All right. You mentioned a few names today,

14 but there were several names that we haven't discussed.

15 So I want to go through them, and these were

16 specifically individuals that you listed in your Rule 26

17 disclosures as people with knowledge.

18        So you mentioned Courtney Jackson, your

19 brother. What does Mr. Jackson know about the claims in

20 this case?

21      A. He knows that I'm -- that I was terminated

22 from the job and he knows the -- the image --

23        (Technical interruption.)

24        THE VIDEOGRAPHER: We lost the witness again.

25     We're going off the record. The time is 5:46.

1          (Recess from 5:46 p.m. to 6:43 p.m.)

2          THE VIDEOGRAPHER:  We are back on the record.

3      This is the beginning of media unit six.  The time

4      is 6:43.

5      Q.  (BY MS. JOZSI)  All right.  Mr. Jackson, I

6  think when we last left off you were talking about

7  witnesses and I asked you about your brother, what he

8  knew, and I think that's when we got cut off.  So what

9  does your brother know about the claims that you're

10 bringing?

11         MR. KATAEV:  Objection.

12         You can answer.

13     A.   He just knew me -- my dismissal, me leaving

14 the job and -- and what I went through and that image

15 and that's pretty much it.

16     Q.  (BY MS. JOZSI)  When you say about the image,

17 are you referring to the statue?

18     A.   That's correct.

19     Q.   And how did he -- he knows of an image.  Is

20 that based on you telling him about that or did he see

21 the image?

22     A.   That's me telling him.

23         MR. KATAEV:  Objection.

24         You can answer.

25     Q.  (BY MS. JOZSI)  Okay.  The next person you've

1    listed in your Rule 26 disclosures is Rosa Acosta.  What

2    does Ms. Acosta know about your claim?

3         A.   She knew about the claim that I had filed.

4    Also, I mentioned to her the same image also.

5         Q.  (BY MS. JOZSI)  Okay.  You list also Louie

6    Jackson, your father.  What does Mr. Louie Jackson know

7    about your claim?

8         A.   The same as I mentioned to my brother and

9    Rosa.

10        Q.   You've listed Johnny Taylor.  I believe we've

11   discussed Mr. Taylor today, but what -- you say that he

12   has knowledge -- personal knowledge of what the issues

13   are in this case.  So what does he know?

14        A.   Well, Mr. Johnny Taylor has the knowledge of

15   knowing what happened with the work orders.  He was an

16   employee there also.  He was willing to testify also at

17   a certain time if I had to go to court on those work

18   orders, and that he was going to state that he was -- he

19   did put his name down on those work orders.

20        Q.   When was the last time that you spoke with

21   Mr. Taylor?

22        A.   I spoke with Mr. Taylor in -- in 2023,

23   prior -- two months after I was dismissed from GT.

24        Q.   Have you -- so you haven't spoken with him

25   since you filed this lawsuit?

1    A.   At the time I had filed the lawsuit, then I
2    spoke with him briefly at times then.  After -- after
3    once the lawsuit had taken place, I haven't spoken to
4    him since then.
5    Q.   Okay.  You also list a Rick Jefferson.  What
6    does Mr. Jefferson know about your claim?
7    A.   Mr. Jefferson knows the whole entire claim.
8    He was actually presented.  He was at court when we went
9    through the actual court the first time.  He sat in
10   through the entire session.
11   Q.   And when you're referring to court, just for
12   the record, you're referring to the gentleman who
13   attended the DOAH proceedings that we had in August of
14   2024?
15   A.   That is correct.
16   Q.   Okay.  Other than what Mr. Jefferson heard
17   during those proceedings, does he have any independent
18   personal knowledge of the issues that you've alleged in
19   this case?
20        MR. KATAEV:  Objection.
21        You can answer the question.
22   A.   As referring to more specific?
23   Q.   (BY MS. JOZSI)  Sure.  You listed him as
24   somebody who has personal knowledge of the issues
25   relevant to this case.  And so I just wanted to know,

1    does he have any knowledge outside of what he may have

2    heard -- to your knowledge, does he have firsthand

3    knowledge of any of the claims that -- that you've

4    raised, other than what he may have heard at the DOAH

5    proceeding?

6         A.   Not to my knowledge, I don't.

7         Q.   All right.  Other than Mr. Jack -- the two

8    Mr. Jacksons you've listed, Courtney Jackson, Louie

9    Jackson, Linda Acosta, Johnny Taylor, and Rick

10   Jefferson, are there any other individuals that you

11   believe are witnesses that have relevant information

12   that we have not discussed today?

13        A.   The only person that has a -- a little bit of

14   knowledge of the case is Darrell -- Darrell Harris.

15        Q.   What does Mr. Harris know?

16        A.   At that time of employment, he knew about the

17   image, he knew about the work orders, and that's pretty

18   much it.

19        Q.   Have you spoken with Mr. Harris since your

20   separation from GT?

21        A.   Only one time after separation, and that

22   was -- that was two weeks after I was separated.

23        Q.   All right.  So have you spoken with him since

24   you filed this lawsuit?

25        A.   No, ma'am.

1        Q.   Have you obtained any written statements from

2    any individual about the claims that you assert in the

3    complaint?

4        A.   No, ma'am.

5        Q.   Your interrogatory responses that you provided

6    to us connection -- in connection with this case

7    reference a statement by Dave Barry.  You said that

8    there was a statement by the manager.  He told plaintiff

9    outside the hearing room words to the effect of, "good

10   luck with your case, you're not going to win anything."

