1

```
 1                        STATE OF FLORIDA
                DIVISION OF ADMINISTRATIVE HEARINGS
 2
      QUENNEL JACKSON,
 3
          Petitioner,
 4
      vs.                              Case No. 24-2043
 5
      GT TECHNOLOGIES,
 6
          Respondent.
 7      _____/

 8

 9

10


11          HEARING BEFORE THE HONORABLE E. GARY EARLY
                          VOLUME I
12                     Pages 1 to 112

13

14         DATE TAKEN:    Tuesday, August 6, 2024

15         COMMENCED:     9:01 a.m.

16         CONCLUDED:     12:36 p.m.

17         LOCATION:      Division of Administrative Hearings
                          1230 Apalachee Parkway, Room 4
18                        Tallahassee, Florida 32399

19

20

21

22

23

24

25
```

2

1                        **A P P E A R A N C E S**

2      On Behalf of Petitioner:

3      QUENNEL JACKSON, PRO SE PETITIONER

4      On Behalf of Respondent:

5      ELIZABETH TURNER JOZSI, ESQUIRE
       Ogletree, Deakins, Nash, Smoak & Stewart
6      100 North Tampa Street, Suite 3600
       Tampa, Florida 33602-5867
7      813-289-6530
       Elizabeth.jozsi@ogletree.com

8

9      Also Present:  Erin Wade, GT Technologies Corporate
                      Representative
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1 **I N D E X**
**VOLUME I**

2

Witnesses for Petitioner
3    Quennel Jackson.....................................12
      Direct & Cross-examination by Ms. Jozsi..........50
4  Certificate of Reporter............................112

5

6 **E X H I B I T S**

Respondent's No.                                    Admitted
7  13 Performance Verbal Warning 8/23/23                33
   18 WO 12442                                          33
8  20 WO 12449                                          33
   23 WO 12384                                          33
9  24 WO 12435                                          33
   25 WO 12440                                          33
10 26 WO 12459                                          33
   28 Performance Notice – Termination 9/8/23           33
11 29 Photographs, Pages 197 and 199                    37
   29 Photographs, Pages 196 and 198                    47
12  9 GT Code of Business Conduct & Ethics Updated
      5/1/19                                            52
13  8 Respondent's signed acknowledgment of GT's Code
      of Business Conduct and Ethics                    53
14 12 GT Associate Conduct Policy                       57
   15 Selection of CMMS Security Log 8/19/23            81
15 40 GT's Investigation File Jackson's Performance
      Warning Notice Page 231                           85
16 21 WO 12455                                         107
   27 WO 12497                                         107

17

18

19

20

21

22

23

24

25

4

1                      **P R O C E E D I N G S**
                            **VOLUME I**
2

3           THE COURT:  This hearing will now be in

4      order.  Today is Tuesday, August 6, 2024.

5      Pursuant to notice, we are here in Tallahassee,

6      Florida for the final hearing before the Division

7      of Administrative Hearings in the case of Quennel

8      Jackson versus GT Technologies, Case No. 24-2043.

9      I'm Gary Early.  I'm the Administrative Law Judge

10     presiding.

11          Now, the purpose of this hearing is to

12     determine whether the Petitioner, Mr. Jackson, was

13     the subject of an unlawful employment practice due

14     to his race or retaliation for his engaging in a

15     protected activity in violation of Section 760.10

16     Florida Statute, which is also known as the

17     Florida Civil Rights Act or the FCHR.  I'll

18     understand what you're talking about if you refer

19     to them as any of those.

20          As to the claim of discrimination,

21     Mr. Jackson, the burden will be on you to show

22     that you are a member of a protected class, and

23     since you're African American you are, you were

24     subject to an adverse employment action, you were

25     terminated from your employment, so that's already

5

1    I think pretty well-established, that GT

2    Technologies treated similarly situated employees

3    outside of your protected class more favorably

4    than you, and that you were qualified to do the

5    job and perform in your job at a level that met

6    their expectations.  So if Mr. Jackson is able to

7    establish those, the burden will then shift to GT

8    Technologies to show that it had a legitimate

9    nondiscriminatory reason for the challenged

10   employment decision.

11        As to the claim of retaliation the burden

12   will again be on you, Mr. Jackson, to establish

13   that you engaged in some statutorily protected

14   expression.  Which is generally that you proposed

15   some unlawful employment practice, that you

16   suffered an unlawful employment action and that

17   there was a causal relationship between the two.

18        So, Mr. Jackson, you're appearing pro se.

19   Since you have the burden of proof you're going to

20   go first.  I'm going to place you under oath and

21   then I'm going to have you testify as a narrative.

22   I'm not going to make you ask yourself a question

23   and then answer the question.  I want you to start

24   at the beginning.  I want you to tell me

25   everything that you think is important for me to

6

1    know.  I know you filed some exhibits.  If you

2    want to explain those exhibits, we'll place them

3    into evidence, you'll tell me what they show and

4    how they relate to your case.

5        And like I said, just start at the beginning

6    and go to the end.  I want you to take all the

7    time you need and I want to make sure that you

8    feel like you've given me everything that I need

9    to have in order to make a good decision.

10       I haven't even asked you all to introduce

11   yourselves.  Let me do that.  State your name for

12   the record.

13       MR. JACKSON:  My name is Quennel Jackson.

14       MS. JOZSI:  Your Honor, Elizabeth Jozsi on

15   behalf of Respondent GT Technologies.  And at the

16   table with me I have Erin Wade.  She's the Human

17   Resources Manager at GT Technologies.  She's

18   serving as the corporate representative.

19       THE COURT:  I normally do that right off the

20   bat.  I just got caught up in the flow of things.

21       So, Mr. Jackson, after you're done testifying

22   Ms. Jozsi will have an opportunity to

23   cross-examine you and ask you questions.  When

24   it's GT Technologies' turn, any witnesses that are

25   placed on the stand by Ms. Jozsi on behalf of GT

7

1    Technologies you'll have an opportunity to

2    cross-examine them.  Any exhibits that they've

3    sponsored you'll have an opportunity to ask

4    questions about those exhibits.  At the end of the

5    process I want to make sure that I have everything

6    that I need to be able to make an informed

7    decision.

8        At the conclusion the parties will have an

9    opportunity to submit written proposed orders.

10   We'll talk about that when we get to the

11   conclusion.

12       Now, we have a court reporter in attendance.

13   It's important that she be able to take down

14   everything we say word for word verbatim, so

15   please speak clearly, speak up.  Some people tend

16   to get a little quiet when they get in a

17   courtroom, but make sure you project enough so

18   that she can hear you.  Don't talk over each

19   other.  So as we start the questioning process

20   make sure that the person asking the question has

21   finished the question.  Make sure the person

22   answering the question has finished the answer,

23   vice versa, so we're not speaking over each other

24   and she can take everything down.

25       Is there anything that we need to take up

8

```
 1        before we start taking evidence?  I don't see any

 2        motions.

 3             MR. JACKSON:  We all got the same exhibits,

 4        right?

 5             MS. JOZSI:  I believe so.  You filed I think

 6        three exhibits.  Is that correct?

 7             MR. JACKSON:  The deposition.

 8             MS. JOZSI:  The deposition, yes.  I've got

 9        all those exhibits here.

10             MR. JACKSON:  All right.  And you have that

11        one image?

12             MS. JOZSI:  Yes, sir, I have six images you

13        sent.

14             THE COURT:  All right.  Ms. Jozsi.

15             MS. JOZSI:  Your Honor, we have four

16        witnesses on behalf of GT Technologies on our

17        witness list.  Mr. Jackson provided some witness

18        names on the 1st, the day that our prehearing

19        statement was due.  We take the position that he

20        waived the opportunity to present any witnesses

21        because he did not timely disclose those to GT.  I

22        saw a gentleman came into the courtroom.  I'm not

23        sure if that's one of the witnesses that

24        Mr. Jackson had listed, but I do want to invoke

25        the rule of sequestration, Your Honor, if that's
```

1     acceptable to you.

2          THE COURT:  That's your call.  It's not

3     whether it's acceptable to me.

4          So, Mr. Jackson, what GT Technologies has

5     asked is that other than the corporate

6     representative, Ms. Wade, all of the witnesses are

7     going to have to sit outside so that they don't

8     hear other people testifying.  Sometimes

9     particularly with fact witnesses if you hear the

10    other person testifying, it might kind of disrupt

11    your flow of thought or kind of change some of the

12    testimony.  So that way everybody is dealing with

13    a clean slate.

14          Sir, are you here for Mr. Jackson?

15          UNIDENTIFIED SPEAKER:  Yes, sir.

16          MR. JACKSON:  He's a friend of mine.

17          THE COURT:  Okay.  Is he going to be

18    testifying?

19          MR. JACKSON:  No, he's just here.

20          THE COURT:  Well, if you're just here- yes,

21    ma'am.

22          MS. JOZSI:  Let me ask, Mr. Jackson, are you

23    presenting any witnesses besides yourself?

24          MR. JACKSON:  No.  My witnesses due to their

25    circumstances, health issues and they had a death

10

1    in the family they was unable to attend.  But then
2    he said he was willing to take phone calls if that
3    was necessary at that point if that does come up.
4    But he was unable to be present at the court
5    hearing.

6        THE COURT:  Well, we're not really set up for
7    a telephonic hearing here and if they haven't been
8    subpoenaed and they're not here I don't think
9    there's much I can do with that.  So we'll proceed
10   with who we have here in-person.

11       Sir, you're welcome to stay and listen since
12   you're not going to be testifying, but if I could
13   have the other witnesses sit outside.  I would ask
14   that you not discuss this proceeding either before
15   or after your testimony.  There's a wide range of
16   other things you can discuss.  The Olympics are
17   on.  It's baseball season.  We had a big storm.
18   Any of that kind of stuff feel free, but please
19   don't discuss the contents of this case.

20       All right.  So I have read the petition.  I
21   do want to note one thing.  Mr. Jackson, you've
22   indicated in your petition for hearing that you're
23   looking for damages, backpay is something I can
24   award, reinstatement to your position is something
25   I can award.  But I cannot award pain and

1    suffering, embarrassment, those types of things.

2    You would have to go to circuit court.  There is a

3    separate section of the Florida Civil Rights

4    Action that deals with what a circuit court can

5    order and it includes things like damages

6    including damages for mental anguish, loss of

7    dignity, any other intangible damages and punitive

8    damages.  They've limited me to actual damages,

9    which generally is backpay and job, so that's what

10   I'll be focussing on.  I have read the petition.

11   I've read the unilateral prehearing statement,

12   Ms. Jozsi, that you filed on the 1st.  I'm pretty

13   familiar with kind of what's going on in this case

14   and the circumstances, but if you'd like to make a

15   brief opening statement.

16       I will tell you, Mr. Jackson, I've had pro se

17   petitioners kind of make an opening statement and

18   then I place them under oath and they kind of

19   forget to say again what they said in their

20   opening.  I'd prefer frankly to just put you under

21   oath and have you tell me what you need me to

22   know.  I think it's probably more efficient that

23   way and that way you haven't forgotten to repeat

24   something.  So if you're okay with that, I'll just

25   go that way.

1           Ms. Jozsi, I've read your unilateral.  I

2      don't know that I really need an opening statement

3      if you're okay with that.

4           MS. JOZSI:  That's fine, Your Honor.

5           THE COURT:  All right.  Well, then, if there

6      is nothing else preliminary, Mr. Jackson, if I can

7      have you raise your- you're more than welcome to

8      come sit up here, but I can hear you just fine

9      from there.  So if I could have you raise your

10     right hand.

11          MR. JACKSON:  Yes, sir.

12          THE COURT:  Do you solemnly swear or affirm

13     that the testimony you're to give today is the

14     truth, the whole truth and nothing but the truth?

15          MR. JACKSON:  Yes, sir.

16  THEREUPON,

17                       QUENNEL JACKSON,

18  having been first duly sworn by this Court, testified

19  and was examined upon his oath as follows:

20          THE COURT:  You may be seated.  You can

21     stand.  You can walk around.  There are different

22     ways people feel comfortable testifying.

23          MR. JACKSON:  I have a back injury previously

24     working there and so I still have to stand up due

25     to that.  I had to stop a couple times trying to

13

1         drive coming in.

2              THE COURT:  That's all right.  I don't think

3         these chairs are the most comfortable chairs ever

4         made.  Anytime you feel like you need to stand,

5         feel free to do so.

6              MR. JACKSON:  Okay.  Yes, sir.

7              THE COURT:  All right.  Well, start at the

8         beginning and tell me what I need to know,

9         Mr. Jackson.

10             MR. JACKSON:  Well, as I worked at GT

11        Technologies I started in 2017.  I was hired

12        December the 4th.  When I entered there it was

13        like working like a kid in a candy store.  I was

14        happy.  I liked the technology they had there.  It

15        was where I wanted to be as far as the fields that

16        I've worked in previously.  So I got to learn new

17        people that was there.  I was hired in through Dan

18        Brinker and his boss, Jamie Sweeny (phonetic).

19        Both was in the engineering department at that

20        time.  And we briefly went over what they was

21        looking for and explained and asked me about my

22        expertise and everything, my work ethics.  And I

23        asked if I could demonstrate and show them what I

24        had to bring to the table that would help their

25        company as far as improvement and which I did.

14

1    They were very impressed and I told them if I was

2    hired in I would bring more to the table.  And I

3    was just showing my appreciation for working for

4    the company.

5        So as time proceed on, I worked, learned

6    more, different things in the company.  And I was

7    able to share my knowledge as well as GT shared

8    their knowledge.  So as time persists over a

9    period of time-

10       THE COURT:  You're kind of soft spoken.  Give

11   me about five more decibels here.

12       MR. JACKSON:  All right.  So as time

13   persists, over time we had people leaving, people

14   coming in, people got hired in.  And during my

15   time of working I noticed during later on in the

16   time frame Mr. White was hired in he was brought

17   in and I helped train him, showed him what needed

18   to be done because he was new.  I was the last of

19   the oldest in the Maintenance Department that knew

20   a lot about what was there.  After the older ones

21   had retired and left, I took upon their knowledge

22   to pursue on to help GT Technologies.  After a

23   period of time I noticed, I started discovering

24   things start to change during the time I was

25   working with Mr. White and two others that was

1      hired in after that.  Patrick, I can't remember

2      Mr. Patrick's last name, Fletcher, so we worked

3      together during the time.  And as I noticed that

4      my work ethic was doing good, I would fix and do

5      repairs, bring things apart.  I would notify

6      Ms. Wade if something was wrong with the building.

7      If we had issues or our security system was down,

8      I let them know because I felt that was very

9      important to the company.  We do have our security

10     that way we don't have things that won't come in-

11          THE COURT:  I don't mean to step on your

12     testimony.  Let me ask you this because I haven't

13     really gotten a good sense of this from either of

14     the parties yet, but what does GT Technologies do?

15     What is the business of GT Technologies?

16          MR. JACKSO:  They build and manufacturer

17     parts for different companies like Chrysler, Ford,

18     Polaris.  They make different parts.

19          THE COURT:  So they're a parts fabricator?

20          MR. JACKSON:  Correct.

21          THE COURT:  All right.  Sorry.  I was just

22     curious.

23          MR. JACKSON:  So knowledge was gained over a

24     period of time.  We learned from each other.  But

25     once we got to that point what I discovered was

16

1     later on the attitude started changing from the

2     individuals due to the fact that what I've known

3     and learned once they've learned a certain amount

4     of information that it was where the different

5     employees in the company would pretty much say,

6     hey, you're doing an excellent job, he's good at

7     this and this and that.  So it was kind of up

8     under the persons, you know.  And, hey, well, I

9     can do a great job.  You know, that's great.  I

10    would do that as well.  I would highly recommend

11    somebody that's doing a great job.  I like what

12    you do.  You know, keep doing what you're doing,

13    you know.  The same way as a child presents a

14    picture to his dad or mother and sits there and

15    waits for that.  So that same entry level runs

16    within all of us.  You know, we look for that

17    buildup.  Hey, I'm doing great and not be turned

18    down at that point as far as I work and do good or

19    we find better strategies as far as helping each

20    other grow in the company.

21         So that turned in a different direction.  At

22    that point it was where the individuals were

23    starting to hide tools, take stuff of that nature

24    that I had.  They were trying to do things to

25    start aggravating me as an individual.  I was last

17

1       after Rosco Ron Gordon retired.  I was the last of

2       my nature in the department.  And during that time

3       Jason was hired in and that's when we started to

4       seeing him in the system, started learning the

5       CMMS system that he had developed into the

6       company.  He brought it to the table, something

7       new that was going to develop, help the

8       maintenance bring it up to par.  He created a tier

9       system with it, so everybody could have a learning

10      opportunity.  With that as I noticed Mr. White

11      would find ways and he would state sometimes that

12      I had trouble with learning saying little slurs

13      and stuff.  In the morning time he said, you know,

14      State of Florida found out they took out the

15      ruling that it's not mandatory that we have to

16      have a minority in the work environment.  So at

17      the present time there was Patrick Fletcher and

18      was Terry Logan and they both discussed, yeah,

19      that was put in there.  I said, really.  I said, I

20      hadn't known that because I don't live in Florida.

21      I live in Georgia.  So this was a statement that

22      was mentioned to me throughout the weeks of

23      occasionally as a friendly reminder that I seen

24      where that it was set in play for me it was going

25      to be a time for me to go.

18

1          THE COURT:  What was kind of the time frame?

2     You started in 2017.  Are we now up-

3          MR. JACKSON:  That time frame was around when

4     everything started in 2022, latter part of 2022

5     when all that started to fall into place.  So I

6     did everything in my power to try to change the

7     individuals' minds.  Do nice things, buy nice

8     things.  This is not how it should be.  We should

9     work together and work as a team.  Kind of dwindle

10    his mind out of that situation where we shouldn't

11    be like that.  You know, we're all here working in

12    an environment.  You know, it's self explanatory.

13    But that lasted for just a short-term until that

14    wore off and that no longer was the case of trying

15    to do that anymore as far as helping the

16    individuals doing nice things and that sort.  Then

17    it leaned over to where he was going back and

18    forth and Dave LaVieri mentioned stuff to him.

19    I've talked to Mr. LaVieri about Mr. White's

20    attitude and that what he could do about resolving

21    the issue.  And his response was, hey, I'll talk

22    to him when I get a chance.  But other than that

23    he said just try to avoid and keep doing what

24    you're doing, you're doing a great job, keep doing

25    what you're doing.  I said, okay.  So went about

1    doing what I'm doing.  Of course, same situation

2    kept persisting on.  I would come in the morning

3    and my chair would be gone, stuff would be moved

4    around, taken.  I would have to look for it.  I

5    was pretty much set up for failure due to the fact

6    I had no tools and stuff to work and work on the

7    jobs.  I said, hey, I don't have any tools, my box

8    has been tampered, my lock has been taken off.

9    The lock was removed from my box.  I said

10   somebody's been in here and went and took stuff

11   out of my box not knowing where it's at.  And

12   nobody could respond back as far as where my tools

13   or anything went.  So, of course, I had to replace

14   those tools and put them back due to the fact that

15   I didn't have them that day to perform the work I

16   needed to do.  I had to borrow from people.  And

17   that was kind of stressful trying to borrow

18   somebody's tools when the really need their tools

19   to perform their work.  So I asked him could they

20   replace these.  Oh, no.  You have to replace your

21   own tools.  I said, okay, that's fine, I'll see to

22   it that I'll replace my tools and I'll have them

23   at work tomorrow.

24        But as that went on working with Jason in a

25   training he did well working with the training.

20

1    Training went well.  I was constantly in there all
2    the time trying to learn, trying to understand how
3    it works, you know, because I wanted to be one of
4    the best ones in there, understand how he created
5    it and that way I can combine what I'm doing to
6    where I can make it better on my end.  My job
7    title was not only maintenance.  I did all the
8    fabrication engineering.  I build/design all the
9    machine parts that goes to those machines.  Part
10   of those machines that I designed are still there
11   working as if I never left there.  So GT is still
12   running the inventions that I had created and put
13   in place to help out the company.
14        During that time also after the training as I
15   noticed after the training that was done even
16   though the training wasn't completed before my
17   dismissal-
18        THE COURT:  So the training was like summer
19   of 2023 because I know your termination was in
20   August?
21        MR. JACKSON:  September the 5th, correct.
22        So we went through the training, but also
23   there was a lot more that needed to be added to
24   training.  We were pretty much in the middle of
25   the training because we were still learning, still

21

1   running things.  We had a lot of bugs.  I was the

2   one that was working on the system as far as

3   running all the tables and stuff for the network.

4   We had glitches in the system on the network, but

5   once we got that worked out the system started

6   working.  We had sometimes the computers would not

7   work and the computers would come back on.  A

8   computer may go down and then comes back on.  We

9   worked out those bugs as well during that time.

10  Later on of 2024 as I proceed I noticed that the

11  way how everything was being done Mr. White was

12  leaning more towards Mr. Felger as far as when we

13  need to do something here with Mr. Jackson because

14  he had a situation with his self where he didn't

15  want me in that department due to the fact from a

16  previous statement that he mentioned.  So I had

17  mentioned that to Mr. Felger about Mr. White's

18  attitude and how it's reflecting and what can we

19  do to resolve the issue.  He mentioned also like

20  Mr. LaVieri.  He would see about having a talk

21  with him.  And this was on about four different

22  occasions that we sat down in his office to talk

23  about Mr. White's behavior at that time.

24  Mr. White was pretty much one stop away before it

25  would be a smooth transition where it would be

22

 1          something where that would cause me to be moved

 2          out of the way.  I noticed that he didn't think

 3          that I would see or understand the patterns that

 4          they were creating.  One with the tier system, my

 5          expertise as far as what I learned, what I was

 6          able to do as far as designing, engineering and

 7          welding.  Mine was brought in as welding

 8          fabrication.  So with the welding fabrication we

 9          created a tier system.  So the tier system was

10          where they combined where we could add in the

11          welding fabrication.  Welding fabrication where

12          they wanted everybody to learn welding fabrication

13          to the fact that they learned what I learned so

14          that way at that time once they learned everything

15          I knew then they would never need me in that

16          department no more.  So and I seen that challenge

17          that was brought against me at that time.

18               Another thing Mr. White did was brought a new

19          gentleman that was hired in.  Michael Mercer was

20          another welder in fabrication.  He just finished

21          welding school out of TCC.  He was brought in at

22          that time and as soon as he was interviewed by

23          Mr. Felger and Mr. White, Mr. White couldn't wait

24          to come out on the floor and introduce him.  He

25          said, hey, I have a new welder, he's going to be

23

1      the best welder, he's going to out weld you.  He's
2      going to be the one that's going to replace you
3      here soon because you don't have a certification.
4      I said, Mr. White, how do you know I don't have
5      certifications?  If I didn't have certifications I
6      wouldn't have been hired in.  So he challenged my
7      work ethic due to the fact he brought this
8      gentleman towards me and showed me this
9      gentleman's certificate.  And I said, wow,
10     Mr. White, I'm in the middle of trying to fix a
11     machine and the line is down and we need to get
12     this machine back up, so what does this have to do
13     with me.  I said there again we're going back to
14     the same thing where you're constantly trying to
15     find ways to remove me from the work environment.
16     And so I shook his hand.  I was really nice.  Glad
17     to have you aboard, Mr. Mercer, you know, welcome
18     to GT Technologies.  I'm sorry you were introduced
19     the wrong way, but I'm glad to have you here.  He
20     said, well, what certifications do you have?  I've
21     got six certifications.  I said, hey, that's
22     wonderful.  He said, how many do you have.  I
23     said, well, I have 26.  And he was kind of a
24     little upset by that.  So I said we're here to
25     help and work together and not try to find ways to

24

```
 1        push somebody.  I knew where he was leaning
 2        towards, what he was trying to do, because
 3        Mr. Gordon had previously before he retired he
 4        told me, Q, I want to remind you of something.  He
 5        said, the system they have is going to set you up
 6        for failure.  I'm going to have to retire because
 7        I see where this is going.  And he said just be on
 8        the watch, know what you're doing because they're
 9        going to find a way to remove you like they
10        removed the last one.  You're the last one.  I
11        don't know how long you're going to be here, but
12        do what you can, do your work, do everything you
13        can and just watch what you're doing.  I said,
14        yes, sir.  So, Mr. Gordon, he was nice, you know,
15        informed me about it.  So after that sure enough
16        it was like he said he seen it for his employment
17        while he been there 30 something years.
18            I done all in my power to present nice
19        things.  I bought Mr. Felger a business binder.
20        Gave my thanks showing my appreciation for
21        creating the tier system.  Things that other
22        employees wouldn't do.  I did that because I said
23        you're a new gentleman in here, been here for a
24        while, created something and doing something
25        different, so my appreciation for training, giving
```

25

1      us this here.

2           So, of course, like I let everybody knew I

3      was allergic to coconut.  I cannot be around

4      coconut, have it in my system.  It causes a flare

5      up.  I have to go to the hospital and I can choke

6      to death and have a very bad allergic reaction.

7      So Mr. White knew this.  Of course, I mentioned

8      this to Mr. Felger.  Of course, my gift was

9      brought back due to the fact that they made

10     something I guess they talked amongst themselves

11     of course.  I have evidence that the treat brought

12     back to me was with coconut on it.

13          THE COURT:  What was brought back to you?

14          MR. JACKSON:  This was made from his house.

15     This is jars.  This is evidence of laced with

16     coconut and sugar.  This would have taken me out.

17     If I would have ate this here, I would not have

18     been here today.

19          THE COURT:  Okay.

20          MR. JACKSON:  So I asked him why would he

21     present something knowing that I had this

22     condition and why would they, you know, do such a

23     thing knowing.  So it was like they were trying to

24     find different ways.  If this didn't work, maybe

25     this would work, you know.  Why?  I haven't done

1    anything to harm this gentleman.  I pretty much

2    helped train this gentlemen.  Had brought him up

3    to speed as far as understanding what's in the

4    system, find certain things that's in the system,

5    understand how the machines work and stuff of that

6    nature and what I learned from previous other

7    gentlemen that worked there.  So I figured we were

8    going to create a good team, but not all this, you

9    know.  So, you know, it was very disturbing on my

10   part to see that this has happened between the two

11   and then understanding, you know, why the nature

12   why he did this.

13       It went from- let's see.  There was one more

14   incident that happened that I want to state.  Yes,

15   then it boils down to where more things was

16   constantly taken.  Then it was due to the fact

17   that it comes to where the date, which was on the

18   19th, a Saturday, which was Friday where this is

19   where we come into play with they talk amongst

20   themselves in the office and they set up where

21   they want me to work to help Mr. Johnny on a

22   second shift.  I never worked weekends.  I'm

23   always Monday through Friday.  So I didn't mind

24   helping if they were short maintenance staff at

25   times, but I do fall in and help make sure that

27

```
 1        maintenance staff didn't fall behind on anything

 2        that needed to be repaired as far as help

 3        productions stay on top.  So I worked that

 4        Saturday.  Me and Mr. Johnny worked together.  Of

 5        course, Mr. Johnny is not here today, but we

 6        worked together on these work orders and I see

 7        that when he put in our work orders for that

 8        Saturday evening, our work showed he added his

 9        work into mine, which there is a category where

10        two people can add on the same work orders.  I

11        noticed that my IP numbers was kicked out.  As I

12        entered four quarters into the system then I

13        noticed that and he seen it as well.  And he said,

14        that's odd.  I said, okay.  So what we did was we

15        were working on a robot station.  So we left the

16        Ford area.  After we fixed the machine we went

17        back to the Maintenance Department to check on

18        other laptops that run into the system that runs

19        back to his office to see why our workforce didn't

20        actually get saved into the system.  So again we

21        reentered in same way as we did before and it

22        kicked back out again.  So Mr. Johnson said what

23        we do now is we're going to have to write

24        everything down that we do because that's the

25        backup that we have.  The system something is
```

28

1    wrong.  Now, it's kind of weird that my IP is not

2    working.  I'm not able to log on my laptop and

3    submit my work or any other laptops in the system.

4    And so that's kind of strange.  I said, okay,

5    well, what I'll do is I will write what we all do,

6    and I said that following Monday I'll reenter the

7    work back into the system that Monday letting them

8    know this is what happened on the weekend and we

9    need to put this back into the system on Monday so

10   that way it shows that we did our work and it

11   doesn't show that we didn't have that.  So me

12   writing down was showing that this was what was

13   done, the work was done because it saves to the

14   database on the machine as well.

15          THE COURT:  What does IP stand for?

16          MR. JACKSON:  IP, yes, that's your

17   identification.  It states that you're the

18   individual that actually logged in that done the

19   work for that work scope.

20          THE COURT:  Okay.  That's your employer code?

21          MR. JACKSON:  Right.  It identifies

22   everybody, each individual that works in the

23   Maintenance Department whether it's on first or

24   second or third shift.

25          THE COURT:  Okay.

29

1           MR. JACKSON:  So as that proceeds on and went
2       from the next thing, the next thing happens after
3       I try to work that in and then once I enter that
4       I've done my work that following Monday.  And then
5       that following Tuesday as I talk to Mr. Felger,
6       Mr. Felger wanted me to do certain assignments and
7       then he sent reports to James.  So I reported to
8       James, did assignments, and then I come back.  But
9       then he has a tendency to forget that he told you
10      and then it gets changed.  So I said you just told
11      me to do the assignments, but why are you changing
12      that you didn't tell me to do that?  Are you all
13      working together to create a confusion?  Because
14      they figured out if I get upset I can't focus on
15      what I need to do, so that way it causes a problem
16      so he has something as far as writing a
17      disciplinary action.  You're not able to do your
18      job.  You're not able to focus.  So by them
19      teaming up like that, I said this is not right.
20      And that was another thing he had.  I didn't see
21      that that he had.  So that was presented to
22      Ms. Elizabeth as well.  But as I noticed that on
23      the day of 8/22, which says that seven hours to
24      conduct one hour of work scope and within an
25      eight-hour shift is not captured in the

1    documentation.  Now, what I notice here is the

2    work that I put in they said that I didn't have

3    any work recorded, that I had falsified these

4    documentations due to the fact they was in the

5    system.  But all of a sudden these happen to pop

6    up.  For some reason, my IP number was blocked.

7    Somehow all of a sudden it reappears.  And that's

8    kind of weird.  So Mr. Felger has control of the

9    system.  He has control of how he wants to use

10   certain things.  There's a lot of documentations

11   that I could not get from GT.  There's a lot of

12   things that was there I couldn't get back and get

13   my hands on as far as the laptop I was assigned

14   to.  It shows certain things that's on there.

15        Let's see.  With the work orders I have here

16   that he printed out and it's stating here as I

17   look here and it shows that I have I was written

18   up for 8/22 because not having these work orders.

19   But all of a sudden it's showing that I completed

20   this work and this is work is completed on 8/22.

21   So I don't know if you have a copy of this or not.

22        THE COURT:  I have a couple of documents that

23   you filed.  I don't see anything that looks like

24   that.  I don't know if they might be in the some

25   of the exhibits that were filed.

