UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

QUENNEL JACKSON

    Plaintiff,

v.                                  Case No. 4:25-cv-218-AW-MAF

GT TECHNOLOGIES, INC.

    Defendant.

_____/

## DECLARATION OF ERIN WADE

    1.    My name is Erin Wade. I am over the age of 18 and competent to give this Declaration. All information contained herein is based upon my personal knowledge.

    2.    I am a White Female.

    3.    I am the Human Resources Manager at GT Technologies, Inc.'s ("GT") Tallahassee, Florida location. GT specializes in the manufacturing of internal engine components for the automotive industry. I have been employed at GT for more than nine years. I currently report to Plant Manager David (Dave) LaVieri.

    4.    As a Human Resources Manager, my duties include running payroll, recruitment, employee benefits, employee relations, Workers' Compensation, safety training, and more. I am also involved in employee discipline and termination.

5. I am familiar with the Plaintiff in this matter, Quennel Jackson. Mr. Jackson was employed by GT as a Facilities Maintenance Technician from December 4, 2017 through September 5, 2023.

6. During Mr. Jackson's employment at GT, I had no direct supervisory capacity over Mr. Jackson.

7. GT's Tallahassee location currently employs approximately 95 employees (7 of which are maintenance technicians). The number has fluctuated throughout the years. At the time of Mr. Jackson's termination, this location employed approximately 150 employees (10 of which were maintenance technicians).

8. During Quennel Jackson's employment, and presently, GT employs minorities in the department.

9. In my capacity as Human Resources Manager, I am familiar with GT's policies and procedures, including GT's equal employment policies, GT's Code of Business Conduct and Ethics, GT's Hotline Policy, and GT's Associate Conduct Policy.

10. GT, as an equal opportunity employer, maintains policies prohibiting discrimination, retaliation, and harassment. The policies are maintained in the GT Code of Business Conduct and Ethics, posted to the employee bulletin board, and are separately distributed to employees on occasion.

11. GT also maintains several mechanisms for employees to voice concerns or complaints. Employees are directed to first voice the concerns to their immediate supervisor; if they cannot resolve the issue, they can report the issue to Human Resources or directly to the Plant Manager. GT also maintains an ethics hotline for employees to report complaints anonymously. Reporting policies, including information on the ethics hotline, are included in the Code of Business Conduct and Ethics, and posted on the employee bulletin board.

12. GT also maintains an Associate Conduct Policy, which is used to determine if an employee needs to receive documentation for unsatisfactory behavior. Some actions, including falsification of company records or reports, are grounds for immediate dismissal of the employee.

13. The policies referenced above are business records, created, kept, and maintained in the course of a regularly conducted business activity. True and accurate copies of GT's equal employment policies, GT's Code of Business Conduct and Ethics, GT's Hotline Policy, and GT's Associate Conduct Policy are provided as ECFs 33-11, 33-12, 33-13, and 33-14.

14. In my capacity as Human Resources Manager, I am also familiar with materials created to train employees, including those materials created by Jason Felger related to the Computerized Maintenance Management Software ("CMMS"). The materials referenced above are business records, created, kept, and maintained

in the course of a regularly conducted business activity. True and accurate copies of the training materials are provided as ECFs 33-7, 33-8, and 33-9.

15. From his initial hire in December 2017 until August 2023, Mr. Jackson received no formal performance warning notices or disciplinary actions.

16. On or about August 23, 2023, Mr. Jackson's supervisor, Maintenance Manager Jason Felger, came to me to discuss a Performance Warning Notice he was going to give to Mr. Jackson related to Mr. Jackson's failure to perform a full days' work during his shift on August 22, 2023. Mr. Felger prepared the Performance Warning Notice, and I reviewed it after he delivered it to Mr. Jackson.

