# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

QUENNEL JACKSON

     Plaintiff,

v.

                        Case No. 4:25-cv-218-AW-MAF

GT TECHNOLOGIES, INC.

     Defendant.

_____ /

## DEFENDANT GT TECHNOLOGIES, INC.'S
## MOTION FOR SUMMARY JUDGMENT

Defendant GT TECHNOLOGIES, INC. ("GT," the "Company," or "Defendant") moves for summary judgment on all counts contained in the Complaint filed by Plaintiff QUENNEL JACKSON ("Plaintiff" or "Jackson") (ECF No. 1). Plaintiff cannot establish Defendant discriminated against him based on his national origin, race, and color (half Colombian and Black), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. § 2000e, *et seq.* ("Title VII"). Rather, Defendant discharged Plaintiff for providing false information during a Company investigation in direct violation of Defendant's policies – a legitimate, nondiscriminatory, non-retaliatory, and non-pretextual reason for his discharge. Defendant is thus entitled to summary judgment.

**MEMORANDUM IN SUPPORT OF GT'S**
**MOTION FOR SUMMARY JUDGMENT** [1]

## I.    STATEMENT OF UNDISPUTED FACTS

### A.    GT is an Equal Opportunity Employer

GT Technologies, Inc., a manufacturer of internal engine components for the automotive industry, is an equal opportunity employer and maintains policies prohibiting discrimination and retaliation and encourages employees to report concerns or complaints if they feel another employee is violating those policies. (ECF 33-3 ¶ 10; ECFs 33-11, 33-13). Employees are directed to first voice the concerns to their immediate supervisor; if they cannot resolve the issue, they can report the issue to Human Resources or directly to the Plant Manager. (ECF 33-3 ¶ 11; ECF 33-11). GT also maintains an ethics hotline for employees to report complaints anonymously. (ECF 33-3 ¶ 11; ECF 33-11). GT's equal employment policies and reporting policies, including information on the ethics hotline, are

---

[1] In accordance with the Court's Initial Scheduling Order (ECF No. 11), exhibits have been filed as attachments to a notice filed at ECF No. 33. For citation purposes, exhibits will be cited as "ECF 33-#", followed by the page and/or page:line information where applicable. Please note that the exhibits filed as ECF 33-7 through ECF 33-30 were used as exhibits at Plaintiff's deposition (provided as ECF 33-1). For the Court's convenience, those exhibits have been provided as used at deposition to include the stickers with designation that corresponds with the transcript references. If the Court requires all exhibits from the Plaintiff's deposition, Defendant is happy to supplement its filing.

included in the Code of Business Conduct and Ethics, and posted on the employee bulletin board. (ECF 33-3 ¶ 11; ECFs 33-11, 33-12, 33-13).

Plaintiff was aware of the policies prohibiting discrimination and retaliation, and the policies related to reporting concerns, and he acknowledged receipt of a copy of the Code of Business Conduct and Ethics upon his initial hire. (ECF 33-1 at 64:15-18, 66:4-5, 66:18-25; ECF 33-10). Plaintiff was aware of the existence of the hotline, but admitted that he never called it to report any concerns. (ECF 33-1 at 68:4-14).

**B.    GT Maintains Multiple Policies Dictating Employee Performance**

GT maintains an Associate Conduct Policy, which informs employee discipline for unsatisfactory behavior. (ECF 33-3 ¶ 12; ECF 33-14). Some actions, including falsification of company records or reports, are grounds for immediate dismissal of the employee. (ECF 33-3 ¶ 12; ECF 33-14). Plaintiff was aware of the Associate Conduct Policy, including the provision that falsification of records could result in immediate termination. (ECF 33-2 at 57:7-14).

In addition to personnel policies, GT maintains a daily workflow management process to guide technicians as to the work orders that must be completed daily. (ECF 33-4 ¶ 11; ECF 33-7). GT uses a Computerized Maintenance Management Software ("CMMS") database to track work in real-time, which provides metrics for the department's performance. (ECF 33-4 ¶¶ 8, 9). All employees in the maintenance department, including Plaintiff, are trained on the CMMS system and expected to

3

complete documentation in real-time upon the completion of the work.[2] (ECF 33-1 at 51:19-23, 63:21-24; ECF 33-4 ¶ 10; ECFs 33-7, 33-8, 33-9). The daily process is memorialized in the Mandatory Flow of Work Order Steps/Processes, which is a document distributed to employees following training that explains how a work order is entered from start to finish, and that reiterates the importance of the steps being completed in real-time. (ECF 33-4 ¶ 12; ECF 33-7).

### C.    Plaintiff's Employment with GT

Plaintiff began his employment with GT on December 4, 2017 as a Facilities Maintenance Technician.[3] (ECF 33-3 ¶ 5; ECF 33-1 at 37:5-16). From at least 2021 through the end of his employment, Plaintiff was supervised by Maintenance Team Lead James White and Facilities and Maintenance Manager Jason Felger. (ECF 33-1 at 43:2-4, 44:5-15; ECF 33-4 ¶¶ 5, 6; ECF 33-6 ¶ 6). Mr. Felger reported directly to plant manager David (Dave) LaVieri. (ECF 33-4 ¶ 4). Erin Wade was the Human Resources Manager, though she had no direct supervisory capacity over Plaintiff. (ECF 33-3 ¶¶ 3, 6). As Plant Manager, Mr. LaVieri was ultimately responsible for

---

[2] Plaintiff acknowledged the Company's expectation that work is entered into the CMMS as it is completed. (ECF 33-1 at 54:5-12). By August 2023, approximately a year after the CMMS training was provided, there were no indications that Plaintiff did not understand GT's expectation to document work into the CMMS system at the time work is completed. (ECF 33-4 ¶ 13).