11            Can you tell me a little bit about the context

12   of that statement, a little bit more detail?

13       A.   Yes.  As I walked out the door, he made a

14   statement of -- of such and I stood there and listened

15   to what he had to say.  And I did not respond back to it

16   and I proceeded walking forward.  As I walked forward,

17   he said, you're going to need it, you know, out in a

18   louder burst.  And I looked back and just kept going and

19   walked on out, proceeded out the door.

20       Q.   Was there anybody else around when -- when he

21   made that comment?

22       A.   Yes, Jason Fergel and Erin -- not Erin, James.

23   They were all sitting out there, just the three

24   gentlemen, kind of snipping and laugh as they said it as

25   I was proceeding out.  I guess it was a big joke to

Page 192

1    them.

2          (Exhibit No. 59 was marked for

3    identification.)

4        Q.  (BY MS. JOZSI)  Okay.  All right.  I'm going to

5    show you what has been marked as Exhibit 59.  This is

6    Plaintiff's 812.  Mr. Jackson, do you recognize this

7    document?

8        A.  I can't really see it.  It's in a small

9    format.

10        Q.  Let me see.  I'm going to zoom as large as I

11    can make it where it will fit on the page.  This is the

12    top and then this is the bottom.  Can you see this?

13        A.  Yes, uh-huh.

14        Q.  Is that your handwriting?

15        A.  Yes, it is.

16        Q.  Okay.  And I'm sharing on my screen, it's the

17    bottom half of this document that I'm interested in.  It

18    appears to be a list of names.  Did you prepare this

19    list of names?

20        A.  Yes.

21        Q.  What does this list represent?

22        A.  These are names of people that I knew that I

23    associated with over the years that I had worked with

24    since the previous employer.

25        Q.  With GT Technologies?

Page 193

1        A.    That is correct.

2        Q.    All right.  There are a lot of names on here

3   that we have not discussed today.  Do any of the folks

4   on this list have knowledge of the claims that you're

5   bringing forward in this lawsuit?

6              MR. KATAEV:  Objection.

7              You can answer the question.

8        A.    No.  The -- the people that's on here that I

9   haven't talked to that I know pretty much sure -- I know

10  the majority of these people here that first know about

11  it because they're still actually employed with GT.

12       Q.    (BY MS. JOZSI)  Okay.  Let me ask it this way.

13  You do not list any of these individuals -- let me just

14  double-check, let me scroll.  You didn't list any of

15  these folks as potential witnesses in your response to

16  interrogatories or Rule 26.  So do you intend or do you

17  believe these to be -- any of these individuals have

18  knowledge about the claims that you're asserting in this

19  lawsuit that you plan on providing as witnesses in this

20  case?

21       A.    No.

22       Q.    All right.  So at this point have we talked

23  about all the individuals that you believe are witnesses

24  to the claims that you're asserting in this lawsuit?

25       A.    Yes, the ones that you had just recently

Page 194

1    mentioned.

2         Q.   Okay.  Have you seen or -- well, let me --
3    strike that.

4              Have you spoken with anyone at GT Technologies
5    since your separation, other than Mr. Taylor that you
6    mentioned, and Mr. Harris, that you said you spoke to
7    briefly after you separated?  Anyone else at GT that
8    you've spoken to after you separated?

9         A.   Let's see.  There's the gentleman that I could
10   not remem -- remember his name.  It's a young gentleman
11   that started out as a welder, that just got hired in.
12   He was the last candidate that was hired in.  I can't
13   think of his name.

14        Q.   Okay.

15        A.   But -- yeah, I can't remember his first and
16   last name.

17        Q.   Okay.

18        A.   But --

19        Q.   Go ahead, I'm sorry.  Continue.

20        A.   You're okay.

21        Q.   All right.  You also produced some documents
22   to us.  There's quite a few.  We'll look at some more.
23   At this point have you turned over all the documents
24   that you believe are relevant to the claims or damages
25   that you're asserting in this case to your attorney?

1      A.   Yes.

2           (Exhibit No. 56 was marked for

3   identification.)

4      Q.  (BY MS. JOZSI)  All right.  You've produced

5   quite a few documents that have handwritten notes on

6   them.  I'm not going to go through them all, but I'm

7   going to show you what is marked as Exhibit 56.  This is

8   Plaintiff's 144 to 147.  Let me know if you can see my

9   screen.  I'm sharing the wrong screen.

10          All right.  Are you seeing -- is this your

11  handwriting?

12     A.   It's real small.  It's hard to see it.

13     Q.   Can you see that?

14     A.   Correct.

15     Q.   Okay.  This is a four-page document that spans

16  144 to 147.  I said 146.  On the first page it says, "To

17  the Florida Commission on Human Relations."

18          Do you see that?

19     A.   Yes.

20     Q.   Okay.  Was this something you submitted to the

21  Florida Commission on Human Relations?

22     A.   Yes.

23     Q.   Do you recall when you submitted this

24  document?

25     A.   I don't recall.  The dates are on the

 1    envelope, on the front of the envelope, when I submitted

 2    it.

 3        Q.   Okay.  Let me ask it this way.  Was this --

 4    because I don't believe there's any date.  No, there's

 5    no date on here.  Was this before or after we had this

 6    hearing?