31

1          MR. JACKSON:  This is exhibits that

2    Ms. Elizabeth will have.  These are documentations

3    I wouldn't have because I couldn't go back to the

4    facility to get these documentations.

5          MS. JOZSI:  Your Honor, if it may help, we

6    have a binder of all of our exhibits.  We have a

7    copy for the Court and a copy for Mr. Jackson.

8          THE COURT:  Why don't you give him a copy?

9    Mr. Jackson, why don't you look through it and

10   pinpoint which exhibits you're looking at.  I'll

11   give you five or ten minutes to do that.

12          (A recess was taken from 9:44 a.m. to 9:57

13   a.m.)

14          THE COURT:  Mr. Jackson, ready to go?

15          MR. JACKSON:  Yes, sir.  All right.  So what

16   I have is No. 24.

17          THE COURT:  Okay.

18          MR. JACKSON:  No. 25, No. 26, No. 20, No. 23,

19   No. 18, No. 13, and No. 28.

20          THE COURT:  Let me take a look at these.  So

21   these are all documents that look like that?

22          MR. JACKSON:  They would like the other side.

23          MS. JOZSI:  Your Honor, there are two pages.

24          THE COURT:  Okay.  For example, I have number

25   24 is one side of the page, some kind of an

32

```
 1        electronic history and then Work Order No. 12435.
 2        Is that what you have for 24?
 3             MR. JACKSON:  Right.
 4             THE COURT:  All right.  So we're looking at-
 5        and you don't have any issue that these are what
 6        they say they are, that they are authentic
 7        documents that have been provided to you by GT?
 8             MR. JACKSON:  Right.
 9             THE COURT:  Why don't we go ahead and
10        introduce them into evidence and I'll sort out
11        what I can do with them as the testimony comes in.
12        But I think to make them clear that these are
13        exhibits, any objection to those exhibits being
14        received in evidence subject to stipulation as to
15        authenticity I'll accept them as business records
16        of GT Technologies.
17             MS. JOZSI:  No objection.  Just for
18        clarification, Your Honor, I think it's probably
19        easier to keep the numbers the same as opposed to
20        trying to renumber them if that's all right.
21             THE COURT:  I'm not going to renumber
22        anything.
23             MS. JOZSI:  Thank you, Your Honor.
24             THE COURT:  So these will come in.  They are
25        in the list of Respondent's exhibits, but I'm
```

33

```
1         receiving them in evidence to allow Mr. Jackson to
2         use them in his direct testimony.  So without
3         objection and subject to stipulation as to their
4         authenticity and the nature of them as a business
5         record of GT Technologies, I'm receiving Exhibits
6         24, 25, 26, 20, 23, 18, 13 and 28 into evidence.
7              (Whereupon, Respondent's Exhibits 13, 18, 20,
8         23, 24, 25, 26 and 28 were admitted into
9         evidence.)
10             THE COURT:  Mr. Jackson, those are in, so
11        what am I looking at here?
12             MR. JACKSON:  Okay.  As you see these work
13        orders and here you notice page 1-
14             THE COURT:  Tell me which one we're looking
15        at.
16             MR. JACKSON:  We're looking at the
17        performance warning notice.
18             THE COURT:  Which exhibit is that?
19             MR. JACKSON:  That would be Exhibit 14.
20             MS. JOZSI:  Exhibit 13, Your Honor, and it's
21        Bates No. 154.
22             MR. JACKSON:  So as I notice that, you know,
23        this written performance, it's showing that
24        conducting seven hours of one hour of work.  So I
25        only did one hour of work scope within eight hours
```

34

```
1      and didn't do anything within the last seven
2      hours.  And so this was written up by James Felger
3      and signed by Erin Wade.  But here if you look at
4      the work orders that's here and it's stating that
5      8/22 that I didn't do any work that day, the work
6      order itself explains itself here.  It says that I
7      completed work on 8/22 and that will show here on
8      that work order No. 24.  That would be number 24.
9      And then we have work order No. 26.  We have work
10     order No. 25.
11          THE COURT:  So 24, 25, 26.  All right.
12          MR. JACKSON:  And we have work order No. 23.
13          THE COURT:  Okay.
14          MR. JACKSON:  So I'm trying to see here with
15     the work that's being done how would this
16     performance warning add up as far as not doing any
17     work.
18          THE COURT:  Let me ask you 23, 24, 25, 26,
19     these are work orders that were performed by you
20     on that Saturday?
21          MR. JACKSON:  No, this is the actual day of
22     the written performance.  Now Saturday work
23     orders-
24          THE COURT:  Well, let's finish this.  I'm
25     easily confused.  Stick with this one.
```

35

```
1          MR. JACKSON:  All right.  So I'm looking at
2     this, so I'm trying to see, you know, this doesn't
3     correspond.  It doesn't add up as far as having a
4     disciplinary action written up for not performing
5     work, but here the evidence shows that I've done
6     the work on the day which would total up for my
7     time working that day.  So you can see that as I
8     mentioned about work performance, so with this by
9     them creating this it doesn't correspond with, you
10    know, where I went wrong as far as performing my
11    work for that day.
12         THE COURT:  23, 24, 25 and 26 show that you
13    performed work on that day and that all ties back
14    to their statement that you only did one hour of
15    work?
16         MR. JACKSON:  Correct.
17         THE COURT:  On the 22nd.
18         MR. JACKSON:  Including the bathroom where
19    the bathroom was entirely messed up real bad.
20    There were four bathrooms that were assigned that
21    I done that day.  On top of that we don't have the
22    rest of those works orders, but I have them here.
23    But the janitor work shows one on here in that
24    work order, but there were four bathrooms that was
25    done.  And in that report I explained that the way
```

36

1    how that bathroom was done we have individuals

2    there that constantly pack entire rolls of toilet

3    tissues into the toilets.  I know Ms. Elizabeth

4    has a copy of that picture of the toilet.

5        MS. JOZSI:  Exhibit 29.  29, Your Honor,

6    Bates 197 and 199.

7        THE COURT:  Okay.

8        MR. JACKSON:  It's worse than that.  I don't

9    want to present the other pictures where the

10   specimen was sitting on top.  They piled it on the

11   toilet.  So I had constantly had to pump and clean

12   the drains that got stopped up.  That's something

13   that me and Mr. Darryl Howard normally have to do

14   at the plant.  Toilets do get stopped up quite

15   frequently due to the fact that we do have

16   individuals on nightshift that would constantly

17   stop up the toilets.  At the time Strickland was

18   over that department.  We designed locks, put on

19   locks and locked up the bathrooms in the back.  We

20   did that several years back.  It stopped the

21   individuals from going to the bathrooms in the

22   back and doing that.  But they chose to do it in

23   other bathrooms throughout the facility and do the

24   same thing there.  So we thought we had eliminated

25   a problem, but it just went to a different area.

37

 1       So we took the locks off and tried to see if we

 2       could catch the individuals that were actually

 3       doing it.  But it got to the point where they

 4       start doing at least two to three bathrooms a

 5       night.  So when we would come in on the day shift,

 6       this is what I have to go after and try to stop.

 7       And it takes more time trying to clean up an

 8       entire mess other than going through your entire

 9       work scope required.

10            THE COURT:  Did you want these two

11       photographs in evidence?

12            MR. JACKSON:  Yes.

13            THE COURT:  Any objection to 197 and 199?

14            MS. JOZSI:  Individually, no, Your Honor.

15       They were presented as a composite originally.

16            THE COURT:  All right.  So I will receive

17       Respondent's Exhibit 29 Pages 197 and 199 into

18       evidence.

19            (Whereupon, Respondent's Exhibit 29 Pages 197

20       and 199 were admitted into evidence.)

21            THE COURT:  Okay.

22            MR. JACKSON:  Okay.  Do you have this?  You

23       should have a copy of that one.

24            MS. JOZSI:  No, this was never provided

25       before.

38

1          MR. JACKSON:  Okay.  That should have been

2      handed to you also by them because that shows the

3      entire scope as far as what time frame for the

4      bathroom how long it takes.

5          MS. JOZSI:  That was never provided to us,

6      Your Honor, by the company or by Mr. Jackson.

7          THE COURT:  All right.  If it hasn't been

8      provided up to this point I can't receive it into

9      evidence.

10         MR. JACKSON:  Okay.

11         THE COURT:  Let me make sure the record is

12     clear.  It's not on an exhibit list provided by

13     either party and Ms. Jozsi has indicated that GT

14     Technologies hasn't seen it before, so in order to

15     avoid surprise at this point I'm not going to

16     receive it.

17         MR. JACKSON:  Okay.  So we got that squared

18     away as far as the showing the work performance on

19     that clearing that that work was there for that

20     time on 8/22.

21         Now we're going to move down towards the date

22     of the discharge where it states as I notice as I

23     read into the notation here-

24         MS. JOZSI:  Mr. Jackson, is that Respondent's

25     181 at the bottom?

39

1          MR. JACKSON:  Yes, 181.

2          MS. JOZSI:  Exhibit 28, Your Honor.

3          THE COURT:  This is the performance warning

4     notice dated September 5, 2023.

5          MR. JACKSON:  Yes, sir.

6          THE COURT:  Okay.

7          MR. JACKSON:  As I notice it says as I was

8     reading it here, latter part of that which says,

9     However, after further discussion with Human

10    Resources he was allowed to provide a list of work

11    orders that were performed on Saturday, 8/19 that

12    were entered into the CMMS on Tuesday, 8/22/23.

13    Those work orders was entered the day before 8/22,

14    which was on 8/21 which was the following Monday

15    those work orders for the Saturday work scope.

16    And that's where the other work orders on 8/22

17    where we just recently discussed fall into play

18    for where the performance was on that.  So that's

19    a correction right there.

20         So with that being said, after they say after

21    further investigations 12 hours of work

22    Mr. Jackson provided only three are entered by

23    Quennel on 8/22 of '23 for the work performed on

24    8/19.  In addition, three other work orders were

25    created by other maintenance techs.  I haven't

40

```
 1        seen those.  Do you have those other three?
 2             MS. JOZSI:  Everything is in that binder.
 3             MR. JACKSON:  Okay.  Does that fall upon this
 4        work order area as far as the other three?
 5             MS. JOZSI:  There's 12 work orders, so we've
 6        gone through several of them.  But they would be
 7        on that list.
 8             THE COURT:  It looks like one of them is
 9        Exhibit 20 which has already been received in
10        evidence.  It's Work Order 12449 for work
11        completed on 8/19, so if that's one you're looking
12        for-
13             MR. JACKSON:  Yes, for 8/19 that's one of
14        them there.  I guess we'll get further down and
15        we'll show the rest of them.  And I have one more.
16        Let's see.  That's No. 18 and the other one is No.
17        20.
18             THE COURT:  Okay.
19             MR. JACKSON:  So, as work order No. 20 I had
20        put into the notes I had put into the system that
21        the reason for the work order is because a work
22        order is not saved into the system.  It kicked
23        back out.  So I notated letting them know so he
24        would see that on his side.  So I covered myself
25        showing that we had a problem with the system,
```

41

```
 1        that my IP was locked somehow, that we're getting
 2        rejected out.  So but when they find the work
 3        order, they find these two and they find the rest
 4        of them.  It's kind of odd that they're able to
 5        find two and they didn't find the rest of them due
 6        to the fact that my IP was blocked.  So I'm trying
 7        to figure out how that came about.  And then on
 8        top of that both of us was on these work orders
 9        the whole time and I don't see any of Mr. Johnny
10        Taylor's name or work on these work orders with
11        me.  So there's been a lot of changes on the work
12        orders after I was dismissed from the facility and
13        I don't see both of us on those work orders
14        working the same jobs at the same time.
15             THE COURT:  Okay.
16             MR. JACKSON:  So that's where it falls into
17        where the discrimination part came in that I
18        received this discharge.  And, you know, on my
19        part and other individuals on the same work orders
20        that we were supposed to have entered back into
21        the system, so one is still working there and the
22        other is not.  Due to the fact that I was told by
23        Mr. Dan Brinker that I was going to be here until
24        retirement because he highly recommended me and he
25        enjoyed what I did.  He liked the performance I
```

42

1    did.  As soon as he gets there he comes looking

2    for me and says, hey, what we got going on.  Now,

3    I know that was crawling under the skin of certain

4    ones.  I've seen it because when I was standing

5    there talking with him I noticed that Mr. White

6    didn't like the fact that I was standing there

7    with him.  But he would always find me because

8    I've been there the longest and he knew I knew

9    exactly what needed to be done because he would

10   tell me previously before he leaves what to do,

11   what to get done because he knows that certain

12   things are not going to get done and I'll go ahead

13   and take care of it, which I would do.  So he

14   would do that before he leaves.  And,

15   unfortunately, he's not here.  It would be good if

16   he was.  But at this time I believe that's right

17   now is other than- well, let me backtrack.

18        Okay, yes.  So since that this work

19   performance now I noticed that with the time frame

20   of this work performance come into play from 8/22,

21   now they took almost entirely two weeks before I

22   got this write-up, this discharge from the time.

23   So if it was that bad that I performed the work

24   and it was in place wouldn't you think I would

25   have been terminated like right then, right after

43

```
 1          falsifying documentation then and not two weeks
 2          later.
 3               THE COURT:  So you were coming to work
 4          normally?
 5               MR. JACKSON:  Yes, normally and putting even
 6          more work orders in on top of that after.  So what
 7          lead us to this was the fact that when I came back
 8          from break that after me and Mr. Darryl Harris
 9          come back from break I discovered and noticed that
10          the image of a tall black man was sitting on my
11          desk with a rope and tie straps around his neck.
12          And I believe Ms. Elizabeth has that exhibit.  Is
13          that in here?
14               MS. JOZSI:  Yes, Your Honor.  That's part of
15          No. 129.
16               THE COURT:  It's page 196?
17               MS. JOZSI:  And 198.
18               THE COURT:  Okay.
19               MR. JACKSON:  So I took a picture of it as it
20          sat before I picked it up and I walked it up
21          towards the front office.  While I didn't let
22          anybody else in the department on the floor see
23          it, because I didn't want to cause any conflict of
24          interest with one of the employees that was there.
25          I took it up there quietly.
```

44

 1          THE COURT:  Do you recall the day that this

 2     showed up on your desk?

 3          MR. JACKSON:  This was actually the day of

 4     the day I was terminated.

 5          THE COURT:  September 5th?

 6          MR. JACKSON:  Yes, sir.  It was at 10:15 that

 7     morning.  I showed the evidence to Erin Wade and

 8     Dave LaVieri and I asked him about it.  I said,

 9     hey, this is on my desk, what we going to do about

10     this?  And his response was, I couldn't do nothing

11     about it.  It was just take it and go back to work

12     and forget about it, you know.  I was like, wow,

13     okay.  So I just took it and put it back.  And I

14     say not even it wasn't even five minutes right

15     after that I was brought into the conference room

16     for this, you know, showing this permanent

17     discharge after that.  And there was no talk about

18     explaining anything during the time of what's

19     going on, why it was.  I felt like that situation

20     with the image should have been directly handled a

21     lot better, more professional wise due to the fact

22     that we have people that have titles in the

23     company, people that are given titles in the

24     company, a lot of issues wasn't addressed properly

25     within the company like it should, which put my

45

```
 1          job at risk.  After serving seven years with the
 2          company doing great with an entire work scope of
 3          excellent work history, score high and I'm trying
 4          to figure out where everything goes wrong.  I
 5          can't help I was born into this world the color I
 6          am, but the fact is I try to treat everybody nice
 7          and done everything.  And from the years I've been
 8          there Ms. Wade knows I've been doing a lot of good
 9          stuff and good things.  But the fact was where all
10          this went wrong started with Mr. White, and
11          everybody else falls in right behind him and it
12          caused a major problem.  And as I know of right
13          now last he stated that once I'm gone all is going
14          to be is white in that Department.  And they got
15          exactly what they wanted.  As I know that's what's
16          in there now.  The thing is people knew me.  They
17          knew my quality.  People loved what I did.  And
18          people would also watch and observe.
19              And another thing I had trouble with just
20          before all this was occasionally Mr. White going
21          through my lunchbox.  There would be four of us
22          standing off to the side.  I would watch him and
23          he would go in there into my lunchbox and go
24          through there and run back to Jason's office.  He
25          didn't know I went in there.  I would watch him
```

46

1     occasionally go into the lunchbox.  If those other

2     people was here they would have said and justified

3     the same thing.  I asked him what was going on

4     with the lunchbox.  He didn't respond back.  He

5     didn't think I knew it.  He would constantly

6     follow me around the plant watching me.  There

7     would be times where I fixed the machine, he would

8     come back and disassemble it.  Anything to make it

9     look like I didn't do my job.  I feel that is very

10    unfair for a man who is trying to complete his

11    work and do it and then not have to go back and

12    redo it.

13         So these are the things that I had to

14    tolerate and go through through my time at work.

15    It was very hard.  At times I had to keep extra

16    composure, stay positive.  My thing was a little

17    kindness kills, so that's what I was trying to do

18    the entire time.  Hopefully I would change the

19    individual.  What is it that you have going on.

20    Life, that such.  But this type of behavior is not

21    accepted in any company.  You're given a title and

22    these titles are not being represented.  Everybody

23    has a title in that company and nobody wants to

24    respond to their titles.  So I look at it as

25    you're supposed to lead by example.  And that was

47

1           a failure on all parts here.

2               THE COURT:  Okay.  Before it slips my mind,

3           did you want pages 196 and 198, the figure, the

4           image of the man on the desk?

5               MR. JACKSON:  Yes, sir.

6               THE COURT:  Any objections?

7               MS. JOZSI:  Your Honor, we do object to

8           those.  Those were provided to us during

9           Mr. Jackson's deposition.  We have no indication

10          of the date they were taken or the authenticity of

11          those photographs.  And the testimony by GT

12          witnesses will show the company had no knowledge

13          of this statue until Mr. Jackson was fired.  Well,

14          after his termination, so...

15              THE COURT:  Well, I think if we're going to

16          have testimony that the company didn't know about

17          it and then it's probably worthwhile having it in

18          the record what they didn't know about that.

19              I'm going to receive Respondent's Exhibit 29,

20          Pages 196 and 198 into evidence.

21              (Whereupon, Respondent's Exhibit 29 Pages 197

22          and 199 were admitted into evidence.)

23              MS. JOZSI:  Your Honor, if I may as well just

24          for clarity, Mr. Jackson earlier showed he has

25          currently sitting on the desk two jars of the

48

1        coconut.  Those are the remaining two pages of

2        that exhibit.  We can stipulate to admit those if

3        Your Honor prefers.

4            THE COURT:  We've got pages 194 and 195 which

5        appear to be the pictures of the same thing you

6        have on the desk.  And I assume one of them looks

7        like that's coconut in there?

8            MR. JACKSON:  Yes, that's something made.  I

9        had it sealed up.  I didn't want to get-

10           THE COURT:  It's probably a couple of years

11       old now so I assume not to have the actual stuff

12       if this is a fair depiction of it.

13           MS. JOZSI:  These were provided by

14       Mr. Jackson.

15           MR. JACKSON:  They're the same way that was

16       handed to me last year.  But it was discovered

17       what was on there because the gentleman knew that

18       was on there was Mr. Terry Logan he said that's

19       coconut on there.  They told me that's real.  I

20       said I am not going to open that.  So I asked him

21       why it's coconut.  Oh, well, I didn't know.  You

22       knew I couldn't have coconut.

23           THE COURT:  He told you it was coconut.  He

24       didn't try to convince you it was something else

25       to get you to eat it?

49

```
 1          MR. JACKSON:  Well, he didn't tell me it was
 2     coconut at first.  He just handed it to me.  I
 3     didn't get the memo until Mr. Logan, the
 4     maintenance guy, told me what I had on my desk.
 5     And I was going to take it home and enjoy it.  He
 6     said, you know that got coconut?  When you start
 7     eating coconut?  I said, I can't.  He said, you
 8     might better take that back.
 9          THE COURT:  All right.  So I'll receive
10     Exhibit 29 and each of the six photographs are
11     received in evidence.  I'll sort out their
12     relevance and what I can do with them as we go.
13          All right.  Anything else, Mr. Jackson, or
14     does that kind of wrap it up?
15          MR. JACKSON:  I think for right now.
16          THE COURT:  You're going to get more
17     opportunities to talk about it because I'm sure
18     Ms. Jozsi is going to have some questions for you.
19          MR. JACKSON:  That's fine.  We can go ahead.
20          THE COURT:  You want to take five minutes and
21     then we can start with cross-examination?
22          MS. JOZSI:  Yes, Your Honor.  Before we
23     break, is it your preference that I stick to this
24     as a traditional cross and then recall
25     Mr. Jackson?
```

50

1          THE COURT:  I'm not a jury.  I'm not going to

2      be confused of the order in which testimony and

3      evidence comes in.  I like doing it all in one

4      fell swoop.

5          MS. JOZSI:  I agree.  Thank you, Your Honor.

6          THE COURT:  Okay.  Let's take five minutes to

7      give Ms. Jozsi an opportunity to get herself

8      organized and then we'll start with your cross.

9          (A recess was taken from 10:33 a.m. to 10:41

10     a.m.)

11                **DIRECT & CROSS-EXAMINATION**

12   BY MS. JOZSI:

13     Q.   Mr. Jackson, to start off are you aware that

14   GT Technologies- and when I say GT Technologies I may

15   say GT or the company.  Do you understand I'm talking

16   about GT?

17     A.   GT.

18     Q.   Okay.  Are you aware if GT maintains policies

19   and procedures that prohibits discrimination?

20     A.   Correct.

21     Q.   So you're aware there's a code of business

22   conduct and ethics?

23     A.   Correct.

24     Q.   Does that policy prohibit discrimination on

25   the basis of race?

51

```
 1        A.   I believe we've seen that somewhere.
 2        Q.   Yes, sir.  In your binder if you turn to tab
 3   No. 9- well, first, do you recognize this document?
 4        A.   Yes, I do.  I believe I have that here in my
 5   files, yes.
 6        Q.   Yes, sir.  Is this the employee handbook or
 7   the code of conduct for GT Technologies?
 8        A.   Yes, it is.
 9             MS. JOZSI:  Your Honor, can we admit
10        Exhibit 9 into the record?
11             THE COURT:  Any objection to Exhibit 9 coming
12        into evidence, Mr. Jackson?
13             MR. JACKSON:  Let's see.  Sorry.  I'm just
14        trying to find a copy of the one I was given.
15             THE COURT:  Sure.  Take your time.
16   BY MS. JOZSI:
17        Q.   Mr. Jackson, if it helps, Exhibits 1 through
18   35 are the exact same ones we looked at and the same
19   numbering in your deposition.  I'm not sure if that
20   helps.
21        A.   Okay.  Exhibits you gave me?  I have that
22   here?  (Perusing.)  Okay.  It matches with the same
23   policy that I have received when I first got hired.  I
24   wanted to make sure there weren't any changes.
25             THE COURT:  Never a bad idea.  Any objection
```

52

```
1           to Exhibit 9 being received in evidence?
2               MR. JACKSON:  No.
3               THE COURT:  Without objection then and with
4           Mr. Jackson's acknowledgment that it does reflect
5           the policy that he received when he started, I'll
6           receive Respondent's Exhibit 9 in evidence.
7               (Whereupon, Respondent's Exhibit 9 was
8           admitted into evidence.)
9               MS. JOZSI:  Thank you, Your Honor.
10      BY MS. JOZSI:
11          Q.  Mr. Jackson, were you aware of GT's policies
12      with respect to prohibiting discrimination in the
13      workplace?
14          A.  As far as the policy stating on
15      discrimination, yes, I was aware of some of that
16      policy.  I referred back to it awhile back when it was
17      presented to me.  And then I briefly looked back over
18      it recently here and briefly during the time we had
19      the deposition.
20          Q.  Yes, sir.  And were you aware that GT has a
21      policy that prohibits retaliation?
22          A.  Yes.
23          Q.  And what about a policy prohibiting
24      harassment?
25          A.  Yes.
```

53

1      Q.   And I believe you just testified that you

2   received a copy of the handbook when you were first

3   employed, correct?

4      A.   Correct.

5      Q.   And if you turn to tab 8 in your binder do

6   you recognize this document?

7      A.   Yes.

8      Q.   And what is this document?

9      A.   This document is where understanding the

10   codes and all, rules and regulations that the company

11   provides and that they do not allow that type of

12   conduct in their facility.

13      Q.   Did you sign this document on December 4th,

14   2017, the date of your initial hire?

15      A.   That is correct.

16          MS. JOZSI:  Your Honor, we'd like to admit

17      Exhibit 8 into the record.

18          THE COURT:  Mr. Jackson, any objection to

19      Exhibit 8 being received in evidence?

20          MR. JACKSON:  No.

21          THE COURT:  Without objection Respondent's

22      Exhibit 8 is received in evidence.

23          (Whereupon, Respondent's Exhibit 8 was

24      admitted into evidence.)

25          MS. JOZSI:  Thank you, Your Honor.

54

1    BY MS. JOZSI:

2        Q.   Mr. Jackson, were you aware of mechanisms

3    that you could report complaints to the company during

4    your employment at GT?

5        A.   Yes, that is correct.

6        Q.   To your knowledge, what were the ways in

7    which you could report any complaints?

8        A.   Well, I went through the proper channels as

9    far as starting with the levels that we have,

10   supervision through our maintenance and then hopefully

11   a maintenance manager will handle the situation.   If

12   not, they went towards management and then Human

13   Resources.

14            THE COURT:   I need a few more decibels.

15            MR. JACKSON:   Sorry.   So proper channels was

16       going through supervision.   And if supervision

17       couldn't handle the situation then it went to

18       maintenance manager.   And if maintenance manager

19       couldn't address the issue then it left and went

20       to formal plant manager.   From there it went to

21       Human Resources.

22   BY MS. JOZSI:

23       Q.   We talked about a lot of names today.   To

24   clarify some names today, you mentioned Mr. James

25   White.   Was that your supervisor at the time of your

55

1    termination?

2        A.    Supervisor or team leader.  I don't know what

3    title they gave to him.

4        Q.    Did you report to Mr. White?

5        A.    Yes, on numerous occasions.

6        Q.    And then above that you said was the

7    maintenance manager.  I believe you referred to him as

8    Mr. Feral.  Is that Jason Felger?

9        A.    I'm sorry.  I probably pronounced his name

10    wrong.

11        Q.    That's okay.  I want to make sure that we all

12    know that we're talking about the same person.

13            So Mr. Farrell or Mr. Felger was the

14    maintenance manager?

15        A.    Yes.

16        Q.    And then you also mentioned Mr. Laverne.  I

17    believe that's Dave LaVieri.  Is that correct?

18        A.    Correct.

19        Q.    And was he the plant manager?

20        A.    Correct.

21        Q.    And then you mentioned Human Resources.  Was

22    that Ms. Erin Wade?

23        A.    Correct.

24        Q.    Were you aware of any other ways in which you

25    could report concerns or complaints to the company?

56

1      A.    Those were the main ways I really had the

2  issue addressed because I didn't want to go outside of

3  that.  So I kept it contained if it was handled,

4  addressed the proper way.  But the only way I thought

5  of if it got to this point was mention to Dan Brinker.

6  So I didn't want to go to that point even though he

7  comes to me.  So I kept that to myself so I could work

8  that situation out among the four of us to resolve the

9  issue with their title.  The behavior that's going on

10  could have been addressed in a better formal way and

11  that way I wouldn't be in the situation where I'm at

12  as far as my work at the job.

13      Q.    Was Mr. Brinker the President of GT

14  Technologies?

15      A.    President, yes.

16      Q.    Were you aware that GT also has an employee

17  hotline?

18      A.    Yes, I seen the hotline on the bulletin

19  board.

20      Q.    And were you aware that you could call the

21  hotline to report complaints or concerns anonymously?

22      A.    No, I didn't know.  I just seen it as I

23  briefly went by.  But as I've worked rushing to other

24  jobs I would see it up there occasionally, but I never

25  bothered about calling.  It was always trying to

57

1   handle within the plant so it wouldn't go outside the

2   perimeter.

3        Q.   But you knew that was an option that you

4   could call the hotline, correct?

5        A.   Not to my knowledge.  I probably would have.

6   I wasn't really aware of that.

7        Q.   And then are you aware that GT maintains an

8   associate conduct policy?

9        A.   Yes.

10        Q.   If you'll turn to tab 12 in your binder to

11   the associate conduct policy.

12        A.   Yes.

13        Q.   So you're familiar with this policy?

14        A.   Correct.

15             MS. JOZSI:  Your Honor, we'd like to move

16        Exhibit 12 into the record.

17             THE COURT:  All right.  Mr. Jackson, any

18        objection to Exhibit 12 being received in

19        evidence?

20             MR. JACKSON:  No objection.

21             THE COURT:  Without objection GT

22        Technologies' Associate Conduct Policy,

23        Exhibit 12, is received in evidence.

24             (Whereupon, Respondent's Exhibit 12 was

25        admitted into evidence.)

58

1    BY MS. JOZSI:

2        Q.   Mr. Jackson, if in that policy you could turn

3    to the final page it has Respondent's 149 in the

4    bottom corner.  Do you see where it says, Disciplinary

5    Actions For Offenses No. 29 through 36?

6        A.   Yes, I see that.

7        Q.   And it says, First Offense, Immediate

8    Discharge?

9        A.   Correct.

10       Q.   And then can you please read what No. 32

11   says?

12       A.   32 states, Falsifying company records or

13   reports including time cards, production counts,

14   personal records and/or medical records.

15       Q.   Were you aware that falsifying records is a

16   behavior that you could be immediately terminated for

17   under the associate conduct policy?

18       A.   Yes.

19       Q.   We discussed that you worked for GT between

20   December 4, 2017 and December 5th, 2023.  Is that

21   correct?

22       A.   Correct.

23       Q.   And I believe you also testified that you did

24   receive training on the computer system which we refer

25   to as the CMMS program.  Is that correct?

59

1        A.    Correct.

2        Q.    And then you also testified during your

3   direct exam that if your supervisors made you upset

4   then you can't focus and that would lead you to get

5   warnings based on your lack of focus.  Is that what

6   you said earlier today?

7        A.    Yes, they would try to do things to see if

8   they could make me upset and see if it would cause me

9   to lose focus, things of that nature, so they could

10  use that as a strategy to find themselves as far as

11  making a statement creating between the two.

12       Q.    Were you ever written up for not being able

13  to focus or receive any type of written warning about

14  focus?

15       A.    No.

16       Q.    In fact, the only performance warning notice

17  that you ever received during your employment was what

18  we looked at, Exhibit 13, that the one dated

19  August 23rd?

20       A.    Correct.

21       Q.    And we'll get to that in a second, but before

22  we do you mentioned earlier that you reported concerns

23  to Jason Felger, James White and Dave LaVieri, right?

24       A.    Can you repeat that?  Sorry.

25       Q.    Yes.  You said earlier that you reported your

1    concerns that you had at various times to Jason

2    Felger, James White and Dave LaVieri, correct?

3        A.    That's correct.

4        Q.    Were any of those reports that you made to

5    either Mr. Felger or Mr. White or Mr. LaVieri, any of

6    those concerns based on race?