17. In my capacity as Human Resources Manager, I have access to employee disciplinary records, including the August 23, 2023 Performance Warning Notice issued to Mr. Jackson. The August 23, 2023 Performance Warning Notice was created at the time of the discipline and is a business record, created, kept, and maintained in the course of a regularly conducted business activity. A true and accurate copy of the August 23, 2023 Performance Warning Notice issued to Mr. Jackson is provided as ECF 33-15.

18. After receiving the Performance Warning Notice, Mr. Jackson came to me to discuss his disagreement with the document.

19. During the conversation, Mr. Jackson told me that the computer was down on Saturday (August 19, 2023), and that he was entering his work from that

day on Tuesday (August 22, 2023). I then asked Mr. Jackson to provide me with a list of work orders for work he performed on Saturday but did not enter until Tuesday.

20. Mr. Jackson provided the rebuttal document to me on August 25, 2023.

21. A true and accurate copy of Mr. Jackson's rebuttal document dated August 25, 2023 as maintained in Mr. Jackson's file is provided as ECF 33-16.

22. The first page of the rebuttal document included a narrative of Mr. Jackson's perception of the Performance Warning Notice. In the note, Mr. Jackson claimed that the "maintenance supervisor" was discriminating against Mr. Jackson's "work ethics."

23. This note was the first time Mr. Jackson had mentioned discrimination on the basis of race (or any other protected characteristic) to me, so I asked him to explain the allegation. Mr. Jackson explained that it was because no other employee entered their work orders on Saturday.

24. I investigated the allegation, but determined that Mr. Jackson's belief that he was disciplined because of his race was incorrect. Rather, the reason Mr. Jackson was disciplined was because work orders were not timely entered into the system. Furthermore, during my investigation, I determined that no employees, including Mr. Jackson, had any problems accessing the computer system on Saturday, August 19, 2023.

25. The second page of the document included a list of twelve undated work orders. Mr. Jackson originally told me that he completed all twelve work orders on Saturday, August 19, 2023.

26. I was surprised by the substantial number of work orders Mr. Jackson was able to complete in one day and asked Mr. Jackson to confirm that he completed them all in one day. Mr. Jackson then told me that half of the work orders were completed on August 19, 2023 and the other half were completed on August 21, 2023. To represent this distinction, I drew a line on the list to represent Mr. Jackson's assertion that the first six orders were completed on August 19, 2023 and the final six orders were completed on August 21, 2023.

27. To confirm Mr. Jackson's account and determine whether the warning should be rescinded, I asked Mr. Felger to pull the CMMS security log data and actual work orders for the twelve work orders on Mr. Jackson's list as I do not have access to this information. At the time, I did not tell Mr. Felger why I was requesting the information.

28. In my capacity as Human Resources Manager, I have access to investigation files, including the investigation into Mr. Jackson's claims as asserted in the August 25, 2025 rebuttal document and the CMMS security logs and work orders for the twelve work orders provided by Mr. Jackson as pulled by Mr. Felger during the investigation. These documents were created and collected in August

2023 and are business records, created, kept, and maintained in the course of a regularly conducted business activity.

29. True and accurate copies of the CMMS security logs and work orders for the twelve work orders provided by Mr. Jackson as pulled by Mr. Felger during the investigation are provided as ECFs 33-17, 33-18, 33-19, 33-20, 33-21, 33-22, 33-23, 33-24, 33-25, 33-26, 33-27, 33-28, and 33-29.

30. After Mr. Felger provided the information, I reviewed the CMMS security logs and the twelve orders on Mr. Jackson's list. The investigation took a little over a week, as it took time to pull and review the relevant documents. While the investigation was pending, Mr. Jackson continued to work his normal schedule.

31. After reviewing all twelve work orders, Mr. Felger and I determined that certain work orders had no apparent involvement from Mr. Jackson as the work orders were created and/or completed by other technicians. Furthermore, we determined that there were several date discrepancies associated with the creation versus work performance on several of the work orders.

32. Ultimately, Mr. Felger and I concluded that Mr. Jackson was dishonest and submitted a falsified document (the rebuttal document) to Human Resources. Specifically, he misrepresented the work orders that he actually performed work on and misrepresented the days he completed various work orders.