[3] At present, GT employs approximately 7 technicians. (ECF 33-3 ¶ 7). During Plaintiff's employment, and presently, GT employs minorities in the department. (ECF 33-3 ¶ 8).

supervising all employees, including Plaintiff, Mr. White, Mr. Felger, and Ms. Wade. (ECF 33-5 ¶ 5).

From his initial hire in December 2017 until August 2023, Plaintiff received no formal performance warning notices or disciplinary actions. (ECF 33-3 ¶ 15; ECF 33-4 ¶ 14; ECF 33-1 at 69:11-16). Rather, Mr. Felger and Plaintiff had occasional informal verbal discussions about areas to improve his performance between August 2022 and August 2023. (ECF 33-4 ¶ 14).

### D.    Plaintiff Works on Saturday, August 19, 2023

On Saturday, August 19, 2023, Plaintiff volunteered to cover an extra shift for which he was not normally scheduled with another technician, Johnny Taylor. (ECF 33-1 at 70-71). Plaintiff alleges that there were computer issues that prevented him from properly submitting any work orders into the CMMS on that date. (ECF 33-1 at 72:7-16). However, the CMMS security log for August 19, 2023 shows that Plaintiff logged into the CMMS and created and edited multiple work orders on that day, a fact that Plaintiff admits. (ECF 33-4 ¶ 22; ECF 33-1 at 115:18-20; ECF 33-17).[4] Data on the CMMS security log cannot be manipulated in any way, even at an administration level, as it is a real record of what occurs in the system. (ECF 33-4 ¶ 28).

---

[4] The CMMS security log shows twelve entries for Plaintiff on August 19, 2023. It also shows entries from three other users (PFletcher, DMay, and PWoodard). (ECF 33-17).

### E.    Plaintiff Receives a Performance Warning Notice

Towards the end of Plaintiff's shift on Tuesday, August 22, 2023, Mr. Felger noticed that he had not seen Plaintiff throughout the day, so Mr. Felger spoke with Plaintiff to ask how he spent his day. (ECF 33-1 at 83:12-16; ECF 33-4 ¶ 15). During that conversation, Plaintiff said that he had worked on two restroom assignments that day. (ECF 33-4 ¶ 16). Mr. Felger asked what else Plaintiff has been doing during his shift, as each restroom assignment should have only taken about 30 minutes, and Plaintiff had been at work for seven hours. (ECF 33-4 ¶ 16). Plaintiff stated that he had spent his day writing up work orders from work that had been completed on Saturday, August 19, 2023. (ECF 33-1 at 83:17-23; ECF 33-4 ¶ 17). Mr. Felger found this odd, as completing paperwork from the prior weekend's shift should not have taken hours, but rather about five minutes per document.[5] (ECF 33-4 ¶ 17).

Based on the prior informal performance discussions and this latest concern, Mr. Felger issued Plaintiff a Performance Warning Notice on August 23, 2023. (ECF 33-4 ¶ 18; ECF 33-15). The Performance Warning Notice indicated that the unsatisfactory performance was for "7 hrs [*sic*] to conduct 1 hr [*sic*] work scope (8 hr [*sic*] shift not captured in documentation)." (ECF 33-15). Mr. Felger drafted it as such because, at that time (within five minutes of the conversation he had with

---

[5] Plaintiff admitted at deposition that it would take him a maximum of three minutes to enter work scope information into a work order on the CMMS. (ECF 33-1 at 80:3-6).

Plaintiff), when he viewed the CMMS system, it showed Plaintiff had completed one hour of work scope (related to the two restroom assignments) on August 22, 2023. (ECF 33-4 ¶ 19). At the time, no other work orders performed by Plaintiff were entered into the CMMS for that day. (ECF 33-4 ¶ 19). Plaintiff was presented with the Performance Warning Notice but refused to sign the documentation. (ECF 33-1 at 87:7-11; ECF 33-2 at 68:13-20; ECF 33-15).

### F. Plaintiff Submits a Rebuttal to the Performance Warning Notice, and GT Investigates Plaintiff's Work Orders

Following the issuance of the Performance Warning Notice, Plaintiff spoke with Ms. Wade to discuss the document. (ECF 33-1 at 94:7-9; ECF 33-3 ¶ 18). Plaintiff told Ms. Wade that the computer was down on Saturday (August 19, 2023), and that he was entering his work from that day on Tuesday (August 22, 2023). (ECF 33-1 at 94:14-17; ECF 33-3 ¶ 19). Ms. Wade asked Plaintiff to provide her with a list of work orders for work he performed on Saturday but did not enter until Tuesday. (ECF 33-1 at 94:18-21; ECF 33-3 ¶ 19). Plaintiff provided the list (hereafter "rebuttal") on August 25, 2023. (ECF 33-1 at 94:22-24, 95-96:24-1; ECF 33-3 ¶ 20; ECF 33-16). The first page of the rebuttal contained a narrative explanation from Plaintiff as to what he believed occurred in connection with the discipline. (ECF 33-1 at 96:9-13; ECF 33-16). The second page of the rebuttal contained a list of twelve work orders. (ECF 33-1 at 107:2-22; ECF 33-16).

As to the first page, Plaintiff claimed that the "maintenance supervisor"[6] was discriminating against Plaintiff's "work ethics." (ECF 33-16). Plaintiff mentioned that he felt discriminated as a "Black Employee," but did not mention how the Performance Warning Notice was discriminatory. (ECF 33-16). This submission was the first time Plaintiff mentioned discrimination on the basis of race (or any other basis), so she asked him to explain the allegation. (ECF 33-1 at 102:20-23, 106:10-13; ECF 33-3 ¶ 23). Plaintiff explained that it was because no other employee entered their work orders on Saturday.[7] (ECF 33-3 ¶ 23). Ms. Wade investigated the allegation but determined that the reason he claimed (that no other employee entered work orders on Saturday) had nothing to do with race. (ECF 33-3 ¶ 24). Furthermore, Plaintiff's claim that no one else entered their work orders was demonstrably false. (ECFs 33-16, 33-17).