 7        A.   This was --

 8             MR. KATAEV:  Objection to form.

 9             You can answer.

10        A.   I believe that was -- I can't remember if it

11    was before.

12        Q.   (BY MS. JOZSI)  That's okay.  If you don't -- I

13    don't want you to guess.

14             You mention on the second page that GT not

15    only provided the Court with false documentation, but

16    lied under oath on various occasions.  Have we discussed

17    the documentation that you believe was false today?

18        A.   That is correct.

19             (Exhibit No. 58 was marked for

20    identification.)

21        Q.   (BY MS. JOZSI)  You also produced several

22    documents that look like this.  This is Exhibit 58, and

23    that is Plaintiff's 761 to 806.  Do you see 58?  It's 46

24    pages.  So I'm not going to go through all of it, but do

25    you recognize generally this document?  There's some

1    highlighting and then some handwritten notes.  Do you

2    see that?

3         A.   It's not opening up.

4         Q.   I can zoom a little bit more, but I just want

5    to make it where you can see that.  Are you able to see

6    this?

7         A.   Yes, I see it.

8         Q.   Okay.  So there's some typed pieces that have

9    highlighting and then there's handwritten pieces.  What

10   was the purpose of -- of these highlighted and

11   handwritten pieces?  Are these your notes?

12        A.   These were notes.  These were highlighted to

13   identify certain areas in the legendary statement and

14   rewritten out.  So this was done for -- for Amber of

15   human relations.  She had wanted that statement sent

16   over to her so she can actually see it.

17        Q.   Okay.  So you mailed this -- these handwritten

18   notes, did you mail those to the FCHR?

19        A.   Yes.

20             (Exhibit No. 61 was marked for

21   identification.)

22        Q.   (BY MS. JOZSI)  You also provided us with a

23   couple of documents that I just don't understand how

24   they're related to this -- this case.  So I'm going to

25   show you.  This is Exhibit 61.  This is Plaintiff's 941

Page 198

1    to 942.  This is an invoice from Wholesale Battery Tire

2    and Auto dated 1/2/26.  What is the purpose of providing

3    this document?

4         A.    Okay.  That was accidentally got into the --

5    into the paper that was sent over.  That was some work I

6    had done prior that day.

7         Q.    Okay.  So no relevance to the case?

8         A.    No, ma'am.

9              (Exhibit No. 69 was marked for

10   identification.)

11        Q.  (BY MS. JOZSI)  Okay.  You also provided us

12   with -- let me show you Exhibit 69.  Exhibit 69 is

13   Plaintiff's 1034 to 1036.  It looks like this is a

14   printout from, really, my firm's website.  What is the

15   purpose of this document?  I can scroll, if you need me

16   to.  It's three pages.  Why -- why did you provide this

17   to your attorney?

18        A.    That was based on as it was showing the

19   Individual Freedom Act.  So I sent that to them so

20   they'll have some idea what it's showing, the program,

21   the act for the rights of minorities as far as working

22   in a work environment --

23        Q.    Okay.

24        A.    -- which is part of the constitution.

25              (Exhibit Nos. 71 and 72, respectively, were

Page 199

1    marked for identification.)

2        Q.   (BY MS. JOZSI)  Okay.  All right.  And then I'm

3    going to show you this is Exhibit 71 and Exhibit 72.

4    This is Plaintiff's 1076 to 1094, that's 71; and then 72

5    is 1096 to 1099.  And there's a bunch of mortgage

6    statements in here from Lakeview.  What was the purpose

7    of providing these?

8        A.   Yes.  I was providing that for my attorney.

9    He wanted to make sure I provide all in my possession

10   due to the fact where -- at the time of being

11   unemployed, this is where lack of work did come in.

12   My -- my mortgage was -- was going under.  I didn't have

13   the funds to pay for the mortgage due to the fact that I

14   was terminated from my job.

15       Q.   Okay.  So are you claiming these as damages in

16   this case, these statements?

17       A.   That is correct.

18       Q.   All right.  And let's talk about your damages

19   in this case.  What -- what are you seeking specifically

20   out of this lawsuit?

21       A.   I'm seeking, first of all is my reputation.

22   It is something that I look at as very highly to me.  My

23   reputation being ruined like that.  First of all, being

24   corrected falsely on that part.  After that, going

25   through a lot of emotional stress over the period of

1    time due to the fact of the behavior that I had to -- to

2    tolerate during the time of the work environment and

3    outside of the work environment.

4         And then for the time that I would have been

5    still there and be employed, compensate for that time,

6    lost wages, employment wages, which led me to go fall

7    back and default with creditors.  I've gotten too far

8    behind, which caused me to lose my credit score and it

9    dropped down to a 4 -- 405.  Caused me stress where I

10   couldn't be able to borrow or move forward in life on

11   any purchases due to the fact of lack of funds.

12        All this takes in account what I had to go

13   through, the humiliation that I had to deal with at the

14   time.  I would like to get this all put behind.  I know

15   right now I suffer from this again, having to rehash

16   and -- and to remember all that I had to go through.

17   And I think about it when I was driving here and I was

18   kind of -- kind of tearful having to through it and then

19   have to remember how it happened.

20        It's not an easy road being a minority.  I

21   wish some people could actually walk in our shoes, you

22   know.  It's going through that during life, being picked

23   on at school.  It was hard then, you know.  Then you --

24   you're working in an environment, just multiple jobs I

25   had to work and I was the only -- only minority in that

1    work environment.  Just as today, I'm the only min --

2    minority in the work environment where I work at now.