7        A.    One incident that I mentioned today about

8    Mr. White mentioned about the statement of bringing up

9    that the State of Florida doesn't have to have a

10   minority in a work environment.  They ruled it out and

11   now it's open.  So he kind of leaned more into that

12   since he says that he found that information.  So he

13   used it to his advantage to push the issue that this

14   is his opportunity to find a way to move me out of the

15   work environment.  And so by that means this is where

16   all this started from that statement to all the way up

17   to now based on how he used it and then how he

18   strategized throughout the whole entire time.

19       Q.    Did you ever ask Mr. White what law he was

20   referring to?

21       A.    Yes, I asked him numerous times what law.  He

22   mentioned some new law that it was.  I wish I could

23   have notated and wrote it down.  I even called the Bar

24   itself.  The two individuals, the man and lady, that

25   was there, they didn't want to speak of it.  They said

61

1    they didn't want to give me information.  They didn't

2    want to get in trouble.  So they advised me to look in

3    other areas of that.  I've checked several places in

4    Tallahassee.  I went to different other buildings

5    looking for that rule that was ruled out by Florida to

6    see how accurate that was.  A lot of people just kind

7    of froze and kind of like wouldn't give me

8    information.  So there I was left going to all these

9    places trying to get answers and no one wants to

10   respond to it.

11       Q.  As you sit here today have you been able to

12   find that law that you believe says that minorities

13   are no longer required to be in the workplace?

14       A.  I have looked, searched.  I have had other

15   people to look for me as well.  Only one individual I

16   talked to, I can't remember what his name was, he said

17   it's there.  He said, I can't tell you where, but it's

18   there.  He said that's all I can give and then he just

19   hung up.

20       Q.  So as of now though you don't know

21   specifically what law, rule, or regulation Mr. White

22   was talking about?

23       A.  Correct.

24       Q.  So you said you reported that comment to Dave

25   LaVieri.  Did you ever report that comment or any

62

1    concern to HR or Ms. Wade?

2          A.    No.

3          Q.    Did you ever report any of these other

4    incidents or concerns other than you mentioned earlier

5    that you talked to Ms. Wade about building security?

6    Other than that did you ever report any of the other

7    instances that you described to Ms. Wade?

8          A.    Only incidents that I described to her as far

9    as the behavior Mr. Felger was having, problems he was

10   causing, stuff of that nature.  I briefly mentioned

11   you know I told them I had trouble with Mr. White.  I

12   didn't go into a lot of details, but I pretty much

13   wrote down with the work orders I had at the time

14   stating this is, you know, this is not right and so

15   forth, that something needs to be done.  It needs to

16   be investigated and looked into.  So I just wrote it

17   as a statement for more her than actually kind of

18   investigating and see or maybe take the time out and

19   maybe just sit back and observe from a distance and

20   watch how the two individuals act upon at that time.

21   But normally HR would do that if they see something

22   that's harming an individual.  Especially an

23   individual that's been there for a number of years.

24   And then you just have two new upcomers come in and

25   then you want to kind of like, okay, with their

63

1    certain behavior, how their behavior was before, they

2    come here at another work environment.  What caused

3    them to leave their previous work environment and come

4    to this work environment.  So you research that.  You

5    know, things of that nature.  And that's what my

6    understanding was with that type of behavior.  This

7    wasn't a good environment especially being there seven

8    years and all of a sudden now to it comes to this.

9         Q.    Just to be clear, you said that you made that

10   report.  Is that what we've been calling the rebuttal,

11   which we're going to look at in a second, the written

12   document that you gave to Ms. Wade?

13        A.    Right.

14        Q.    Other than that did you ever report any

15   complaints of discrimination to Ms. Wade?

16        A.    No, this is the only time.

17        Q.    And you never brought any of those concerns

18   up to Dan Brinker, the president of the company?

19        A.    No.

20        Q.    And you never called the hotline.  You

21   testified today, made a serious accusation about this

22   coconut dish that was provided to you.  Did you ever

23   bring that up to Ms. Wade?

24        A.    No, I only addressed that issue with the

25   maintenance manager himself.

64

1      Q.   Mr. Felger?

2      A.   Correct.

3      Q.   Was it Mr. White or was it Mr. Felger that

4  you said brought you the candies?

5      A.   Mr. Felger.

6      Q.   Mr. Felger brought it and then you addressed

7  that issue to him?

8      A.   Correct.

9      Q.   But never HR or Mr. LaVieri?

10     A.   No, the only issue I addressed to them was

11  the statue that was on my desk which they both seen

12  that I had in my hand when I walked through the front

13  office and presented and showed them and I was told to

14  take it back to maintenance.

15     Q.   That statue was the picture we just looked at

16  in Exhibit 29?

17     A.   Correct.

18     Q.   You also mentioned earlier that you felt that

19  you were the only one that was punished essentially

20  for falsifying the work orders.  You alluded to

21  Mr. Taylor was working with you that same shift I

22  believe?

23     A.   Yes.

24     Q.   Did you ever report your assertion that you

25  believed anybody else was falsifying work orders?

1      A.    Anybody else falsifying work orders?

2      Q.    Did you report that to anybody else?

3      A.    Let's see.  (Perusing.)  Only people that

4    knew was James White.  Other than Jason himself and of

5    course Dave and Erin they're the only others during

6    that time I was there.  The last person I'm missing is

7    Mr. Terry Logan.

8      Q.    Just to be clear, are you saying that those

9    individuals, James, Jason, Dave, Erin, Darryl and

10   Terry, that they knew that people were falsifying

11   documents or that you told those individuals that

12   people were falsifying documents?

13     A.    No.  You talking about the documents that I

14   have or you talking about other people's?

15     Q.    You alluded to the fact that other people

16   were doing the same kind of thing but didn't get

17   written up.  Is that right?

18     A.    Well, yeah.  Let me go back to that.  There

19   were times that people didn't write in their CMMS

20   logbook as far as entering their work scope for the

21   days.  There's Michael Mercer.  He told me that he

22   never puts his work orders in on Saturday.  So we have

23   a whole month of time when he started from January

24   onto May that he doesn't have work orders entered into

25   the system.  So if we was to go back to the computer

1    system and pull back up the actual data, we'll see

2    where a lot of the work orders hadn't been entered by

3    a lot of the guys that worked there between him.

4    There's Bill.  I don't know Bill's last name.  There

5    was a lot of individuals, but he let those slip by and

6    those people we knew of as well as other employees

7    that works on the machines up front as far as over by

8    my line, over by Boston line, Scorpion, all those

9    areas.  So those individuals would constantly tell me

10   you know, hey, they're up there just standing around

11   and not working.  So there was a gap where time they

12   only just work on the machine whenever the

13   whistleblowers call comes through they would just go

14   back.  Other times they're on their phone playing

15   games the whole time and they're standing around.  And

16   that normally happens a lot there and it was a big

17   complaint with the rest of the employees there because

18   they're all seen not working doing something.  Well,

19   that's not fair you doing all this work and nobody

20   else has to do anything.  That's very unfair.  I said,

21   there's nothing I can do about it, but I'm not running

22   the show here.  I try to do my part and I understand

23   you all see this, but it happens.  But if you were to

24   do a walk through right now and talk to these

25   individuals, they would actually tell you.

67

1    Q.    Two things.  One, you mentioned that you said

2    he let that slip by.  Who are you referring to as he?

3    A.    That's Jason.

4    Q.    My question still is you said that you were

5    aware of these things.  Did you ever report any of

6    that to anyone in management or HR that you believe

7    these people were not working, not entering their work

8    orders, falsifying documents?  Did you ever report any

9    of that conduct?

10   A.    Not to them.  Only to Jason.  I addressed the

11   issue with him to handle it because I feel like it's a

12   proper channel.  I said, listen, we're all working

13   here, we understand it's a new system, but you

14   constantly stressed that we're supposed to be doing

15   this and that, but other people complain.  So if you

16   address the issue before it gets to the front office

17   because the people on the floor was complaining about

18   them not doing their job and not fixing the machines.

19   So the rest of the employees would tell me.  They

20   wouldn't go to them.  So I would go to him because

21   there were two incidents that two of the employees on

22   the floor was going to the front and going to report

23   it to Eric, two of the ladies were.  So I told them

24   hold off, let me address it with my maintenance

25   manager, I can handle it.  They were losing production

68

1    because they couldn't find the individual that worked

2    on the machine.  At certain times it was down longer.

3    And they said they looked on there and the computer

4    line was inaccurate.  It didn't add up to the time the

5    machine was down and so forth.  So we had a lot of

6    hiccups.  But I was trying to help resolve the issues.

7    So I understood that Ms. Erin had a job to do, but to

8    try to help her not go backwards and go into

9    situations my thing was to go address it to him to

10   handle the floor so that way she could move forward

11   doing what else she had there.  So that's how I had

12   done it since I worked there.

13        Q.   If you could turn to tab 13 that's the

14   performance warning that was already admitted into

15   evidence this morning.  You testified that you

16   received a copy of this document?

17        A.   Yes.

18        Q.   At the bottom under the employee's signature

19   section it says, Refused to sign.  Do you see that?

20        A.   Yes.

21        Q.   And why did you refuse to sign it?

22        A.   I refused to sign it because I see that

23   looking at this here I didn't see that this should

24   apply to me due to the fact that I did my job to the

25   best of my knowledge and ability and conducted in a

69

1    way because me working seven years I would not have

2    tried to jeopardize my job and in my job at this time

3    knowing that I was told, hey, you're going to be here

4    until you retire.  And so that was uplifting energy

5    coming from the actual president himself.  So that was

6    just striving me, gave me more motivation to excel to

7    even produce more, what can I do to help the company.

8         Q.   Was it your testimony today that your

9    understanding of this performance warning notice was

10   because you didn't perform work on August 22nd, 2023?

11        A.   Yes, that's what was stated here, that I

12   didn't perform any work on August 22nd, 2023.

13        Q.   It looks like it's signed by Jason Felger.

14   Is that correct?

15        A.   Correct.

16        Q.   So Mr. Felger presented this document to you?

17        A.   Yes.

18        Q.   Did you have a discussion with Mr. Felger

19   when he handed this to you about why you were being,

20   this is a verbal warning, why you were receiving this

21   document?

22        A.   Yes, we had a discussion.

23        Q.   Did the Saturday, August 19th date ever come

24   up during that discussion?

25        A.   No, that didn't come up in the discussion.

70

1      Q.    So it's your testimony that you were

2  disciplined based off of your activity on August 22nd,

3  2023?

4      A.    Correct.

5      Q.    You never discussed that you had troubles

6  entering work orders into the work system on Saturday,

7  August 19th?

8      A.    No, because if that was a problem it would

9  have been another written up for that if that was a

10  problem.  So we only discussed the 8/22 about the

11  work.  On Monday I entered that work in there and I

12  notated into the system where I put on notes that I

13  sent it in when I reenter in what it showed on one of

14  those work orders that I pulled up earlier.

15      Q.    We'll get to the work orders in one second,

16  but before we do that, Mr. Jackson, you remember you

17  had your deposition taken in this case, right?

18      A.    Correct.

19      Q.    We actually did it twice because our court

20  reporter lost power on our first attempt on the Zoom

21  and then we met here in Tallahassee and had your

22  deposition continued?

23      A.    Right.

24      Q.    You remember that you were under oath for

25  that deposition, correct?

71

1       A.    Correct.

2       Q.    I want to hand you a copy of your deposition.

3   This is Volume II.

4           MS. JOZSI:  It was not filed.  It's just for

5           impeachment.

6   BY MS. JOZSI:

7       Q.    Mr. Jackson, in that large packet Day 2 would

8   you please turn to page 61?  You can take the clip

9   off.  I couldn't staple it.  It was too fat.  Pages

10  are on the top-right corner.

11      A.    You said 61?

12      Q.    Yes, sir.  And then you go down to about line

13  17.  We were talking about the performance warning and

14  the question was- I'm sorry.  For the record, it says,

15  Description of unsatisfactory work performance, seven

16  hours to conduct one hour work scope (eight-hour shift

17  not captured in documentation).  So did he explain why

18  he was writing that?  And you said, He asked.  He

19  couldn't explain.  He said, well, you only did one

20  work of this.  I showed him where I had done the work.

21  I said okay.

22          And then if you'll turn to page 62 you said,

23  So the work was what I conducted was I did some work

24  as far as adding the existing orders that I could not

25  enter into the CM system prior to me and Johnny Taylor

72

1    was on the same work orders at the same time.  And I

2    asked, Why couldn't you add them to the system?  And

3    you said, Well, on Saturday, that Saturday that I

4    worked for them that afternoon, me and Johnny Taylor

5    we both tried to enter the work orders into the

6    system.  So when we put everything in it kept

7    rejecting out.  Do you see that?

8         A.    Yes.

9         Q.    So is it your testimony- you testified in

10   your deposition that you discussed the Saturday work

11   orders with Mr. Felger in relation to your performance

12   work notice?

13        A.    No, that was the day before the work

14   performance.  The discussion that we had was the work

15   that was done that actual day that I gave.  We

16   mentioned about all the work orders that we had talked

17   about previously the day before, but we went back

18   slightly talked about what we done that following day,

19   which was the 21st and we talked about it.  Then when

20   this comes up that he said that what was James went to

21   him and told him that this wasn't he's all done.  I

22   said there is more work because it's documented that I

23   have these work orders because they're completed in

24   the system.  We just have to pull them up, you know.

25        Q.    So just to be clear, you understood that you

1    were being disciplined for work on August 22nd not

2    August 19th?

3         A.    Yes.   So that's where the confusion comes in

4    because they're saying that this is supposed to be in

5    corresponding with the final discharge because of work

6    being conducted.   So 8/22 is supposed to be saying

7    that I didn't have work done or falsifying

8    documentation on 8/22 when here I have the work for

9    8/22 and it's there in plain black and white writing.

10   So I'm trying to figure out what was the issue of not

11   having the work when it's showing I only did one hour

12   of work scope and I have multiple time of work scope

13   during the time plus the hours with cleaning the

14   bathroom on top of the other work orders.   So there is

15   more time accounted for.   And on top of that we talked

16   about in the deposition where and it states here in

17   this last work order where here it shows the projects

18   that I do.   So the projects take the rest of the few

19   hours that's left of the rest of the day.   Because out

20   of my work history throughout times working for so

21   many years it's the same sequence that I do all the

22   way throughout up until my day of dismissal.   So I

23   perform all my work orders first and then I go back

24   and start working on my projects.   And the projects is

25   what takes the rest of the day out.   So if there's

74

1    approximately 6.5 hours of work that's been done that

2    day and then there's an eight-hour shift, so those

3    last of couple hours I can start working on a project

4    that excels from day-to-day until he creates more work

5    orders that next following day.  And I might have to

6    stop that project and then I start, you know, doing

7    the work orders.  So that's where we fall in at the

8    two weeks in-between.  When this actually started up

9    until my day of dismissal you can see where work was

10   created, I've done work, worked on projects all the

11   way up until the actual day of being dismissed.  So

12   that's why I'm looking at if they was trying to create

13   something to find a way to push me out just say, hey,

14   we just don't want you to work here instead of just

15   creating a false pattern and it turns around and

16   reverts backs to them, you know.

17        Q.   So why were you discussing your work on

18   Saturday, August 19th?  What was the context of that

19   if that wasn't meant to be part of this performance

20   warning notice?

21        A.   As far as mentioning to him?

22        Q.   Yes, sir.

23        A.   Well, I mentioned to him because the fact

24   that I came in Saturday and volunteered to work and I

25   didn't have to.  So they asked if I could volunteer.

75

1    I was supposed to go out of town on a trip.  I

2    postponed my trip to stay with GT.  I canceled my

3    reservation and all that stuff to do this here and

4    then not to have to fall into this category.  But I

5    explained to him the reason why because, you know, I

6    said this is unfair because I took my time off

7    Saturday to work, then I had trouble, I went back,

8    entered work into the system and did my work on top of

9    that and then come back the next day and work again

10   and now you saying I'm not doing any other work.  So

11   what's the problem.  What are you all trying to create

12   against me, you know.  Because see if that's the

13   problem and I'm doing poor and I'm not doing my work-

14        Q.   Well, that's not in evidence, but I

15   understand.  So your testimony is that you couldn't

16   enter your work orders into the system on Saturday,

17   August 19th and so were you unable to log anything or

18   log into the system on Saturday, August 19th?

19        A.   No.  As I stated, on that 19th me and Johnny

20   Taylor we did work and when we got finished with the

21   work, we tried to complete and write out what was done

22   in the CMMS.  And after we did that we entered it and

23   submitted it as completed.  We went in and after a few

24   seconds we got kicked out and he looked at it and he

25   said that's not right.  He said your IP is blocked.

1     And I said, yes, I see that.  And I said that's not

2     right.  So I said, let's go try other computer on the

3     stands that's out there on the floor that has

4     permanent instead of because everything is on Wi-Fi so

5     it works off the Wi-Fi throughout the building.  So

6     maybe we have a glitch on the Wi-Fi system.  Let's go

7     to a permanent location where actual data is actually

8     tieing into the wall system.  It did the same thing.

9     It would not let me in.  So then I knew right then

10    that we had a problem.  I said, well, what we're going

11    to do, Johnny, is we're going to write down all our

12    documentation, the backups, so that way it don't look

13    bad on us, we don't get in trouble.  I said, let's go

14    back to the old system.  That's why we keep the old

15    system as far as when the computer system goes down we

16    have those work orders that I showed you, the blank

17    ones that we sometimes fill out or we just write it

18    down.

19        Q.    Okay.  So it's your testimony that you

20    weren't able to edit anything in the CMMS system on

21    Saturday, August 19th, right?

22        A.    Yeah.  I was able to write it in, but it

23    didn't take.  But for some reason or another that it

24    didn't take and it said it wasn't in the system, but

25    here since I've been out away from GT for almost this

77

1    makes it-

2        Q.    Eleven months?

3        A.    Eleven months, but they're able to find work

4    orders that come up that wasn't there.

5        Q.    Is it your testimony that GT is creating,

6    they're creating documents after you left?

7        A.    No, it's not creating.  It's they were able

8    to find the documents that was in the system that we

9    got that we seen got rejected out on our end.  So that

10   was there at the time I wrote down on the paper and

11   they said they couldn't find it, but all of a sudden

12   it's found after the fact I was dismissed.

13       Q.    Can you turn to tab 15 please in the binder?

14   Do you recognize this document?

15       A.    No.

16       Q.    This does not look familiar to you at all?

17       A.    There is something different about this here.

18   It's got an identification number here, but it's

19   showing- it doesn't show the work order number.

20       Q.    Well, let me ask you this.  Do you remember

21   we looked at this during your deposition on July 25th?

22       A.    Yes, we looked at it.

23       Q.    It shows on the first page, which is

24   Respondent's 156, login is Q. Jackson at the bottom of

25   the page.  The last six lines say Login Q. Jackson.

78

1    I'm sorry.  On that first page there.  That first page

2    the last six lines say Q. Jackson.

3         A.    Mm-hmm.

4         Q.    The date says 8/19/2023?

5         A.    Yes.

6         Q.    And then it has various time stamps between

7    1455 and 2232?

8         A.    Yes, I see those times on there.

9         Q.    And then it's got it says Group WO, which I

10   believe is work order type.  And then if you go to the

11   column that says, Identification, you'll see the

12   numbers 12353 and 12354 and 122355 up here on that

13   first page, correct?

14        A.    Right.

15        Q.    And then the next column says Description,

16   and there's various descriptions.  But it looks like

17   they say things like Work Order Was Created, Changes

18   Made to Part History, Changes Made to Labor History,

19   et cetera.  Do you see that?

20        A.    Yes, I see that.

21        Q.    And then it has that PC name and it

22   identifies that as a laptop number and for your

23   entries it looks like laptop 6L5LSE.  You believe your

24   number was different?

25        A.    That's strange.  My number was different.

79

1      Q.   You believe your number was different?

2      A.   But then we have right here where you have

3   12353 you have it four times on here.

4      Q.   Okay.

5      A.   Is that the same work order number?

6      Q.   You tell me.  It looks like it.

7      A.   It's showing created and then it just

8   constantly repeated.  I wonder why it's so many times

9   on here.

10     Q.   It looks to me that those line entries are

11  different descriptions.  Is that correct?  The first

12  one it looks like the work order was created, below

13  that it was changes made to part history, changes made

14  to labor history and that the work order was edited.

15  Is that correct?

16     A.   I see where it shows the work order was

17  edited.

18     Q.   So does this document show that you were able

19  to login and enter work into the CMMS system on

20  8/19/2023?

21     A.   Yes, on 8/19 on that Tuesday I can enter the

22  work into the system.  I can type it all in.  You can

23  go in and type it in, but to submit showing complete

24  where it supposed to go in it get rejected out.

25     Q.   And then if you flip to the back of that

80

1  page, 157, there are six more entries on there,

2  correct?

3       A.   Yes.

4       Q.   And they show similar type of things that we

5  were just discussing, same field, same columns, all

6  that, different work orders.  I understand they're

7  different, but generally the same type of information?

8       A.   Uh-huh.  So with these work orders that

9  you're stating again it goes back to when I was told

10  that these work orders that I had didn't exist.

11      Q.   And who was telling you that these work

12  orders didn't exist?

13      A.   That was between Jason Felger and then when

14  Erin went and checked it she said they wasn't there.

15  So out of the two of them these work orders that I

16  wrote down weren't there.

17      Q.   Does this document show the company records

18  reflect that you were able to login and perform work

19  in the CMMS system on 8/19/2023?

20      A.   8/19 we would have performed work.  Again,

21  the second individual's name is not on here as well.

22      Q.   I understand.  We're just looking at your

23  entries for Q. Jackson.

24      A.   Right.

25      Q.   So it shows that Q. Jackson you were able to

81

1    login and perform work in the system on 8/19/2023?

2        A.    Right.

3              MS. JOZSI:  Your Honor, I don't believe I

4        asked to move this into evidence, 15.

5              THE COURT:  Are you moving it?

6              MS. JOZSI:  Yes, sir.

7              THE COURT:  Mr. Jackson, any objection to No.

8        15 coming in?

9              MR. JACKSON:  Let's see.  No.

10             THE COURT:  I'll receive Exhibit 15;

11       although, I think I'm going to probably want a

12       little something from the company.  I don't think

13       Mr. Jackson was all that familiar with it.  I'll

14       receive it in evidence, but until I get a little

15       more information as to what it is and what it

16       means I'm unlikely to give it much weight.

17             MS. JOZSI:  Understood.

18             THE COURT:  I'll receive it in evidence

19       though without objection.

20             (Whereupon, Respondent's Exhibit 15 was

21       admitted into evidence.)

22   BY MS. JOZSI:

23       Q.    Mr. Jackson, you received the performance

24   warning notice.  After you received the performance

25   warning notice did you have any discussions with

82

1    anyone in the company about the performance warning

2    notice?  I can ask it a different way.  Did you ever

3    got to HR and discuss the performance warning notice

4    and your dispute with that?

5         A.    Yes, I did.

6         Q.    And you spoke with Ms. Wade?

7         A.    Correct.

8         Q.    And did she provide you the opportunity to

9    submit a written rebuttal to the performance warning

10   notice?

11        A.    Yes.

12        Q.    And did you?

13        A.    Yes.

14        Q.    If you'll turn to tab 14 in your binder.  I

15   think it's one more after that.  Do you recognize this

16   document?

17        A.    Yes, but I see he got something initialled to

18   the side.

19        Q.    There is a line.  Is that what you're

20   referring to?

21        A.    Yes.  Well, somebody wrote in the 8/21 there.

22        Q.    Well, let me ask you did you submit a written

23   rebuttal though first to Human Resources?

24        A.    Yes, this is the written.

25        Q.    This is a two-page document.  Is that your

83

1    handwriting and your signature at the bottom?

2         A.    That is correct.

3         Q.    And it's August 25th, 2023?

4         A.    Yes, that is correct.

5         Q.    And it looks like it's a photocopy of two

6    pages.  On the left side is a narrative.  On the right

7    side there is a list of 12 work orders.  Is that

8    correct?

9         A.    Yes.  There should have been a second page

10   with this as well.  It was two pages.  Do you have

11   that copy?

12        Q.    I've only seen the one that has the narrative

13   on one side and the work orders on the other side.

14   You never provided anything else.

15        A.    There was another list of work orders that

16   went with this one.

17        Q.    There was only ever this that was provided to

18   HR.

19             THE COURT:  I'm looking at the exhibits that

20        you filed, Mr. Jackson, and this looks consistent

21        other than like you said I don't see the Saturday

22        8/19 and its Monday, 8/21 notation on it.  But it

23        looks to be the same as the one you filed.  It

24        looks like this might be two pages, but they're

25        set side by side.

84

```
 1              MR. JACKSON:  Okay.
 2    BY MS. JOZSI:
 3         Q.   Mr. Jackson, if you turn to tab 40 and then
 4    you go to the third page it's marked as Respondent's
 5    231.  Go a few more pages.  So there's a Post-it note
 6    that somebody else stuck onto that, but other than
 7    that this is the same without that line, correct, this
 8    is the same document that you submitted to HR?
 9         A.   Correct.
10         Q.   Respondent 231.  Forget the Post-it note.
11         A.   Yeah, that's fine.
12         Q.   You submitted this list to HR?
13         A.   I had two lists and I guess we don't have the
14    other one that went with it unfortunately.  I guess we
15    have to just go with this one then.
16         Q.   But what is marked as Respondent's 231, that
17    page that you're looking at, other than the Post-it
18    note that's there in the gray box this first page of
19    the letter and the page of the list this is what you
20    provided to HR?
21         A.   Yes.
22              MS. POZSI:  Your Honor, we would move to
23         admit Respondent 231 which is part of Exhibit 40
24         in evidence.
25              THE COURT:  So in lieu of Exhibit 15?
```

85

```
 1              MS. JOZSI:  We'll probably do both but...
 2              THE COURT:  So, Mr. Jackson, Ms. Jozsi has
 3         asked to receive page 231 in evidence.  Any
 4         objection to that?
 5              MR. JACKSON:  No.
 6              THE COURT:  So Respondent's Exhibit 40, page
 7         231 is received in evidence.
 8              (Whereupon, Respondent's Exhibit 40 was
 9         admitted into evidence.)
10    BY MS. JOZSI:
11         Q.   So the left side of this page, the letter
12    side was your explanation of what happened, correct,
13    in your words?
14         A.   Correct.
15         Q.   If you look at the last three lines it says,
16    As stated below, here are the work orders listed below
17    that was completed.  And then it says, Next Page 2.
18    Do you see that?
19         A.   Mm-hmm.
20         Q.   And then on the second part where it's the 12
21    work orders was that your submission of the 12 work
22    orders that you thought you completed?  Let me
23    rephrase that.  What 12 work orders are these that you
24    provided to HR?  What do they represent?
25         A.   This is work that was conducted at the time
```

86

1    of that write-up on 8/22 that are mentioned here, and

2    these are the same work orders that we have that I

3    mentioned was in earlier to the Court showing that

4    this list corresponds with what we already had seen

5    earlier.

6        Q.   So it's your position that all 12 of those

7    work orders were performed on August 22nd of 2023?

8        A.   There are some that was on 22, 23 and there

9    was some that was on the Exhibit 19 on there

10   somewhere.

11       Q.   So this list represents several days worth of

12   work.  Is that accurate?

13       A.   Yes, several days of work that was done.  It

14   was 19 and 22 as well.  So the ones that I couldn't

15   find that was on there, work that they stated wasn't

16   accurate or didn't show.  So this list here showed

17   that none of this work was on CMMS.

18       Q.   How did you create this list of 12 work

19   orders?

20       A.   I created this list off the little book that

21   I had that me and Mr. Johnny Taylor created due to the

22   fact that we could not conduct our work ethics on the

23   laptops at the time so we had to write down

24   everything.  And that was for our notes.  Had we not

25   done this we would have never had these records today

87

1    to go by.

2        Q.    So these were personal notes that you were

3    writing down that you did?  For example, the first one

4    on that list is Work Order 12353, so you wrote that

5    down.  You did that on a particular date as a backup?

6        A.    Yes, these are some of the list.  There's a

7    longer list of notes.  I think you have that list of

8    all the work orders that I've done.

9        Q.    You showed that in your deposition.  It's not

10   in evidence.

11       A.    I thought that was supposed to be part of the

12   evidence, all those work orders that went with this.

13       Q.    This is the only thing in the record or it's

14   been admitted now that we had received.

15       A.    You didn't put it in there?

16       Q.    No, sir, we never received a copy of it.  You

17   showed it at your deposition, but we never received a

18   copy.

19       A.    Oh, no, I laid it out for you to make a copy

20   of it on your scanner with the rest of the other

21   things I gave you.  Remember?

22       Q.    You brought it to the deposition, but you

23   never sent it to my office.

24       A.    No.  Yes, that's why I brought it because you

25   said you were going to make copies of it.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

88

1     Q.   But if I remember correctly that long list

2     that you have there are no dates or anything on those

3     records, right, it's just a list of numbers?

4     A.   There are a list of numbers just like this

5     page here.

6     Q.   But there's nothing in there that indicates I

7     think you told me at your deposition you couldn't tell

8     me for any of those work orders what day you did that

9     or it was just a running log?

10    A.   Yes.  It shows a running log and it shows

11    each number that's recorded here.  If you actually go

12    into the computer it will give the actual dates and

13    time.

14    Q.   Right.

15    A.   Just like these here you were able to find

16    that information.

17    Q.   And those are just your personal notes.

18    Those are not company records.  That's not anything

19    official.  That's just for your benefit?

20    A.   No, this is all company work ethic that was

21    done showing the proof of the dates that's mixed in

22    with this here that it takes before and after up until

23    the time I was dismissed.

24    Q.   Right.  They correspond with company records

25    that you enter into the system, but those themselves,

89

1    these handwritten notes, are not an official company

2    document or anything that you have to record as part

3    of your work.  That's your practice to write those

4    down, right?

5         A.   Well, I'm using this as far as evidence

6    because all this is for January of 2023 until

7    September the 5th.

8         Q.   Again, you said there's no dates on that,

9    right?

10        A.   No.  The date for all this done is I recorded

11   the dates on when I actually started from January

12   because that note pad was then up until September.  So

13   I did have, I was recording all these documentations

14   from January.  I did that for the last three years for

15   my records.

16        Q.   But you just keep- it sounds to me you just

17   keep like a pad of paper or something because if we

18   look at what we're looking at now, Exhibit 14, for

19   example, there's no dates, there's no times, it's just

20   numbers and a short description of the work, right?

21        A.   Correct.

22        Q.   So for the dates and times that you actually

23   performed the work you go the computer system to match

24   those numbers up with that work order, right?