33. While the investigation started as a review of the rebuttal evidence from Mr. Jackson, the concern shifted after reviewing Mr. Jackson's list, the CMMS logs, and work orders because there was a disconnect between the records and the story from Mr. Jackson.

34. Mr. Felger and I concluded that such falsification was a violation of the Associate Conduct Policy, and recommended Mr. Jackson's termination to the plant manager, Mr. LaVieri.

35. I have no reason to doubt that the company records accurately reflected the work that was performed and documented and the decision to terminate Mr. Jackson's employment reflected the honest belief that he falsified documents during the investigation process.

36. On September 5, 2023, GT terminated Mr. Jackson's employment. During the termination discussion, in which I, along with Mr. Felger and Mr. LaVieri were present, Mr. Jackson was presented with a copy of the Performance Warning Notice that I prepared related to the termination.

37. In my capacity as Human Resources Manager, I have access to employee disciplinary records, including the September 5, 2023 Performance Warning Notice issued to Mr. Jackson. The September 5, 2023 Performance Warning Notice was created at the time of the termination and is a business record, created, kept, and maintained in the course of a regularly conducted business

activity. A true and accurate copy of the September 5, 2023 Performance Warning Notice issued to Mr. Jackson is provided as ECF 33-30.

38.  The Performance Warning Notice summarized the investigation's findings, and advised Mr. Jackson that his termination was due to his falsification of documentation during a Human Resources investigation, which is a violation of the Associate Company Policy.

39.  Mr. Jackson's termination is consistent with prior business practices as GT has terminated other employees for violation of the same policy. Specifically, GT terminated three employees between July 2023 and December 2023 for falsification of company records or reports.

40.  I did not recommend Mr. Jackson's termination for any retaliatory or discriminatory reasons, and, except for the narrative contained in his rebuttal submitted to me on August 25, 2023, Mr. Jackson never complained to me of any discriminatory behavior from any employee at GT.

41.  I am also unaware of any hotline complaints ever filed by Mr. Jackson, nor did I ever receive a hotline complaint describing incidents of the nature that Mr. Jackson has alleged in his case. Additionally, no one else raised discriminatory complaints on behalf of Mr. Jackson to me.

42.  Mr. Jackson never reported that he found a toy or statue with a noose around his neck.

43. I have viewed the photographs of the statue Mr. Jackson alleges was discriminatory. While Mr. Jackson <u>never</u> presented the statue to me, I am familiar with it, as it belonged to a former employee and has been sitting on a desk in the maintenance department for years. After Mr. Jackson filed his initial legal challenge and raised allegations related to the statue, I obtained the statue and have secured it in my office.

44. The statute itself is a carved wooden figure of a fisherman holding a large fish. The only item around the statue's neck is the collar of the shirt the fisherman is wearing.

45. On February 9, 2026, I took four photographs of the statue. The photographs are provided as Exhibit A to this Declaration.

46. I was unaware that Mr. Jackson believed anything about the statue was discriminatory until Mr. Jackson alleged it in the course of litigation post-termination.

47. I did not recommend Mr. Jackson's termination for any retaliatory or discriminatory reasons. Mr. Jackson's race, national origin, or color had no bearing on the decision to terminate Mr. Jackson. I recommended Mr. Jackson's termination solely because he violated the Associate Conduct Policy by falsifying records during an investigation.

48. During Mr. Jackson's employment, I was unaware of Mr. Jackson's national origin, and was not aware that he was half Colombian.

49. I did not discriminate or retaliate against Mr. Jackson. I do not believe or have any reason to believe that anyone involved in the decision to terminate Mr. Jackson discriminated or retaliated against him.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing information contained in this declaration is true and correct.

Dated this ⎯11⎯ of February, 2026.

⎯⎯⎯Erin Wade⎯⎯⎯

Erin Wade

# EXHIBIT A