---

[6] At deposition, Plaintiff clarified that the maintenance supervisor referred to Mr. Felger. (ECF 33-1 at 96:17-19).

[7] When asked at his deposition what he considered to be discriminatory behavior on the part of Mr. Felger, Plaintiff oscillated between alleged incidents of discriminatory behavior, claiming that Mr. Felger told him "[he] didn't produce work and that he was falsifying documents." (ECF 33-1 at 96-97:23-7). But when asked to clarify what specifically Mr. Felger did that was discriminatory, Plaintiff said that "his demeanor changed" and broadly discussed Mr. Felger's relationship with other GT employees, including Mr. White. (ECF 33-1 at 97:10-16, 99-100:15-5). Ultimately, Plaintiff was unable to pinpoint what exactly Mr. Felger did that he found to be discriminatory, admitting that while he claimed that Mr. Felger was "trying to find anything he could do… [to] give [Plaintiff] a write-up at some point," Plaintiff was never given a write-up, and Mr. Felger "didn't follow through." (ECF 33-1 at 100:8-14).

The second page of the rebuttal was a list of twelve work orders that Plaintiff claimed he completed on August 19, 22, and 23, 2023.[8] (ECF 33-1 at 107:2-22; ECF 33-16). Plaintiff originally told Ms. Wade that he completed all twelve work orders on Saturday (August 19, 2023). (ECF 33-1 at 110:12-17; ECF 33-3 ¶ 25). Ms. Wade was surprised by the substantial number of work orders Plaintiff was able to complete in one day and asked Plaintiff to clarify the list. (ECF 33-3 ¶ 26). Plaintiff then told Ms. Wade that half of the work orders were completed on August 19, 2023 and the other half were completed on August 21, 2023.[9] (ECF 33-3 ¶ 26). Ms. Wade drew a line on the list to represent Plaintiff's assertion that the first six orders were

---

[8] According to Plaintiff, the list of work orders came from a larger list of work orders that he wrote down for personal notes. Plaintiff stated that the list was a running list from approximately January 2023 until September 2023, and admitted that there are no dates on the list associated with any of the entries. Plaintiff said that the dates and times for the work performed could be found in the CMMS, but he could not specifically identify the dates for which he claimed he performed each work order based only on the list alone. The larger list was not produced in discovery. (ECF 33-2 at 86-88:18-14).

[9] Plaintiff has repeatedly wavered in his explanation of which dates the listed work orders represent. In his deposition, Plaintiff first stated that the list "represented work that I've done for [] that Saturday [August 19], me and Johnny Taylor worked on." (ECF 33-1 at 110:15-17). But just minutes later he stated that the list represented "the work I performed on – on that Saturday and – and that Monday." (ECF 33-1 at 113:7-8). Plaintiff previously testified that the list also included work performed on August 23, but then later stated the work represented work on August 19 and 22, before testifying that he "[doesn't] have the exact dates for these." (ECF 33-2 at 86:6-10, 90:19-24, 91:2-3). Plaintiff himself does not seem to know what exactly the list represents.

completed on August 19, 2023 and the final six orders were completed on August 21, 2023. (ECF 33-3 ¶ 26; ECF 33-16).

To confirm Plaintiff's account and determine whether the warning should be rescinded, Ms. Wade asked Mr. Felger to pull the CMMS security log data and actual work orders for the twelve work orders on Plaintiff's list, though she did not inform Mr. Felger of why she was requesting the security log. (ECF 33-3 ¶ 27; ECF 33-4 ¶ 21). After Mr. Felger provided the information, Ms. Wade reviewed the CMMS security log and the twelve orders on Plaintiff's list. (ECF 33-3 ¶ 30). The investigation took a little over a week, as Ms. Wade and Mr. Felger took time to pull and review the relevant documents. (ECF 33-1 at 124:2-10; ECF 33-3 ¶ 30; ECFs 33-17 to 33-27).

Ms. Wade and Mr. Felger reviewed all twelve work orders and determined that certain work orders had no involvement from Plaintiff, and that there were several date discrepancies associated with their creation versus work performance. (ECF 33-3 ¶ 31; ECF 33-4 ¶ 23). Of the six work orders Plaintiff represented he completed on August 19, 2023 (WO Nos. 12353, 12355, 12442, 12444, 12449, and 12445):

- two work orders (WO Nos. 12353 and 12355) were created by Plaintiff on August 19, 2023, but did not have any associated work by Plaintiff,

with WO 12353 specifically worked on by other maintenance technicians[10] (ECFs 33-18, 33-19);

- three work orders (WO Nos. 12442, 12444, and 12449) were created by Plaintiff on August 22, 2023, but backdated to reflect work completed on August 19, 2023, even though Plaintiff admits the work order was completed August 22, 2023 (ECF 33-2 at 30:15-21; 104-105:23-8, 142:18-23, 143-144:23-5, 144-145:25-9; ECFs 33-20, 33-21, 33-22); and

- one work order (WO No. 12445) was created and worked on by another technician on August 22, 2023, with no apparent involvement by Plaintiff. (ECF 33-23). Plaintiff admitted the records do not reflect he performed the work. (ECF 33-2 at 97:5-21, 146:5-23).