3        Q.    So you provided a figure -- sorry, I'm looking

4    for a cough drop.

5            You provided a figure in your Rule 26

6    disclosures of what you're seeking in -- in this lawsuit

7    in a total of $237,839.40; is that correct?

8        A.    Give me a moment.

9        Q.    Sure.

10        A.    Could you repeat the question?

11        Q.    Yes, of course.  Your Rule 26 disclosures

12    provide a total amount you're seeking in this lawsuit as

13    $237,839.40.  Does that sound right?

14        A.    No, the figure was off.  It was -- it was

15    another hundred thousand.  It was 300,000 and the

16    same -- the same numbers behind, but it was just only

17    three.

18        Q.    337,000?

19        A.    Yes, that is correct.

20        Q.    Okay.  And we're going to break that down now

21    a little bit further.  And you're seeking -- according

22    to your Rule 26, you're seeking back pay, front pay,

23    emotional distress, COBRA, and 401(k); is that right?

24        A.    That is correct.

25        Q.    Let's start with the back pay.  We talked

Page 202

1    earlier in the day and we looked at your final paycheck,

2    and we agreed your hourly rate at the time of your

3    separation was $24.51; is that right?

4        A.    That is correct.

5        Q.    Were you generally working 40 hours a week for

6    GT Technologies?

7        A.    That is correct.

8        Q.    If you multiply the 40 hours times your hourly

9    rate, that comes out to $983.28, but you say you that

10   received $1,200 per week while you were employed with

11   GT.  How did you arrive at that $1,200-per-week figure?

12       A.    Plus the overtime that I was -- that I was

13   getting entitled from them, that they gave me the

14   overrate on the work.

15       Q.    Okay.  So the 1,200 included an average of, it

16   looks, maybe, in this case, $200 of overtime a week, a

17   little more?

18       A.    Correct.

19       Q.    All right.  So you said $1,200 a week is your

20   back pay and you -- you are claiming $1,200 a week for

21   the 17 weeks you were unemployed following your

22   termination, which is a total of $20,400.  Does that

23   sound right?

24       A.    I don't have the actual paperwork in front of

25   me --

1    Q.   Okay.

2    A.   -- what I did.

3    Q.   You -- you said -- you testified that you

4  started working for your new job in January 2024.  Is

5  that accurate?

6    A.   That's correct.

7    Q.   Do you remember when in January of 2024 you

8  started working at your new job?

9    A.   Let's see.  I don't recall.

10    Q.   All right.  So you're -- you're seeking the

11  $1,200 per week for the 17 that you were unemployed and

12  then your -- your Rule 26 disclosures say that you're

13  seeking $275 per week differential in pay for the

14  remaining time that you were employed.  I thought you

15  testified earlier today that your -- your current

16  salary, you're making more money now than you were at GT

17  Technologies; is that accurate?

18    A.   That is correct.

19    Q.   Okay.  So when you got your new job at GSS

20  Services, you were making more than 24.58?

21        MR. KATAEV:  Objection; assumes -- objection;

22        assumes facts not in evidence.

23        You can answer.

24    A.   What -- what -- could you repeat that?

25    Q.   (BY MS. JOZSI)  Sure.  Earlier today you

1  testified that you're making $30 an hour in your role

2  job; is that correct?

3       A.    That is correct.

4       Q.    Okay.  Were you making $30 an hour when you

5  first got the job at GSS Services?

6       A.    No.

7       Q.    Do you recall what you were making when you

8  first got the job at GSS Services?

9       A.    That's a good question.  I -- I don't remember

10 an actual figure of what I was actually making when I

11 first hired in.

12      Q.    Do you remember, was it the same or more than

13 what you were making at GT Technologies?

14      A.    It was more than I was making at GT

15 Technologies.

16      Q.    Okay.

17      A.    Yeah.

18      Q.    You're also seeking front pay representing 13

19 weeks at $1,200 per week.  Do you recall how you arrived

20 at that figure?

21      A.    You said what type of pay it was?

22      Q.    You're claiming front pay for 13 weeks.

23      A.    I remember that it's -- let's see.  Those 13

24 weeks was -- was referring to -- oh, boy, that -- that

25 was, if I'm not mistaken, due to unemployment.

Page 205

1      Q.    Okay.  The next thing in your plaintiff's
2   disclosures is emotional distress damages which is at
3   $100,000.  So can you describe to me your emotional
4   distress damages?
5             MR. KATAEV:  Quennel, I'm sorry.  You -- your
6        hand is covering your face.  Can you just put your
7        hand down?
8             THE DEPONENT:  (Complies.)
9      A.    Yeah, I was kind of -- the emotional part, my
10  head started hurting a little bit, but I have those
11  slight migraines that comes in and comes and goes.  So I
12  don't have the medication I can take for them.  So I
13  kind of -- kind of have to rub the forehead, kind of
14  ease it down a little bit, something like that.  It's
15  just something I'll have to -- I'll have to deal with
16  for the rest of my life.
17     Q.    (BY MS. JOZSI)  I'm sorry to ask this, but
18  you're claiming emotional distress damages.  So would
19  you just -- can you describe to me what -- your
20  emotional distress, what -- what that man -- like, how
21  that looks, what that manifests as?
22     A.    Emotional distress, going through things,
23  like, pretty much what I'm going through now, the same
24  as, like, pain and suffering.  And it's just a means
25  of -- of going through where -- where I've seen through

1    other testimonies, other lawsuits I had went through,

2    the same situation and where the same -- where they've

3    been rewarded for the same thing.