25        A.   Right, I only did for each year I only did

90

 1    just the beginning of like January 1st and I have that

 2    notated.  So say like if I did last year of

 3    January 2022, I have a section in that book where all

 4    of 2022 all the way from January to December just

 5    those work orders.  But I don't go each individually

 6    day, weeks, months.  So it's just kind of like a data

 7    log showing this was what was created so if the

 8    computer was to go down at some point and they need

 9    documentation then I have backup documentation showing

10    this is what we've done, verify if the company needs

11    to go back on what was done on that particular

12    machine.  So that way it helps them present it to a

13    formal customer.

14         Q.   So, again, they're just your personal notes

15    not any company record, right?  It's not an official

16    company record?

17         A.   Well, if you present it that way you could,

18    but I look at it as both.

19         Q.   So let's turn back to the ones we're looking

20    at here.  So this list that you gave to HR represents

21    work that you said you completed on Saturday,

22    August 19th through August 22nd.  Is that correct,

23    these 12 work orders?

24         A.   12 work orders.

25         Q.   What are the dates you're saying you did

91

1     these 12 work orders on?

2          A.    Dates for these work orders I don't have the

3     exact dates for these, but these are work orders

4     during that time that they needed and the dates that I

5     did was I pull out a pad because the pad I had has the

6     abbreviation up top what it was for as far as what was

7     performed that day.  And so I couldn't flip that pad

8     far enough where I could get that actual date.  So

9     from that point I just seen it up there, flipped it

10    back and just wrote down the times those work orders

11    were in.  Because I still have the laptop showing some

12    of this still in the system.  So I went ahead and went

13    back and got the record that out of the laptop, wrote

14    down, made sure everything matches the same and then

15    wrote everything and presented it to Erin so that way

16    she could see it on her end.  But unfortunately it was

17    on that personal laptop that I had.  But at some point

18    it didn't show on his side.  So she went to look and

19    it wasn't there.  So either two things.  Either there

20    was and it was lost, or she was showing it wasn't

21    presented because that's where this notation came up

22    as far as, you know, filing false documentation that's

23    not there.  And then all of a sudden now it's

24    presented as showing it.

25         Q.    Did you ever have a conversation with

92

1    Ms. Wade where she asked you to clarify this list

2    about the dates that you say that you completed these

3    work orders?

4        A.    No.  We haven't had a conversation.  She just

5    took those and took what I had and went over to

6    Mr. Felger's office to pull up these numbers and see

7    if these because I told-

8            THE COURT REPORTER:  Your Honor, I can't hear

9        him.

10   BY MS. JOZSI:

11       Q.    My question was did you ever have a

12   discussion with Ms. Wade about trying to clarify the

13   dates on which these work orders were performed?

14       A.    No, what was always done was that these dates

15   we always discussed that these were the work orders

16   that I had the fact that it started from '19 all the

17   way up until - I'm sorry - August 19th to August 22nd.

18       Q.    So if you take a look at that tab 14 that we

19   had looked at earlier, the one that had a line on it-

20   Tab 14.  I'm sorry.

21       A.    This one?

22       Q.    That's the same.  You can look at that one.

23   It's another copy.  This version.  So instead of 14

24   you're looking at what's in tab 40 and it's

25   Respondent's 233, but it has that line drawn down the

93

1    middle?

2        A.    Correct.

3        Q.    And above it says, Saturday, 8/19 and Monday,

4    8/21?

5        A.    Okay.

6        Q.    So does that represent that the first six

7    work orders were work that you completed on 8/19 on

8    that Saturday and the following six orders are the

9    ones that you said you completed on 8/21?

10        A.    That- I see one work order on that.  There is

11    two work orders on that.  There is three.  There is

12    three work orders on that.  That's leaving- so we're

13    missing three other work orders that was put on there.

14        Q.    So we're missing three?

15        A.    We're missing three.  They was able to redeem

16    three of the work orders out of six.

17        Q.    Didn't you provide this list to the company

18    with the 12?

19        A.    This here I did.

20        Q.    So what's missing?

21        A.    So the work orders that they pulled up I

22    don't see those other ones other than what you showed

23    in that list that you showed on the computer.

24        Q.    Yes, sir.

25        A.    That 153 that 12353 that was on there, you

94

1    don't have it in the work order status but you have it

2    on when you flipped through that page it showed it.

3         Q.   On the log?

4         A.   Yes, on that log.

5         Q.   That was Exhibit 15.  You're saying that

6    12353 is on the security log and that's the first one

7    on your list; isn't it?

8         A.   Right.

9         Q.   So what's missing?

10        A.   I don't see 1445 on there.

11        Q.   Where is that missing from 12445?

12        A.   I don't see it in any other work orders.

13        Q.   The 12455?  Why don't you turn to tab 21?

14   You see the first page is a screen shot of that CMMS

15   and if you look in the column that says,

16   Identification, that's 12445, correct?

17        A.   Right.

18        Q.   If you turn to the back page of Respondent's

19   168, that's a copy of the work order and that one is

20   12445, correct?

21        A.   Mm-hmm.

22        Q.   For the login it says, P. Fletcher?

23        A.   Yes.

24        Q.   And on the work order it also says it was

25   assigned to and the labor was done by Fletcher, Pat,

95

1    correct?

2        A.    Yeah.   I'm trying to figure out how that work

3    order changed in the system because-

4        Q.    It's your assertion that somebody changed the

5    work order?

6        A.    Yes, that can be done.

7        Q.    Somebody can go in and delete Q. Jackson from

8    the login logs?

9        A.    Yes, because it's been done when we had work

10   orders as far as doing bathroom work or operating on

11   the (inaudible).   So I sat and watched when Mr. James

12   White himself was able to-

13       Q.    Could you speak up a little bit for the court

14   reporter?

15       A.    And he took it out of the system and swapped

16   it over after it's been done, so the computer system

17   has always been open.   Hasn't it never been

18   completely, you know, dialed in where it was locked in

19   at any point.   So it was still as work is accessed as

20   far as being in completion.   It may be completed now

21   since I haven't been there, maybe completed around

22   December at some point.   At the time that I was still

23   there employed in September it was still where

24   somebody can go in.

25       Q.    Okay.   Well, this says, this one we're

96

1   looking at, 12455, that you mentioned shows P.

2   Fletcher logged in on 8/22/2023.  There is 1, 2, 3, 4,

3   five entries for P. Fletcher on 8/22/2023.  That was

4   while you were still employed, correct?

5       A.   Yes.

6       Q.   Okay.  It looks like if you turn to the back

7   of that page this work order was issued and completed

8   on 8/22/2023 by Pat Fletcher.  Is it your assertion

9   that this documentation is false, this is wrong?

10      A.   Something ain't right.

11      Q.   Because you provided this as a work order to

12  the company that you performed work on, correct?

13      A.   Okay.  There is a mixup on that.

14      Q.   You say there is a mixup because you told the

15  company you did work on this work order, correct?

16      A.   (Perusing.)  There's it looks like two of the

17  same work orders and with what date is it?

18  (Perusing.)  Okay.  So-

19      Q.   Let me repeat my question.  So my question

20  was you told the company in that letter in that list

21  of work orders you're looking at right now that you

22  did work on Work Order No. 12455, correct?

23      A.   Yes, I wrote down 145 and I did work on

24  12449.

25      Q.   Let's focus on 12455.  That's on the list

97

1    that you provided to Ms. Wade and you said you did

2    work on that work order, correct?

3        A.    Yes, I said I did work on it, but then I'm

4    trying to see where.

5        Q.    Tab 21 is the copy of the CMMS log and the

6    work order for No. 12445 and it doesn't show your name

7    anywhere on it, correct?  It's tab 21.  I just want to

8    make sure you're looking at the right thing.  We're

9    looking at tab 21.

10        A.    Yes, I was looking at the work orders that I

11    put in and seeing what went wrong there.

12        Q.    And I understand that, but right now I have

13    copies of all 12 work orders and all 12 CMMS logs and

14    we looked at those in your deposition and they're all

15    the same in here.  Right now I'm asking you to focus

16    on 21.

17        A.    Yes, that's why I'm looking on 21 because-

18        Q.    I just want you to tell me on tab 21 your

19    name doesn't appear anywhere on this work order in the

20    official company records, correct?

21        A.    Okay.  Yeah.  It's that I just happened to

22    look and seen where that's a mishap on my part on that

23    one there.  I actually wrote down one number too many

24    on here because the hydromat numbers are the same here

25    stating on hydromat because I turn around and wrote

98

1    M129 Hydromat No. 3 again which is the same work order

2    that I did.  So what happened here is it looks like I

3    wrote the same work order down twice doing the same

4    work order twice when it's only one on that day.

5        Q.   But again you told the company you did work

6    on 12455, but then if we look at the documents for

7    Work Order 12445 your name doesn't appear anywhere on

8    there, right?  It just says Pat Fletcher?

9            THE COURT:  I don't have a 12455.  I have a

10           12445.  I want to make sure we have the right

11           number.

12           MS. JOZSI:  That is my mistake.  It's the

13           12445 and I was saying 12455.

14   BY MS. JOZSI:

15       Q.   12445 you wrote down M129 Hydromat No. 3.

16   And if you go to tab 21 that is for Work Order 12445.

17           Thank you, Your Honor.

18       A.   Okay.  Yes.  Yes.  All right.  I was

19   wondering what you were.

20       Q.   So let me re-ask my question.  So you told

21   the company you performed work for 12445, correct?

22       A.   Correct.

23       Q.   And then if you turn to tab 21, which is a

24   screen shot of Work Order 12445, there is a CMMS log

25   and on the back side is the work order for 12445.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

99

1    Does your name appear anywhere on that work order or

2    on the CMMS logs?

3        A.    No, it's not showing up on there.

4        Q.    Okay.  So the official company records do not

5    reflect that you did work for that work order?

6        A.    That's the day on the 19th when the work

7    order was entered in the system when we was kicked out

8    and that wasn't pulled up or recorded at that time.

9        Q.    But you testified that you entered all the

10   work for the work orders that you did on Saturday the

11   19th when you got back to the office on Monday the

12   21st, correct?

13       A.    Correct.

14       Q.    So if you would have entered the work order

15   on the 21st, wouldn't the work order have your name on

16   it?

17       A.    It's supposed to and that's why I'm trying to

18   figure out how Mr. Fletcher wound up with the number

19   instead of mine because here I have all the rest of

20   the numbers here except for just that one.  That's

21   kind of weird.

22       Q.    So you would agree the company record being

23   the work order itself and the CMMS log show that

24   Mr. Fletcher performed the work.  It does not list

25   your name, correct?

100

```
 1        A.   That's what it's showing here on this work

 2   order.  Of course, these work orders were printed out

 3   after the fact that I left.

 4        Q.   So are you disputing the authenticity of the

 5   work orders?

 6        A.   Well, this work order that has this number

 7   here I'm not sure about how that got changed because

 8   like I mentioned all these other work orders here are

 9   in the system and are printed out with my name on them

10   and then we have one that doesn't have it.

11        Q.   So you're not disputing authenticity of the

12   work orders that we've already admitted into the

13   evidence, right?

14        A.   Correct.

15        Q.   But this one you are?

16        A.   Just this one in particular.

17        Q.   Okay.  What about turn to tab 27, please?

18   That's Respondent's 180 and this is work order 12497,

19   correct, in that column?

20        A.   Just that page.

21        Q.   In the identification column it says this is

22   Work Order 12497, correct?

23        A.   Correct.

24        Q.   And that's one of the work orders if you turn

25   back to your list that you submitted to HR that's the
```

101

```
1    final work order you said you completed, 12497?  This

2    is tab 14.

3         A.   14.  (Perusing.)  Okay.  Yes, 12497.

4         Q.   Yes, sir.

5         A.   Okay.

6         Q.   And that was one of the work orders that you

7    said you completed between August 19th, 2022 and

8    August 20, 2023, correct?

9         A.   Correct.

10        Q.   If you look at the work order in tab 27 what

11   is the date that it says it was created on the first

12   line?  The first line what is the date that it says

13   that it was created?

14        A.   They're showing 8/23.

15        Q.   And it says that you performed work on 8/23?

16        A.   8/23 on this work order.

17        Q.   So, again, the work order reflects a

18   different date than the date that you claimed to the

19   company that you performed the work, correct?

20        A.   That's what it's showing on this laptop here,

21   but I'm trying to figure out- so what's done here is

22   we have work orders that's issued out on later dates

23   and just like here on these other work orders.  I have

24   work orders on 8/22 and I completed them a day ahead

25   like 8/19.  So the same way here work was completed
```

102

1    the day before, but it's also dated to be completed on

2    8/23.  So a lot of times if I have time, I see an

3    issue needs to be addressed before that actual date, I

4    go ahead and do that work and complete it.

5        Q.   How can you complete a work order if it

6    hasn't been created yet?

7        A.   If the work order has already been created,

8    it's in the system like they have here, we create work

9    orders and work orders are sitting there.  So on that

10   CMMS system when you pull up you'll see the name and

11   it has a list of everybody that has work listed that's

12   assigned to them.  So you have dates when those that

13   will be like four or five days ahead.  When it's time

14   to do a change or it's time to fix this or address the

15   issue and you have time, you go ahead and finish that

16   assignment just like here like issue 8/22 but I

17   completed on 8/19.

18       Q.   Which one are you looking at?  Which work

19   order number is that?

20       A.   This is 12449.

21       Q.   Exhibit 20?

22       A.   Yes.

23       Q.   And again you're saying in that case you said

24   that you- I thought that was one of ones you said you

25   entered in after the fact because of the computer was

1   down on Saturday.  So you performed the work on

2   Saturday but then created that work order after the

3   fact because you documented it afterwards?

4        A.    These down here are the ones that I done that

5   reflects back to where the disciplinary action comes

6   in that I did the work for it.  I have work scope.  So

7   that would be that same work order that shows that I

8   only did one hour of work.  So now I done that work,

9   but I completed it ahead instead of waiting 8/23 to

10  actually do that work.

11       Q.    So you completed work before a work order was

12  ever created?

13       A.    No, the work order was already created.  I

14  just went ahead and did it.

15       Q.    So the work order was created so the date for

16  the work order creation should be before the date you

17  did that work on that work order?

18       A.    Correct.  So I actually did that work before

19  that date.

20       Q.    So in this case we were looking at tab 27 for

21  the Work Order 12497 and that was created on 8/23/23

22  by Jay White and then you performed work on it on

23  8/23/23?

24       A.    Work was created.  He created it before 8/23

25  and put the date on there that when it was due.  So we

104

1    have a deadline that you have to meet on a work order,

2    so they're creating work orders ahead of time.  So

3    it's like let's say 8/21 they'll create a work order

4    then you have a due date.  A due date is like you have

5    until-

6         Q.   In advance?

7         A.   Right.  So you got enough time in case you

8    run into other problems or technology you can't

9    actually meet.  But it allows you where it won't turn

10   into red.  Because once it go into the red then you

11   have to go back and explain what caused you not to

12   complete this work order.  So you have to write in

13   there due to fact of other issues wasn't able to

14   respond.

15        Q.   So I understand you can create a work order

16   with a due date that's in the future, but again the

17   system logs when a work order gets created.  So for

18   this example this work order was created on 8/23/23.

19   Isn't that what it says?

20        A.   It was created before 8/23.  It's initially

21   put in as a due date of 8/23 before it goes to a

22   different status.

23        Q.   Okay.  You admitted some exhibits yourself of

24   work orders and those were numbers you admitted

25   Exhibit Numbers 24, 25, 26, 23, and 18.  Those were

105

```
1    the work orders you admitted earlier.  Were those work
2    orders things that you are saying you completed the
3    work on 8/22?
4         A.   The work that I presented earlier?
5         Q.   The ones that you admitted to the Court
6    earlier are those ones you are claiming you did work
7    for on August 22nd?
8         A.   August 22nd.
9         Q.   Okay.  You testified you were terminated on
10   September 5, 2023?
11        A.   Yes.
12        Q.   And we looked at what's been admitted as
13   Exhibit 28.  That was your termination warning notice?
14        A.   Is that No. 14?
15        Q.   No. 28?
16        A.   Okay.
17        Q.   So you testified about this was the
18   termination form essentially that you received, right?
19        A.   Correct.
20        Q.   And under the description it says the third
21   line, However, after further discussions with Human
22   Resources he was allowed to provide a list of work
23   orders that were performed on Saturday, 8/19/23 that
24   were entered into CMMS on 8/22/23, right?
25        A.   Mm-hmm.
```

106

1      Q.   And then it says, After further investigation

2  of the 12 work orders that Quennel provided only three

3  were entered on 8/22/23 for work performed on 8/19/23.

4  In addition, three other work orders were created by

5  other maintenance techs.  Correct?

6      A.   Mm-hmm.

7      Q.   And then it says, Due to falsification of

8  these documents during an investigation Quennel's

9  employment is being terminated effective immediately,

10 right?

11     A.   Yes, that's what it stated there.

12     Q.   So was it your understanding you were

13 terminated for falsifying documents during an

14 investigation?

15     A.   Yes, that's what they stated here in the

16 paragraph.

17     Q.   And then briefly- we didn't discuss this

18 today.  The Judge did mention this at the beginning.

19 You're seeking damages as part of this case, correct?

20     A.   Correct.

21     Q.   Turn to tab 35.

22          THE COURT:  Before we get too far, you

23     elicited a fair amount of testimony about Exhibit

24     21 and Exhibit 27.  Did you want those received in

25     evidence?

107

```
 1              MS. POZSI:  Yes, Your Honor.  I'm also
 2         prepared to put other witnesses.
 3              THE COURT:  I don't think I'll need to hear
 4         from other witnesses, but let's go ahead.
 5              Mr. Jackson, we talked a lot about 21 and 27.
 6         Any objection to those coming into evidence?  I
 7         don't know what weight I'll give them until I hear
 8         from somebody else.
 9              MR. JACKSON:  Yes.
10              THE COURT:  So I'll receive 21 and 27 in
11         evidence.
12              (Whereupon, Respondent's Exhibits 21 and 27
13         were admitted into evidence.)
14    BY MS. JOZSI:
15         Q.   If you'll turn to tab 35?
16         A.   Okay.
17         Q.   Do you recognize this document?
18         A.   Yes.
19         Q.   And what is this document?
20         A.   This is a total summary payout for the
21    settlement of this case.
22         Q.   Is this a document you sent to me
23    representing what you thought your damages were in
24    this case?
25         A.   Yes.
```

108

1    Q.    And so you're seeking compensation for, and

2    we discussed this before, but you're seeking

3    compensation for your lost wages and wages that you

4    would have been entitled to had you stayed until

5    retirement age at GT.  Is that correct?

6    A.    Yes.

7    Q.    Is that what that $1,200,000 represents?

8    A.    Yes.

9    Q.    You're also seeking the pain and suffering

10   and retaliation fees of $250,000.  Is that correct?

11   A.    Yes.

12   Q.    And then you're seeking for 401K benefits

13   essentially it was $22,471.52, correct?

14   A.    Yes.

15   Q.    And then we talked at the deposition about

16   how the math did not add up, and I believe you agreed

17   that if you add those three figures up that should be

18   around 1.5 million dollars?

19   A.    Yes.

20   Q.    Just again you did those calculations based

21   on your wages damages what you think you would have

22   made at GT Technologies had you stayed an additional

23   16 years up to the age of 65, correct?

24   A.    Correct.

25   Q.    You were earning 24.58 per hour with GT at

109

```
 1    the time of your termination, correct?
 2         A.   Correct.
 3         Q.   And you're currently employed?
 4         A.   Yes.
 5         Q.   Who is your current employer?
 6         A.   GSS Services.
 7         Q.   And what is your hourly rate at GSS Services?
 8         A.   It's 31 an hour.
 9         Q.   So you make more at your current job than you
10    did with GT?
11         A.   Correct.
12         Q.   And you've been at that job since
13    January 2024?
14         A.   Yes.
15         Q.   So you have been making more at your current
16    job since January of 2024 than what you were making
17    when you were terminated on September 5th, 2023,
18    correct?
19         A.   Correct.
20         Q.   And then you're also seeking damages for the
21    401K amount.  Is that based off of a contribution you
22    were making during your employment?
23         A.   Yes.
24         Q.   Would the company records reflect whether or
25    not you were contributing from your paycheck to the
```

1    401K?

2         A.    Can you repeat that one?

3         Q.    Yes, sir.  Would company records show whether

4    or not you contributed from your paycheck to the 401K?

5         A.    It should.

6         MS. JOZSI:  I don't have any other questions,

7    Your Honor.

8         THE COURT:  Mr. Jackson, anything else you

9    want to add in terms of your testimony before we

10    move over to GT?  Anything you think hasn't been

11    covered that should be covered?

12         MR. JACKSON:  Well, other than what I had to

13    go through as have there been any other cases

14    involved such as mine happening at GT?

15         THE COURT:  That's a good question.  I

16    suspect they're going to put somebody on the stand

17    and that would be something you can ask on cross

18    particularly if Ms. Wade goes on the stand.

19    That's probably something she would be able to

20    answer.  You'll have an opportunity.  Whoever

21    Ms. Jozsi puts on the stand you get to ask them

22    questions, so it's far from over.

23         But anything that you want me to know in your

24    direct testimony, anything you feel that hadn't

25    been covered that you want me to know today before

111

1       we move over to GT?

2            MR. JACKSON:  I think that pretty much

3       summarizes it there.

4            THE COURT:  All right.  Well, it's 12:35.  I

5       don't know if you're interested in having

6       something to eat.  We can take a break.

7            MS. JOZSI:  Lunch would be appreciated.

8            THE COURT:  Let's come back at 1:30.

9            (A luncheon recess was taken from 12:36 p.m.

10      to 1:44 p.m. after which the proceedings were

11      continued in Volume II.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

112

```
 1                    CERTIFICATE OF REPORTER

 2

 3     STATE OF FLORIDA  )

 4     COUNTY OF LEON    )

 5

 6          I, Doreen Mannino, Court Reporter, do hereby

 7     certify that I was authorized to and did report in

 8     stenotypy and electronically the foregoing proceedings

 9     and evidence and the captioned case, and that the

10     foregoing pages constitute a true and correct

11     transcription of my recording thereof.

12          IN WITNESS WHEREOF, I have hereunto affixed my

13     hand the 27th day of August 2024 at Tallahassee, Leon

14     County, Florida.

15

16

17

18     _____

19                Doreen M. Mannino

20

21

22

23

24

25
```

_Doreen Mannino_

113

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

QUENNEL JACKSON,

    Petitioner,

vs.                         Case No. 24-2043

GT TECHNOLOGIES,

    Respondent.
_____/


HEARING BEFORE THE HONORABLE E. GARY EARLY
VOLUME II
Pages 113 to 246


DATE TAKEN:    Tuesday, August 6, 2024

COMMENCED:    1:44 p.m.

CONCLUDED:    5:19 p.m.

LOCATION:    Division of Administrative Hearings
                  1230 Apalachee Parkway, Room 4
                  Tallahassee, Florida 32399

114

1                    **A P P E A R A N C E S**

2      On Behalf of Petitioner:

3      QUENNEL JACKSON, PRO SE PETITIONER

4      On Behalf of Respondent:

5      ELIZABETH TURNER JOZSI, ESQUIRE
       Ogletree, Deakins, Nash, Smoak & Stewart
6      100 North Tampa Street, Suite 3600
       Tampa, Florida 33602-5867
7      813-289-6530
       Elizabeth.jozsi@ogletree.com

8

9      Also Present:  Erin Wade, GT Technologies Corporate
                      Representative
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

115

**I N D E X**
**VOLUME II**

Witnesses for Respondent
 Jason Donald Felger
    Direct Examination by Ms. Jozsi...................116
    Cross-Examination by Mr. Jackson.................161
    Redirect Examination by Ms. Jozsi...............177
Erin Wade
    Direct Examination by Ms. Jozsi...................181
    Cross-Examination by Mr. Jackson.................206
    Redirect Examination by Ms. Jozsi...............211
David LaVieri
    Direct Examination by Ms. Jozsi...................213
    Cross-Examination by Mr. Jackson.................217
    Redirect Examination by Ms. Jozsi...............222
James White
    Direct Examination by Ms. Jozsi...................224
    Cross-Examination by Mr. Jackson.................228
    Redirect Examination by Ms. Jozsi...............236
Respondent Rests....................................238
Certificate of Reporter.............................246

**E X H I B I T S**

Respondent's No.                                  Admitted
  5 GT Training: Mandatory Flow of Work Order
    Steps/Processes                                   123
  6 GT Training: TLH Maintenance Training Module
    Daily Work Instructions                           127
  7 GT Training: TLH Maintenance Training Module
    Mpro CMMS                                         128
 16 WO 12353                                          140
 17 WO 12355                                          142
 19 WO 12444                                          144
 22 WO 12450                                          149
 10 GT Hotline Policy                                 185
 11 Composite of GT Policy Equal Employment
    Opportunity                                       187
 14 Jackson's Rebuttal to Performance Warning         194
 50 Prior Employee Terminations for Falsification
    of Records                                        204

116

**P R O C E E D I N G S**
**VOLUME II**
**(Proceedings continued from Volume I.)**

1

2

3    THE COURT:  Ms. Jozsi, who do we have on

4    deck?

5    MS. JOZSI:  Mr. Felger.  Do you want me to

6    bring him in?

7    THE COURT:  Yes, ma'am.

8    Please raise your right hand.

9    Do you solemnly swear or affirm that the

10    testimony you're to give today is the truth, the

11    whole truth and nothing but the truth?

12    THE WITNESS:  Yes.

13    THE COURT:  And your full name, please.

14    THE WITNESS:  Jason Donald Felger.

15    THE COURT:  All right.  Please have a seat.

16    THEREUPON,

17                    JASON DONALD FELGER,

18    having been first duly sworn by this Court, was

19    examined and testified upon his oath as follows:

20                    **DIRECT EXAMINATION**

21    BY MS. JOZSI:

22    Q.   I will hand Mr. Felger a copy of the exhibit

23    binder.  Good afternoon, Mr. Felger.  Can you please

24    introduce yourself to the Court, your name, your

25    occupation, and where you're currently employed?

117

 1      A.    Jason Donald Felger.  I'm currently employed

 2  as Facilities and Maintenance Manager with GT

 3  Technologies in Tallahassee.

 4      Q.    And if we say today GT or the company, you'll

 5  understand that that means GT Technologies?

 6      A.    Yes.

 7      Q.    How long have you served in your current role

 8  at GT?

 9      A.    Present day back to December of 2021.

10      Q.    And is that when you first started working

11  for GT?

12      A.    Yes.

13      Q.    Can you briefly describe your general duties?

14      A.    I oversee the maintenance team on both

15  production maintenance and facility maintenance and

16  that's all facility grounds as well as every asset in

17  the company.

18      Q.    Who do you report to?

19      A.    I report to Dave LaVieri.

20      Q.    What is his role?

21      A.    Plant manager.

22      Q.    Is that in the Tallahassee location?

23      A.    Yes.

24      Q.    Do you know the Petitioner in this case,

25  Mr. Jackson?

118

```
 1        A.    Yes.

 2        Q.    How do you know Mr. Jackson?

 3        A.    Mr. Jackson was a prior employee under my

 4   management.

 5        Q.    Were you his direct supervisor?

 6        A.    Yes.

 7        Q.    Would you assign him work in your role?

 8        A.    At times, yes, and my lead would also assign.

 9        Q.    Who is your lead?

10        A.    James White.

11        Q.    Was Mr. Jackson already employed by GT when

12   you first started working for the company?

13        A.    Yes.

14        Q.    And what position did Mr. Jackson hold?

15        A.    Facility maintenance technician.

16        Q.    Can you describe the general duties of a

17   facility maintenance technician?

18        A.    So daily it might be preventative maintenance

19   regarding any asset in the plant, main focus on

20   facility assets, fabrication work as well as potential

21   sanitation janitorial duties dealing with outside

22   services for waste water removal.  That was pretty

23   much it.

24        Q.    And for the Court's benefit, could you please

25   describe briefly a little bit about what GT does?
```

119

1    A.   So GT makes internal engine components for

2  the automotive industry and that's lifters, valve

3  train components.  So they do assembly work primarily

4  and a little bit of machine in relation to that.

5    Q.   You mentioned that you would occasionally

6  assign Mr. Jackson some work.  Can you generally

7  describe the way in which work is assigned to

8  Mr. Jackson and just others under your supervision?

9    A.   So there's a structure that's meant to be the

10  fire fight on the floor.  So the production assets

11  being down take precedence over everything else.  So

12  the entire team focuses on those points first.

13  They're trained to do a daily workflow management

14  document that states that you would first look by

15  yourself for any work orders that may be out there

16  open relating to down equipment.  Following that it

17  then moves into preventative maintenance open work

18  orders.  And at anytime in that mix as things come in

19  the top priority job in real-time James White or

20  myself might see who's available that could rapidly

21  address some urgent issue that's just come up and that

22  would be anybody on the team.  They end up getting

23  assignments in real-time based on that.

24    Q.   Are your employees assigned a set number of

25  tasks in any one day or does that fluctuate depending

120

1    on the work?

2        A.    There is fluctuation.  So by work order count

3    it's not really tracked in that manner.  It's just

4    anything that's out there live getting knocked out as

5    quickly as possible.  And that's an ever growing task

6    throughout the day.

7        Q.    How are the technicians informed that they

8    have a work order that needs to be completed?

9        A.    So they are to go in and look for things in a

10   specific order off of that daily workflow management

11   list in order.  And there may be certain PMs or other

12   tasks that are assigned directly to that person.  So

13   when they're looking for anything that's open that

14   nobody is working on yet as a top priority it would

15   also then add the next step and you're looking for an

16   open work order that's assigned to you.  So it would

17   be a mix of that, things that are assigned to you at

18   the same time to you, but at the same time if

19   nothing's assigned to you directly what else is out

20   there waiting for someone to assign it to themselves

21   and move forward.

22       Q.    You talk about assigning and these work

23   orders.  Are they in some sort of centralized computer

24   system or database?

25       A.    Right.  We utilize a CMMS system which stands

121

1    for Computerized Maintenance Management Software.  And

2    everything is entered in as a database for any kind of

3    future reference and to keep track of everything in

4    real-time.

5        Q.   And when you say keep track of everything in

6    real-time, are you saying from a documentation

7    perspective?

8        A.   Correct, as well as data for other

9    references.  Being done in real-time gives you time

10   stamps associated with equipment going down,

11   maintenance teams response to be getting the scope of

12   work and then the closure of the work order indicates

13   the downtime it stopped.  So it gives you real-time

14   metrics associated with the department's performance

15   and how we're affecting the OEE for the plant.  OEE is

16   Over Equipment Effectiveness.

17       Q.   Is there an expectation that your employees

18   are documenting their work contemporaneously to when

19   it is completed?

20       A.   Right.  The training from the beginning is

21   that it would be done in real-time with the work and

22   that as the manager it was more critical that I had

23   them spend a couple extra minutes here and there to do

24   that in conjunction with getting the machine running

25   as fast as possible.  And the reason for that as

1    stated for metrics that are accurate for downtime

2    calculations and maintenance response.

3        Q.   Mr. Felger, can you turn to tab 5, please.

4    You have a binder in front of you.  Can you turn to

5    tab 5, please?