Of the six work orders Plaintiff represented he completed on August 21, 2023 (WO Nos. 12450, 12384, 12435, 12440, 12459, and 12497):

- one work order (WO No. 12450) represents work completed by Plaintiff over multiple days, starting August 22, 2023 (a day after he represented working on the work order) (ECF 33-24);

- two work orders (WO Nos. 12384 and 12459) represent work completed by Plaintiff on August 22, 2023 (a day after he represented working on the work order), which Plaintiff admitted (ECF 33-2 at 104-105:23-8, 146:9-20, 152:3-23; ECFs 33-25, 33-28);

- two work orders (WO Nos. 12435 and 12440) represent the bathrooms Plaintiff cleaned on August 22, 2023 (a day after he represented working on the work order), which Plaintiff admitted (ECF 33-2 at 104-105:23-8, 150:7-17, 151:5-18; ECFs 33-26, 33-27); and

- one work order (WO No. 12497)[11] was created by Mr. White and completed by Plaintiff on August 23, 2023 (two days after he

---

[10] Plaintiff admitted that the CMMS security log would show the names of all individuals who worked on the work order and entered information into the work order. (ECF 33-1 at 130-131:23-2). Plaintiff's name is notably absent from the CMMS security log.

[11] Plaintiff testified that he either anticipated the issue for this work order or that it was created in advance of August 23, 2023, and suggested the work order was actually created before the records say it was created. (ECF 33-2 at 102:5-17, 103:15-19; ECF 33-29). However, it is impossible to perform work on a work order

represented working on the work order, and one day after Mr. Felger's conversation with Plaintiff that resulted in the Performance Warning Notice. (ECF 33-29).

### G.    GT Terminates Plaintiff for Violation of the Associate Conduct Policy

While the investigation started as a review of the rebuttal evidence from Plaintiff, the concern shifted after reviewing Plaintiff's list, the CMMS logs, and work orders because there was a disconnect between the records and the story from Plaintiff. (ECF 33-3 ¶ 33; 33-4 ¶ 26). Ultimately, because Plaintiff submitted a falsified document to Human Resources and given the Associate Conduct Policy, Ms. Wade and Mr. Felger recommended Plaintiff's termination to Mr. LaVieri. (ECF 33-3 ¶ 32; ECF 33-4 ¶ 25; ECF 33-14). Mr. LaVieri was not involved in the investigation, but reviewed the data collected during the investigation before making a final decision. (ECF 33-5 ¶ 8).

On September 5, 2023, GT terminated Plaintiff's employment because he violated the Associate Conduct Policy by providing false information during an investigation.[12] (ECF 33-1 at 137:12-14; ECF 33-3 ¶¶ 34, 36; ECF 33-5 ¶ 9; ECF 33-30). During the termination discussion, in which Ms. Wade, Mr. Felger, and Mr.

---

that has not been created yet, unless an individual changes the date to erroneously reflect that work had been performed. (ECF 33-4 ¶ 29).

[12] GT has terminated other employees for this kind of behavior in the past. (ECF 33-3 ¶ 39). GT terminated three employees between July 2023 and December 2023 for falsification of company records or reports. (ECF 33-3 ¶ 39).

LaVieri were present, Plaintiff was presented with a copy of the Performance Warning Notice related to the termination. [13] (ECF 33-3 ¶ 36; ECF 33-30; ECF 33-2 at 158:3-6).

Mr. Felger, Ms. Wade, and Mr. LaVieri had no reason to doubt that the company records accurately reflected the work that was performed and documented. (ECF 33-3 ¶ 35; ECF 33-4 ¶ 27; ECF 33-5 ¶ 10; ECF 33-2 at 154:9-12, 212:17-21, 222-223:23-5). The decision to terminate Plaintiff's employment reflected the honest belief that he falsified documents during the investigation process. (ECF 33-3 ¶ 35; ECF 33-4 ¶ 27; ECF 33-5 ¶ 10; ECF 33-2 at 154:9-12, 212:22-25, 222-223:1-14).

### H.    Plaintiff's Claims of Alleged Discriminatory Behavior

Now, and <u>not</u> while he was a GT employee, Plaintiff claims that he was discriminated against multiple times during his employment. For example, Plaintiff alleges that his tools and chair would go missing.[14] (ECF 33-1 at 174:1-13). At one point during Plaintiff's employment, Mr. Felger instructed Mr. White to remove <u>all</u> of the chairs in the workshop, but this was because of general productivity concerns

---

[13] At the DOAH hearing, Plaintiff testified that he understood that he was terminated for falsification of documents during an investigation. (ECF 33-2 at 106:7-16; ECF 33-30).

[14] Mr. White and Mr. Felger do not have any knowledge of Plaintiff complaining that any of his tools went missing during his employment at GT. (ECF 33-4 ¶ 31; ECF 33-6 ¶ 8).

and was not specific to Plaintiff. (ECF 33-1 at 176:1-10; ECF 33-4 ¶ 32; ECF 33-6 ¶ 9; ECF 33-2 at 227:3-19). Importantly, Plaintiff fails to connect how these alleged actions were in any way related to race, national origin, color, or retaliation. (ECF 33-2 at 19:1-23, 227-230:3-5).

Plaintiff also vaguely claims that James White made a comment to the effect that the State of Florida does not require minorities in the workplace.[15] (ECF 33-1 at 88:8-14; ECF 33-2 at 17:10-16, 60:7-18). Plaintiff admits he did not report the comment to Ms. Wade. (ECF 33-2 at 61-62:25-2). Mr. White denied he ever made such a statement. (ECF 33-6 ¶ 10).