4         Q.   You're suggesting that the prior issues that

5    you had kind of compound or -- or, you know, stack on

6    top of the emotional distress that you are claiming

7    related to this suit?

8              MR. KATAEV:  Objection.

9              You can answer.

10        A.   Okay.  Can you rephrase that?

11        Q.  (BY MS. JOZSI)  Sure.  It sounded to me -- and

12   I don't want to put words in your mouth.  I want to just

13   make sure I understood when you're saying things that

14   have happened before.  Are you suggesting that prior

15   things that have happened to you have added on to the

16   emotional distress that you feel as a result of the

17   allegations in this case?

18             MR. KATAEV:  Objection.

19             You can answer.

20        A.   No, not -- not prior.  That's only through --

21   only through what -- what is present now.

22        Q.  (BY MS. JOZSI)  Have you ever sought treatment

23   for any of these emotional distress damages, medical

24   treatment?

25        A.   The -- only on -- to -- prior to when all the

1    litigation had started as far as the statements that was

2    brought forth to me from James White.  And due to that,

3    I had back issues, when I bounced my back at the same

4    time.  I seek the same doctor for -- he noticed that I

5    was emotionally stressed and I asked him, Dr. Peters,

6    about it.

7              So I was telling him about the headaches and

8    stuff that I have behind it.  So the generic Tylenol

9    medication is what I've been using that was provided at

10   the time to -- to take out the migraines that I would

11   have from that.

12        Q.   This doctor that you're referring to, is this

13   your physical therapy doctor, related to your back

14   injury?

15        A.   No.  This is my primary doctor.

16        Q.   Your primary care physician.  All right.  So

17   you talked to your primary care physician about your

18   emotional distress.  Do you have any records to support

19   that, any medical records?

20        A.   The medical records, yes, where I went in and

21   talked with him on the matter and he was able to listen

22   to me on -- he's another individual that knew about my

23   situation at the job when I discussed and talked to him

24   what I was going through and, you know, so advised --

25   referred me that I could go to a -- a -- a mental place

1  where -- that was on Martin Luther King Drive that would

2  help with my emotional distress and things of that

3  nature.

4      Q.   Okay.  So your primary care physician gave you

5  a referral for mental health treatment.  Have you --

6  have you attended any sessions or sought any mental

7  health treatment?

8      A.   I drove over there and went there for the

9  first time, but at the time their office was closed and

10  so I was going to reenter to go back.  At the time, I

11  didn't reenter due to the fact I was scheduled -- going

12  through physical therapy.  I didn't get the time to

13  allow to -- to go back over.

14      Q.   And when was that, approximately?

15      A.   I couldn't remember the -- the specific time

16  and date.

17      Q.   Was that shortly after your separation, like

18  within a year of your separation or was it longer?

19      A.   It was shortly after the separation.

20      Q.   Do you have any records -- medical records for

21  that -- that discussion with your primary care physician

22  that you have not sent over?

23      A.   No, I don't have any records of that.

24      Q.   Okay.  So just to confirm, you had a referral

25  for a mental health treatment facility, but you've not

Page 209

1   actually received any medical treatment related to your
2   mental health; is that correct?
3        A.    Okay.  Could you repeat that one more time?
4        Q.    Yes.  You talked about how you got a referral
5   for mental health treatment, but I just want to make
6   sure, you have not actually had any sort of consultation
7   or appointments or any -- any -- received any actual
8   mental health counseling or treatment; is that correct?
9        A.    That's correct.
10       Q.    Have you ever had any diagnosis from any
11  medical professional of any mental health disorders or
12  emotional disorders in the past?
13       A.    No, other than just talked to Dr. --
14  Dr. Peters during the time of working at GT
15  Technologies.
16       Q.    Did Dr. Peters tell you that he thought any
17  physical manifestations or anything like that was
18  attributed to the claims you're bringing in this
19  lawsuit?
20       A.    You kind of went out -- in and out on me
21  there.
22       Q.    Did Dr. Peters ever tell you or diagnose you
23  with anything related -- any -- any physical or mental
24  issues that are attributed to your time with GT
25  Technologies?

1     A.   He discussed some things about what I could do

2  that would be helpful.

3     Q.   Like what?

4     A.   You know, as far as try to relax and do things

5  different.  If you ask questions of anything, make sure

6  that you could -- that -- that you, like -- that you put

7  mind to or something, you know, that would take your

8  mind off it, things of that nature and just try

9  something, you know, different that would -- that you

10  could do that would take your mind off and see if that

11  would help, you know.

12     Q.   Did you try any of those things?

13     A.   Yeah.  I have tried at times when I get under

14  emotional stress from work.  When things happen at the

15  job and then I would have to go home, I would find

16  myself -- I will leave the job and I will go over to

17  the -- to the park and I will go and sit with the ducks

18  and feed the ducks, and that will help just being around

19  the ducks at the pond.  That would be over in Lake Ella,

20  in Tallahassee.

21     Q.   Okay.  Anything else about your emotional

22  distress that we haven't discussed?