6        A.   Yes.

7        Q.   Are you familiar with this document?

8        A.   Yes.

9        Q.   Can you identify this document please?

10       A.   This is the Mandatory Flow of Work Order

11   Steps/Processes.  So this was meant to act as a

12   training aid following the full training on using the

13   CMMS to reiterate the importance of the steps being

14   done in real-time, what that measures are and have

15   everybody have a full understanding of why it has to

16   happen in this manner.

17       Q.   Did you create this document?

18       A.   Yes.

19       Q.   And I see there is a date at the top.  What

20   is the date of this document?

21       A.   This was October 27th of 2022.

22           MS. JOZSI:  Your Honor, we would like to move

23       to admit Exhibit 5 into evidence.

24           THE COURT:  Mr. Jackson, any objection to

25       Exhibit 5?

123

```
 1              MR. JACKSON:  Exhibit 5.
 2              MS. JOZSI:  It's the one you have open, sir.
 3              MR. JACKSON:  This here?
 4              MS. JOZSI:  Yes, sir.
 5              THE COURT:  Any objection?
 6              MR. JACKSON:  No.
 7              THE COURT:  Without objection Respondent's
 8         Exhibit 5 is received in evidence.
 9              (Whereupon, Respondent's Exhibit 5 was
10         admitted into evidence.)
11    BY MS. JOZSI:
12         Q.   You mentioned a minute ago this CMMS system.
13    Is this document explaining how the CMMS program is to
14    be used?
15         A.   This gets a little more focused.  This is how
16    a work order would be created to finish.  So there is
17    other aspects of CMMS, but this is directly from start
18    to finish of a work order specifically.
19         Q.   Was this information disseminated to
20    employees?
21         A.   Yes, everyone in the Maintenance Department
22    was trained on this document following their original
23    full training on the CMMS.
24         Q.   To your knowledge, was Mr. Jackson aware of
25    this process?
```

124

1      A.   Yes.

2      Q.   Before we move on from here, under the first

3  I guess number there is a small paragraph there that

4  starts with Create before.  Can you read that

5  paragraph please?

6      A.   Sure.  So create work order, create before

7  anything else occurs.  A common problem that we were

8  facing, waiting until work order is done to create a

9  work order.  Gives bad time stamps, incorrect task

10 line entry for work order creation the other issue.

11     Q.   Again, does that explain the company's

12 expectation was that these things were entered

13 contemporaneously to when the work is done?

14     A.   Yes.

15     Q.   You mentioned some trainings sessions.  What

16 kind of training sessions did you conduct on these

17 processes?

18     A.   So the origination of the CMMS going into

19 action everybody was trained on a PowerPoint directly

20 from myself and that was done one-on-one for them to

21 understand what the CMMS is, the data that it is going

22 to collect, the value of the data, how it will be

23 used, and then the processes of creating work orders,

24 responding to work orders, completely populating the

25 data fields of the work order, and then closing the

125

1    work order.  And then again this process you see here

2    on this document how that would be done, what time,

3    what sequence.  And this document followed that up.

4    So they were all then trained again specifically to

5    this as these bottom paragraphs state for common

6    problems that were occurring and try to polish it up

7    for more understanding.

8        Q.   Did you create the CMMS program when you

9    joined GT?

10       A.   So it's a purchased program from an outside

11   vendor and it's a maintenance database.  What I did

12   was customize some of the fields that are available

13   for that to make it to suit our application more

14   comfortably.  So it was a purchased package.  Prior to

15   me purchasing that I did replace an existing CMMS in

16   the company called Rimmel (phonetic) which had limited

17   functionality.  So this was to expand on that concept.

18       Q.   For all intents and purposes, this was kind

19   of a new process when you came into your role?

20       A.   For doing work orders, for everything, yes.

21       Q.   Can you turn to tab 6 in your binder?  Are

22   you familiar with this document?

23       A.   Yes.

24       Q.   And what is this document?

25       A.   So this was the actual training module put

1    together for daily work instructions to determine how

2    to lay it out for everyone to be trained on what I

3    talked about already, which was priority list that

4    they would go out looking for work orders and the

5    other potential things that could override this.  As I

6    indicated, myself or my lead, James White, might have

7    to override that to give specific tasks.  So this was

8    meant to give everybody more detail on how you use the

9    CMMS to determine the next priority work level work

10   order that you want to assign yourself to complete.

11   And if we were to go into a zone operation we would

12   have myself and James laying out in advance here are

13   the specific things we need you to do and we won't

14   roll you back into the priority work assignment until

15   that stabilizes.

16        THE COURT:  Let me ask a question.  How many

17        facility maintenance technicians do you have on

18        staff?

19        THE WITNESS:  At one time it was 17.  Today

20        it would be 14 roughly.

21        THE COURT:  And is Mr. White in that role or

22        his-

23        THE WITNESS:  He's hands-on lead, so he's

24        also one of the technicians performing assignments

25        as well as being the lead.

127

```
 1           THE COURT:  Okay.  So there's 14 individual
 2      what is that job title?
 3           THE WITNESS:  Only one with lead, but the
 4      technician role is a mixture of facilities
 5      maintenance techs and mechanical maintenance techs
 6      and electromechanical techs.
 7  BY MS. JOZSI:
 8      Q.   Are you the author of this training module
 9  document?
10      A.   Yes.
11      Q.   What is the date of this one?
12      A.   This is August 11th of 2022.
13           MS. JOZSI:  Your Honor, we'd like to admit
14      Exhibit 6 into evidence.
15           THE COURT:  Mr. Jackson, have you had an
16      opportunity to look at 6?  It looks like you have
17      it there.  Do you have any objection to it being
18      received in evidence?
19           MR. JACKSON:  No objection.
20           THE COURT:  Without objection Respondent's
21      Exhibit 6 is received in evidence.
22           (Whereupon, Respondent's Exhibit 6 was
23      admitted into evidence.)
24  BY MS. JOZSI:
25      Q.   Mr. Felger, to your knowledge, did Mr.
```

128

1    Jackson receive training on these daily work

2    instructions?

3        A.    Yes.

4        Q.    If you could turn to tab 7 this one is quite

5    lengthy, but do you recognize this document?

6        A.    Yes.

7        Q.    And what is this document?

8        A.    This is the full maintenance use of

9    Maintenance Pro CMMS software.  So this was the

10   original detailed training that took them through

11   everything that the Maintenance Department would need

12   to utilize in that CMMS software.

13       Q.    Once again there is a date and author?

14       A.    Right.  So my name, I'm the author, Jason

15   Felger.  And the date I put this out was August 11th

16   of 2022.

17            MS. JOZSI:  I would like to move Exhibit 7

18        into evidence as well.

19            THE COURT:  Mr. Jackson, any objection to

20        Exhibit 7?

21            MR. JACKSON:  No, sir.

22            THE COURT:  Without objection Respondent's 7

23        is received in evidence.

24            (Whereupon, Respondent's Exhibit 7 was

25        admitted into evidence.)

129

BY MS. JOZSI:

Q.   Once again to your knowledge, did Mr. Jackson receive training on this Mpro CMMS training?

A.   Yes.

Q.   Did Mr. Jackson ever during his employment did he ever come to you with questions about the workflow or the scope that lead you to believe that he did not understand the company's expectations?

A.   Originally when it came out there were a lot of questions across everyone on the team, so we were fielding those.  The expectation that wouldn't be we wouldn't have the expectation of 100% accurate data for a period of time following.  But everybody moved past that and there were not regular questions on it. After that when the questions stopped coming, it was review of the data for accuracy and other fancy completeness.  And I would then find people that maybe needed I felt touched up training or to go through a second time.

Q.   So this training was given in August of 2022. In August of 2023 to your knowledge, did Mr. Jackson have any indications to you that he didn't understand these expectations?

A.   No.  We were well past the original grace period for everyone at that point.

130

1    Q.   To your knowledge, did Mr. Jackson ever

2  receive any sort of performance warning notices or

3  disciplinary actions at GT?

4    A.   Prior to the one that we have already here?

5    Q.   That's what I'm asking about.

6    A.   Right.  There was nothing official.  There

7  were just verbal discussions, you know, going over

8  that kind of information to say that we see things

9  slipping in the wrong direction, what's going on, what

10 can we do about it, but not formally.

11   Q.   Do you recall approximately when those

12 informal counseling sessions would have occurred?

13   A.   There would have been a couple of those that

14 occurred over probably the 12-month period prior to

15 the actual verbal written up warning.

16   Q.   So when the CMMS was coming onboard?

17   A.   It would have been following the CMMS being

18 implemented, so it was already passed then.

19   Q.   If you would turn to tab 13 in your binder.

20 This has already been admitted into evidence.  Do you

21 recognize this document?

22   A.   Yes.

23   Q.   Is that your signature on the bottom under

24 where it says, Supervisor?

25   A.   Yes.

131

```
1        Q.    Did you review or prepare this document?

2        A.    Yes, I did.

3        Q.    Can you just please tell us in your own words

4   what the warning was about, how it came to be?

5   Explain to the Court how this came about.

6        A.    So on the 22nd we hadn't seen Q throughout

7   the day and I was just asking my lead about that, if

8   he knew if he was there, if he is okay, whatever the

9   case might be or what he's working on.  And Q had

10  actually came into my office at that time.  Hey, there

11  he is, how are you doing, what's going on.  And he had

12  indicated that he had been working on two restroom

13  assignments for the day.  And those restrooms under

14  normal circumstances would be 30 minutes a piece, so

15  the question was raised wait a minute, there is seven

16  hours out there, so what else have you been doing.

17  And he just indicated I was writing up work orders

18  from the previous Saturday.  So that was not really

19  something that would take you hours to do.  It should

20  have been minutes to write up work orders, so that

21  question was thrown out there in that case.  And

22  because we had the previous discussions, I felt we

23  needed to take it to the next step at this point to

24  try to get some better performance happening.  So

25  that's what directed this document to be created.  And
```

132

1    it was based on the verbal discussion we had regarding

2    the work that had been done up to that point.

3        Q.   So you said he told you about cleaning two

4    restrooms that day.  Does that account for where it

5    says description of unsatisfactory performance, you

6    said one hour work scope?

7        A.   Correct.

8        Q.   That's the restrooms?

9        A.   Yes.

10       Q.   And then I think you said that he said that

11   he had spent the rest of the day preparing work orders

12   from the prior Saturday?

13       A.   Right.

14       Q.   How long would you expect that process to

15   take to enter work orders after the fact?

16       A.   You're not performing any of the work.

17   You're only just writing up from memory what was

18   there.  So I would expect that reasonably to be five

19   minutes per document.

20       Q.   Did he tell you at that time how many work

21   orders he had been entering?

22       A.   There was no statement of numbers.

23       Q.   Did he give any other explanation as far as

24   how he spent his day?

25       A.   Not at that time, no.

133

1    Q.    And so you wrote again you wrote seven hours

2    to conduct one hour work scope, eight-hour shift not

3    captured in documentation.

4    A.    Right.

5    Q.    What do you mean by that eight-hour shift not

6    captured in documentation?

7    A.    At that time a follow-up to that discussion

8    when looking at the work hours for that day on the

9    record at that point of discussion it only showed the

10    work scope for one hour on the restrooms.

11    Q.    Would you consider yourself a decision-maker

12    as far as issuing this performance warning notice?

13    A.    Within reason.  I still have to consult with

14    HR to confirm what I feel I need to do to make sure

15    that it's accurate and in agreement.

16    Q.    And you said you had a discussion with

17    Mr. Jackson.  Did you physically present Exhibit 13 to

18    him?

19    A.    Yes.

20    Q.    Did he sign the copy of the document?

21    A.    No, he did not.

22    Q.    Did he tell you why he was not signing?

23    A.    He mentioned wanting to just have it be a

24    discussion amongst ourselves and not formally

25    documented.  That was the only explanation given.

134

1    Q.    Was anyone else in the room when you all had

2    this conversation?

3    A.    No.

4    Q.    Did Mr. Jackson mention anything else about

5    entering those work orders for Saturday, which I think

6    was August 19th?  Did he mention anything else to you

7    during that initial conversation?

8    A.    No.

9    Q.    Are you aware what happened after you gave

10    Mr. Jackson this performance warning notice?

11    A.    Only through Erin contacting me.

12    Q.    What did Erin Wade contact you about?

13    A.    Erin asked me for additional documentation

14    that had some specific notes that provided to know

15    what I'm trying to get out of the CMMS for

16    documentation.

17    Q.    Do you recall what documentation she asked

18    for?

19    A.    She had a list of work orders and she asked

20    me for the security logs and the actual work order

21    printouts themselves.

22    Q.    Can you turn to tab 15 in that binder?  Can

23    you explain to the Court what it is that tab 15 shows?

24    A.    So this is a printout of the CMMS security

25    log specific to August 19th of '23.  So this is a log

135

1    of everything that would have been an entry and edit

2    or anything to that nature relating to a work order

3    for that specific date.

4        Q.   Did you physically pull this data for

5    Ms. Wade?

6        A.   Yes.

7        Q.   And can you explain column by column just

8    kind of what the CMMS security log shows and what the

9    company uses this for?

10        A.   So this function in the CMMS is a log of all

11    activity and this will give you the login, user ID,

12    the date that it happened, the time it happened, if

13    it's referencing a group in this case work order, what

14    type of entry it was be it creating the work order or

15    editing the work order.  And the identification number

16    here is the work order number.  Then the description

17    here would be a brief indication of maybe the data

18    field that was edited if it was edited.  The PC name

19    would be the specific computer asset that was utilized

20    for that particular login entry.

21        Q.   Can this CMMS security log be manipulated in

22    anyway?

23        A.   The security log cannot be edited or deleted.

24    It's all a real record of what has happened that

25    nobody can edit.

136

1      Q.    So you don't have the ability to go in and

2  delete entries from the security log or manually add

3  entries?

4      A.    No, not even administration level can change

5  anything about it.

6      Q.    The login I see, for example this particular

7  page, lists Q. Jackson.  Well, the first page lists Q.

8  Jackson and P. Fletcher.  Are these logins

9  individualized to an employee?  In other words, if you

10 go in can you go in as Q. Jackson for example?

11     A.    No.  The only way somebody can go in is

12 somebody else would have their password.  But this is

13 indicating the login use and that would be a person

14 using the password to get in.  And there are assigned

15 laptops to each individual, so those would all have a

16 unique PC name that would indicate if it happened from

17 that person's assigned laptop or somebody else's.

18     Q.    Now, this is the security log for 8/19/2023.

19 According to this company document- well, is this a

20 company record?

21     A.    Yes.

22     Q.    According to this company record was

23 Mr. Jackson able to log into the CMMS on August 19,

24 2023?

25     A.    Yes.

137

```
 1        Q.    Was he able to create work orders?

 2        A.    Yes.

 3        Q.    Was he able to edit those work orders?

 4        A.    Yes.

 5        Q.    If you turn briefly to tab 41, is this the

 6   same log which is more complete with everyone's

 7   information?

 8        A.    Yes.

 9        Q.    To your knowledge, did anyone have any

10   troubles logging in or entering work in the CMMS on

11   August 19, 2023?

12        A.    No.

13        Q.    You mentioned also that Ms. Wade gave you a

14   list of work orders.  If you'll turn to tab 14, is

15   this the list that you reviewed?

16        A.    Yes.

17        Q.    And are there 12 work orders on that list?

18        A.    Yes.

19        Q.    Did you personally review or pull the records

20   for the corresponding work orders on that list?

21        A.    Yes.

22        Q.    Did you review those in consultation with

23   anyone else?

24        A.    No.

25        Q.    I'm going to go through those now.  It may
```

138

1    just be helpful if you want to pull out that No. 14

2    just to keep the list so you don't have to flip back

3    and forth.  Let's start with turn to tab 16.

4    Actually, this list that Ms. Wade gave you from

5    Mr. Jackson, what was your understanding of what those

6    work orders signified?

7        A.    What I was told at the time was I need the

8    CMMS records for the actual work orders as well as the

9    security log relating to all of these.

10        Q.    So you had no knowledge of what Mr. Jackson

11    was claiming, the relevance of these documents?

12        A.    Not initially, no.

13        Q.    When did you learn that?

14        A.    Following presenting the data and us going

15    over it together.

16        Q.    Who did you present it to?

17        A.    Erin.

18        Q.    So let's go through the work orders.  Tab 16,

19    and we've already admitted some of these records, but

20    are you familiar with this document?

21        A.    Yes.

22        Q.    It's a two-page document.  It's double-sided.

23    So can you describe on the first page, which is

24    Respondent's 158, what is this that we're looking at?

25        A.    So the first page is the security log in the

139

1    CMMS and that indicates all activity associated with

2    the work order number.  12353 being the work order

3    number.  You see that the identification column has

4    that work order number throughout and then there are

5    different logins and dates associated with that and

6    descriptors for what was done.

7        Q.   The prior security log we looked at was all

8    of the work for a given date.  This is just isolated

9    to this particular work order?

10        A.   Correct.

11        Q.   I think you just said this was work order

12    12353?

13        A.   Yes.

14        Q.   Is that the first one on Mr. Jackson's list

15    that was on Exhibit 14?

16        A.   Yes.

17        Q.   So looking at this work order, what is it

18    that you're able to determine happened with this work

19    order?

20        A.   So I see two technicians on here with labor

21    and notes against the actual scope of work and it was

22    Pat Fletcher for 1.5 hours and James White for 1.5

23    hours.  And according to the security log, I see that

24    Mr. Jackson created the work order and he does have

25    edits for part history and labor history and I'm not

140

```
1    sure why.  Additional changes to part history,
2    additional labor history change, and it just gives
3    general edit and another general edit, and then it's
4    other people involved.
5         Q.   So this first page from the security log,
6    does this show that Mr. Jackson did work on this work
7    order on August 19th?
8         A.   It shows that he did create it.  It just
9    doesn't have any labor entry or notes for his
10   involvement.
11        Q.   On the actual work order?
12        A.   On the actual work order.
13        Q.   But the security log does show that he was
14   able to login on the 19th?
15        A.   Yes.
16             MS. JOZSI:  Your Honor, I don't think this
17        one had been admitted yet, so we would like to
18        admit Exhibit 16.
19             THE COURT:  All right.  Mr. Jackson, any
20        objection to the security log and work order for
21        No. 12353 being received in evidence?
22             MR. JACKSON:  No.
23             THE COURT:  Without objection then
24        Respondent's Exhibit 16 is received in evidence.
25             (Whereupon, Respondent's Exhibit 16 was
```

141

 1          admitted into evidence.)

 2     BY MS. JOZSI:

 3          Q.    Going down to the next tab 17, please, can

 4     you tell us what this document is?

 5          A.    This is the CMMS security log and it shows

 6     one line entry that Mr. Jackson on the 19th he created

 7     Work Order No. 12355.

 8          Q.    Is there any other associated work with this

 9     work order?

10          A.    No, it shows a creation and it doesn't show

11     an actual work order with any data in the CMMS.

12          Q.    Do you have any understanding or belief as to

13     why this shows just that one line entry?

14          A.    The numbers get assigned automatically upon

15     the beginning of the creation process.  If you do not

16     save it back to the server then there is no document

17     there to have any reference to.  So security log would

18     have showed it being created, the number being

19     reserved, but then it was not saved back to the CMMS,

20     so therefore the CMMS does not show a work order.

21          Q.    Is this Work Order No. 12355 on Mr. Jackson's

22     list, which is Exhibit 14.

23          A.    Yes.

24          MS. JOZSI:  Your Honor, we'd like to admit

25     17.

142

1          THE COURT:  All right.  Mr. Jackson, any

2     objection to the security log for Work Order 12355

3     being received in evidence?

4          MR. JACKSON:  No.

5          THE COURT:  Without objection Respondent's

6     Exhibit 17 is received in evidence.

7          (Whereupon, Respondent's Exhibit 17 was

8     admitted into evidence.)

9  BY MS. JOZSI:

10     Q.   If you can now turn to tab 18, which is for

11  Work Order 12442.  This has already been admitted into

12  evidence.  Can you tell us what this document is

13  showing?

14     A.   So this is the CMMS security log and it shows

15  Mr. Jackson's created the Work Order 12442 and doing

16  an edit, part history change, change to labor history

17  and then an additional edit.

18     Q.   What date does that document show that that

19  work was performed?

20     A.   That shows all of those entries occurring on

21  August 22 of '23.

22     Q.   Including the creation of the work order?

23     A.   Yes.

24     Q.   If you turn to the next page same exhibit,

25  which is Respondent's 162, is that also reflected on

143

1    the actual work order itself?

2         A.    It shows issued on August 22nd of '23.

3         Q.    What about the completed date?

4         A.    The completion date shows it backdated as

5    August, 19th 2023.

6         Q.    What is your understanding of why there are

7    two different dates there?

8         A.    So that would indicate that the work order

9    was created several days after the work was performed.

10   So it's showing a creation date on the 22nd, but a

11   completion date several days before the creation date.

12        Q.    Is that in accordance with your expectations

13   as far as the workflow?

14        A.    No, it did not happen in real-time as

15   trained.

16        Q.    Does this show that either the security log

17   or the work order, does it show that Mr. Jackson was

18   the one performing the work?

19        A.    It does show Mr. Jackson as the one creating

20   the work order and doing any edits to it.

21        Q.    Can you turn to tab 19 please?  This is Work

22   Order 12444.  What does this document show?

23        A.    This is again CMMS security log specific to

24   Work Order 12444.  All login entries are from

25   Mr. Jackson, created and edits to the work order, part

144

1    history and labor history and then another general

2    edit.

3         Q.   Did you say the date that those were entered?

4         A.   These were all entered on August 22nd of

5    2023.

6         Q.   Can you turn to the back to the actual work

7    order and tell me what date that says?

8         A.   Issued August 22nd of 2023 and completed

9    August 19th of 2023.

10        Q.   All by Mr. Jackson?

11        A.   Correct.

12             MS. JOZSI:  Your Honor, we'd like to move 19

13        into evidence at this time.

14             THE COURT:  Mr. Jackson, any objection to

15        Respondent's Exhibit 19?

16             MR. JACKSON:  No objection.

17             THE COURT:  Without objection Respondent's

18        Exhibit 19 is received in evidence.

19             (Whereupon, Respondent's Exhibit 19 was

20        admitted into evidence.)

21    BY MS. JOZSI:

22        Q.   Mr. Felger, if you could turn to 20 and this

23    is Work Order 12449, it's already been admitted into

24    evidence, can you tell me what this one shows?

25        A.   This is again CMMS security log for Work

145

1  Order 12449 and it does show created by Mr. Jackson,

2  history, edit and a general edit by Mr. Jackson, and

3  it shows that I added an edit to this as well.  Then

4  there was additional part history entered by

5  Mr. Jackson, labor history and another general edit.

6      Q.   What about the work order, which is the

7  actual work order itself, what does it show?

8      A.   So the work order shows it was issued created

9  on August 22nd of 2023.  It shows completed as

10  August 19th of 2023.  And it does show the note that I

11  would have added to the work order under notes, which

12  is the security number, and then go back and populate

13  with a note for the reason you created the work order.

14  The reason for work order is because work order not

15  saving in the system to get back out.

16      Q.   What was the purpose of you adding that note

17  in there?

18      A.   It would have been the idea that there is no

19  task line explanation for why the work order was

20  created and that's the very starting point of the work

21  order as trained.  So this was a reminder that that

22  has to be done.

23      Q.   So again this is the third one in a row that

24  the work order was issued several days after the work

25  was performed?

146

1       A.    Correct.

2       Q.    If you could turn to 21, this is for Work

3   Order 12445 and this has already been admitted into

4   evidence.  What does this one show?

5       A.    CMMS security log shows all entries and login

6   by Pat Fletcher.  All were on August 22nd of 2023 and

7   Pat created this work order and he did a general edit,

8   he had to change the part history, change the labor

9   history and another general edit.

10      Q.    What about the work order itself; what does

11  that reflect?

12      A.    It shows it was officially created on

13  August 22nd of 2023, completed August 22nd, 2023,

14  assigned to Pat Fletcher and he has his maintenance

15  task line at station 1 and his labor description as

16  adjusted bearing on station 1 and he has three

17  quarters of one hour in the labor time entry.

18      Q.    Mr. Jackson's name anywhere on either the

19  CMMS or the work order?

20      A.    No.

21      Q.    What does that indicate to you?

22      A.    It indicates the only involvement with this

23  work order was Pat Fletcher from creation to close.

24      Q.    If you look back at Exhibit 14 is this Work

25  Order No. 12445 one of the ones that Mr. Jackson put

147

1    on his list of work orders that he completed?

2        A.   Yes.

3        Q.   Can you turn to 22?  This is for Work Order

4    12450.  Can you tell the Court what it is we're

5    looking at here?

6        A.   So it's two pages of CMMS security log

7    associated here and there are several entries by

8    Mr. Jackson for August 22 and August 23 and the 24th

9    and the 25th and multiple edits due to labor history,

10   part history.  And there is one entry that's a note by

11   me on the 24th.

12       Q.   What about the actual work order itself?

13       A.   The actual work order shows assigned to

14   Mr. Jackson.  He would have had notes here.  Project

15   continues tomorrow.  And I would have added this JHA

16   note, which is JHA is not for describing scope of

17   work, it is an assessment of safety risks present in

18   the job and what you are doing to protect yourself and

19   mitigate the risk.  As trained previously, this would

20   mean assessing the risks as 1 through 3, stating steps

21   to lower the risks and post assessing to determine of

22   risk present after lowering the risk.  Again, 1, 2, 3

23   is low, moderate, high.  The attached JHA is

24   incorrectly filled out and not mitigating risks at

25   all.  In addition, a new JHA needs to be completed

148

```
1   each time you return to an on-hold work order to

2   return-

3        Q.   Can you slow down a little bit for the court

4   reporter?

5        A.   As the risks may have changed since previous

6   involvement.  In the case of this work order

7   specifically as of today, 24/23, there should have

8   been three JHAs, 8/22, 8/23 and 8/24.  See me to be

9   retrained on the JHA process prior to continuing the

10  work scope.

11            THE COURT:  What does JHA stand for?

12            THE WITNESS:  Job Hazard Analysis.

13  BY MS. JOZSI:

14       Q.   Does this work order show a completion date?

15       A.   This work order was not closed.  This was a

16  project.  So the scope on a project work order may be

17  multiple days.  So in this case there was continued

18  ongoing needs, so it was not closed as of that date.

19       Q.   Based on your narrative in the note section,

20  was the work performed starting on August 22nd, 2023?

21       A.   This was a continuation of the project on a

22  separate work order.  So yes, it would be accurate to

23  the work order.

24            MS. JOZSI:  Your Honor, we would like to

25            admit 22 at this time.
```

149

```
1            THE COURT:  Mr. Jackson, any objection to 22

2       coming into evidence?

3            MR. JACKSON:  No objection.

4            THE COURT:  Without objection Respondent's 22

5       is received in evidence.

6            (Whereupon, Respondent's Exhibit 22 was

7       admitted into evidence.)

8  BY MS. JOZSI:

9       Q.   Mr. Felger, can you please turn to 23 which

10  has already been admitted into evidence and this is

11  Work Order 12384.  What does this document show?

12      A.   So this shows the CMMS security log for Work

13  Order 12384 and creation by James White and edit by

14  James White.  And then I have several line items by

15  Mr. Jackson that an edit part history change, change

16  to labor history and another general edit.

17      Q.   What date was this created by Mr. White?

18      A.   August 21st of 2023.

19      Q.   What date did Mr. Jackson complete the work?

20      A.   All of his entries show August 22 of '23.

21      Q.   Is that consistent with what the work order

22  on the next page shows?

23      A.   Yes, so it does show issued created on

24  August 21st of '23.  And it shows completed on

25  August 22nd.  It shows that it was assigned to
```

150

1    Mr. Jackson.  And it shows it was a preventive

2    maintenance work order and it lists the steps and

3    scope to perform that.  And Mr. Jackson has a labor

4    entry and description as having checked both lights

5    which were green which then just required documenting

6    that it was found as to be okay.

7        Q.    Then if you turn to 24, this one has also

8    been admitted into evidence.  This is work order

9    12435.  Again, what does this one show?

10        A.    CMMS security log shows James White created

11    the work order and did an edit.  And then the rest of

12    it was Mr. Jackson.  And these are all on August 22nd,

13    '23.  Mr. Jackson has an edit, change to part history,

14    labor history, and a general edit.

15        Q.    And the work order what does that show?

16        A.    It shows the work order was issued on

17    August 22nd of '23, completed on August 22, '23.  It

18    was assigned to Mr. Jackson and he has added a note

19    that the scope took longer than 30 minutes due to the

20    fact that he had to restock the supply cart and this

21    was a preventative maintenance work order for the

22    Tuesday cleaning of a restroom, which would have been

23    FR10.  And the JHA is part of the checklist, so that's

24    what that depicts there.  And Mr. Jackson shows labor

25    against that of .52 hours.

151

1      Q.   You mentioned earlier that Mr. Jackson said

2  he cleaned two restrooms that day.  Is this one of the

3  work orders to show that?

4      A.   Yes.

5      Q.   Can you turn to 25?  Again, this has already

6  been admitted into evidence.  This is Work Order

7  12440.  What does this show?

8      A.   That shows the CMMS security log for Work

9  Order 12440 created by James White on August 22nd of

10  2023, edited by James White and all entries are on

11  August 22nd.  There are additional entries by

12  Mr.  Jackson for a general edit, change to part

13  history, change to labor history, and then another

14  general edit.

15      Q.   And again the work order?

16      A.   The work order shows it was issued created on

17  August 22, 2023, completed on August 22, 2023, that it

18  was assigned to Mr. Jackson.  And he has a note on

19  here that cleaning took longer than scope due to the

20  fact that a No. 2 stall was filled up with tissue.

21  And this is for Restroom FR9 and it shows the general

22  scope.  And Mr. Jackson has a labor entry here as

23  clean bathroom one out.

24      Q.   Is this the second restroom that you

25  mentioned earlier that he said he cleaned on

152

1    August 22nd?

2         A.    Yes.

3         Q.    If you turn now to 26, this has already been

4    admitted.   This is Work Order 12459.   What does this

5    one show?

6         A.    This is the CMMS security log.   It shows all

7    entries by Mr. Jackson on August 22nd.   And that would

8    be created, general edit, another general edit, then

9    change to part history, change the labor history, and

10   another general edit.

11        Q.    What does the work order show?

12        A.    It shows issue created on August 22, 2023,

13   completed on August 22, 2023, assigned to Mr. Jackson.

14   And he has a note on here discovered that the speed

15   volume was down still too low.   As for No. 2 and the

16   task, was going over to check the bowl to see why it's

17   not turning.   For labor Mr. Jackson has described what

18   he had done as found out that reasonably did not

19   rotate enough, cause was not turned up enough on the

20   adjusted speed.   After I checked everything else out

21   there were a few bolts that were loose that needed to

22   be tightened down.   And he shows .3 hours for the work

23   scope.

24        Q.    Finally, No. 27, this has already been

25   admitted.   This is work order 12497.