Plaintiff also alleges that on September 5, 2023 (the day of his termination), he returned from break and found "a toy man with a noose around his [n]eck" on his desk.[16] (ECF 1 ¶32; ECF 33-1 at 138:18-23). The "statue" is a carved wooden figurine of a fisherman holding a large fish. (ECF 33-3 ¶ 44; ECF 33-3 Ex. A). The statue belonged to a former employee of GT who left it behind when he departed and had been around the shop as a desk decoration for years, a fact even Plaintiff acknowledges. (ECF 33-3 ¶ 43; ECF 33-1 at 139:12-15; ECF 33-2 at 236:12-18). Importantly, the Company has no knowledge of the statue having a noose around the figure's neck. (ECF 33-3 ¶ 44; ECF 33-3 Ex. A). Plaintiff claims he reported the

---

[15] Plaintiff has never provided details as to when the statement was made, or clarified what law he believes Mr. White was allegedly referring to.

[16] The "toy man" has repeatedly been referred to as a statue throughout the litigation.

statue to Ms. Wade and Mr. LaVieri, but neither have any memory of being shown the statue by Plaintiff, nor have they observed the statue with anything around its neck. (ECF 33-1 at 141:11-19; ECF 33-3 ¶ 42; ECF 33-5 ¶¶ 12, 13; ECF 33-2 at 44:7-8, 205:14-16, 209:4-5, 215-216:21-2; ECF 33-3 Ex. A).

During his employment, Plaintiff never complained to Mr. Felger about discrimination, never reported any comments he felt were inappropriate, never reported anything that Mr. Felger believed needed to be reported to Human Resources, and never made any complaints about Mr. White or any other GT employee. (ECF 33-1 at 102:20-23; ECF 33-4 ¶ 30; ECF 33-2 at 158:9-12, 169:12-25). Likewise, other than the brief reference in Plaintiff's rebuttal, Plaintiff never complained about discrimination to Ms. Wade. (ECF 33-1 at 93-94:19-6, 106:10-13; ECF 33-3 ¶¶ 40, 41). Finally, Plaintiff never complained to Mr. LaVieri or Mr. White about any other employees, and never made complaints about discrimination or retaliation. (ECF 33-1 at 102:20-23; ECF 33-5 ¶ 11; ECF 33-6 ¶ 7; ECF 33-2 at 215:10-20, 216:7-13).

Notably, when asked if he believed any individuals were treated better than himself because they were a different race, Plaintiff testified that "No. We was treated equal. Everybody got treated fair, you know, as far as performing work." (ECF 33-1 at 155:11-16). When asked if anyone was treated better because they

were of a different national origin, he similarly replied "not to my knowledge." (ECF 33-1 at 156:6-11).

## I.    Plaintiff Cannot Establish Retaliation

When asked how he believes GT retaliated against him, Plaintiff was unable to provide a concrete answer. When asked why he believed GT targeted him specifically, Plaintiff answered "I was trying to find out – I was able to produce the documents and the work orders that I had later on going forward when they actually said that I didn't have any documentation of work orders at all during the time I was terminated." (ECF 33-1 at 158:10-20). Plaintiff seems to believe that the work orders discussed above (ECFs 33-18 through 33-29) "magically appeared" in the system after he was terminated, and that that shows retaliation. (ECF 33-1 at 159:4-7). At no point has Plaintiff alleged that he was retaliated against for reporting or complaining of any discriminatory behavior, or any similar occurrence. (*See generally*, ECF 33-1).

## J.    Plaintiff's Misconduct Results in the Decision to Terminate Plaintiff's Employment

Ms. Wade, Mr. Felger, and Mr. LaVieri, the decision makers in Plaintiff's termination decision, all confirm that Plaintiff never complained to them about discriminatory behavior, never reported any inappropriate comments, and never made complaints about other GT employees, other than the one complaint raised in the rebuttal submitted to Ms. Wade on August 25, 2023. (ECF 33-3 ¶¶ 40-42; ECF

33-4 ¶ 30; ECF 33-5 ¶¶ 11, 12; ECF 33-2 at 204:9-17, 158:9-12, 169:12-25, 215:10-20, 216:7-13). Neither Ms. Wade, Mr. Felger, nor Mr. LaVieri came to the decision to terminate Plaintiff because of his race, national origin, or color. (ECF 33-3 ¶ 47; ECF 33-4 ¶ 33; ECF 33-5 ¶ 15). In fact, none of them even knew that Plaintiff's national origin was Colombian. (ECF 33-3 ¶ 48; ECF 33-4 ¶ 34; ECF 33-5 ¶ 16). Instead, they terminated Plaintiff's employment because of his violations of the Associate Conduct Policy by falsifying records during an investigation, a termination they would have recommended for any employee committing the same infraction. (ECF 33-3 ¶ 47; ECF 33-4 ¶ 35; ECF 33-5 ¶ 15).

## II.    LEGAL ARGUMENT

### A.    GT is Entitled to Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The non-moving party must produce substantial evidence to defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Here, viewing Plaintiff's allegation in the light most favorable to his claims, no genuine issues of material fact exist for trial as Plaintiff fails to establish his claims.

**B.    Plaintiff's Discrimination Claims Fail as a Matter of Law**

Plaintiff, who bears the ultimate burden, cannot establish intentional discrimination. *Selby v. Tyco Healthcare Grp., L.P.*, 301 F. App'x 908, 911 (11th Cir. 2008). Here, Plaintiff can present no direct evidence of discrimination[17] on the basis of race, national origin, or color, and instead should satisfy the *prima facie* case established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[18]

Under *McDonnell Douglas*, a plaintiff establishes a *prima facie* case of discrimination by showing: (1) he is a member of a protected class; (2) he was qualified for the position or otherwise met legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).[19]

---

[17] As Eleventh Circuit precedent illustrates "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor" constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quoting *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir. 1999 (citations and quotations omitted)).