23     A.   Other than I -- I have -- sort of isolate

24  myself from people that I used to associate with or talk

25  to or family members and I would pretty much stay alone

Page 211

1    as of -- same as of now.  I try to avoid letting people

2    see me in that stage.  So I work at -- so that way I

3    could avoid answering questions that there may be

4    concern about.

5        Q.   Okay.  You are also claiming damages related

6    to COBRA.  You say that you were not provided with a

7    COBRA notice.  You said that's an additional overall

8    $70,000 in damages; is that correct?

9        A.   That is correct.

10           (Exhibit No. 46 was marked for

11   identification.)

12       Q.   (BY MS. JOZSI)  I'm going to share my screen

13   and show you Exhibit 46, and this is Defendant's 77 --

14   I'm sorry, 777 to 790.  Have you seen this document

15   before?

16       A.   No, I've never seen that document.

17       Q.   And up here at the top, 1700 North Monroe

18   Street, Suite 11, PMB 226, Tallahassee, Florida, is that

19   the address that you gave us at the beginning of the day

20   today as your mailing address?

21       A.   For the hiring date?

22       Q.   Pardon?

23       A.   You said the address for the hiring date?

24       Q.   No.  Is this address you provided us earlier

25   as your mailing address today, in the deposition?

Page 212

1      A.    That is correct.

2      Q.    But you say you never got this notification

3  about COBRA?  It's several pages long.  You haven't seen

4  that document?

5      A.    To my knowledge, I haven't seen that document.

6      Q.    This address for the North Monroe Street, that

7  was your address at the time of your separation, your

8  mailing address, correct?

9      A.    That is correct.

10      Q.    Okay.  And I think earlier today we were

11  talking about your current job.  You said you do receive

12  insurance, medical insurance through your current

13  employer.  Is that accurate?

14      A.    That's correct.

15      Q.    And then you're also claiming, you're seeking

16  $324.70, representing two years' worth of 401(k)

17  3 percent matching.  Were you entitled or -- strike

18  that.

19          Were you contributing to a 401(k) at the time

20  of your separation?

21      A.    At the time -- after separation, I had no

22  money to contribute.

23      Q.    Before you were separated, though -- you were

24  still employed -- were you contributing to your 401(k)

25  at GT Technologies?

Page 213

1      A.    There still should have been taken out, but to
2   my knowledge if it was, that's what was done during time
3   when I had the 401(k).
4      Q.    So is it your testimony that the company would
5   contribute to the 401(k) even if you're not contributing
6   to the 401(k)?
7      A.    As far as that works, as long as you -- they
8   match what you -- you put in.
9      Q.    So they match your contribution?
10     A.    Correct, 3 percent of -- according to the
11  documentation --
12     Q.    But if you put in zero --
13     A.    -- three percent --
14     Q.    I'm sorry, continue.
15           So if you were not -- if you were contributing
16  $0 to the 401k, they would match it with $0, right?
17           MR. KATAEV:  Objection; argumentative.  At the
18        appropriate time, I would like to check out the
19        testimonial time.  I think we're getting close.
20           MS. JOZSI:  I think I have until 8 o'clock.
21           MR. KATAEV:  I don't think so.
22           MS. JOZSI:  Okay.  We can -- let's go off the
23        record and we can get an update on that.
24           THE VIDEOGRAPHER:  We are going off the
25        record.  The time is 7:35.

Page 214

1           (Recess from 7:35 p.m. to 7:37 p.m.)

2           THE VIDEOGRAPHER:  We are back on the record.

3     The time is 7:37.

4           (Exhibit No. 64 was marked for

5     identification.)

6           Q.  (BY MS. JOZSI)  Let me share Exhibit 64.  This

7     is Plaintiff's 1021 to 1022.  This is one of the

8     documents you produced to us, Mr. Jackson, the 401(k)

9     savings plan.  It's two pages.  Do you see this?

10          A.  Yes.

11          Q.  I'm going to rotate the screen.  All right.

12    So this first page that you produced is for the

13    statement period of 4/1/2023 to 6/30/2023.  So while you

14    were still employed, right?

15          A.  Yes.

16          Q.  Okay.  And if you see contributions and

17    deposits, it says $0, correct?

18          A.  Correct.

19          Q.  All right.  So as of at least April 2023, you

20    were not contributing any money into your 401k; is that

21    right?

22          A.  Their money was supposed to be contributing to

23    it.

24          Q.  Who's supposed to be contributing into it?

25          A.  Well, from the front office, once you put in,

1     they should have it signed and put in.  There's a way

2     that's handled as far as how they handle all of it

3     that's contributing, that comes out of your -- out of

4     your paycheck.

5          Q.   So there -- there's a contribution that's

6     supposed to come out of your paycheck?

7          A.   Right, that -- that goes into it.  There

8     should be a statement that shows what will come out on

9     the -- on the paycheck as far as...

10         Q.   Would you -- during your employment did you

11    have to elect to make this contribution?

12         A.   Elect?

13         Q.   Did you have to tell GT, I want you to take X

14    dollars or X percent, or whatever it is, out of my

15    paycheck to go into my 401(k)?  Is that something you

16    had to do?

17         A.   That's correct.

18         Q.   Okay.  And so if you didn't elect to -- for

19    them to take money, to deduct the money from your

20    paycheck to go into your 401(k), there would be no

21    contribution, right?