153

1    A.    So this is the CMMS security log.  It shows

2    the work order was created by James White on

3    August 23rd of 2023, edited by James White for the PM

4    history, and edited by James White as a general edit.

5    And the rest of the entries were by Mr. Jackson and

6    that was a general edit, another general edit, changes

7    the part history, changes the labor history, and

8    another general edit.

9    Q.    Is the date for Mr. Jackson's activity on

10   that particular work order?

11   A.    All of those show as August 23 of 2023.

12   Q.    Is it possible to perform work on a work

13   order that hasn't been created yet?

14   A.    No, other than if you change the dates to

15   erroneously state such.

16   Q.    Have we now looked at all 12 work orders that

17   were on the list that Mr. Jackson presented to HR?

18   A.    Yes.

19   Q.    You mentioned that you pulled these records

20   and then reviewed them with Ms. Wade.  Is that

21   correct?

22   A.    Correct.

23   Q.    Can you describe generally after you reviewed

24   all the records what was it that you determined?

25   A.    What we noticed was there were certain work

154

1    orders that had no involvement from Mr. Jackson, that

2    there were several date discrepancies associated with

3    how it was created versus how it may have been done.

4    In some cases, like the one that wasn't saved

5    correctly, it wasn't in the system passed the security

6    log indicating it had been created.  Those were the

7    main things that were pointed out from the initial

8    investigation.

9        Q.   Do you have any reason to doubt that the

10   company records reflect the work that was performed

11   and documented?

12       A.   No.  Security logs cannot be edited, so no.

13       Q.   After you reviewed all of the CMMS logs and

14   the work orders themselves what did you do next?

15       A.   I was on standby for any additional requests

16   for documentation.  At that point Erin was reviewing

17   the documents and reviewing the notes of our

18   discussion about the findings.  So that was where it

19   was left at that point.

20       Q.   Did you have any conversation with Erin about

21   any further disciplinary action against Mr. Jackson?

22       A.   Not up until that point, no.

23       Q.   At that point did you then have any

24   discussions?

25       A.   Following that we reconvened together to go

155

 1    over that and the ramifications versus the company

 2    policy together to confirm that it was, you know,

 3    falsely stated as to who the ownership of the scope

 4    work and work orders go onto.

 5         Q.    Do you recall approximately how long that

 6    investigative process took?  Was it a day?  Was it a

 7    week?

 8         A.    It was more than a day and less than a week.

 9    It was a few days I believe.

10         Q.    But it took sometime to review all the

11    materials?

12         A.    Yeah, to pull it out of CMMS was lengthy and

13    then, yeah.

14         Q.    Was there a concern that Mr. Jackson was

15    actually falsifying the work orders, or was the

16    concern that he was saying that he did work that he

17    didn't perform?  I mean, what was the concern there?

18         A.    Originally or upon reviewing the list

19    supplied?

20         Q.    I suppose both.

21         A.    So originally the concern was that there

22    wasn't a full scope of work conducted on an eight-hour

23    pay period that was paid and that that would be a

24    performance issue, which was the verbal warning that

25    was issued.  Upon reviewing this list and finding what

156

1    we found in relation to what was being stated, the

2    concern was that there was a complete disconnect

3    between what had really happened, the security logs in

4    CMMS versus what was being stated by Mr. Jackson.

5        Q.    Would you have gone through this whole

6    process of pulling these records, the logs, the work

7    orders without having this list from Mr. Jackson?

8        A.    No.

9        Q.    So after you reviewed everything, had

10   discussions with Erin, how did the decision to

11   terminate Mr. Jackson come about?

12       A.    So in looking at it and the ramifications of

13   what was being implied it was determined that this was

14   purposely falsified and that was why we decided to

15   take the next step.

16       Q.    To your knowledge, is there a company policy

17   that prohibits that behavior?

18       A.    Yes, there is a specific reference to

19   falsification of documentation resulting in

20   termination.

21       Q.    So you consider that policy when having these

22   discussions with Ms. Wade?

23       A.    Yeah.  Once we've reviewed it and realized

24   the full ramifications of what we were looking at,

25   yes, we discussed that.

157

1       Q.   Did you discuss the possibility of

2  termination with anyone else besides Ms. Wade?

3       A.   No.

4       Q.   Did you have to consult anyone for any

5  approval to terminate Mr. Jackson above your level or

6  Ms. Wade's?

7       A.   Not myself personally.

8       Q.   Can you please turn to No. 28 which has

9  already been admitted into evidence?  Do you recognize

10  this document?

11       A.   Yes.

12       Q.   Is this the termination form essentially for

13  Mr. Jackson?

14       A.   Yes.

15       Q.   Were you involved in the creation of this

16  document?

17       A.   The consultation prior Erin did create the

18  document.

19       Q.   It looks like that's your signature in the

20  supervisor section.  Is that correct?

21       A.   Yes.

22       Q.   Then below that there is a signature.  Do you

23  know whose signature that is?

24       A.   I'm believing that's Dave LaVieri.

25       Q.   And it says the date of discussion, which was

1    9/5/2023?

2        A.    Date of this document being signed, yes.

3        Q.    Do you know how Mr. Jackson was terminated?

4    Like, was this in-person or on the phone?

5        A.    It was in-person in the conference room with

6    myself, Erin, and Dave.

7        Q.    And Mr. Jackson presumably?

8        A.    Yes.

9        Q.    Before Mr. Jackson was terminated during his

10   entire tenure that you worked at GT did he ever make

11   any complaints to you about discrimination?

12       A.    No.

13       Q.    Did he ever report any comments that he felt

14   were inappropriate that had to do with race or

15   minorities?

16       A.    No.

17       Q.    Did he ever make any complaints to you about

18   anything that you felt needed to be reported to HR or

19   anything of that nature?

20       A.    No.

21       Q.    Did he ever complain to you about James

22   White?

23       A.    No.

24       Q.    To your knowledge, did he ever accuse you of

25   any discriminatory conduct?

159

1      A.   No.

2      Q.   Are you aware of an incident with Mr. Jackson

3  involving some sort of dish that contained coconut?

4      A.   Only as a result of our discussion here.  At

5  one point- should I describe the coconut or how should

6  I-

7      Q.   Let me ask you this.  They're on the table.

8  They're also tab 29.  If you could turn to tab 29

9  there's some photographs.  It's two pages, 194 and

10  195.  Do you recognize the contents of this

11  photograph?

12      A.   Yes.  The first photograph is homemade ginger

13  that my wife had prepared.

14      Q.   And the second photograph?

15      A.   And the second photograph is homemade coconut

16  that my wife's family prepared.

17      Q.   So when I say the incident, I'm referring to

18  these two dishes.  Can you tell me what you know about

19  these dishes?  You said your wife prepared them?

20      A.   My wife and her family prepared these, and my

21  wife had asked if I wanted to share them with my

22  co-workers at work, so I had brought in a few jars of

23  each into my office and had mentioned to everybody

24  here's some coconut, here's some ginger that my wife

25  and family had put together if anybody would like to

160

```
 1    try it.  And several people had indicated I'd like to

 2    try that and they took a jar of each or one or the

 3    other as they wanted and that was the end.

 4         Q.   Did you specifically give a jar to

 5    Mr. Jackson?

 6         A.   He did come in and ask about it, and I

 7    mentioned what it was and welcomed him to have them if

 8    he wanted them.  He said okay and thanks and took

 9    them.

10         Q.   Did you tell him it contained coconut?

11         A.   Yeah.  I was very clear to everybody this is

12    coconut, this is ginger, because not everybody may

13    want them and it would be a waste to just give them

14    out.

15         Q.   You said everybody, so did you give these

16    treats to individuals that were not Mr. Jackson?

17         A.   Yes, there were several other people that

18    wanted to try them.

19         Q.   Were you aware that Mr. Jackson had a coconut

20    allergy?

21         A.   No.

22         Q.   Did you have any intention of bringing this

23    treat into the office with the intent to harm

24    Mr. Jackson?

25         A.   No.
```

161

```
 1          Q.    Did you ever discriminate against Mr. Jackson
 2    based on his race?
 3          A.    No.
 4          Q.    Did you ever treat Mr. Jackson differently
 5    than any other employee?
 6          A.    No.
 7          MS. JOZSI:  I have nothing further for
 8          Mr. Felger at this point.
 9          (A recess was taken from 2:47 p.m. to 2:53
10          p.m.)
11          THE COURT:  Mr. Jackson, Mr. Felger is your
12          witness if you have questions for him.
13                       CROSS-EXAMINATION
14    BY MR. JACKSON:
15          Q.    Mr. Felger, as she stated earlier on work
16    orders, I notice you know the work that I performed on
17    the 19th when you and Mr. James White asked me to work
18    that following Saturday to help on second shift.  Do
19    you remember that day?
20          A.    So the 19th was the Saturday and I believe
21    you did cover for somebody else.  You offered to cover
22    for I think maybe Lucas.
23          Q.    Yes, volunteered to come in and help out.
24    Mr. John Taylor was working with me at that time?
25          A.    He was also scheduled to work that day,
```

162

1    correct.

2        Q.   And while we did the work we both had

3    combined our work ethic together on the work orders

4    and we had tried to reenter that work back in on that

5    following Monday where we had technical issues

6    involving CMMS computer status where we couldn't enter

7    it and it kicked back out.  Do you recall me

8    mentioning that to you that following Monday?

9        A.   No.

10       Q.   You don't recall.  Okay.  All right.  You do

11   recall that I did reenter those work orders back in on

12   Monday also, correct?

13       A.   I don't remember that.

14       Q.   Since you don't remember that actually

15   happened, do you recall the work that was done on the

16   22nd that you said that I performed out of the two

17   bathrooms do you recall that there were four bathrooms

18   that I completed during that work scope other than the

19   two?

20       A.   No, CMMS does not reflect anything but the

21   two.

22       Q.   So that's where I'm looking at on the two

23   here, but Mr. James White had assigned those two

24   existing plus the other two by the bathrooms over by

25   the what is that called the C machines.  That would be

163

1    over on the far west side.  That's the bathroom where

2    I actually had the back entry in the ladies restroom?

3        A.    There are no other entries in the CMMS for

4    any other scope other than what we've already covered.

5        Q.    Okay.

6             THE COURT:  Mr. Felger, would each bathroom

7        get its own work order?

8             THE WITNESS:  Yes.

9    BY MR. JACKSON:

10       Q.    My understanding is that the work that was

11   done by the two bathrooms and you said that was only

12   work that was discovered on 8/22 and there was no

13   other work that was entered into the log system.  Is

14   that correct?

15       A.    What was originally discussed between

16   yourself and I was the two restrooms and that was the

17   only thing the CMMS shows in the system.

18       Q.    What I see here stated within the time frame

19   where work was done for the bathrooms we have 1, 2, 3,

20   four work orders that's showing that work was

21   conducted and completed on 8/22.  So as I mentioned

22   earlier to Ms. Elizabeth, how is that only one hour of

23   work scope was conducted when we have numerous work

24   orders here showing completion on 8/22?

25       A.    So the discussion that we had at the time you

164

1    mentioned the two restrooms and everything else being

2    work orders from the 19th.  So that was how the one

3    hour was established of work scope which would have

4    been two restrooms.  Following that I checked with the

5    CMMS.  It revealed no other labor entries for the day

6    at that point of discussion.

7         Q.   Of course we discussed that the work was done

8    on the 19th.  At the time that was mentioned there was

9    other work that was also involved that was done.  So

10   during the time you said that you couldn't find where

11   I was.  Had you not tried to check in the CMMS system

12   because normally that's how you would know exactly

13   where everybody would be in reference to where they're

14   working at in different areas throughout the plant?

15   And that's why I was trying to see why it was

16   difficult, why you all couldn't locate me if I was

17   able to complete these tasks and have this work

18   provided here that's printed out and stated.  And so

19   that's why I don't understand why this verbal warning

20   conduct doesn't tie in with not having the work ethics

21   that's actually done as far as completion because here

22   you have a matching situation here where work is being

23   conducted on 8/22 versus work is not being conducted

24   on 8/22?

25        A.   So the CMMS will tell me who's in progress at

165

1    any given time as a spot check and you weren't found

2    to be in progress on anything at the point that were

3    looked at throughout the day.  When we had our

4    discussion face-to-face and you only mentioned the two

5    restrooms as the scope that is what dictated how the

6    conversation went.  And then the records being

7    reviewed following that conversation specific to the

8    22nd was that the work orders from the restrooms were

9    the only ones shown in there.

10        Q.   But also I did mention there was other work I

11   was working on as well.  And two, that not only those

12   previous work there, was also the project that I was

13   working on that went continuously onto the next

14   following day as well.  So with the project

15   continuously working on the brake header how does it

16   reflect as not having any work scope or not working on

17   an hourly basis and not conducting any work at all for

18   an eight-hour scope?

19        A.   At the time of the discussion that we had the

20   only thing in the CMMS for labor hours for you on the

21   22nd that were documented were the two restrooms.

22        Q.   So if it was at that time of day that wasn't

23   in the system that you looked and seen it in there and

24   you followed through the next following day, wouldn't

25   it be at that point that you make corrections after

166

1    the fact once you saw it in there and say, oh, okay, I

2    made a mistake, this needs to be disregarded because

3    now his work has shown up as it did as of right now?

4         A.   It was not reviewed the next day.  We

5    reviewed the same day within five minutes of our

6    conversation and the conversation your point was that

7    you cleaned two restrooms and you caught up entering

8    work orders from the 19th.  There was no other labor

9    discussion.  When it was checked there was no other

10   labor present at that time following the discussion.

11   So that's what the system indicated.

12        Q.   Well, the system indicated that I completed

13   on the 19th the work orders that was put into the

14   system and due to the fact that other work orders was

15   entered into the system after the fact after this was

16   an issue up until discharge.  So as you stated with

17   Ms. Elizabeth there, that it took sometime to research

18   and find documentation.  So when did you discover all

19   of this work order?  Was it after the fact that I was

20   terminated or during the time before I was terminated

21   that these work orders came about?

22        A.   Can you rephrase the question and maybe

23   specify the exact work order?

24        Q.   Work order from 12440, 12459, 12435 and then

25   we have work order 12384.

167

1          MS. JOZSI:  Your Honor, for the record, those

2     are Exhibits 23 through 26.

3          MR. JACKSON:  On the book numbers?

4          MS. JOZSI:  Yes.

5          MR. JACKSON:  Okay.  I'm sorry.

6  BY MR. JACKSON:

7     Q.   So what I'm saying is did you discover these

8  before or after I was terminated?

9     A.   The records were reviewed prior to you being

10 terminated as trying to figure out what the claim was

11 here and what information could be provided by each

12 work order.

13    Q.   Okay.  So I was terminated upon you didn't

14 have these in your possession?

15    A.   Incorrect.

16    Q.   Until after the fact, but now it's in our

17 possession.  Now it's presented, so-

18    A.   Wrong.  It was reviewed and pulled from the

19 CMMS prior to your termination as an investigation

20 that you prompted relating specifically to these work

21 orders, so the information was pulled for the

22 investigative process.

23    Q.   It was pulled, but these weren't presented at

24 the time because had these been presented this

25 wouldn't come about?

168

1      A.    Everything that we just went over with these

2    was confirmed and gone over with Erin and myself at

3    the time that this list was provided.

4      Q.    So why wasn't I shown this list during the

5    time at the table?

6      A.    At the table for what?

7      Q.    During the time when we called the meeting

8    inside the conference, the actual date of dismissal on

9    which was termination on the 5th of 2023.  Why wasn't

10   this document presented if you all had discovered it?

11     A.    I'm not the one that would be presenting

12   information, but it was part of an investigation and

13   the list that is on here you had prompted.  So the

14   investigation was based on your list of these work

15   orders.  The information that Erin had that we went

16   over for her to write-up the documentation of

17   termination to my knowledge the document of

18   termination is the only thing that's required to be

19   gone over at that time.

20     Q.    So the document of termination was told to me

21   as I was stating that remember that none of these

22   documents exists, that I falsified all documentation

23   and none of them was found and I was dismissed,

24   correct, that's what was stated in that room?

25     A.    The information on here determined that it

169

1    was inaccurate what you had put here for credit for

2    those work orders and that's what proceeded from that

3    point.

4        Q.   But now it's accurate at this point?

5        A.   This information was all provided at that

6    point.  That was the original investigation.

7        Q.   Okay.  Well, we have it now stated where with

8    this states this work is now provided and showing

9    accuracy and then this write-up as it's stating.

10           THE COURT:  Give me some more volume.

11   BY MR. JACKSON:

12       Q.   It's showing that all of this is correct, you

13   know.  Another thing that I noticed that you

14   mentioned, you and me talked numerous times on the

15   behavior of James White and we had the discussion,

16   remember, in your office about James how he's acting?

17       A.   I don't recall any discussions.

18       Q.   You don't recall when I walked into your

19   office and closed the door and I told you what James

20   was doing and we kind of addressed the issue and you

21   said you would talk to him and see about it?

22           THE COURT:  What issue?

23           MR. JACKSON:  The way how he's acting,

24       conducting himself on the floor and-

25           THE WITNESS:  There was no such discussions

170

1       had.

2    BY MR. JACKSON:

3        Q.   You don't remember that discussion that we

4    had?

5        A.   There was no discussions like that at all

6    with myself.

7        Q.   I remember the discussions that we had and

8    you said verbally that you would have a talk with him

9    and you were saying that at the time that if there is

10   something wrong, Mr. Jackson, if something is

11   bothering you, I told you remember I explained to you,

12   yes, I have a problem with James and what he's doing

13   out on the floor?  Remember me addressing the issue

14   about what was wrong with me at the time?

15       A.   There was no such discussions had.

16       Q.   Okay.  All right.  Well, now you do know and

17   recall that at the time I bought you a business

18   binder.  Do you remember that?

19       A.   I do.

20       Q.   And we exchanged gifts.  Do you remember what

21   gift you gave me in return?

22       A.   I don't remember.

23       Q.   Okay.  Well, the gift you gave me is the gift

24   that I have here that I still have that you gave me

25   and we swapped.  Everybody knows in the department

171

1    that I'm allergic to coconut.  James is aware.  A

2    couple times I mentioned that.  But I told everybody

3    anything you all have I cannot have coconut because

4    I'm allergic to it.  So I don't know what happened or

5    why I was after bringing in and making exchanges with

6    gifts.  Of course, it was your birthday and I wasn't

7    able to attend to your birthday because I had another

8    engagement, but in turn I bought you a gift and for

9    certain employees in the Maintenance Department in

10    exchange for certain appreciation.  You know, I

11    appreciate you being our maintenance manager showing

12    hospitality and so forth.  And in turn I get a coconut

13    laced, which I'm allergic to and you were aware of the

14    coconut situation I had?

15        A.    No idea about anything of allergic to

16    anything and clearly stated what the items were and it

17    was not relating to a birthday situation.  It was

18    probably around the holidays actually and it was this

19    is coconut, this is ginger, anybody is welcome to have

20    some if they'd like to have some and that was it.

21        Q.    Well, mines was separate because we had this

22    separate prior before it happened.  I remember that

23    part.  That was later on in the months, but with this

24    we had exchanged all that prior to that.  So if it

25    wasn't for Mr. Logan saying because I was going to try

172

1    it and fortunately, he did because I was going to take

2    it home and eat upon it.  I didn't know exactly what

3    it was.  All I knew was that it was a dish.  I didn't

4    know it had coconut in it.  And if I knew it had

5    coconut in it, I would have to leave it at your desk

6    and not accept it.

7            MS. JOZSI:  Your Honor, can I ask is there a

8        question coming?

9            THE COURT:  I think we're getting there.

10   BY MR. JACKSON:

11       Q.   I was wondering why would you present the

12   coconut to me if everybody knew I couldn't have it?

13       A.   It had never been mentioned to me.  I was

14   completely unaware that you had any allergy to coconut

15   and I did clearly state this is coconut, this is

16   ginger prior to anyone taking any of it from my desk.

17   So that's it.

18       Q.   And you was aware of Mr. White's behavior as

19   I mentioned the way how he was treating me.  Do you

20   recall I mentioned that tools and stuff was taken from

21   my toolbox and stuff?

22       A.   There was no mention of that whatsoever.

23       Q.   Interesting.  So what was the entire purpose

24   of that you told me that you assigned me to do a task

25   with Mr. White and then check back with you later and

173

1    that was days prior before which was on the 21st and

2    I'd done some work and then I reported back to you and

3    then initially you said you got upset that I done the

4    work doing stuff for James, I'm only supposed to do

5    work for you not James, but you told me to go ahead

6    and did this for James and then come back, but then

7    that wasn't the case and you got mad and upset?

8        A.    I don't remember anything about the 21st or

9    what you're talking about there.  It wasn't something

10   we had investigated.  I have no memory of that.

11       Q.    When Darryl was sitting there at the door and

12   he turned around and walked off and you told me just

13   go do what James says and then I come back and finish

14   it and you said why did I do this job?

15       A.    I don't remember any discussion.

16       Q.    You don't remember that?

17       A.    No.

18       Q.    To me it kind of seems you all was pairing up

19   working together back and forth.  To me it seems as

20   though and I worked there, I was one of the last ones

21   left of my nature.  Okay.  And you didn't know that

22   James repeatedly would say we don't have to have a

23   minority in our department, stuff of that nature, and

24   I knew what he was leaning towards?  Now, the other

25   discussion went I mentioned they were learning about

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

174

1    the situation and I've talked to you about the

2    situation about his behavior and what he was doing.

3    And it seems though the issues didn't get addressed

4    and kept leading on.  I think how it went is because

5    in fact I was tensed up and you figured I get

6    aggravated because of things they was doing, they was

7    doing taking my tools, moving my chair, hiding stuff.

8    It was all fun and games, but being management I felt

9    like a lot of the issues could have been resolved that

10   I mentioned when I came to the office and talked to

11   you about them.  And things could have moved and got

12   out of the way where we were on a better path and I

13   could still be employed, still working and help the

14   company.  I worked on a lot of assignments.  We were

15   trying to build and do certain things, but it seems

16   though that they way how things were being strategized

17   and how you were doing certain things and James coming

18   in and talking over about certain things and I could

19   read between the lines on certain issues on how things

20   were being set up.  That's the nature of a certain

21   person.  I can sense certain things.  I see it as an

22   unfair way of how things was done.  Now, if it was an

23   issue or a problem me being the last one in the

24   department, I would prefer you would come say that

25   upfront and it not be to the point of creating certain

175

1    levels that was caused.  Do you recall James going in

2    my book bag, my food bag, lunch bag, and then come

3    back to your office and tell you what was in there?

4        A.    Nothing of what you've just stated was ever

5    discussed or happened at least in my presence.

6        Q.    So he never came back to your office and tell

7    you what was in that lunch bag?

8        A.    For everything you just said none of that has

9    actually happened in my presence.

10       Q.    There were four witnesses including myself.

11   We stood over the glass house and watched James

12   literally went in and open that bag and we watched him

13   on several occasions.

14           THE COURT:  Mr. Jackson, we've got this

15       witness right now, so I need to know what this

16       witness knows.  I think he's been pretty

17       definitive about what he knows and what he

18       doesn't.

19           MR. JACKSON:  Yes.  There is a lot of things

20       that he knows he's not going to really respond

21       correctly that actually happened.

22           MS. JOZSI:  Your Honor, that's improper.

23       He's trying to impeach or mischaracterize

24       Mr. Felger.

25           THE COURT:  I think Mr. Felger has given the

176

```
 1          answer.  It's obviously not the answer you were
 2          expecting or you thought he should have given, but
 3          it's the answer he's given me under oath.  So if
 4          there is a different question that maybe can
 5          elicit some answers, let's ask him.  But this
 6          isn't the time for you to testify.  I think some
 7          of the things you've talked about in the form of
 8          that question were things you testified to in your
 9          direct examination earlier.  I recognize some of
10          the fact patterns.  So if you have some questions
11          for Mr. Felger, let's get those out.
12   BY MR. JACKSON:
13          Q.   Do you recall that Mr. James went back to
14   your office and reported to you that the machines that
15   I fixed wasn't working properly after I repaired them?
16   Do you recall any of that?
17          A.   I do not recall any of that.
18          Q.   He didn't mention that to you?  All right.
19          MR. JACKSON:  There is one more question I
20          need to ask and I can't find that notation.  I
21          guess I'm going to have to move on from that last
22          one I had that I had written down earlier.
23          Unfortunately, I can't find that one statement I
24          wanted to ask Mr. Felger at this time, so that
25          will be all the questions.
```

177

1          THE COURT:  Any redirect?

2          MS. JOZSI:  Briefly, Your Honor.

3                    **REDIRECT EXAMINATION**

4   BY MS. JOZSI:

5      Q.   Mr. Felger could you turn to tab 40 please?

6      A.   Okay.

7      Q.   Specifically if you turn- to you'll see

8   there's some numbers on the bottom of the papers.  If

9   you turn to the one that's Respondent's 236, this is

10  for Work Order 12353, correct?

11     A.   Yes.

12     Q.   Is there a date at the bottom that shows the

13  date and time that this was printed?

14     A.   Yes, printed by me on August 25th of '23.

15     Q.   Was that during the investigation where you

16  were reviewing these work orders?

17     A.   I believe it was, yes.

18     Q.   Contrary to Mr. Jackson's characterization

19  you had all these work orders, the 12 work orders we

20  looked at, this is an example, but did you have all 12

21  work orders and were they printed and reviewed during

22  the time of the investigation in August of 2023?

23     A.   Yes.

24          THE COURT:  Let me do this because that is

25     also Exhibit 16 which is in evidence.  So rather

178

 1          than putting another piece of paper that's not yet

 2          in evidence, why don't we have him take a look at

 3          Exhibit 16 and he give me what appears to be the

 4          same date.

 5               MS. JOZSI:  Yes, sir, Exhibit 16.  Thank you,

 6          Your Honor.

 7     BY MS. JOZSI:

 8          Q.   Does Exhibit 16 contain that same notation

 9     that was printed on August 25th, 2023?

10          A.   Yes.

11          Q.   By you?

12          A.   Yes.

13          Q.   And then I don't want to go through all of

14     them, but if you look through let's say 18, does that

15     also contain that same indication that it was printed

16     in August 2023?

17          A.   Yes, August 25th of 2023 by me.

18          Q.   To your knowledge, all 12 work orders were

19     reviewed and printed in August 2023?

20          A.   Correct.

21          Q.   Mr. Jackson also suggested that there were

22     four restrooms that he cleaned instead of the two.

23     You testified that CMMS only shows two restrooms,

24     correct?

25          A.   Correct.

179

1    Q.    As far as any other work orders that we

2    reviewed during your direct testimony that may have

3    indicated that Mr. Jackson did perform work on

4    August 22nd, were you aware of the existence of those

5    work orders during your initial conversation with

6    Mr. Jackson connected to that performance write-up?

7    A.    No.

8    Q.    Mr. Jackson also said something to the effect

9    that he was the last of his nature in the department.

10   Do you know what he was referring to there?

11   A.    I'm not sure what he means by that.

12   Q.    Let me ask this way.  Was Mr. Jackson the

13   only minority employee in the department during his

14   employment?

15   A.    No.

16   Q.    Do you still have minorities in your

17   department to this day?

18   A.    Yes.

19   Q.    Mr. Jackson was also suggesting at one point

20   that I believe he was suggesting that you should fix

21   the performance warning notice once you determined

22   that there was work completed August 22nd.  Was there

23   a reason that you didn't go back and revise that work

24   performance warning notice?

25   A.    The records were reviewed following the

180

```
 1    conversation based on what he had said based on what
 2    was in the CMMS and at the time of the investigation
 3    that's all that was in the CMMS.
 4           MS. JOZSI:  I don't have any other questions,
 5       Your Honor.
 6           THE COURT:  Mr. Felger, thank you, sir.
 7       You're welcome to stick around in here.  You're
 8       welcome to go home.  It's up to you.
 9           THE WITNESS:  Thank you.
10           THE COURT:  Who is next?
11           MS. JOZSI:  Ms. Erin Wade.  Can we take two
12       minutes to use the restroom?
13           THE COURT:  We'll come back at 3:35.
14           (A recess was taken from 3:30 p.m. to 3:35
15       p.m.)
16           THE COURT:  Please raise your right hand.
17           Do you solemnly swear or affirm that the
18       testimony you're to give today is the truth, the
19       whole truth and nothing but the truth?
20           THE WITNESS:  I do.
21           THE COURT:  And your full name, please.
22           THE WITNESS:  Erin Wade.
23           THE COURT:  All right.  Please have a seat.
24    THEREUPON,
25                          ERIN WADE,
```

181

1    having been first duly sworn by this Court, was

2    examined and testified upon her oath as follows:

3                    **DIRECT EXAMINATION**

4    BY MS. JOZSI:

5        Q.    Good afternoon, Ms. Wade.  Can you please

6    introduce yourself to the Court, where you work, and

7    your current job title?

8        A.    My name is Erin Wade.  I'm the HR manager at

9    GT Technologies.

10       Q.    How long have you been the HR manager at GT

11   Technologies?

12       A.    Seven years.  Almost eight in October.

13       Q.    Can you just tell me what are your duties as

14   the HR manager?

15       A.    Some of my duties include payroll,

16   recruitment, employee benefits, employee relations,

17   Worker's Compensation, safety, training and et cetera.

18       Q.    Anything having to do with employees?

19       A.    Yes.

20       Q.    Are you involved in employee discipline and

21   termination?

22       A.    Yes.

23       Q.    And have you been an HR manager the entire

24   time you worked for GT?

25       A.    Yes.

182

```
 1          Q.    Who do you report to?

 2          A.    I report to Dave LaVieri.

 3          Q.    Who is he?

 4          A.    He is our plant manager.

 5          Q.    Do you directly report or consult with anyone

 6     else in Human Resources within the company?

 7          A.    Yes.   I have I guess a guideline to our

 8     Corporate HR office.

 9          Q.    Are they located in Tallahassee?

10          A.    No, they are located in Westland,

11     Michigan.

12          Q.    Do you know the Petitioner in this case,

13     Mr. Jackson?

14          A.    Yes.

15          Q.    How do you know him?

16          A.    He was a former employee.

17          Q.    We've already gone through some of these

18     today, but are you familiar with GT Technologies's

19     employment policies and procedures?

20          A.    Yes.

21          Q.    Is that one of your jobs to implement or to

22     ensure those policies are being implemented?

23          A.    Yes.

24          Q.    Would you turn to Tab 9 in the binder?   Do

25     you recognize this document?
```

183

```
 1        A.    Yes.

 2        Q.    Is this the employee handbook?

 3        A.    Yes, it's the Code of Business Misconduct and

 4   Ethics.

 5        Q.    Does GT have a policy prohibiting

 6   discrimination?

 7        A.    Yes.

 8        Q.    Does it have a policy prohibiting

 9   retaliation?

10        A.    Yes.

11        Q.    What about harassment?

12        A.    Yes.

13        Q.    If an employee has any concerns or

14   complaints, what is the company's reporting mechanisms

15   to voice those concerns or complaints?

16        A.    We direct them to their immediate supervisor

17   first.  If they can't resolve the issue with the

18   immediate supervisor, they can come to Human

19   Resources, myself, or the plant manager.  There is

20   also an ethics hotline that we have if employees want

21   to report anonymously.

22        Q.    Do you maintain that ethics hotline

23   personally?

24        A.    No.

25        Q.    If an employee calls the ethics hotline are
```

184

```
 1    you notified about that?

 2         A.   If it involves our plant, yes, I do.

 3         Q.   Who notifies you of that?

 4         A.   Amy McCorry.  She's our HR manager at our

 5    Westland office.

 6         Q.   The corporate HR?

 7         A.   The corporate HR.

 8              THE COURT:  So does the hotline go to the

 9         corporate HR office?

10              THE WITNESS:  Essentially it's a third party

11         that monitors the line and then they send all the

12         information to Amy.

13              THE COURT:  And if it's something that deals

14         with Tallahassee she sends it to you?

15              THE WITNESS:  Yes.

16    BY MS. JOZSI:

17         Q.   To your knowledge, did Mr. Jackson ever

18    receive this code of conduct?

19         A.   Yes.

20         Q.   Does the employer ever remind its employees

21    of the policies from time to time?

22         A.   Yes.

23         Q.   Can you turn to tab 10 please?  Do you

24    recognize this document?

25         A.   Yes.
```

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

185

1      Q.   Can you tell the Court what this document is?

2      A.   This is our ethics hotline and it gets posted

3   on our bulletin board in the employee area for all

4   employees to see.