[18] Whether a plaintiff can establish a *prima facie* case or not, he can still attempt to survive summary judgment by "present[ing] a convincing mosaic of circumstantial evidence" of discrimination. *Ismael v. Roundtree*, 161 F.4th 752, 760 (11th Cir. 2025). Such circumstantial evidence can include that the employer's justification is pretextual. *Id.* Plaintiff's failure to present a convincing mosaic of discriminatory and retaliatory behavior is further discussed below.

[19] While race, color, and national origin discrimination claims are different, the *prima facie* case analysis is the same for all three protected classes. *See Gupta v.*

For purposes of summary judgment <u>only</u>, Defendant acknowledges Plaintiff is a member of a protected class,[20,21] and that he suffered an adverse employment action. However, he cannot establish that he was meeting GT's legitimate expectations, nor can he establish valid comparators.

### 1.    Plaintiff Was Not Meeting Legitimate Expectations

Plaintiff cannot establish the second element of his *prima facie* case. To do so, he must show that he was performing his job "at a level that met his employer's legitimate expectations." *Huhn v. Koehring Co.*, 718 F.2d 239, 243 (7th Cir. 1983); *see also Baker v. Sears, Roebuck & Co., 90*3 F.2d 1515, 1520 (11th Cir. 1990) (recognizing an employer's right to establish and enforce performance standards regarding the qualification prong). Critically, Plaintiff must establish that he was performing at a level which met GT's legitimate expectations <u>at the time of his termination.</u> *Johnson v. Switch & Data Mgmt. Co. LLC,* No. 8:04-cv-1750-T-

---

*Walt Disney World Co.*, 256 F. App'x 279, 282 (11th Cir. 2007) (finding plaintiff did not establish a prima facie case for race, national origin, and color discrimination because he failed to show he was qualified for the position, and he failed to establish that he was treated differently from other similarly situated employees).

[20] While Plaintiff has never distinguished the two, race and color are not synonymous. *See Bell v. Hobby Lobby Stores, Inc.*, No. 8:21-cv-2455-WFJ-AAS, 2023 WL 1102647, at *3 (M.D. Fla. Jan. 30, 2023). One does not automatically imply the other. *Gill v. Bank of America Corporation*, No. 2:15–cv–319–FtM–38CM, 2015 WL 4349935, at *4 (M.D. Fla. July 14, 2015).

[21] Though Plaintiff's Complaint alleges he is "half Columbian" (ECF 1 ¶ 10), he testified at his deposition that his national origin is "Black" (ECF 33-1 at 17-18:21-2, 106-107:24-1), which does not meet the definition of national origin set forth by the Supreme Court in *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973).

17MAP, 2005 U.S. Dist. LEXIS 28075, at *11 (M.D. Fla. Nov. 14, 2005) ("the issue in this case is whether [the employee] was meeting [the employer's] legitimate employment expectations at the time of his termination, not whether he performed well at past jobs"). Plaintiff's dishonesty and falsification of information during a Human Resources investigation clearly falls below GT's expectations of its employees as such conduct is a violation of the Associate Conduct Policy. (ECF 33-3 ¶ 47).

### 2.    Plaintiff Cannot Identify Comparators

Plaintiff also fails to establish that GT treated a similarly situated employee, who was of a different race, color, or national origin, more favorably. It is a long-held principle that "[d]iscrimination consists of treating like cases differently." *Lewis v. City of Union City*, 918 F.3d 1213, 1222 (11th Cir. 2019)(internal citations omitted). The converse is true as well: "[t]reating different cases differently is not discriminatory, let alone intentionally so." *Id.* at 1222-23; *see also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186 (11th Cir. 1984) ("If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown." (internal quotations omitted)). Thus, as part of his *prima facie* case, Plaintiff must establish that he was treated differently than employees outside of his protected classes. *Lewis* at 1222. Without such a

20

comparator, Plaintiff cannot generally establish a *prima facie* case under the *McDonnell Douglas* framework. *Id.* at 1224.

Plaintiff has not, and cannot, show that GT treated him differently than other employees. Plaintiff did not specify any individual, let alone any similarly situated employee, who was treated differently. This failure alone is detrimental to his discrimination claims. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."); *see also Alansari v. Tropic Star Seafood Inc.*, 388 F. App'x 902, 904 (11th Cir. 2010); *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). In fact, Plaintiff specifically testified that there were no other employees treated better than him based on race, color, or national origin. (ECF 33-1 at 155-156:11-11).[22]

Furthermore, there are no other similarly situated employees who were treated differently than Plaintiff. While Plaintiff may believe that others experienced computer issues on Saturday, August 19, 2023 he ultimately acknowledged that belief to be false. (ECF 33-1 at 74-75:22-4). Contrary to his belief, GT did not issue its initial Performance Warning Notice due to a failure to enter Saturday's work into the CMMS on time; rather, he was disciplined because the CMMS did not show that

---

[22] When asked if there were individuals treated better than him, Plaintiff specifically said "No. We was treated equal." (ECF 33-1 at 155:15).

he completed a full days' worth of work by the end of his shift on Tuesday, August 22, 2023.[23] (ECF 33-4 ¶¶ 18, 19; ECF 33-15). As to the termination, Plaintiff cannot establish that others falsified information during an HR investigation but were not terminated. In fact, GT has established that it routinely enforces its falsification policy, as it separated three additional employees within a six-month window of Plaintiff's separation. (ECF 33-3 ¶ 39).

As such, Plaintiff's discrimination claims fail.