22         A.   That is correct.

23         Q.   So in here where it's showing $0 of

24    contributions for the period of 4/1/2023 to 6/30/2023,

25    there's -- at the time -- and then, let's -- actually,

1   let's go to the second page of the exhibit.  7/1/2023 to

2   9/30/2023, it's still covering your employment as your

3   employment ended in September of 2023, it's still $0 in

4   contributions; is that correct?

5         A.   Yes, that's showing correct.

6         Q.   Okay.  And so you were no longer contributing

7   at the time of your separation and yet you're contri --

8   you're seeking 401(k) matching?

9              MR. KATAEV:  Objection; argumentative.

10             You can answer.

11        Q.  (BY MS. JOZSI)  Let me rephrase that question.

12   That was a bad question.  Do you know when you stopped

13   contributing to your 401(k)?

14        A.   I never did stop.  So that's why I'm trying to

15   figure out how did it stop at the time when I was

16   contributing.  Because once I started it, it was

17   contributing in there and -- and then somehow it -- it

18   got changed and I didn't catch that during the

19   periodical [sic] time when I was actually an employee

20   working.

21             (Exhibit No. 45 was marked for

22   identification.)

23        Q.  (BY MS. JOZSI)  I'm showing you Exhibit 45.

24   This is a composite of all your paychecks from your

25   employment.  And I'm going to turn your attention to

Page 217

1  Defendant's 685.  So Defendant's 685, this is for a pay

2  date of 8/23/2019.  The period start was 8/12/2019.

3  Period end was 8/18/2019.  And if you look under, it

4  shows 401(k) deduction.  Do you see that?  I've

5  highlighted it here.

6       A.   Uh-huh.

7       Q.   Okay.  So then that was a pay date of

8  8/23/2019.  If we go to your next paycheck -- they go in

9  reverse order -- here, that's Defendant's 684.  This is

10  for a pay date of 8/30/2019.  It says 401(k) deduction

11  is zero.  Do you see that?

12       A.   Yes.

13       Q.   Okay.  And I will represent to you that for

14  every subsequent paycheck after this paycheck from

15  8/30/2019, the 401(k) deduction was zero.  If we go to

16  your final paycheck -- I don't even think it shows up on

17  the deductions because it's a brand-new fiscal year.

18  Yeah, it doesn't show up as a deduction because you

19  stopped contributing in 2019.  Were you aware that you

20  stopped contributing in 2019?

21       A.   No, ma'am.

22       Q.   All right.  All right.  And then you said

23  today that you're also seeking -- so we've covered all

24  the things that were in your Rule 26 disclosures, but

25  today you said you are seeking an additional $100,000.

Page 218

1   What does that $100,000 represent?

2        A.   It's written in a statement that I sent to

3   Emanuel on that.  I don't have that statement in front

4   of me.  I don't know if he's -- he presents that.

5        Q.   He did not present that.

6             So what does that statement say?  I know you

7   say you don't have it in front of you, but can you tell

8   me generally what it says?

9        A.   I can't remember in -- in specific words to

10  where -- what it was in reference to, but it was -- it

11  was a statement onto it allegedly went for.

12       Q.   There's a different calculation than what you

13  put in your Rule 26 disclosures?

14       A.   That is correct.

15       Q.   So you're not sure which -- let's call them

16  buckets -- which bucket that $100,000 is attributed to?

17       A.   Correct.

18       Q.   All right.  Are you seeking any attorney's

19  fees in this lawsuit?

20       A.   Yes.

21       Q.   Do you have a signed agreement with your

22  attorney?

23       A.   I can't recall at the moment.

24       Q.   Are you currently paying your attorneys any

25  fees associated with this lawsuit?

1        A.    Any fees at the moment?

2        Q.    Yes, sir.

3        A.    Not to my knowledge.

4        Q.    So are you on a contingency fee arrangement

5    whereby you don't pay your attorneys unless they --

6    unless you win or receive money?

7              MR. KATAEV:  Objection to form.

8        A.    Yes.

9        Q.    (BY MS. JOZSI)  Okay.  All right.  With that

10   have we -- I know it's been a very long day.  Have we

11   discussed all the facts that you believe support your

12   claim?

13       A.    Yes.

14       Q.    There's that -- that statement that you just

15   referenced with respect to your damages.  I don't

16   believe we've been provided that, but other than that,

17   are there any documents that you have, that you have not

18   provided to your attorney or that your attorney has not

19   provided to us that you're aware of that are relevant to

20   your claim?

21       A.    You kind of went out on that last one.

22       Q.    So I understand there's a -- the statement

23   that you have prepared about damages, which I don't

24   believe we've received.  So we can -- I'll address that

25   with your attorney after the deposition, but is there

Page 220

1    any other document that you possess that you have not

2    turned over to your attorneys that you believe is

3    relevant to your claim?

4            MS. JOZSI:  Is he frozen for everybody else or

5        is it just me?

6            THE VIDEOGRAPHER:  He's frozen.

7            (Discussion off the record.)

8            THE VIDEOGRAPHER:  We're going off the record.

9        The time is 7:47.

10           (Recess from 7:47 p.m to 7:50 p.m.)

11           THE VIDEOGRAPHER:  We are back on the record.

12       The time is 7:50.

13       Q.  (BY MS. JOZSI)  Mr. Jackson, have we talked

14   about -- is there any other evidence or anything else

15   that you think is important that we haven't -- about

16   your claims that we haven't talked about today?