5      Q.   What is the date of this document?

6      A.   October 3rd, 2022.

7      Q.   So was this document posted during

8   Mr. Jackson's employment?

9      A.   Yes.

10     Q.   And it's signed by Dan Brinker.  Who is Dan

11  Brinker?

12     A.   He's the President of GT Technologies.

13     Q.   Is this language that was posted consistent

14  with the language in the employee handbook regarding

15  the hotline?

16     A.   Yes.

17          MS. JOZSI:  Your Honor, I'd like to move 10

18      into evidence.

19          THE COURT:  Mr. Jackson, any objection to

20      Exhibit No. 10?

21          MR. JACKSON:  That's fine.

22          THE COURT:  Without objection Respondent's

23      Exhibit 10 is received into evidence.

24          (Whereupon, Respondent's Exhibit 10 was

25      admitted into evidence.)

186

 1    BY MS. JOZSI:

 2         Q.    Other than that hotline notice are there any

 3    other notices that are regularly distributed to

 4    employees regarding GT's policies?

 5         A.    During new hiring orientation.

 6         Q.    After new hire orientation do you ever inform

 7    employees or remind employees about your policies?

 8         A.    They're posted for employees to review.

 9         Q.    On the bulletin board?

10         A.    On the bulletin board.

11         Q.    Can you turn to tab 11, please?  This is

12    several pages, but do you recognize these documents?

13         A.    Yes.

14         Q.    Can you identify these documents?

15         A.    The first one is our statement of policy that

16    we do not discriminate and we are an equal opportunity

17    employer for all employees and perspective employees.

18    These are also posted on our bulletin with the ethics

19    hotline.

20         Q.    What is the date of that document?

21         A.    October 3rd, 2022.

22         Q.    What about the next one?

23         A.    This is the reaffirmation of policy similar

24    to the Equal Employment Opportunity Policy.

25         Q.    And the date of that one?

187

```
 1        A.    October 3, 2022.

 2        Q.    What about the next one?

 3        A.    Similar to the one before that we're an equal

 4    opportunity affirmative action employer.

 5        Q.    And the date?

 6        A.    October 3rd, 2022.

 7        Q.    And the last one please?

 8        A.    This one is notice to all applicants and

 9    employees that GT Technologies will not discriminate,

10    harassment will not be tolerated and do an

11    investigation if anything is brought forward.

12        Q.    And the date on that?

13        A.    October 3rd, 2022.

14            MS. JOZSI:  Your Honor, I'd like to move

15        composite Exhibit 11 into evidence.

16            THE COURT:  Mr. Jackson, any objection?

17            MR. JACKSON:  No, sir.

18            THE COURT:  Without objection Respondent's

19        Exhibit 11 is received in evidence.

20            (Whereupon, Respondent's Exhibit 11 was

21        admitted into evidence.)

22    BY MS. JOZSI:

23        Q.    Ms. Wade, all those four statements that we

24    looked at as Exhibit 11, are those also consistent

25    with the code of conduct?
```

188

```
 1          A.   Yes.

 2          Q.   And does the company have a separate policy

 3     for associate conduct and behavior for employees?

 4          A.   Yes.

 5          Q.   Can you turn to tab 12, please?  This has

 6     previously been admitted into evidence.  Do you

 7     recognize this document?

 8          A.   Yes.

 9          Q.   What is this document?

10          A.   This is our associate conduct policy.

11          Q.   Do you use this in your capacity as the HR

12     manager?

13          A.   Yes.

14          Q.   How do you use this document?

15          A.   To determine if an employee needs to receive

16     documentation for unsatisfactory behavior.

17          Q.   Are there levels of documentation or

18     requirements for different types of discipline?

19          A.   Yes.

20          Q.   Is this like a progressive discipline policy?

21          A.   Yes.

22          Q.   And are there any actions that would warrant

23     an immediate dismissal of an employee?

24          A.   Yes.

25          Q.   Can you turn to the third page, Respondent's
```

189

1    149?  Does that page list disciplinary actions that

2    result in immediate discharge?

3        A.   Yes.

4        Q.   And if you we look at No. 32 can you read

5    that one please?

6        A.   Falsifying company records or reports

7    including time cards, production counts, personnel

8    records and/or medical records.

9        Q.   You testified that you are familiar with

10   Mr. Jackson as a former employee.  Did he report to

11   you?

12       A.   No.

13       Q.   Who was his supervisor?

14       A.   Jason Felger.

15       Q.   Were you in anyway involved on a daily basis

16   in supervising his work performance or evaluating his

17   work performance?

18       A.   No.

19       Q.   To your knowledge, did Mr. Jackson ever

20   receive any performance or disciplinary notices?

21       A.   Yes.

22       Q.   How do you know that?

23       A.   Jason and myself discussed his verbal warning

24   that he received.  We discussed it before it was

25   delivered to him.

1    Q.   Can you turn to tab 13?  This has been
2    admitted into evidence.  Is this the verbal warning
3    that you were just referring to?
4    A.   Yes.
5    Q.   Is that your signature there at the bottom?
6    A.   Yes.
7    Q.   So did you review or prepare this document?
8    A.   No.  Well, I reviewed it after it had been
9    delivered to Mr. Jackson.
10    Q.   But did you discuss the contents with
11    Mr. Felger before it was presented?
12    A.   Yes.
13    Q.   During that discussion with Mr. Felger did
14    you have any concerns about the performance warning
15    notice being presented as written?
16    A.   No.
17    Q.   Would you say you were a decision-maker as
18    far as deciding to issue this discipline?
19    A.   I was a consult within the decision-making.
20    Q.   What was your understanding of the reason
21    that Mr. Jackson was receiving this performance
22    warning notice?
23    A.   My understanding was that on 8/22 he only
24    performed one hour of work during an eight-hour shift.
25    Q.   How did you know that?

191

1        A.    Based on Jason and I's conversation and what

2    was in the CMMS.

3        Q.    To your knowledge, did Mr. Jackson get a copy

4    of this document?

5        A.    I don't believe so.

6        Q.    To your knowledge, was he at least informed

7    about this performance warning notice?

8        A.    Yes.  So when documentation is delivered the

9    employee is allowed to review the information, but we

10    don't provide a copy to the employee.

11        Q.    But he was aware of the warning?

12        A.    Yes.

13        Q.    Did Mr. Jackson ever discuss this performance

14    warning notice with you?

15        A.    Yes.

16        Q.    Can you tell us about that discussion?

17        A.    So he came to me a couple days later after I

18    had received it on my desk and said that he disagreed

19    with the documentation.  I asked him why did he

20    disagree with it and he said that the computer was

21    down and he was entering his work on that day.

22        Q.    So what did you do next after he told you

23    that?

24        A.    So I asked him to provide me a list of work

25    orders that he had performed on that Saturday and that

192

```
 1    he had entered on that Tuesday.
 2         Q.   During that initial conversation did
 3    Mr. Jackson ever mention anything about discrimination
 4    to you?
 5         A.   In the initial conversation, no.
 6         Q.   You said you asked Mr. Jackson to submit a
 7    list of work orders.  Did he ever submit that?
 8         A.   Yes.
 9         Q.   Can you turn to tab 14, please?
10         A.   Yes.
11         Q.   What is this document?
12         A.   So this is the-
13              THE COURT:  Hang on.  This is another one
14         we've introduced and it has a different number.
15              MS. JOZSI:  Yes, Your Honor.  There is a
16         reason for that and I will have Ms. Wade explain
17         that.
18              THE COURT:  Sorry to interrupt.
19              MS. JOZSI:  I appreciate the efficiency, but
20         there is a reason we are introducing this one.
21    BY MS. JOZSI:
22         Q.   So this is the document Mr. Jackson provided
23    you?
24         A.   Yes.
25         Q.   As the Judge just pointed out, we've seen
```

193

1    another version of this.  Was there ever a version

2    that looked slightly different than this?

3        A.    Yes.

4        Q.    What was the difference between that version

5    and what you're seeing as Exhibit 14?

6        A.    So the difference is the line that's drawn

7    between numbers 12445 and 12450 and then the Saturday,

8    8/19 date and the Monday 8/21 date.

9        Q.    Who drew that line?

10       A.    I did.

11       Q.    Why did you do that?

12       A.    Because the original list that he provided he

13   stated that he did all of those work orders on

14   Saturday, 8/19.  The list was left on my desk that

15   day, so I wanted to verify with him that all of those

16   work orders were in fact completed on Saturday because

17   it did look like a significant amount of work orders

18   for a maintenance tech to complete in one day.  So

19   when I went back to him he said, no, half of those

20   were on Saturday and half of those were on Monday.

21       Q.    Did you draw that line?

22       A.    So I drew the line and I wrote Saturday, 8/19

23   at the top and Monday, 8/21 because he changed his

24   story of when the work orders were actually completed.

25       Q.    So the first six work orders Mr. Jackson

194

1    claimed to have performed on 8/19 and the final six he

2    said he did on 8/21?

3          A.   Yes.

4          Q.   Other than that is there any other change to

5    this document of how the document was presented to you

6    originally by Mr. Jackson?

7          A.   No.

8               MS. JOZSI:  Your Honor, I'd like to move

9          Exhibit 14 in the record.

10              THE COURT:  All right.  Mr. Jackson, any

11         objection to Exhibit 14, which is your document as

12         written on by Ms. Wade?

13              MR. JACKSON:  No, sir.

14              THE COURT:  Without objection Respondent's

15         Exhibit 14 is received in evidence.

16              (Whereupon, Respondent's Exhibit 14 was

17         admitted into evidence.)

18   BY MS. JOZSI:

19         Q.   Ms. Wade, we were talking a lot about the

20   list, but the document has the first page as well.  Do

21   you see that?

22         A.   Yes.

23         Q.   That says to HR August 25th, 2023 and it

24   appears to be signed by Mr. Jackson.  Is that correct?

25         A.   Yes.

195

```
1        Q.    Was this presented at the same time as the

2   list?

3        A.    Yes.

4        Q.    When you reviewed this document what did you

5   do?

6        A.    I asked him- well, I asked him about the work

7   orders and then he I asked him if I verified that

8   these work orders were actually completed when you

9   said they were completed that the CMMS and the

10  security logs are going to show the same thing, and he

11  said yes.  This was also the first time that I heard

12  of him mentioning that he was discriminated as a black

13  employee.  So I asked him how he felt that he was

14  discriminated and he said because nobody else was able

15  to enter their work orders on Saturday.

16       Q.    So when he says discriminating a black

17  employee that works as a maintenance fabrication

18  welder engineer of GT Technologies, that's the first

19  time you ever heard a complaint of discrimination from

20  him?

21       A.    Yes.

22       Q.    Did you investigate that claim?

23       A.    Yes.

24       Q.    What did you determine based on that

25  investigation of the discrimination claim first?
```

196

1      A.    Basically the reason for discriminating had

2  nothing to do with race at the time.  It had nothing

3  to do with race.  It had to do with work orders that

4  were being entered into the system.

5      Q.    During your investigation did you determine

6  any other employees had problems accessing the

7  computer system on Saturday, August 19th?

8      A.    No.

9      Q.    In your view as an HR professional was he

10 treated any differently than any employees conducting

11 the same conduct?

12     A.    No.

13     Q.    As to the actual list of work orders you

14 mentioned that you spoke with Mr. Jackson and drew the

15 line.  What did you do next?

16     A.    So it was I went to Jason with the list and

17 asked him to pull all of these work orders and the

18 security logs so we could do the investigation on when

19 the work orders were performed and any documentation

20 he could provide based on the list that he gave me

21 because Mr. Jackson was rebutting his verbal warning.

22 So we had to do an investigation to basically figure

23 out if the warning needed to be removed or not.

24     Q.    Do you have the ability to pull CMMS or work

25 order data?

197

1    A.    No.

2    Q.    So you said Mr. Felger was the one that

3    actually pulled those records?

4    A.    Yes.

5    Q.    Did you review all those records that

6    Mr. Felger pulled?

7    A.    Yes.

8    Q.    Did you keep notes during your investigation

9    as far as your conversations or you know what orders

10    you reviewed and things of that nature?

11    A.    Yes.

12    Q.    Let's turn to tab 40.  It's several pages,

13    but do you recognize generally this exhibit?

14    A.    Yes.

15    Q.    What is this?

16    A.    These are my notes of my conversation with

17    Mr. Jackson on 8/25/23.

18    Q.    Is that all that this document is?

19    A.    No, this is the investigation on the work

20    orders.

21    Q.    Did you keep these notes or did you take

22    these notes and keep these documents contemporaneous

23    to your investigation?

24    A.    Yes.

25    Q.    If you'll go through you'll see we've already

198

```
1    introduced- I don't want to confuse the issue, but
2    we've already introduced all of these work orders and
3    both Mr. Jackson and Mr. Felger have gone through them
4    all, but these are the same that have some
5    highlighting of handwriting on them.  Do you see that?
6         A.   Yes.
7         Q.   Are these the things you actually were
8    looking at during this investigation?
9         A.   Yes.
10        Q.   Is that your handwriting or highlighting?
11        A.   No.
12        Q.   Who is that?
13        A.   Jason Felger.
14             THE COURT:  What page is that?
15             MS. JOZSI:  That would be Respondent's 234 to
16        240.  And then as you go through the remainder,
17        235 through 257 there is miscellaneous
18        highlighting and some notations.
19             THE COURT:  And so all the purple highlights
20        are done by Mr. Felger?
21             THE WITNESS:  Yes.
22   BY MS. JOZSI:
23        Q.   Did you discuss all those notes and comments
24   with him?
25        A.   Yes.
```

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

199

1     Q.   So, did you review the CMMS security log

2   yourself?

3     A.   I reviewed the printout.

4     Q.   If you turn to tab 15, is that the printout

5   you're referring to?

6     A.   Yes.

7     Q.   And I don't want to belabor the point or

8   waste anybody's time again, but if you could briefly

9   look through Exhibit 16 through 27 and just let us

10   know if those are copies of the work orders that you

11   reviewed?

12     A.   (Perusing.)  Yes.

13     Q.   Did you review anything else during your

14   investigation besides the work orders, the CMMS

15   security logs, and the list made by Mr. Jackson?

16     A.   No.

17     Q.   Can you describe what your ultimate findings,

18   your conclusions were at the end of that

19   investigation?

20     A.   It was determined that only a few of the work

21   orders had been entered by Mr. Jackson and that he had

22   falsified documents.

23     Q.   When you say he falsified documents, can you

24   explain what you mean by that?

25     A.   That there were other maintenance techs that

200

1    had entered the information based on the work order

2    numbers that he had given me instead of himself.

3         Q.   So the list that he provided didn't

4    necessarily match with the work that was being done?

5         A.   Correct.

6         Q.   Were there any instances of work orders that

7    Mr. Jackson said he performed work on a certain- let

8    me take that back.

9              Were there any orders that you discovered

10   Mr. Jackson may have in fact performed work on but not

11   on the date that he claimed that work?

12        A.   Yes.

13        Q.   And I think you already said this, but based

14   on your investigation did you determine anyone else

15   had any kind of computer issues on the 19th?

16        A.   No one else had computer issues on the 19th.

17        Q.   How long did it take you to review all these

18   work orders and the documents approximately?

19        A.   I can't remember, but maybe a week, maybe a

20   little bit longer than that.  The Labor Day holiday

21   was in the mix of that, so I'm not for certain.

22        Q.   While you were doing this investigation was

23   Mr. Jackson still working?

24        A.   Yes.

25        Q.   After you finished your review of all the

201

1    documents did you consult with Mr. Felger again?

2        A.    Yes.

3        Q.    And what did you all discuss or what did you

4    determine?

5        A.    We determined that there was falsification of

6    company documents and that the disciplinary action was

7    immediate termination.  Once we determined that, we

8    presented the information to Dave LaVieri for his

9    approval and then also had discussion with our

10   corporate office on termination.

11       Q.    And so did you make a recommendation to Dave

12   about termination?

13       A.    Yes.

14       Q.    And you say you discussed it with the

15   corporate office.  Do you recall who you discussed it

16   with?

17       A.    It wasn't myself, but I believe Dave

18   discussed it with Dan Brinker.

19       Q.    Who is Dan Brinker?

20       A.    He is the President of GT Technologies.

21       Q.    Can you turn to Exhibit 28?  This has already

22   been introduced, but are you familiar with this

23   document?

24       A.    Yes.

25       Q.    Did you prepare this document?

202

1      A.    Yes.

2      Q.    Does this document accurately explain your

3   rationale for terminating Mr. Jackson's employment?

4      A.    Yes.

5      Q.    Were you involved in the discussion of

6   termination with Mr. Jackson?

7      A.    Yes.

8      Q.    To your knowledge has GT Technologies ever

9   terminated any other employees for this kind of

10  behavior?

11     A.    Yes.

12     Q.    Can you turn to tab 50?  This is a composite

13  document.  It's three pages.  Can you review that and

14  tell me if you're familiar with this document or these

15  three documents I suppose?

16     A.    Yes.

17     Q.    What do these documents show?

18     A.    These are three former employees that were

19  terminated for falsifying company records or reports.

20     Q.    It says, Rule involved No. 32.  Is that the

21  same rule that was used to terminate Mr. Jackson's

22  employment?

23     A.    Yes.

24     Q.    And is your signature on all three of these

25  documents?

```
 1        A.   Yes.
 2        Q.   And, again, there is three documents.  Can
 3   you tell us the dates of those three documents?
 4        A.   The first one is 12/21/223, the second one is
 5   7/5/2023, and the third one is 9/5/2023.
 6        Q.   So roughly all within the same time frame as
 7   Mr. Jackson's termination?
 8        A.   Yes.
 9             MS. JOZSI:  Your Honor, we'd like to admit
10        Exhibit 50 into the record.
11             THE COURT:  What date is this?
12             THE WITNESS:  Under the date of occurrence-
13        I'm sorry.  Do you-
14             THE COURT:  Just the date of occurrence.
15             THE WITNESS:  It's at the top under rules and
16        then date of occurrence.
17             THE COURT:  Got you.  Okay.  All right.
18             Mr. Jackson, Exhibit 50, any objection to
19        that being received in evidence?
20             MR. JACKSON:  50 I have an objection.
21             THE COURT:  On what basis?
22             MR. JACKSON:  Based on it's not corresponding
23        with what I had to go through.  It's a different
24        scenario due to what their circumstances are or
25        determined to be at that point.
```

204

```
 1              THE COURT:  All right.  Well, their dismissal
 2         is based on No. 32.  I'm going to receive them in
 3         evidence over objection.  You'll obviously have an
 4         opportunity to cross-examine her.  I'll receive
 5         Respondent's Exhibit 50 in evidence.
 6              (Whereupon, Respondent's Exhibit 50 was
 7         admitted into evidence.)
 8    BY MS. JOZSI:
 9         Q.   Ms. Wade, other than the letter that was part
10    of Exhibit 14 with the list that we talked about did
11    Mr. Jackson ever make any other complaints about
12    discrimination to you?
13         A.   No.
14         Q.   To your knowledge, did anyone else ever raise
15    any complaints from Mr. Jackson and bring that to your
16    attention?
17         A.   No.
18         Q.   And I believe you already testified that you
19    did investigate the claim of discrimination?
20         A.   Yes.
21         Q.   And did you find anything to support that
22    claim?
23         A.   No.
24         Q.   To your knowledge, did Mr. Jackson ever make
25    a hotline complaint?
```

205

```
 1        A.    Not to my knowledge.
 2        Q.    Have you ever received a hotline complaint
 3   describing incidents of the nature that Mr. Jackson
 4   has testified to today regarding discriminatory
 5   comments or conduct by Mr. White, Mr. Felger,
 6   Mr. LaVieri, any of those individuals?
 7        A.    No.
 8        Q.    Did Mr. Jackson ever complain to you about
 9   anything else during his employment?
10        A.    No.
11        Q.    Did he ever report incidents with a coconut
12   dish?
13        A.    No.
14        Q.    Did he ever report to you that he found a toy
15   or a statue with a noose around its neck?
16        A.    No.
17        Q.    Ms. Wade, have you ever discriminated against
18   Mr. Jackson?
19        A.    No.
20        Q.    Have you ever retaliated against Mr. Jackson?
21        A.    No.
22              MS. JOZSI:  I don't have anything further at
23         this time, Your Honor.
24              THE COURT:  All right.  Mr. Jackson, Ms. Wade
25         is your witness.
```

206

1                          **CROSS-EXAMINATION**

2      BY MR. JACKSON:

3          Q.    Ms. Wade, during my work time and history

4      have I ever complained to you about any of my work

5      before any of this incident occurred?

6          A.    No.

7          Q.    Have I always reported to you if there was

8      any problems with the facility and I would come to you

9      and let you know what was wrong with it and we would

10     address the issue if anything that was wrong with the

11     faculty?

12         A.    Sometimes.

13         Q.    Okay.  When you would contact maintenance and

14     needed someone to help out and you've asked, have I

15     always stopped what I was doing and come help fix

16     whatever you needed done in your office or doing

17     anything outside the office in the parking lot for

18     you?

19         A.    I believe so.

20         Q.    As you've know me for over seven years you

21     know I always had a good work history and I

22     participated in helping the company out in anyway

23     that's possible as far as working a tremendous amount

24     of overtime and pursuing on tasks for the company.  Is

25     there any point in time during my work time that you

207

 1    may have felt that I didn't perform a task good enough

 2    over the years as far as helping the company?

 3         A.   I don't recall anything.

 4         Q.   During this past year, 2023, of course you

 5    were unaware of the maintenance action that was

 6    occurring at that time up until due to- how did you

 7    feel about the work performance warning that I got?

 8    What was your reaction on that?

 9         A.   I'm sorry.  What was my reaction to the

10    performance?

11         Q.   Right.  Were you surprised this actually

12    happened that I received such a matter of this?  How

13    was your response to it as far as Mr. Felger, Jason

14    Felger- I'm sorry.  I'm bad with names, Judge.

15              THE COURT:  Join the club.

16    BY MR. JACKOSN:

17         Q.   Was you disturbed at that time being

18    presented to you at some point?

19         A.   Disturbed, no.

20         Q.   Okay.  Did you fully understand why he wrote

21    this performance warning?

22         A.   Yes.

23         Q.   After reviewing the documentations that I

24    gave to you and then going back to speak with

25    Mr. Jason do you feel that he gave you the accurate

208

```
1    information that you needed at this time to pursue
2    further actions?
3         A.    Yes.
4         Q.    And how long did it take for you all to try
5    to find and review the documentation as far as the
6    work orders?
7         A.    I've already answered that question.
8         Q.    I just want to make sure it's the same
9    answer.
10             THE COURT:  Well, I think she's already
11        answered it.  I took notes.  It's my recollection
12        you said it took you about a week, but you had
13        Labor Day stuck in there so it extended a little
14        bit.  Is that fair?
15             THE WITNESS:  Yes.  Yes, that's fair.
16             THE COURT:  I'm always interested to make
17        sure I understand things because I've got to write
18        this up at some point.
19    BY MR. JACKSON:
20         Q.    After that after I worked that following week
21    do you remember or recall the image that I brought to
22    the front office where I showed you and Mr. Dave
23    LaVieri and you were all standing in the hallway
24    there?  Do you remember the little brown image I
25    brought to you?
```

209

1      A.    No.

2      Q.    No?

3      A.    You did not bring me anything.

4      Q.    I didn't bring the little statue to you?

5      A.    No.

6      Q.    That's interesting.  Okay.  All right.  Do

7  you recall after I left out of there I think five

8  minutes later that I was called to the conference

9  room?

10     A.    No.

11     Q.    So was there any other discussion brought to

12 your attention as far as anything that was mentioned

13 as far as what went on during the time that I was

14 working from the date of the 19th up until the 22nd?

15 Was anything mentioned in-between to you from either

16 Dave LaVieri or Jason as far as where James' behavior

17 was mentioned?  Did they mention that to you at any

18 point?

19     A.    No.

20          MR. JACKSON:  Did you gave me the picture of

21     the book cover?

22          MS. JOZSI:  You gave me six pictures.  Those

23     two coconut, two dishes, two statues and the two

24     toilets.

25          MR. JACKSON:  That was it?

210

```
 1            MS. JOZSI:  That's all.

 2            MR. JACKSON:  All right.  Okay.

 3            That will be all as far as Ms. Wade.

 4            THE COURT:  All right.  Let me ask you

 5       because you did have an objection.  I'm not trying

 6       to school you on how to present, but you did have

 7       an objection to 50, which were the three employees

 8       that were terminated for a violation of 32.  I

 9       didn't know if you wanted to follow-up on that

10       because they did introduce them in evidence.

11            MR. JACKSON:  Yeah, I didn't want to and I

12       did.

13            THE COURT:  It's your call.  I just wanted to

14       make sure it wasn't something that slipped your

15       mind.

16            MR. JACKSON:  That's fine.  We can add it in

17       there.

18            THE COURT:  They're in evidence.  I didn't

19       know if you wanted to ask anything.

20            MR. JACKSON:  Yes, that's fine.  Let's see.

21  BY MR. JACKSON:

22       Q.   So we do have other people that was

23  terminated due to falsifying information.  That's

24  correct?

25       A.   Yes.
```

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

211

1      Q.   Are there anymore postings as far as charges

2   such as mine on falsifying information that you all

3   know of or are aware of that's actually taking place

4   other than here today, any other charges being filed

5   as far as what's being presented today as far as

6   anybody testifying?

7      A.   I don't understand your question.

8      Q.   Well, what I mean is with these three other

9   people that's here are they pursuing anything-

10         THE COURT:  Are they pursuing any sort of

11      legal action?

12         MR. JACKSON:  Right.

13         THE WITNESS:  No, not to my knowledge.

14         MR. JACKSON:  Okay.  That's all the questions

15      I have.  That will be all for now.

16         THE COURT:  Okay.  Recross?

17                  **REDIRECT EXAMINATION**

18   BY MS. JOZSI:

19      Q.   We were on the subject of those other

20   terminations that were admitted as Exhibit 50.  It

21   looks like the first one was for falsification of time

22   records and the other two had to do with FMLA

23   documentation.  Is that correct?

24      A.   Yes.

25      Q.   To your knowledge, has anyone else ever

212

1    committed the same type of violation where they were

2    falsifying work orders or submitting documents

3    purporting to be completed on one day and actually not

4    necessarily completed by that individual on a

5    different day?  Has that ever happened before

6    Mr. Jackson?

7        A.    No.

8        Q.    Has that happened since Mr. Jackson to your

9    knowledge?

10        A.    Not to my knowledge.

11        Q.    So would it be accurate to say the company

12    has enforced its policy on falsification of records,

13    No. 32, but this is the only time this exact

14    circumstance has came up to your knowledge within the

15    company?

16        A.    Yes.

17        Q.    Do you have any reason to doubt your findings

18    as to the company records at the time you made the

19    determination in consultation with others to terminate

20    Mr. Jackson?

21        A.    No.

22        Q.    Did your decision to terminate Mr. Jackson

23    reflect your honest belief that Mr. Jackson falsified

24    documents during that investigation process?

25        A.    Yes.

213

```
1           MS. JOZSI:  I don't have any further
2      questions, Your Honor.
3           THE COURT:  All right.  Ms. Wade, thank you.
4           MS. JOZSI:  Your Honor, I have two more
5      witnesses on my end which I anticipate being very
6      brief.
7           THE COURT:  Let's get them done.  Raise your
8      right hand please.
9           Do you solemnly swear or affirm the testimony
10     you're to give today is the truth, the whole truth
11     and nothing but the truth?
12          THE WITNESS:  I do.
13          THE COURT:  Full name please.
14          THE WITNESS:  David LaVieri.
15          THE COURT:  Please be seated.
16 THEREUPON,
17                    DAVID LAVIERI,
18 having been first duly sworn by this Court, was
19 examined and testified upon his oath as follows:
20                 DIRECT EXAMINATION
21 BY MS. JOZSI:
22     Q.   Mr. LaVieri, for the court reporter's benefit
23 state and spell your full name.
24     A.   David.  Last name is L-A-V-I-E-R-I.
25     Q.   Can you introduce yourself to the Court to
```

214

1    say who you're employed with and your job title?

2        A.    I work with GT Technologies and I am the

3    Plant Manager currently.

4        Q.    How long have you been the plant manager for

5    GT Technologies?

6        A.    It'll be three years in December.

7        Q.    Can you describe your general duties as the

8    plant manager?

9        A.    Shipping production, shipping, receiving,

10   making sure the customers are satisfied, inbound

11   products.  Just overall overseeing most of the

12   managers, all the managers working with the corporate

13   team.

14       Q.    By extension are you responsible for

15   essentially supervising all the employees at the

16   Tallahassee location?

17       A.    Yes.

18       Q.    Do you know the petitioner in this case,

19   Mr. Quennel Jackson?

20       A.    Yes, I do.

21       Q.    How do you know him?

22       A.    He was a member of the maintenance team,

23   first shift.

24       Q.    And you were the plant manager during his

25   employment or part of his employment?

215

1        A.    Part of it, yes.

2        Q.    During Mr. Jackson's employment did he ever

3   complain to you about any conduct of let's start

4   anyone?  Did he ever make any complaints about conduct

5   of any of the other employees to you?

6        A.    No.

7        Q.    Specifically did he ever complain about James

8   White to you?

9        A.    No.

10        Q.    Did he ever complain about Jason Felger to

11   you?

12        A.    No.

13        Q.    Did he ever make any complaints about

14   discrimination based on race or any other category to

15   you?