## C.    Plaintiff's Retaliation Claim Fails

Plaintiff also fails to establish retaliation. To establish a *prima facie* case for retaliation, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Ward v. Troup Cnty. Sch. Dist.*, 856 F. App'x 225, 229 (11th Cir. 2021); *Walker v. Indian River Transp. Co.*, 741 F. App'x 740, 749 (11th Cir. 2018). Here, Plaintiff cannot establish that his isolated complaint of discrimination is at all connected to his discharge.

The evidence supports Plaintiff made only one complaint of discrimination (contained within the rebuttal submitted to Human Resources on August 25, 2023). (ECF 33-3 ¶¶ 22-24, 40). However, Plaintiff cannot show that there was a causal

---

[23] To the extent Plaintiff alleges Johnny Taylor is a valid comparator, this argument fails, as there is no evidence that Mr. Taylor did not enter a full days' worth of work into the CMMS in a timely fashion.

connection between that protected activity and his termination. GT immediately investigated the allegation of discrimination raised by Plaintiff and found it was without merit, as there was no evidence that the Performance Warning Notice was issued for any reason other than Plaintiff's failure to timely submit paperwork into the CMMS. (ECF 33-3 ¶ 24). Furthermore, Plaintiff's intervening behavior (i.e. the presentation of false information during an HR investigation) severed any causal inference created by the temporal proximity between his complaint and termination. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023) ("[T]he intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity."); *see also Fletcher v. JM Smucker Co.*, No. 24-10392, 2025 U.S. App. LEXIS 3205, at *6-7 (11th Cir. Feb. 12, 2025) (finding an employee's violation of an attendance policy severed any causal inference created by temporal proximity for her termination seven days after filing a complaint). Thus, Plaintiff's retaliation claim fails.

### D. GT had Legitimate, Non-Discriminatory, and Non-Retaliatory Reasons for Terminating Plaintiff's Employment

If, and only if, a *prima facie* case of discrimination or retaliation is established, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory or non-retaliatory reason for its actions. *Ward*, 856 F. App'x at 228.

As detailed above, Plaintiff's termination was strictly due to his own misconduct and decision to submit false information to HR in the course of an

investigation. Dishonesty is a non-discriminatory reason for termination. *See Boyland v. Corr. Corp. of Am.*, 390 F. App'x 973, 975 (11th Cir. 2010) (finding employee's violation of work policy and lying during subsequent internal investigation were legitimate, non-discriminatory reasons for termination); *see also Kelley v. Allegiant Air, L.L.C.*, No. 8:23-cv-1162-WFJ-SPF, 2024 U.S. Dist. LEXIS 191411, at *30 (M.D. Fla. Oct. 22, 2024).

Ironically, had Plaintiff never submitted a rebuttal to the Performance Warning Notice, GT would likely never have looked into the matter. However, once presented with demonstrably false information, GT had no choice but to enforce its policy and terminate Plaintiff's employment. Courts in the Eleventh Circuit routinely hold that discharge for violation of a work rule is a legitimate, non-discriminatory reason for separation. *See, e.g., Bush v. Hous. Cnty. Comm'n,* 414 F. App'x 264, 267 (11th Cir. 2011); *Xingzhong Shi v. Montgomery*, 679 F. App'x 828 (11th Cir. 2017). While Plaintiff might disagree with or dislike that decision, "[i]t is by now axiomatic that [the court] cannot second guess the business decisions of an employer." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005); *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (finding the plaintiff cannot avoid summary judgment "simply quarreling with the wisdom of that reason.").

Further, as to his national origin discrimination claim, GT cannot be liable for alleged discriminatory conduct when the company employees did not know Plaintiff's national origin in the first place. *See, e.g., Nieves v. Metro. Dade Cnty.,* 598 F. Supp. 955 (S.D. Fla. 1984) (finding that the employer could not be liable for national origin discrimination under Title VII because the employer did not know the employee's national origin until the filing of an Equal Employment Opportunity Commission complaint). The individuals involved in the termination decision (Ms. Wade, Mr. Felger, and Mr. LaVieri) were all unaware that Plaintiff claimed he was "half-Columbian" (ECF 33-3 ¶ 48; ECF 33-4 ¶ 34; ECF 33-5 ¶ 16), and therefore could not have had discriminatory intent based on an unknown national origin.

As such, Defendant has established legitimate non-discriminatory and non-retaliatory reasons for Plaintiff's termination.

### E.    Plaintiff Fails to Establish Pretext or Present a Convincing Mosaic of Discrimination or Retaliation

As Plaintiff fails to establish his *prima facie* case for his claims, and GT has provided evidence of a legitimate, non-discriminatory, non-retaliatory reason for Plaintiff's termination, Plaintiff is not entitled to a presumption of discrimination or retaliation. *See Coleman v. Morris-Shea Bridge Co.,* No. 21-13764, 2026 WL 144791, at *6 (11th Cir. Jan. 20, 2026). Even had Plaintiff established his *prima facie* case, which he did not, because GT has shown that it terminated Plaintiff for a legitimate, non-discriminatory reason, Plaintiff must "present[] a convincing mosaic

of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Ismael*, 161 F.4th at 760 (internal quotations omitted).