17       A.   I pretty much think we -- we -- we went over

18   all the material that --

19       Q.   Okay.

20       A.   -- that's for this claim.

21       Q.   All right.  Have you understood all my

22   questions today?

23       A.   Yes.

24       Q.   And if there's any questions you didn't

25   understand, did we clarify them before you answered?

1       A.    No.

2       Q.    All right.  I just want to make sure.  If

3  there were questions that you didn't understand, we

4  clarified them before you answered the question,

5  correct?

6            MR. KATAEV:  Objection; asked and answered.

7            MS. JOZSI:  Well, he said no.

8       Q.  (BY MS. JOZSI)  So that makes me wonder if

9  there are any questions that you answered that you

10 didn't understand?

11      A.    Okay.  Yeah, when I answered, that means that

12 you had asked if -- you said that is there any questions

13 that I didn't understand and I -- and I said no.

14      Q.  (BY MS. JOZSI)  Okay.

15      A.    That means I did understand.

16      Q.    Okay.  Anything that we need to correct or

17 amend or expand upon before we close the record?

18      A.    You kind of went out a little bit.  Could

19 you --

20      Q.    Is there anything that -- that you need to

21 correct or amend before we close the record today?

22      A.    Other than I think the only last part was as

23 far as the number figures I had mentioned.  You said

24 you'll -- you would -- you'll look into that part.

25      Q.    Okay.

Page 222

1          A.   Do you -- do you need me to provide that --
2     that statement or -- or my attorney provide that for
3     you?
4          Q.   If you provided it to your attorney, then I
5     can get it from him, but I will let you-all separately
6     connect just to make sure that -- that -- that you-all
7     have -- that he has what it is that you're talking
8     about.  But you can do that later, you can do that off
9     the record.
10               MS. JOZSI:  All right.  So for the record,
11          we -- I introduced the final exhibits, Exhibits 1
12          through 9, 13 through 18, 21, 29 through 32, 36, 45
13          to 46, 56, 58, 59, 64, 65, 66, and then 69 through
14          72.
15               Madam Court Reporter, I will send those to you
16          probably tomorrow at this point.
17               I have nothing further at this time.  We
18          reserve the right to reopen this deposition subject
19          to any additional discovery.
20               Mr. Jackson, you have the right to read your
21          deposition transcript before it's certified in
22          order to correct any errors that the court reporter
23          may have made.  You can also waive that right, if
24          you choose to do so.  You just need to state on the
25          record today whether you choose to read or waive.

1         MR. KATAEV:  Under Rule 30(e)(2), on my

2    client's behalf, I'm requesting a copy of the

3    transcript to do so.

4         MS. JOZSI:  Okay.  All right.  He'll read.

5    All right.

6         MR. KATAEV:  You're going to provide the

7    exhibits to the court reporter or will you provide

8    the transcript with the exhibits to me or will you

9    send it to me with the court reporter?

10        MS. JOZSI:  I will send you the exhibits when

11   I send them to the court reporter.  Again, it will

12   probably be tomorrow because I need my assistant to

13   put it into a share file and she's long gone and

14   I'll send you a copy of the exhibits at the same

15   time.

16        MR. KATAEV:  Okay.  I don't have any

17   questions.  Do we have anything in closing?

18        MS. JOZSI:  All right.  And we're going to go

19   ahead and order the transcript.

20        THE VIDEOGRAPHER:  We are off the record --

21        MR. KATAEV:  I'm sorry?

22        THE COURT REPORTER:  Did you want a copy,

23   Mr. Kataev?

24        MS. JOZSI:  Yes, he does.

25        MR. KATAEV:  Yes.

Page 224

1          THE VIDEOGRAPHER:  We are off the record at

2     7:55 p.m., and this concludes today's testimony

3     given by Quennel Jackson.  The total number of

4     media used was six and will be retained by

5     Veritext.

6               (Signature was reserved.)

7               (The deposition concluded at 7:55 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 225

1                    CERTIFICATE OF OATH
2    STATE OF FLORIDA:
3    COUNTY OF HILLSBOROUGH:
4
5              I, Tonya H. Magee, Registered Professional
6    Reporter, Notary Public, State of Florida, certify that
7    QUENNEL JACKSON personally appeared before me on
8    January 13, 2026, and was duly sworn.
9
10             Witness my hand and official seal this 30th
11   day of January 2026.
12
13
14
15             *Tonya H. Magee*
16                  Tonya H. Magee,
                    Registered Professional Reporter
17                  Notary Public, State of Florida
                    My Commission No. HH 462606
18                  Expires:  March 8, 2028
19
20
21   Type of Identification Produced:  Georgia Driver's
     License
22
23
24
25

Page 226

1                   CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF HILLSBOROUGH:

4

5              I, Tonya H. Magee, Registered Professional

6    Reporter, Court Reporter, and Notary Public, certify

7    that I was authorized to and did stenographically report

8    the deposition of QUENNEL JACKSON; that a review of the

9    transcript was requested; and that the foregoing

10   transcript, pages 5 through 224, is a true and accurate

11   record of my stenographic notes.

12             I FURTHER CERTIFY that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18        DATED this 30th day of January 2026.

19

20

21

22

23        *Tonya H. Magee*

24             Tonya H. Magee, RPR

25

Veritext Legal Solutions

800-726-7007                                    305-376-8800