16        A.    No.

17        Q.    Did he ever complain that he felt retaliated?

18        A.    No.

19        Q.    Or harassed?

20        A.    No.

21        Q.    Did Mr. Jackson ever present anything to you

22   that made you feel that he was the victim of

23   discrimination?

24        A.    No.

25        Q.    Did he ever- do you ever recall him showing

216

1    you a statue of any kind?

2         A.    No.

3         Q.    Were you involved in the decision to

4    terminate Mr. Jackson's employment?

5         A.    Yes.

6         Q.    Were you involved in the investigation that

7    lead to his termination?

8         A.    No, but I reviewed the data at the time and

9    helped make the decision, yes.

10        Q.    And who presented that to you?

11        A.    Erin Wade and Jason Felger.

12        Q.    Were you onboard with the decision to

13   terminate Mr. Jackson?

14        A.    Yes.

15        Q.    To your knowledge, has any other employee

16   during your tenure with the company, has any other

17   employee ever committed the same kind of conduct as

18   Mr. Jackson that resulted in his termination?

19        A.    Not to my knowledge.

20        Q.    Have you ever discriminated against

21   Mr. Jackson?

22        A.    No.

23             MS. JOZSI:  That's all I have, Your Honor.

24             THE COURT:  Mr. Jackson, pretty succinct,

25        your witness.

217

1                    **CROSS-EXAMINATION**

2    BY MR. JACKSON:

3        Q.    You mentioned Ms. Elizabeth that during a

4    conversation that I had mention to you anyone above

5    coming to your office as far as-

6        A.    I can't hear you.

7        Q.    Do you recall me coming to your office on two

8    different occasions where I verbally talked to you and

9    we coached through and I sat and spoke with you about

10   Mr. James White's behavior on the floor?

11       A.    No, I do not.  Not specifically, no.  We had

12   a lot of discussions, but not specifically about

13   James.

14       Q.    All right.  All right.  All right.  Were you

15   aware of Mr. White coming to your office on several

16   occasions and mentioning to you certain things about

17   me at any point?

18       A.    No.  He didn't talk about you at all.

19       Q.    No?

20       A.    Not specifically, no.

21       Q.    All right.  Has Mr. Jason Felger ever come to

22   you and mentioned anything of such as far as my

23   behavior or work ethics or anything of that nature?

24       A.    No, not at all.

25       Q.    Okay.  All right.  For years you know me and

218

1    me working there at GT Technologies as far as helping

2    out with everything, the machines and stuff of that

3    nature, working overtime.  Would you describe that as

4    me being a good team player in the Maintenance

5    Department as far as helping out at GT?

6        A.    I would say of what I've seen, yes, you were

7    a good employee, yes.

8        Q.    And during that time was there any doubt in

9    your mind or thought that a situation like this would

10   ever occur as far as me working at GT for all the

11   number of years I worked?  Would that have been a

12   doubt in your mind before this incident occurred?

13       A.    I don't know how to answer that.

14       Q.    Okay.  Do you feel like at this time that I

15   had the capabilities of falsifying documentations?

16       A.    Capability?

17       Q.    Yes, all the time since I been working there?

18       A.    Based on the evidence I would say, yes.

19       Q.    Once you looked at the evidence and

20   discovered that all the documentation was in place due

21   to the fact that the work that was done and the work

22   orders that are here and accounted for where it shows

23   from the performance warning notice up until the

24   performance warning notice of discharge, did you at

25   any point during that last discussion we had would

219

1    think, hey, let's relook at the situation before we

2    take another step to see if it's something that we

3    missed?  Had that crossed your mind?  Well, this

4    gentleman worked here several years, let's maybe sit

5    down a little further; did that ever cross your mind

6    to see?

7        A.   I don't know if I understand the question.

8    Can you be more specific?

9        Q.   As far as say if I was in your shoes and say,

10   hey, Mr. Dave LaVieri worked here a number amount of

11   years, so I need to do a little more research, let's

12   dig a little deeper and see to make sure, maybe check

13   two or three times to make sure this is correct on

14   where the situation went at?

15       A.   I think that was in the investigation that

16   that was looked at and verified.

17       Q.   Was you aware that there was one other person

18   on this work order with me as well?

19       A.   I know there was a person that worked that

20   day with you, yes.

21       Q.   Correct.  And his name and information was

22   supposed to be attached to those work orders as well

23   as we have different ones in the CMMS.  We have

24   different work orders in the CMMS where it shows a

25   number of people that works here.  Sometimes you have

1    up to four people working together working on that

2    same work order and they're working on a project and

3    they will be listed in there.  So my partner that

4    works with me, he was removed from that work order and

5    it only specifies just myself on that work order.  So

6    there that's when the rest of everything came in place

7    as far as where is Mr. Taylor at.  We're trying to

8    resume the issue.  So I move out of my work area, but

9    Mr. Johnny Taylor still existed and is still working

10   there.  So that's the issue that I see there with as

11   far as work orders because there's a terrible mistake

12   that's been made there as far as that being handled.

13   So that's why I said was there a time that you

14   actually took the initiative when you looked over

15   everything and see why he's not there and I'm here and

16   what happened for an investigation?

17       A.   I think that was part of the investigation

18   prior to the termination, yes.

19       Q.   So where is Mr. Johnny Taylor at now?

20       A.   Who?

21       Q.   Mr. Taylor?  He works in the Maintenance

22   Department.

23       A.   He's in the Maintenance Department, yes.

24       Q.   What is his job title now?

25       A.   He was services-

221

1          THE COURT:  It doesn't matter if Ms. Wade
2      knows.  It's if you know.
3          THE WITNESS:  He's in maintenance.  I don't
4      know.  I don't know his exact job title in
5      maintenance.  If he's got a title, yes, Johnny
6      Taylor's in maintenance.
7  BY MR. JACKSON:
8      Q.   Well, he was in maintenance.  Mr. Taylor is
9  cleaning the bathrooms at this time.  He's the janitor
10 guy that actually cleans the restrooms in GT
11 Technologies as of now.  I spoke with Mr. Taylor
12 himself and that's where he is.  He's been taken off
13 from being in the maintenance technician part.  For
14 what reasons maybe because of this here to pursue, but
15 that's where he's at as of now.
16         MS. JOZSI:  Your Honor, Mr. Taylor is not a
17     witness.
18         THE COURT:  Yes, I think I've got credible
19     evidence that Mr. Taylor is still an employee of
20     GT which is probably as much I'm going to be able
21     to unless there's somebody else that can give me a
22     job description.  I'm not sure.
23         THE WITNESS:  He's in maintenance.
24         MR. JACKSON:  Okay.
25 BY MR. JACKSON:

222

1      Q.   You know that's a major concern is this is

2   unfair treatment as far as knowing I been there all

3   these years, I've trained previous employees that are

4   employed as far as Jason Felger, James White.  I got

5   them up to speed as far as the machines.  After Rosco

6   Ron Gordon retired I got all of those knowledge and

7   training for them and made sure they understood the

8   way the maintenance whole system works.  And then

9   whenever was needed or anything else needed at times

10   you would come to me because I knew pretty much where

11   everything was.  So you know that's why it's a little

12   disturbing to understand what went wrong here and I

13   felt by your position and Ms. Wade you all went

14   further to investigate the situation a lot better than

15   what it was because we had one more individual that

16   was in there on the same work orders.  So it was

17   divided and that's what occurred.

18           MR. JACKSON:  That will be all.

19           THE COURT:  Okay.  Anything further?

20           MS. JOZSI:  Yes, briefly, Your Honor.

21                   **REDIRECT EXAMINATION**

22   BY MS. JOZSI:

23      Q.   Do you have any reason to doubt the accuracy

24   of the company records in general?

25      A.   No.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

223

1      Q.   Mr. Jackson was suggesting that maybe you

2   needed to reconsider, did you miss anything.  Did you

3   have any reason to doubt the evidence that was

4   presented to you as part of the investigation?

5      A.   Not at all.

6      Q.   Did Mr. Jackson give you any evidence to make

7   you dig a little deeper, suggest that you need to look

8   further?

9      A.   I think we looked as deep as we needed to at

10  the time.

11     Q.   And at the time of termination did

12  Mr. Jackson present anything else for you to look

13  into?

14     A.   No.

15     Q.   Mr. Jackson asked and you testified that he

16  was generally a good employee, correct?

17     A.   Generally a good employee, yes.

18     Q.   Can good employees make bad decisions?

19     A.   Yes, sure.

20          THE COURT:  All right.  That's it.

21          MS. JOZSI:  This is James White.

22          THE COURT:  All right.  Raise your right hand

23     please.

24          Do you solemnly swear or affirm that the

25     testimony you're to give today is the truth, the

224

```
 1              whole truth and nothing but the truth?
 2                   THE WITNESS:  Absolutely.
 3                   THE COURT:  And your full name please.
 4                   THE WITNESS:  James Kelly White, Jr.
 5                   THE COURT:  Please be seated.
 6      THEREUPON,
 7                        JAMES KELLY WHITE, JUNIOR,
 8      having been first duly sworn by this Court, was
 9      examined and testified upon his oath as follows:
10                       DIRECT EXAMINATION
11      BY MS. JOZSI:
12           Q.   Good afternoon, Mr. White.  Thank you for
13      being patient with us.  Your our last victim here.
14      Can you please introduce yourself to the Court by
15      saying who you work for and your job title?
16           A.   I work for GT Technologies and I am the
17      Maintenance Team Lead.
18           Q.   And as a maintenance team lead do you also
19      perform the work of a maintenance technician?
20           A.   Yes, I do.
21           Q.   How long have you been a maintenance team
22      lead at GT Technologies?
23           A.   December will be five years.
24           Q.   And prior to December of 2019 did you work
25      for GT in a different capacity?
```

225

```
 1         A.   No, ma'am.

 2         Q.   So you've been the team lead the entire time

 3    that you've been an employee of GT?

 4         A.   Yes, ma'am.

 5         Q.   Can you just generally describe to me what

 6    your duties are as a team lead?

 7         A.   Direct members on the team as far as working

 8    on what needs to be worked on, job duties.  I assign

 9    bathrooms that need to be cleaned.

10         Q.   Do you supervise employees?

11         A.   Well, supervise.

12         Q.   And who do you report to?

13         A.   Jason Felger.

14         Q.   He's the maintenance manager?

15         A.   He's the maintenance manager.

16         Q.   Do you know the Petitioner in this case,

17    Mr. Quennel Jackson?

18         A.   Yes, ma'am.

19         Q.   How do you know him?

20         A.   By working through GT.

21         Q.   Were you his supervisor while you worked at

22    GT?

23         A.   Yes, ma'am.

24         Q.   Did Mr. Jackson ever make any complaints to

25    you about discrimination?
```

226

1       A.    Not to me he did not, no.

2       Q.    Did he ever complain generally about any

3    employee's conduct that he thought was inappropriate?

4       A.    No.

5       Q.    Did you ever make any comments directed at

6    Mr. Jackson regarding race or a law that minorities do

7    not have to be in the workplace?

8       A.    No, ma'am.  No.

9       Q.    Are you familiar with any such law that says

10   workplaces do not have to include minorities?

11      A.    No, ma'am.

12      Q.    Did Mr. Jackson make any complaints to you of

13   any nature that you would have reported to HR?

14      A.    No.  If he would have came to me with

15   something, I would have reported it to HR.

16      Q.    Did you ever discriminate against Mr. Jackson

17   based on his race?

18      A.    No.

19      Q.    Did you ever discriminate against Mr. Jackson

20   based on any reason?

21      A.    No.

22      Q.    Did you ever give Mr. Jackson anything

23   involving coconuts?

24      A.    No.

25      Q.    Are you aware that Mr. Jackson has a coconut

227

1    allergy?

2         A.    No, ma'am.

3         Q.    Did you ever have any reports of stealing or

4    moving tools or chairs or anything like that?

5         A.    Nothing that I wasn't told to do.

6         Q.    What do you mean by that?

7         A.    I was told by Jason we had employees that

8    want to take and sit down when they were supposed to

9    have been working.  We've got a break room that you

10   take breaks in not the maintenance shop.  And Jason

11   had instructed me to remove all the chairs out of the

12   maintenance shop and I done so.

13        Q.    Did that include Mr. Jackson's chair?

14        A.    Yes, ma'am.

15        Q.    Did that include other employees' chairs?

16        A.    Yes, ma'am, all the chairs.

17        Q.    And you said that was a directive from

18   Mr. Felger?

19        A.    Yes, ma'am.

20        Q.    Other than that did you ever have any reports

21   of people stealing Mr. Jackson's tools?

22        A.    No, ma'am.

23        Q.    And you already said you did not discriminate

24   against Mr. Jackson.  Did you ever treat Mr. Jackson

25   any differently than any other employee?

228

```
 1        A.   No, ma'am.
 2             MS. JOZSI:  That's all I have, Your Honor.
 3             THE COURT:  All right, Mr. Jackson, your
 4        witness.
```

### CROSS-EXAMINATION

```
 6   BY MR. JACKSON:
 7        Q.   Mr. White, do you recall 6:45 in the morning
 8   on a Thursday in the maintenance shop that we had a
 9   discussion where you presented Patrick Fletcher and
10   Terry Logan and we had a discussion talking and you
11   mentioned that you stated that minority there was a
12   law that was passed that the work environment didn't
13   have to have minorities in the work environment?  They
14   had amended that law?  Do you remember that and Terry
15   Logan agreed to it?
16        A.   I don't recall that.
17        Q.   You just don't remember at this moment, okay.
18   Do you remember again of course that was mentioned on
19   several occasions, but on this particular day again on
20   a Tuesday morning I come into work at 6:46 again and
21   of course, you know, I had my chair chained to the
22   table?  It was removed.  Remember that Mr. Fletcher
23   removed the chair and hid it that morning?
24        A.   I can't recall him hiding it.
25        Q.   But you knew it was missing?
```

1    A.    I recall Jason had told me to remove the

2    chairs from the shop.

3    Q.    No.  The chairs wasn't removed at that time.

4    The chairs were removed six months later.  During this

5    time the chairs were in place because I used my chair

6    to work at the table to perform welding tasks.  That's

7    why that chair is there.  It's been there for the last

8    seven years and before I had, before you were hired

9    due to the fact that an older gentleman that worked in

10   there, Mr. Terry, had to use the chair for taking

11   small components.  But the chair wasn't removed

12   because we all use our chairs to work from our desk as

13   far as putting in information.  But there was a smiley

14   face put on the floor, do you remember that?

15   A.    Mr. Jackson, I can't recall.

16   Q.    And they hid the chair.  All right.  Okay.

17   Do you recall that I come to you on several occasions

18   that my tools, my toolbox was broken into and my tools

19   was taken out and I showed that to you?  Do you

20   remember that?

21   A.    No, sir.

22   Q.    You don't remember standing right there with

23   me and I showed you I didn't have tools?

24   A.    No, sir, because if you told me you had no

25   tools, I would have saw that you got replacements.

230

1      Q.    So you never mentioned to me that without

2  having tools with Mr. Darryl standing there that I

3  can't perform my job work ethic?  Do you remember

4  that?

5      A.    No.

6      Q.    Okay.  That's interesting.  Do you recall

7  when you hired Mr. Michael in and you brought him

8  directly to me after you and Mr. Jason Felger

9  interviewed him and remember you brought him toward me

10  and you showed me his certificate, his welding

11  certificate, and I was working on the boat iron?

12      A.    I don't recall that neither.

13      Q.    You don't recall bringing Mr.-

14      A.    I probably brought him to meet you, but-

15      Q.    Yes, you brought him over to meet me and

16  showed me his welding certificate.

17      A.    I have never seen no welding certificate.

18      Q.    He had it in his hand?

19      A.    No, I don't remember.

20      Q.    So none of that you don't recall, but you do

21  remember-

22      A.    I remember bringing him to you, but no

23  certificate because he didn't bring no certificate to

24  me.

25      Q.    So it didn't occur to you that the statement

231

1   that you brought forth was that he's got a welding

2   certificate, you don't have certifications and so

3   forth?  You don't remember saying that?

4        A.   No.

5        Q.   Okay.  All right.  That's interesting.  What

6   was your reason for entering the lunchbox under the

7   desk right there in my work area?  Remember the little

8   blue box sitting there that I always had that you

9   always complained I have too much lunch?

10       A.   I never entered your lunchbox and I don't

11  expect you to enter mine.

12       Q.   Okay.  Well, of course that was seen.  The

13  problem is during the time working there what was the

14  problem that you had with me as far as working with GT

15  that you always had to report to David LaVieri about

16  certain issues or Jason about certain issues that I

17  had that was a problem that I was performing with my

18  work ethic?

19       A.   I don't have a problem with your work ethic.

20       Q.   Okay.  So none of this occurred as far as all

21  that happened, the tool stuff taken, I'd come to you

22  and tell you about the situation and then the issue

23  was never brought to your attention that Jason talked

24  to you about what was going on?

25       A.   No.

232

1      Q.   No?  That's it?  So you're very unaware of

2  the decision-makings that you made or done during the

3  time working at GT?  You have no knowledge of it,

4  correct?

5      A.   Can you repeat that?  I can't hear you.

6  Speak up.

7      Q.   So you're not aware of the decision-makings

8  that occurred that affected me during the time working

9  at GT that you're aware of?

10     A.   How am I supposed to answer that?

11     Q.   As far as how the way you approached things

12 that you've done over a period of time working there

13 that reflect towards me as working at GT?

14     A.   I still don't understand how to answer it I

15 mean.

16     Q.   So, in other words, toward one individual

17 that you were targeting more of as doing more work and

18 so to speak more petty things or stuff to irritate an

19 individual at some point or to cause problems that,

20 you know, initially upset him at some point.  Was you

21 aware of doing that?

22     A.   No.  No.

23     Q.   Why was you not when I asked numerous times

24 about replacement tools why couldn't I get certain

25 tools that I needed?

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

233

```
 1        A.   If you come to ask me for a tool, I try to
 2   get it or I go to Jason or- there wasn't nothing that
 3   you came and asked me for that I didn't try to get.
 4        Q.   Are you sure?
 5        A.   I can't recall.
 6        Q.   So when I came to you about Patrick doing
 7   certain things, why was it that you didn't address the
 8   issue about what he was doing as far as taking stuff,
 9   moving stuff that wasn't belonging to him and you were
10   the team lead?
11        MS. JOZSI:  Your Honor, I'm going to object
12        to lack of foundation for some of these questions.
13        He's explaining certain things.  I don't know if
14        it's clear on the record what-
15        THE COURT:  I tend to agree.  I think they're
16        kind of questions that I'm not sure this witness
17        can answer.  There is a person named Patrick?
18        THE WITNESS:  Yes, sir, I do know Patrick.
19        THE COURT:  Did Mr. Jackson or anybody else
20        come to complain to you that Patrick was taking
21        their stuff or moving their stuff?
22        THE WITNESS:  Not direct, no, sir.  And if I
23        may say so about the chairs, if this is where it's
24        going because I was instructed to remove the
25        chairs from the work area.
```

234

```
1    BY MR. JACKSON:

2         Q.    Okay.  How many chairs at that time was it

3    instructed you move?  The chairs always been there.

4    But do you recall on September 5th that the image, did

5    you see the image placed on my desk at 10:00 after

6    break?

7         A.    No, I did not.  I have not seen no image.

8         Q.    You didn't see the little brown black statue

9    sitting there in the middle of the desk?

10        A.    I seen the statue, but I didn't see no image

11   of it.

12        Q.    You've seen the statue.  Okay.  Have you seen

13   what was on that statue?

14        A.    No, I have not.

15        Q.    So you seen the statue during break and then-

16        A.    I said I saw it prior to September the 5th.

17   The statue had been on that desk a long time.

18        Q.    On another desk?

19        A.    No, it was on that desk, the desk you're

20   referring to because it was sitting there for three

21   years I know.

22        Q.    Okay.  That statute has been in that plant

23   for that length of time but there were other dates.

24   But the way how that statute positioned sitting on

25   that desk that prior day did you see it?
```

235

1        A.    No, I did not see it.

2        Q.    Did you see it after the fact after 11:30 on

3   the 5th of September?

4        A.    No.

5        Q.    Did you see any other of my belongings that

6   you might have seen in other people's tool bags and

7   cases of that nature laying around anywhere else that

8   you knew that I had that had my name stitched on it?

9   Did you by any chance see those?

10       A.    No, I have not.

11       Q.    Well, Mr. White, due to the fact the question

12   I asked and the response I get back it's not the same

13   as when we was in place being at the job-

14            THE COURT:  Can you speak up a little bit?

15   BY MR. JACKSON:

16       Q.    I'm sorry.  Due to the fact that we worked

17   together in an environment and the way how everything

18   was presented, it's not the same as when we was there

19   at GT Technologies.  I'm a little disappointed in your

20   statements, but what can I say, you know.  You know, I

21   worked hard, I've done my job, I was always helpful,

22   but at times to be treated unfairly I felt was very

23   common.  And I know I can't get an apology from people

24   that had at this date and time you know.  At least I'm

25   here.  Only God knows, you know.

236

1              MR. JACKSON:  I'll just go ahead and leave it

2         like that.

3              THE COURT:  All right.  Anything further?

4              MS. JOZSI:  Briefly, Your Honor.

5                    **REDIRECT EXAMINATION**

6    BY MS. JOZSI:

7         Q.   This statue that you were referring to, can

8    you describe the statue?

9         A.   It's a brown like a wooden carved statute

10   with a man, an older man.  He's got a hat on and he's

11   holding a fish, and I believe he's sitting on a stump.

12        Q.   And you had seen it around on this desk

13   before?

14        A.   Oh, yes, it's been there for years.

15        Q.   Do you know who it belonged to?

16        A.   I do not.  No, it was just someone that left

17   it whenever they retired or left or whatever.  I do

18   not know who it belongs to.

19        Q.   So just like a desk decoration?

20        A.   Yes.

21        Q.   Mr. Jackson mentioned a Michael I think it's

22   Mercer, correct?

23        A.   Yes, ma'am.

24        Q.   What job was Mr. Mercer hired for?

25        A.   He was hired for a second-shift welder.

237

1     Q.    Is that-

2     A.    Or mechanic/welder- I mean maintenance tech.

3     Q.    Is that the same job that Mr. Jackson had?

4     A.    No.  I mean, Mr. Jackson was more of a

5  fabricator and he would help out.  I mean, I'm not

6  trying to take anything away from his work ethic or

7  anything like that.  He done excellent as far as that

8  goes.

9     Q.    Was Mr. Jackson second shift?

10     A.    He was the first shift whenever I started

11  there.

12     Q.    So Mr. Mercer was hired for a different job

13  on a different shift?

14     A.    No.  Mr. Mercer was hired in as a different,

15  yeah, job.  Second shift maintenance tech/welder.

16     Q.    Mr. Jackson asked you if you remembered

17  making the comment about not needing a minority in the

18  workplace.  I want to clarify for the record do you

19  not remember making the comment or did you not say it?

20     A.    I didn't make that kind of comment, no,

21  ma'am.

22     Q.    And other than Mr. Jackson were there other

23  minorities employed in that department?

24     A.    Yes, ma'am.

25     Q.    Are there still employees employed in that

238

1    department?

2         A.    Yes, ma'am.

3              THE COURT:  All right.  Short and sweet.

4    Thank you, sir.

5              MS. JOZSI:  Respondent rests.

6              THE COURT:  So, Mr. Jackson, you kind of get

7    the last say.  If there's anything that you feel

8    like hasn't been covered now would be the time;

9    otherwise, we'll move into the post hearing what

10   we do from here.  If there is something you think

11   I should know that hasn't been discussed yet, I'll

12   give you that chance.

13             MR. JACKSON:  Well, at least he did admit he

14   did see the image on the desk, so one person out

15   of four knew the image was there.  Of course, I

16   forgot to ask him did he actually see the rope

17   around his neck while it was sitting there.  That

18   was one of the questions I forgot to ask, but

19   that's fine.  It shows in the photo there.  But

20   the fact was it was a little disturbing, you know,

21   like the EEOC said as they told me they said

22   you're not going to get all the correct responses

23   that you're supposed to get because the company

24   denies or can do changes to anything in their

25   system.  That's just part of our system.  So

239

1      there's not much you can do about it.  But as I
2      see as of today as I stated earlier and mentioned
3      to Mr. LaVieri, that, you know, there could have
4      been a lot more done in this here due to the fact
5      that I worked there that length of time that where
6      you didn't have a second individual in place as
7      far as work.  And then the two work orders here
8      now are all in place showing that the work is here
9      and the issue could have been resolved where this
10     termination could have been avoided and I could
11     have still been employed.

12         The fact is I don't hate anybody.  I wish I
13     could still work with the company and pursue it
14     on.  But of course things happened of that nature,
15     you know.  Here at this point I just pretty much
16     rest assured for the time that I would have been
17     there as Mr. Dan had promised me that I would have
18     been there to retirement.  I just look forward to
19     closing this case and be compensated for what I
20     would have gotten if I retired and try to move
21     forward from this day on.

22         THE COURT:  All right.  Well, with that let's
23     talk about where we go from here.  I think you've
24     indicated, Ms. Jozsi, that you're ordering the
25     transcript?

240

1          MS. JOZSI:  Yes, Your Honor.

2          THE COURT:  So when the transcript is filed,

3     I'll enter a notice that says the transcript has

4     been filed and we'll talk about what we do from

5     there.  But it will show up in the exhibit section

6     in the DOAH portal.  So if you look at it that's

7     where it will be with all the other exhibits.

8          Typically what I'm going to do is I'm going

9     to give the parties an opportunity to give me a

10    written summary of what you want me to say, what

11    you think the evidence shows and what you think I

12    should pay attention to when I'm writing my order.

13    So you'll have an opportunity to file a proposed

14    order.  It doesn't have to be in any particular

15    form, but just tell me what you think I should pay

16    attention to.

17         Normally those are due ten days from the date

18    of the filing of the transcript and if that gives

19    you enough time, I'll set that as the date.  So

20    we're probably looking a good solid month if it's

21    going to take three weeks for the transcript and

22    then ten days from that.  We're probably looking

23    mid September.

24         MS. JOZSI:  Ten days, Your Honor?

25         THE COURT:  Yes.  If you need more time, tell

241

1      me.  It's up to you.  I'm happy to give more.

2          MS. JOZSI:  I usually ask for two weeks, so

3      14 days.

4          MR. JACKSON:  What's the time frame?

5          THE COURT:  I will tell you if it's ten days,

6      I have 20 days to get my recommended order out.

7          MS. JOZSI:  I can do it in ten.

8          THE COURT:  So ten days then.

9      So, Mr. Jackson, you'll get a notice.  It will pop

10     up.  You're registered to get e-filing, so you'll

11     see a little notice pop up that will say the

12     transcript is filed.  It will say whatever date

13     the transcript is filed, it will add ten days for

14     that, and that will be the date for proposed

15     orders.  If that date falls on a Saturday, you'll

16     get to the next Monday.  And then I'll get my

17     order out within 20 days of that date and we'll go

18     from there.

19         MR. JACKSON:  It will be where I can access

20     and submit that in?

21         THE COURT:  Yes, sir.

22         MR. JACKSON:  A section where I can add in on

23     there?

24         THE COURT:  Yes.  You're going to be drafting

25     your own proposed order.  This is what I think the

242

1    evidence showed, this is what my testimony showed,

2    this is what Mr. LaVieri's testimony showed, what

3    do you want me to pay attention to.  And write

4    that down.  Ms. Jozsi is going to do the same.  If

5    you want to see what one of these looks like- I

6    don't require any kind of form.  I'm interested in

7    the substance.  The form will take care of itself.

8    But if you want to see what one looks like, if you

9    go onto the DOAH website on the left-hand side

10   there is a little list of things you can click on

11   and I think one of them you can see what other

12   judges have done.  You can go to case search.

13   It's the third tab on that thing.  You can go to

14   case search.  You can go to closed cases.  There's

15   a drop-down and you can go to Florida Commission

16   on Human Relations, click search, and it will

17   bring up all the orders that this agency has

18   issued in FCHR cases.  And you can take a look at

19   it.  They're all kind of the same.  We're fairly

20   standard in our format.  Like I said, I don't need

21   it to be in any particular format, but if you want

22   to see what they look like that's where you can

23   find them.

24        MR. JACKSON:  I appreciate that.

25        MS. JOZSI:  Just a housekeeping matter, Your

243

```
 1        Honor.  I have written down that we did exhibits
 2        5-
 3             THE COURT:  You've beaten me to my punch.
 4        That's my pattern.
 5             MS. JOZSI:  Go for it.
 6             THE COURT:  So what I have- I usually do it
 7        at varying times during the hearing, but these
 8        were all fairly sequential.  So I have 5 through
 9        29, 40 page 231, and 50.  Those are the exhibits.
10        So if there is anything in those exhibits you want
11        me to pay attention to, just cite me to it.
12             MS. JOZSI:  The exhibits have been submitted
13        on the portal.
14             THE COURT:  This will not be the official
15        record.  The official record will be on the
16        docket.  By this time tomorrow I will have entered
17        on the exhibit portal which have been admitted.
18        Anything that's not admitted I'm not going to say
19        not offered or anything, but it will tell you all
20        the ones that are admitted.  So with that I think
21        that's probably everything we need to deal with.
22        Any questions, Mr. Jackson?
23             MR. JACKSON:  I guess that pretty much sums
24        it.
25             THE COURT:  All right.  Any questions,
```

244

1          Ms. Jozsi?

2              MS. JOZSI:  No, sir.

3              MR. JACKSON:  Final decision-making of

4      everything else as far as all that goes in after

5      you do all that.

6              THE COURT:  What I do is I will enter within

7      20 days after I get you all's proposed orders I'll

8      enter a recommended order.  That goes to the

9      Florida Commission on Human Relations.  If you

10      have objections to what I filed, you can file your

11      objection.  Then everything transfers to the FCHR,

12      so I'm out of the equation.  They're in the

13      equation.  So anything you want to file after I

14      file my recommended order goes to FCHR.

15              MR. JACKSON:  The decision as far as payout-

16              THE COURT:  If I rule that you have been

17      discriminated against and that you're entitled to

18      compensatory damages, I'll figure out how to

19      memorialize that.  I'm probably not going to do a

20      dollar figure.  And then if FCHR were to agree

21      with me, they'll send it back to me to calculate

22      the number.  Okay?

23              MR. JACKSON:  All right.

24              THE COURT:  Anything else?

25              MS. JOZSI:  No, sir.

245

1           THE COURT:  It's been a very productive day.

2      Mr. Jackson, you did a nice job today.

3           (Hearing concluded in Volume II at 5:19 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

246

CERTIFICATE OF REPORTER

STATE OF FLORIDA   )

COUNTY OF LEON     )


        I, Doreen Mannino, Court Reporter, do hereby

certify that I was authorized to and did report in

stenotypy and electronically the foregoing proceedings

and evidence and the captioned case, and that the

foregoing pages constitute a true and correct

transcription of my recording thereof.

        IN WITNESS WHEREOF, I have hereunto affixed my

hand the 27th day of August 2024 at Tallahassee, Leon

County, Florida.




                    _____
                          Doreen M. Mannino