To present a convincing mosaic of circumstantial evidence, Plaintiff can provide a range of circumstantial evidence, which may include "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual" *Id.* (internal quotations omitted). The Eleventh Circuit has held that a showing of pretext, or lack thereof, is relevant to the mosaic analysis. *See id.*

First, Plaintiff cannot prove that GT's stated reason for the termination was not the true reason, but merely pretext for discrimination or retaliation. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *See Chapman*, 229 F.3d at 1030; *Nix*, 738 F.2d at 1187 (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). To show pretext, Plaintiff "must show not merely that [Defendant's] employment decision[] [was] mistaken but that [it was] in fact motivated by [his protected category] ... a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might

motivate a reasonable employer." *Thomas v. Hall*, No. 3:10cv171/MCR/EMT, 2011 U.S. Dist. LEXIS 101873, at *12 (N.D. Fla. Sept. 9, 2011) (internal quotations omitted). Other than Plaintiff's own speculative and misguided belief that his actions did not justify termination, Plaintiff offered no credible evidence indicating GT's reason for terminating Plaintiff was pretext for discrimination or retaliation. Plaintiff's self-serving testimony, without more, is not enough to establish that he was subjected to unlawful discrimination or retaliation. *See Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1073-74 (11th Cir. 1995) ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext of intentional discrimination where [an employer] has offered ... legitimate, non-discriminatory reasons for its actions."); *see also St. Hilaire v. Pep Boys*, 73 F. Supp. 2d 1350, 1360 (S.D. Fla. 1999) (plaintiff's mere belief, speculation, or conclusion he was subject to discrimination did not create an inference of discrimination).

But Plaintiff does not fail to present a mosaic of discriminatory or retaliatory behavior solely because of his failure to establish pretext. As discussed above, Plaintiff also fails to put forth a single employee outside of his protected class he claims was treated more favorably for <u>nearly identical conduct</u>, let alone

systematically better treatment of similarly situated employees.[24] This failure is yet another fatal blow to Plaintiff's claims of discriminatory and retaliatory behavior. *See Burke–Fowler v. Orange County, Fla.,* 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming the district court's grant of summary judgment in part because plaintiff failed to establish valid comparators).

Finally, Plaintiff has not put forth a single shred of credible evidence from which an inference of discriminatory intent may be drawn. GT terminated Plaintiff for violating its Associate Company Policy after he provided false information during GT's investigation. (ECF 33-3 ¶¶ 32, 34, 38). The record shows that this decision was not pretextual for discriminatory or retaliatory reasons, and Plaintiff cannot show otherwise.

In support of his claim of discrimination, Plaintiff proffers an alleged comment about minorities from James White (without any details), which Mr. White denies was ever made. Even so, a stray remark by a non-decision maker has consistently been held to be insufficient to defeat a summary judgment motion. *See, e.g., Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1267-68 (11th Cir. 2010).

Plaintiff also claims a statue was placed on his desk before his termination, which he claims was discriminatory. However, there is no evidence that the

---

[24] In fact, as discussed above, Plaintiff actually testified that he was unaware of any employees treated better than him. (ECF 33-1 at 155-156:11-11).

existence of this statue, which is a wooden carving of a man holding a fish, was discriminatory, nor were decision makers aware that Plaintiff even believed it to be during the course of his employment. (ECF 33-3 ¶ 46; ECF 33-5 ¶ 14; ECF 33-1 at 139:12-15). Plaintiff's mere feeling or perceptions that the statue was discriminatory is insufficient to defeat summary judgment. *See, e.g., Ray v. Tandem Computers,* 63 F.3d 429, 434 (5th Cir. 1995) (employee's subjective belief of discriminatory intent insufficient to defeat summary judgment). On its face, there is nothing inherently discriminatory about the statue, and Plaintiff has presented no evidence to suggest otherwise.

As such, GT is entitled to summary judgment. *Adewumi v. Wellstar Med. Grp.*, No. 24-12243, 2025 WL 831584, at *8 (11th Cir. Mar. 17, 2025) (finding that plaintiff's circumstantial evidence, considered as a whole, was insufficient to survive summary judgment under the convincing mosaic approach because plaintiff did not identify any suspicious timings, ambiguous statements, or other information from which discriminatory intent might reasonably be inferred, and he did not present evidence of pretext).

## III.    CONCLUSION

Ultimately, Plaintiff's termination from GT was for one reason: his own dishonesty and choice to submit false information to Human Resources during a Company investigation, which is a clear violation of GT's policies. GT acted in a

manner consistent with its internal policies and practice of enforcing those policies and terminated Plaintiff's employment for his own poor decisions, and not for any discriminatory or retaliatory reasons.

**WHEREFORE**, Defendant GT respectfully requests that this Court grant summary judgment in favor of GT and grant all other just and equitable relief.

## CERTIFICATE OF COMPLIANCE REGARDING WORD COUNT

Pursuant to Local Rules 56.1 and 7.1, the undersigned certifies that the memorandum of law section of this filing contains 7,330 words, according to the word-processing system used to prepare this memorandum.

Dated:  February 12, 2026        Respectfully submitted,

*/s/ Elizabeth Jozsi*
Elizabeth Jozsi
Florida Bar No: 119428
Sarah Kuehnel
Florida Bar No: 124765
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART, P.C.
100 North Tampa Street
Suite 3600
Tampa, FL 33602
Telephone: 813.221.7239
Facsimile: 813.289.6530
elizabeth.jozsi@ogletree.com
sarah.kuehnel@ogletree.com
Secondary emails:
celynda.pavone@ogletree.com
melissa.salazar@ogletree.com
susan.urso@ogletree.com
TAMdocketing@ogletree.com

*Attorneys for Defendant GT*
*TECHNOLOGIES, INC.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 12, 2026, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will

send a notice of electronic filing to:

Emanuel Kataev, Esq.
David Pinkhasov, Esq.
Consumer Attorneys, PLLC
6829 Main Street
Flushing, NY 11367
Telephone:  718.412.2421
Facsimile:  718.489.4155

ekataev@consumerattorneys.com
dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiff*

**I FURTHER CERTIFY** that to the best of my knowledge there are not any

non-CM/ECF participants that require notification of this response via U.S. Mail.

*/s/ Elizabeth Jozsi*
Attorney