**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

QUENNEL JACKSON,

               Plaintiff,

v.

GT TECHNOLOGIES, INC.,

               Defendant.

Case No.: 4:25-cv-218 (AW) (MAF)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR <u>SUMMARY JUDGMENT</u>**

Plaintiff Quennel Jackson ("Plaintiff" or "Jackson"), by his attorneys, Sage Legal LLC, hereby respectfully submits this opposition (and counterstatement of facts) to Defendant GT Technologies, Inc.'s ("GT," the "Company," or "Defendant") Motion for Summary Judgment. As further set forth below, there is a genuine dispute as to the material facts. Accordingly, Defendant is not entitled to judgment as a matter of law.

**I.  PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

**A.  AS TO "GT is an Equal Opportunity Employer"**

Plaintiff began his employment with GT in 2017. ECF <u>33-1</u> at 37:5-10. Plaintiff does not dispute that GT is "a manufacturer of internal engine components for the automotive industry," but denies that it is, in practice, "an equal opportunity employer" that "maintains policies prohibiting discrimination and retaliation and encourages employees to report concerns or complaints if they feel another employee is violating those policies;" although GT has such written policies, they have failed to comply with same by treating all employees equally. ECF <u>34</u> at 2 (<u>citing</u> ECF <u>33-3</u> ¶ 10; ECF <u>33-11</u> and <u>33-13</u>); ECF <u>33-1</u> at 66:23-67:17 (it was not made obvious to Plaintiff until the day of his separation that a hotline for reporting complaints existed); 68:12-69:5 (Jackson never called the hotline to complain because he "did not have any knowledge of it"); 98:11-21 (James White ("White") had explained "you got everything going right, […] you

1

act like us, you think like us and you talk like us.  You just […] got one problem, […] one thing, […] And I can read between the lines to know what he was talking about"); 99:6-11 (White made statements about Jackson's race on different occasions around different individuals); 99:6-100:22 (Jason Felger ("Felger") and White were conspiring to confuse Jackson and increase likelihood that he would be written up); 100:23-102:19 (prior to Jackson submitting his letter to HR, Jackson had spoken to Dave LaVieri ("LaVieri") and HR about discriminatory incidents); 103:4-105:7 (other employees did the same things as Jackson and worse, yet were not disciplined); 105:24-106:5 (Jackson can remember other employees on second shift and day shift who did not enter work orders and were not disciplined); 138:18-143:25 (termination notice issued shortly after Jackson reported discriminatory statue to Wade and LaVieri); 149:8-150:18 (White had "said one time, and they told me they was just joking about it, they said, you got -- you got all the credentials, only if you -- … It was only if he was something. Yeah, only if he was slightly lighter on […] the color," in front of other employees); 156:12-21.

Plaintiff admits that employees of GT were "directed to first voice the [*sic*] concerns to their immediate supervisor; if they cannot resolve the issue, they can report the issue to Human Resources or directly to the Plant Manager," but notes that he *did* first voice his concerns to his immediate supervisor, Felger, to HR, and to plant manager LaVieri. ECF 34 at 2 (citing ECF 33-3 ¶ 11; ECF 33-11); ECF 33-1 at 44:7-15; 66:6-22; 96:14-98:10; 100:23-101:9; 138:18-143:25.

Plaintiff admits that GT maintains an ethics hotline which employees may use to report complaints anonymously; however, he notes that it was not made obvious to Plaintiff until the day of his separation that this hotline existed. ECF 34 at 2 (citing ECF 33-3 ¶ 11; ECF 33-11); ECF 33-1 at 66:23-67:17; 68:12-69:5.

Plaintiff admits that GT has equal employment policies and reporting policies, including information on the ethics hotline, which are included in their Code of Business Conduct and Ethics, and posted on the employee bulletin board; but again, notes that this is not dispositive as to the parties' proper compliance with these policies, and that notwithstanding their existence, Plaintiff still suffered discrimination and retaliation. ECF 34 at 2-3 (citing ECF 33-3 ¶ 11; ECF 33-11, 33-12, 33-13); ECF 33-2 at 62:3-63:13 (Plaintiff had reported to HR via rebuttal, to no avail).

Plaintiff admits he was aware of the policies prohibiting discrimination and retaliation, and the policies related to reporting concerns, which he acknowledged receipt of upon his initial hire, and that he was aware of the existence of the hotline, and that he never called it to report any concerns; but again, notes that this is because he was not aware of the hotline until the day of his termination; and nonetheless, this is not dispositive as to Plaintiff's proper implementation of these practices, as Plaintiff still suffered discrimination and retaliation. ECF 34 at 3 (citing ECF 33-1 at 64:15-18, 66:4-5, 66:18-25; ECF 33-10; ECF 33-1 at 68:4-14); ECF 33-1 at 66:23-67:17; 68:12-69:5; 98:11-21; 99:6-102:19; 103:4-105:7; 105:24-106:5; 138:18-143:25; 149:8-151:2 (explaining that he did not report a racially discriminatory comment by White because White was a supervisor, and Jackson wanted to "not stoop to that level and just prayed about the situation and just moved forward"); ECF 33-2 at 62:3-63:13.

**B. AS TO "GT Maintains Multiple Policies Dictating Employee Performance"**

Plaintiff admits that "GT maintains an Associate Conduct Policy, which informs employee discipline for unsatisfactory behavior." ECF 34 at 3 (citing ECF 33-3 ¶ 12; ECF 33-14). Plaintiff admits that "[s]ome actions, including falsification of company records or reports, are grounds for immediate dismissal of the employee," but notes that other employees violated Company Policy in the same and other ways, yet were not disciplined for same; and that such discrepancies in

documentation were not uncommon or nefarious. ECF 34 at 3 (citing ECF 33-3 ¶ 12; ECF 33-14);
ECF 33-1 at 103:4-105:7; 105:24-106:5; 128:16-131:2. Plaintiff admits that he "was aware of the
Associate Conduct Policy, including the provision that falsification of records could result in
immediate termination;" but notes that, to his knowledge, this Policy had *never* been enforced,
despite widespread violation of this provision among employees. ECF 34 at 3 (citing ECF 33-2 at
57:7-14); ECF 33-1 at 103:4-105:7; 105:24-106:5. Plaintiff also objects to Defendant's implied
characterization of Plaintiff's retroactive timekeeping as rising to the level of "falsification of
company records as reports"; while retroactive timekeeping may not constitute best practices,
equating it with such behaviors that could likewise be grounds for termination under the same
provision – for example, behaviors like engaging in dishonesty – provides evidence of
discrimination, not only due to its disparate enforcement (only Jackson, and none of his non-Black
counterparts, was ever disciplined for same), but due to the strained and disproportionate
construction of the policy provision, which elevates a commonplace administrative practice into
terminable misconduct in a manner suggestive of pretext rather than legitimate, good faith
enforcement. ECF 34 at 3 (citing ECF 33-3 ¶ 12; ECF 33-14); ECF 33-1 at 103:4-105:7; 105:24-
106:5; ECF 33-2 at 62:3-63:13.

Plaintiff admits that, "[i]n addition to personnel policies, GT maintains a daily workflow
management process to guide technicians as to the work orders that must be completed daily."
ECF 34 at 3 (citing ECF 33-4 ¶ 11; ECF 33-7). Plaintiff admits that "GT uses a Computerized
Maintenance Management Software ('CMMS') database to track work in real-time, which
provides metrics for the department's performance," but notes that employees scarcely entered
data and work orders into the CMMS in real-time and were not disciplined for same.  ECF 34 at 3
(citing ECF 33-4 ¶¶ 8, 9); ECF 33-1 at 103:4-105:7; 105:24-106:5.

Plaintiff admits that "[a]ll employees in the maintenance department, including Plaintiff, are trained on the CMMS system and expected to complete documentation in real-time upon the completion of the work," but notes, again, that employees had rarely documented their work in real-time, and were never disciplined for not doing so. ECF 34 at 3-4 (citing ECF 33-1 at 51:19-23, 63:21-24; ECF 33-4 ¶ 10; ECF 33-7, 33-8, 33-9); although "Plaintiff acknowledged the Company's expectation that work is entered into the CMMS as it is completed," this is not the same as Plaintiff acknowledging that this policy was consistently applied by all employees or enforced against violators. ECF 34 at 4 n.2 (citing ECF 33-1 at 54:5-12); ECF 33-1 at 103:4-105:7; 105:24-106:5. Although Plaintiff maintained an understanding of GT's general policy regarding contemporaneous timekeeping up through August 2023 ("approximately a year after the CMMS training was provided"), this again is not the same as Plaintiff admitting to an understanding that this policy was regularly practiced by employees and enforced by the Company. ECF 34 at 4 n.2 (citing ECF 33-4 ¶ 13); ECF 33-1 at 103:4-105:7; 105:24-106:5.

Plaintiff admits that "[t]he daily process is memorialized in the Mandatory Flow of Work Order Steps/Processes, which is a document distributed to employees following training that explains how a work order is entered from start to finish, and that reiterates the importance of the steps being completed in real-time," but again, notes that documentation was scarcely implemented by employees in real-time, and that no employees had ever been disciplined for violating this policy. ECF 34 at 4 (citing ECF 33-4 ¶ 12; ECF 33-7); ECF 33-1 at 103:4-105:7; 105:24-106:5.

### C. AS TO "Plaintiff's Employment with GT"

Plaintiff admits that he "began his employment with GT on December 4, 2017 as a Facilities Maintenance Technician." ECF 34 at 4 (citing ECF 33-3 ¶ 5; ECF 33-1 at 37:5-16).

Plaintiff admits that "[a]t present, GT employs approximately 7 technicians." ECF 34 at 4 n.3 (citing ECF 33-3 ¶ 7). Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "presently, GT employs minorities in the department," but denies that they employed any minorities during the relevant time period of his employment. ECF 34 at 4 n.3 (citing ECF 33-3 ¶ 8); ECF 33-1 at 146:11-21. Notably, these minorities were fired soon after being hired. ECF 33-1 at 146:17-147:23.

Plaintiff admits that "[f]rom at least 2021 through the end of his employment, [he] was supervised by Maintenance Team Lead … White and Facilities and Maintenance Manager … Felger," and that prior to White, LaVieri had been another of his supervisors (among others). ECF 34 at 4 (citing ECF 33- 1 at 43:2-4, 44:5-15; ECF 33-4 ¶¶ 5, 6; ECF 33-6 ¶ 6); ECF 33- 1 at 42:21-44:15.

Plaintiff lacks knowledge or information sufficient to form a belief as to whether "Felger reported directly to plant manager … LaVieri." ECF 34 at 4 (citing ECF 33-4 ¶ 4). Plaintiff admits that "Erin Wade [("Wade")] was the Human Resources Manager, though she had no direct supervisory capacity over Plaintiff." ECF 34 at 4 (citing ECF 33-3 ¶¶ 3, 6); ECF 33- 1 at 41:23-44:15. Plaintiff admits that "[a]s Plant Manager, … LaVieri was ultimately responsible for supervising all employees, including Plaintiff, … White, … Felger, and … Wade," ECF 34 at 4-5 (citing ECF 33-5 ¶ 5), but submits that this is an immaterial fact.

Plaintiff admits, emphatically, that "[f]rom his initial hire in December 2017 until August 2023, Plaintiff received no formal performance warning notices or disciplinary actions" ECF 34 at 5 (citing ECF 33-3 ¶ 15; ECF 33-4 ¶ 14; ECF 33-1 at 69:11-16); ECF 33-1 at 69:7-22.

Plaintiff denies that "Felger and Plaintiff had occasional informal verbal discussions about areas to improve his performance between August 2022 and August 2023," but notes that if such

conversation(s) had occurred (as Felger maintains), they were no different than any such discussion between supervisors and employees within the scope of Felger's job duties. ECF 34 at 5 (citing ECF 33-4 ¶ 14); ECF 33-1 at 69:17-70:3 (the only such informal conversation was with supervisor Curtis); ECF 33-2 at 130:1-15; 117:13-17 (duties include overseeing the maintenance team).

### D.  AS TO "Plaintiff Works on Saturday, August 19, 2023"

Plaintiff admits that "[o]n Saturday, August 19, 2023, Plaintiff volunteered to cover an extra shift for which he was not normally scheduled with another technician, Johnny Taylor." ECF 34 at 5 (citing ECF 33-1 at 70-71); ECF 33-1 at 70:4-71:10.

Plaintiff admits to there being "computer issues that prevented him from properly submitting any work orders into the CMMS on that date." ECF 34 at 5 (citing ECF 33-1 at 72:7-16). Plaintiff admits that "the CMMS security log for August 19, 2023 shows that Plaintiff logged into the CMMS and created and edited multiple work orders on that day," and that "the CMMS security log shows twelve entries for Plaintiff on August 19, 2023.  It also shows entries from three other users (PFletcher, DMay, and PWoodard)." ECF 34 at 5 (citing ECF 33-4 ¶ 22; ECF 33-1 at 115:18-20; ECF 33-17) and 5 n.4 (citing ECF 33-17); ECF 33-1 at 118:19-24. Plaintiff, however, objects to Defendant's mischaracterization of this as a nefarious action showing falsification, because he had been keeping track of work orders on his tablet, a habit which he had always maintained in case of computer issues. ECF 33-1 at 76:7-25. Moreover, non-contemporaneous documentation of work orders was commonplace at GT, and in Jackson's case, was only done because he had other work to perform, and because he had been having computer issues on that Saturday. ECF 33-1 at 75:9-76:6; 78:20-80:19; 103:4-105:7; 105:24-106:5; 128:16-131:2.

Accordingly, Plaintiff denies Defendant's assertion that "[d]ata on the CMMS security log cannot be manipulated in any way, even at an administration level, as it is a real record of what occurs in the system." ECF 34 at 5 (citing ECF 33-4 ¶ 28); ECF 33-1 at 119:4-120:9 ("everybody can go in and enter anybody's work order"); 127:21-130:14; 132:1-133:12 ("The only person that has access to [go into Jackson's login] and edit it is either … White or [Felger]"); 136:18-137:9; 161:18-163:10 (Jackson insists that something was edited, and that this can be proven ("I can provide the hours and go in there and pull the time database and it will show everything that was done […] It will show the whole entire status")); 167:9-168:14 (documentation regarding termination was changed after the fact).

### E.  AS TO "Plaintiff Receives a Performance Warning Notice"

Plaintiff admits that "[t]owards the end of Plaintiff's shift on Tuesday, August 22, 2023, … Felger noticed that he had not seen Plaintiff throughout the day, so … Felger spoke with Plaintiff to ask how he spent his day," but notes, again, that such discussions would have been within the scope of Felger's job duties. ECF 34 at 6 (citing ECF 33-1 at 83:12-16; ECF 33-4 ¶ 15); ECF 33-2 at 117:13-17; 130:1-15; ECF 33-1 at 83:7-85:22 (during this conversation, Plaintiff discussed his computer issues with Felger).

Plaintiff admits that "[d]uring that conversation, Plaintiff said that he had worked on two restroom assignments that day." ECF 34 at 6 (citing ECF 33-4 ¶ 16); ECF 33-1 at 91:7-14. Plaintiff admits that "Felger asked what else Plaintiff has been doing during his shift, as each restroom assignment should have only taken about 30 minutes, and Plaintiff had been at work for seven hours." ECF 34 at 6 (citing ECF 33-4 ¶ 16); ECF 33-2 at 131:3-132:9; 150:7-151:4; 163:10-165:21 (Jackson denies that only one hour of work orders was conducted, given that numerous work orders

show completion on 8/22, and does not understand why he could not be located in CMMS given that he was completing these tasks and had documented same); ECF 33-1 at 91:7-14.

Plaintiff admits to stating "that he had spent his day writing up work orders from work that had been completed on Saturday, August 19, 2023," but again notes that this was only because of computer issues, that such practice was not uncommon in the course of operations at GT, and that other employees did the same and worse, yet were not disciplined. ECF 34 at 6 (citing ECF 33-1 at 83:17-23; ECF 33-4 ¶ 17); ECF 33-1 at 78:20-80:24; 103:4-105:7; 105:24-106:5.

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Felger found this odd, as completing paperwork from the prior weekend's shift should not have taken hours, but rather about five minutes per document," but admits that Felger testified as such, and admits that "it would take him a maximum of three minutes to enter work scope information into a work order on the CMMS;" regardless, this fact does not prove lack of pretext, because Jackson did not spend all day on same, but had been performing other work on Monday and Tuesday as well. ECF 34 at 6 (citing ECF 33-4 ¶ 17) and 6 n.5 (citing ECF 33-1 at 80:3-6); ECF 33-1 at 80:13-81:16.

Plaintiff admits that "Mr. Felger issued Plaintiff a Performance Warning Notice on August 23, 2023," but denies that this was "[b]ased on the prior informal performance discussions and this latest concern." ECF 34 at 6 (citing ECF 33-4 ¶ 18; ECF 33-15); ECF 33-1 at 69:17-70:3 (the only such informal conversation was with supervisor Curtis), 83:7-85:22 (during discussions contemporaneous with issuance of the notice, Plaintiff had discussed his computer issues with Felger). Plaintiff admits that "[t]he Performance Warning Notice indicated that the unsatisfactory performance was for '7 hrs [sic] to conduct 1 hr [sic] work scope (8 hr [sic] shift not captured in documentation),'" but denies this is true. ECF 34 at 6 (citing ECF 33-15); ECF 33-1 at 83:7-85:22.

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Mr. Felger drafted it as such because, at that time (within five minutes of the conversation he had with Plaintiff), when he viewed the CMMS system, it showed Plaintiff had completed one hour of work scope (related to the two restroom assignments) on August 22, 2023," beyond knowledge that Felger had testified as such, but notes that this possibility was due both to the notice's issuance at 9:45 AM on 8/22/23 (accusing him of working only one hour in his eight-hour shift on 8/22/23), as well as due to computer issues. ECF 34 at 6-7 (citing ECF 33-4 ¶ 19); ECF 33-1 at 75:9-76:25; 78:20-80:24 (Plaintiff was still in the process of inputting work orders from Saturday on Monday and Tuesday), 83:7-85:22, 87:12-25; ECF 33-15. Plaintiff admits that "[a]t the time, no other work orders performed by Plaintiff were entered into the CMMS for that day," but notes, again, that employees had rarely documented their work in real-time, and were not disciplined for not doing so. ECF 34 at 7 (citing ECF 33-4 ¶ 19); ECF 33-1 at 103:4-105:7; 105:24-106:5. Plaintiff admits that he "was presented with the Performance Warning Notice but refused to sign the documentation," and elaborates that this refusal was because Jackson had been given the notice, accusing him of working only one hour in his eight-hour shift on 8/22/23, at 9:45 AM on 8/22/23. ECF 34 at 7 (citing ECF 33-1 at 87:7-11; ECF 33-2 at 68:13-20; ECF 33-15); ECF 33-1 at 87:12-25.

### F.  AS TO "Plaintiff Submits a Rebuttal to the Performance Warning Notice, and GT Investigates Plaintiff's Work Orders"

Plaintiff admits that, "[f]ollowing the issuance of the Performance Warning Notice, Plaintiff spoke with Ms. Wade to discuss the document." ECF 34 at 7 (citing ECF 33-1 at 94:7-9; ECF 33-3 ¶ 18). Plaintiff admits that he "told Ms. Wade that the computer was down on Saturday (August 19, 2023), and that he was entering his work from that day on Tuesday (August 22, 2023)." ECF 34 at 7 (citing ECF 33-1 at 94:14-17; ECF 33-3 ¶ 19).

Plaintiff admits that "Wade asked Plaintiff to provide her with a list of work orders for work he performed on Saturday but did not enter until Tuesday." ECF 34 at 7 (citing ECF 33-1 at 94:18-21; ECF 33-3 ¶ 19). Plaintiff admits that he "provided the list (hereafter "rebuttal") on August 25, 2023." ECF 34 at 7 (citing ECF 33-1 at 94:22-24, 95-96:24-1; ECF 33-3 ¶ 20; ECF 33-16). Plaintiff admits that "[t]he first page of the rebuttal contained a narrative explanation from Plaintiff as to what he believed occurred in connection with the discipline." ECF 34 at 7 (citing ECF 33-1 at 96:9-13; ECF 33-16). Plaintiff admits that "[t]he second page of the rebuttal contained a list of twelve work orders." ECF 34 at 7 (citing ECF 33-1 at 107:2-22; ECF 33-16).

Plaintiff admits that, "[a]s to the first page, Plaintiff claimed that the 'maintenance supervisor' was discriminating against Plaintiff's 'work ethics;'" the basis of this assertion and belief of Plaintiff's is that he is Black, that other employees did the same conduct and worse yet were disciplined, and that GT had repeatedly turned a blind eye to discrimination he faced (notably, by White). ECF 34 at 8 (citing ECF 33-16); ECF 33-1 at 98:11-21; 99:6-11; 99:6-100:22; 100:23-102:19; 103:4-105:7; 105:24-106:5; 149:8-150:18. Plaintiff admits that employees of GT were "directed to first voice the [*sic*] concerns to their immediate supervisor; if they cannot resolve the issue, they can report the issue to Human Resources or directly to the Plant Manager," but notes that he *did* voice his concerns to his immediate supervisor, Felger, to plant manager LaVieri, and to HR. ECF 34 at 2 (citing ECF 33-3 ¶ 11; ECF 33-11); ECF 33-1 at 44:7-15; 66:6-22; 96:14-98:10; 100:23-102:19; 138:18-143:25 (termination notice issued shortly after Jackson reported discriminatory statue to Wade and LaVieri).

Plaintiff admits that, "[a]t deposition, Plaintiff clarified that the maintenance supervisor referred to Mr. Felger." ECF 34 at 8 n.6 (citing ECF 33-1 at 96:17-19).

Plaintiff admits to feeling discriminated as a "'Black Employee,'" but denies Defendant's assertion that Plaintiff "did not mention how the Performance Warning Notice was discriminatory;" apart from the previously cited references to Jackson's discriminatory experiences at GT, the Notice itself implies that discrimination may be inferred from the very fact that Jackson was disciplined, despite completing the listed work orders. ECF 34 at 8 (citing ECF 33-16). Plaintiff admits to testifying that "[t]his submission was the first time Plaintiff mentioned discrimination on the basis of race (or any other basis)" to human resources, but clarifies that he *had* reported concerns to Felger, LaVieri, and HR, and that GT was otherwise aware due to many witnessing White's outbursts. ECF 34 at 8 (citing ECF 33-1 at 102:20-23, 106:10-13); ECF 33-1 at 44:7-15; 66:6-22; 96:14-98:10; 99:6-100:22; 100:23-102:19; 99:6-100:22; 149:8-150:18; 138:18-143:25.

Plaintiff admits that Wade had "asked him to explain the allegation." ECF 34 at 8 (citing ECF 33-3 ¶ 23). Accordingly, Plaintiff had explained to Wade that discriminatory intent could be found from the fact that "no other employee entered their work orders on Saturday," yet only he had been disciplined, and in the harshest form – termination. ECF 34 at 8 (citing ECF 33-3 ¶ 23); ECF 33-1 at 103:4-105:7; 105:24-106:5. Plaintiff disputes Defendant's characterization of Plaintiff's description of Felger's (and, by extension, GT's) discriminatory behavior as "oscillat[ing]," "broad," and "unable to [be] pinpoint[ed]." ECF 34 at 8 n.7 (citing ECF 33-1 at 96-97:23-7, 97:10-16, 99-100:15- 5; 100:8-14); ECF 33-1 at 138:18-143:25 (the incident with the racist statue, shortly after which a termination notice was issued to Jackson, may be the clearest evidence of all). Felger had written Jackson up despite work orders being done, and had – with White – imposed inconsistent and shifting performance expectations on Plaintiff, undermining the credibility of GT's stated rationale for discipline. ECF 33-1 at 97:8-98:10; 99:6-100:22.

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Ms. Wade investigated the allegation but determined that the reason he claimed (that no other employee entered work orders on Saturday) had nothing to do with race," but denies the truth of this conclusion. ECF 34 at 8 (citing ECF 33-3 ¶ 24); ECF 33-1 at 124:11-14. Plaintiff denies Defendant's assertion that "Plaintiff's claim that no one else entered their work orders was demonstrably false." ECF 34 at 8 (citing ECF 33-16, 33-17); ECF 33-1 at 103:4-105:7; 105:24-106:5; 61:10-63:5 (work orders can be edited by multiple people; work orders can be entered under another person's name); 128:3-130:14 (the discrepancy in the date on 8/22 is because "somebody went in and edited and changed the date earlier;" "Anybody can go into the computer and change and move people's work orders around and change it;" Jackson has seen White do this).

 Plaintiff admits that "[t]he second page of the rebuttal was a list of twelve work orders that Plaintiff claimed he completed on August 19, 22, and 23, 2023." ECF 34 at 9 (citing ECF 33-1 at 107:2-22; ECF 33-16). Plaintiff admits to Defendant's representation of Plaintiff's explanation that "the list of work orders came from a larger list of work orders that he wrote down for personal notes. […] [T]he list was a running list from approximately January 2023 until September 2023, and admitted that there are no dates on the list associated with any of the entries. [T]he dates and times for the work performed could be found in the CMMS, but [Plaintiff] could not specifically identify the dates for which he claimed he performed each work order based only on the list alone. The larger list was not produced in discovery," but notes that "[i]f you actually go into the computer it will give the actual dates and time." ECF 34 at 9 n.8 (citing ECF 33-2 at 86-88:18-14); ECF 33-1 at 108:6-21; 109:9-110:4 (Wade and Felger determined the dates of work orders based from computer).

Moreover, the larger list was not produced in discovery solely due to a misunderstanding; Plaintiff had brought it to the DOAH deposition thinking Defendant's counsel would make copies. ECF 33-2 at 87:22-25. Plaintiff denies that he had "originally told Ms. Wade that he completed all twelve work orders on Saturday (August 19, 2023)," and notes that Defendant omits Plaintiff's testimony that the list also includes prior work. ECF 34 at 9 (citing ECF 33-1 at 110:12-17; ECF 33-3 ¶ 25); ECF 33-1 at 110:12-23.

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Wade was surprised by the substantial number of work orders Plaintiff was able to complete in one day and asked Plaintiff to clarify the list," and further objects on the basis of speculation, but notes that any seeming surprise of Wade's would not by itself be dispositive of wrongdoing by Plaintiff. ECF 34 at 9 (citing ECF 33-3 ¶ 26).

Plaintiff admits to telling "Ms. Wade that half of the work orders were completed on August 19, 2023 and the other half were completed on August 21, 2023." ECF 34 at 9 (citing ECF 33-3 ¶ 26); ECF 33-1 at 113:3-16. Plaintiff denies Defendant's characterization of "his explanation of which dates the listed work orders represent" as "waver[ing]" and seeming like "Plaintiff himself does not seem to know what exactly the list represents." ECF 34 at 9 n.9 (citing ECF 33-1 at 110:15-17, 113:7-8; ECF 33-2 at 86:6-10, 90:19-24, 91:2-3); ECF 33-2 at 88:6-13 (Plaintiff explained that "[i]f you actually go into the computer it will give the actual dates and time"); ECF 33-1 at 108:6-21; 109:9-110:4 (Wade and Felger determined the dates of work orders based from computer). Plaintiff admits that "Ms. Wade drew a line on the list to represent Plaintiff's assertion that the first six orders were completed on August 19, 2023 and the final six orders were completed on August 21, 2023." ECF 34 at 9-10 (citing ECF 33-3 ¶ 26; ECF 33-16); ECF 33-1 at 109:9-110:4.

Plaintiff admits that "Ms. Wade asked Mr. Felger to pull the CMMS security log data and actual work orders for the twelve work orders on Plaintiff's list," and that "she did not inform Mr. Felger of why she was requesting the security log," and that this was "[t]o confirm Plaintiff's account and determine whether the warning should be rescinded." ECF 34 at 10 (citing ECF 33-3 ¶ 27; ECF 33-4 ¶ 21); ECF 33-2 at 134:12-21.

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "[a]fter Mr. Felger provided the information, Ms. Wade reviewed the CMMS security log and the twelve orders on Plaintiff's list," beyond knowledge that Felger testified regarding same (though, Plaintiff objects that Felger lacks personal knowledge of Wade's review, given that they each reviewed independently). ECF 34 at 10 (citing ECF 33-3 ¶ 30); ECF 33-2 at 153:19-22; 137:22-24; 154:13-19.

Plaintiff denies that "[t]he investigation took a little over a week," and lacks knowledge or information sufficient to form a belief as to the truth of whether this was because "Ms. Wade and Mr. Felger took time to pull and review the relevant documents," beyond knowledge that Felger testified as such. ECF 34 at 10 (citing ECF 33-1 at 124:2-10; ECF 33-3 ¶ 30; ECF 33-17 to 33-27);[1] ECF 33-1 at 124:11-14 (Plaintiff was not present when Wade and Felger reviewed records); ECF 33-1 at 155:5-13 (investigative process "was more than a day and less than a week. It was a few days I believe").

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Ms. Wade and Mr. Felger reviewed all twelve work orders and determined that certain work orders had no involvement from Plaintiff," but notes that they had informed him about their belief "that there were several date discrepancies associated with their creation versus work

---

[1] Plaintiff objects to this citation as irrelevant, because screenshots of the CMMS do not prove how long the investigation lasted.

performance." ECF 34 at 10 (citing ECF 33-3 ¶ 31; ECF 33-4 ¶ 23); ECF 33-1 at 124:11-14

(Plaintiff was not present when Wade and Felger reviewed records).

Plaintiff disputes Defendant's characterizations of the six work orders he completed on

August 19, 2023 (WO Nos. 12353, 12355, 12442, 12444, 12449, and 12445):

- Plaintiff denies that "two work orders (WO Nos. 12353 and 12355) were created by Plaintiff on August 19, 2023, but did not have any associated work by Plaintiff, with WO 12353 specifically worked on by other maintenance technicians." ECF 34 at 10-11 (citing ECF 33-18, 33-19); ECF 33-1 at 61:10-63:5 (work orders can be edited by multiple people; work orders can be entered under another person's name); 128:3-130:14 (the discrepancy in the date on 8/22 is because "somebody went in and edited and changed the date earlier;" "Anybody can go into the computer and change and move people's work orders around and change it;" Jackson has seen White do this). Plaintiff admits to "admitt[ing] that the CMMS security log would show the names of all individuals who worked on the work order and entered information into the work order," but maintains that these have been edited. ECF 34 at 11 n.10 (citing ECF 33-1 at 130:13-23:2); ECF 33-1 at 132:4-133:19 (people can log in under others' names; edits would not necessarily reflect editor's name); 125:1-127:20 (Jackson has documentation to prove he worked on 12355).

- Plaintiff denies that "three work orders (WO Nos. 12442, 12444, and 12449) were created by Plaintiff on August 22, 2023, but backdated to reflect work completed on August 19, 2023, even though Plaintiff admits the work order was completed August 22, 2023." ECF 34 at 11 (citing ECF 33-2 at 30:15-21; 104-105:23-8, 142:18-23, 143-144:23-5, 144-145:25-9; ECF 33-20, 33-21, 33-22);. ECF 33-1 at 104:23-105:8 (Defendant misrepresents this testimony ("Q. The ones that you admitted to the Court earlier are those ones you are claiming you did work for on August 22nd? A. August 22nd"). Any such backdating was properly documented. ECF 33-2 at 144:6-11 ("Q. Can you turn to the back to the actual work order and tell me what date that says? A. Issued August 22nd of 2023 and completed August 19th of 2023"); 145:6-22 ("Q. What about the work order, which is the actual work order itself, what does it show? A. So the work order shows it was issued created on August 22nd of 2023. It shows completed as August 19th of 2023").

- Plaintiff denies that "one work order (WO No. 12445) was created and worked on by another technician on August 22, 2023, with no apparent involvement by Plaintiff." ECF 34 at 11 (citing ECF 33-23); ECF 33-1 at 136:18-137:9 ("I performed work on that work order, but […] it's been edited […] [I]f you notice on that work order, it shows where it's been edited"). Although Plaintiff admits to "admitt[ing] the records do not reflect he performed the work," Plaintiff disputes Defendant's characterization that this reflects nonperformance; Plaintiff merely acknowledges what the records state. ECF 34 at 11 (citing ECF 33-2 at 97:5-21, 146:5-23).

Plaintiff disputes Defendant's characterizations of the six work orders he completed on August 21, 2023 (WO Nos. 12450, 12384, 12435, 12440, 12459, and 12497):

- Plaintiff admits that "one work order (WO No. 12450) represents work completed by Plaintiff over multiple days, starting August 22, 2023 (a day after he represented working on the work order)," but notes that this is "two pages of CMMS security log associated here and there are several entries by Mr. Jackson for August 22 and August 23 and the 24th and the 25th and multiple edits due to labor history, part history. And there is one entry that's a note by me on the 24th;" the records are not falsified because ECF 33-24 clearly indicates editing history; and that non-contemporaneous documentation was commonplace among employees of GT, and that no other employees had ever been disciplined for same. ECF 34 at 11 (citing ECF 33-24); ECF 33-2 147:3-11; ECF 33-1 at 103:4-105:7; 105:24-106:5.

- Plaintiff admits that "two work orders (WO Nos. 12384 and 12459) represent work completed by Plaintiff on August 22, 2023 (a day after he represented working on the work order)," and admits that "Plaintiff admitted" this, but notes that this was standard practice ("It was created before 8/23. It's initially put in as a due date of 8/23 before it goes to a different status"), again, that non-contemporaneous documentation was commonplace among employees of GT, and that no other employees had ever been disciplined for same. ECF 34 at 11 (citing ECF 33-2 at 104-105:23-8, 146:9-20, 152:3-23; ECF 33-25, 33-28); ECF 33-2 at 104:15-22; ECF 33-1 at 103:4-105:7; 105:24-106:5.

- Plaintiff admits that "two work orders (WO Nos. 12435 and 12440) represent the bathrooms Plaintiff cleaned on August 22, 2023 (a day after he represented working on the work order)," and that "Plaintiff admitted" this, but notes, again, that non-contemporaneous documentation was commonplace among employees of GT, and that no other employees had ever been disciplined for same. ECF 34 at 11 (citing ECF 33-2 at 104-105:23-8, 150:7-17, 151:5-18; ECF 33-26, 33-27); ECF 33-1 at 103:4-105:7; 105:24-106:5.

- Plaintiff admits that "one work order (WO No. 12497) was created by Mr. White and completed by Plaintiff on August 23, 2023 (two days after he represented working on the work order, and one day after Mr. Felger's conversation with Plaintiff that resulted in the Performance Warning Notice[)]," to "testif[ying] that he either anticipated the issue for this work order or that it was created in advance of August 23, 2023, and suggested the work order was actually created before the records say it was created," but explains that documentation of the due date rather than work date was common practice at GT ("[s]o you got enough time in case you run into other problems or technology you can't actually meet. But it allows you where it won't turn into red. Because once it go into the red then you have to go back and explain what caused you not to complete this work order. So you have to write in there due to fact of other issues wasn't able to respond"), notes that such practice of non-contemporaneous documentation was commonplace among employees of GT, that no other employees had ever been disciplined for same, and that it is irrelevant that this conversation occurred one day following Plaintiff's conversation with Felger. ECF 34 at 11-12 (citing ECF 33-29); ECF 34 at 11 n.11 (citing ECF 33-2 at 102:5-17, 103:15-

19; ECF 33-29); ECF 33-2 at 103:20-104:22; ECF 33-1 at 103:4-105:7; 105:24-106:5. Plaintiff denies that "it is impossible to perform work on a work order that has not been created yet, unless an individual changes the date to erroneously reflect that work had been performed." ECF 34 at 11-12 n.11 (citing ECF 33-4 ¶ 29); ECF 33-1 at 61:10-63:5 (work orders can be edited by multiple people; work orders can be entered under another person's name); 128:3-130:14 (the discrepancy in the date on 8/22 is because "somebody went in and edited and changed the date earlier;" "Anybody can go into the computer and change and move people's work orders around and change it;" Jackson has seen White do this).

### G. AS TO "GT Terminates Plaintiff for Violation of the Associate Conduct Policy"

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "the investigation started as a review of the rebuttal evidence from Plaintiff," but then "the concern shifted after reviewing Plaintiff's list, the CMMS logs, and work orders," and denies that "there was a disconnect between the records and the story from Plaintiff," given that any disconnects can be explained by widespread Company practice and/or editing by others. ECF 34 at 12 (citing ECF 33-3 ¶ 33; 33-4 ¶ 26); ECF 33-1 at 61:10-63:5; 128:3-130:14; 103:4-105:7; 105:24-106:5. Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Ms. Wade and Mr. Felger recommended Plaintiff's termination to Mr. LaVieri" "because Plaintiff submitted a falsified document to Human Resources and given the Associate Conduct Policy," beyond mere awareness that this was the stated reason for his termination, denies Defendant's characterization of the document he provided as "falsified," and denies Defendant's implication that he violated the Associate Conduct Policy. ECF 34 at 12 (citing ECF 33-3 ¶ 32; ECF 33-4 ¶ 25; ECF 33-14); ECF 33-1 at 143:13-25; 144:3-20; 103:4-105:7; 105:24-106:5; 61:10-63:5; 128:3-130:14; 167:9-168:14 (documentation regarding termination was changed after the fact). Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Mr. LaVieri was not involved in the investigation, but reviewed the data collected during the investigation before making a final decision." ECF 34 at 12 (citing ECF 33-5 ¶ 8); ECF 33-1 at 124:7-14.

Plaintiff admits that GT terminated his employment on September 5, 2023, and that GT's stated reason was that "he violated the Associate Conduct Policy by providing false information during an investigation," but denies that he in fact violated the Policy or provided false information. ECF 34 at 12 (citing ECF 33-1 at 137:12-14; ECF 33-3 ¶¶ 34, 36; ECF 33-5 ¶ 9; ECF 33-30); ECF 33-1 at 143:13-25; 144:3-20 (Plaintiff notes that this stated reason was not documented until after his termination); 103:4-105:7; 105:24-106:5; 61:10-63:5; 128:3-130:14; 167:9-168:14 (documentation regarding termination was changed after the fact). Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "GT has terminated other employees for this kind of behavior in the past." ECF 34 at 12 n.12 (citing ECF 33-3 ¶ 39); ECF 33-1 at 103:4-105:7; 105:24-106:5. Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "GT terminated three employees between July 2023 and December 2023 for falsification of company records or reports." ECF 34 at 12 n.12 (citing ECF 33-3 ¶ 39); ECF 33-1 at 103:4-105:7; 105:24-106:5. Plaintiff admits that, "[d]uring the termination discussion, […] Ms. Wade, Mr. Felger, and Mr. LaVieri were present," but denies that "Plaintiff was presented with a copy of the Performance Warning Notice related to the termination." ECF 34 at 12-13 (citing ECF 33-3 ¶ 36; ECF 33-30; ECF 33-2 at 158:3-6); ECF 33-1 at 144:14-23 ("This is the wrong notice. This is something done after I left. This […] is not the same paperwork that I […] received and I looked at"). Plaintiff admits to testifying at the DOAH hearing "that he understood that he was terminated for falsification of documents during an investigation," but denies the underlying conduct. ECF 34 at 13 n.13 (citing ECF 33-2 at 106:7-16; ECF 33-30).

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "Mr. Felger, Ms. Wade, and Mr. LaVieri had no reason to doubt that the company records accurately reflected the work that was performed and documented," beyond his own assertion that

he performed the work stated, and documented same in accordance with Company norms. ECF 34 at 13 (citing ECF 33-3 ¶ 35; ECF 33-4 ¶ 27; ECF 33-5 ¶ 10; ECF 33-2 at 154:9-12, 212:17-21, 222-223:23-5); ECF 33-16; ECF 33-1 at 103:4-105:7; 105:24-106:5; 61:10-63:5; 128:3-130:14.

Plaintiff lacks knowledge or information sufficient to form a belief as to the truth of whether "[t]he decision to terminate Plaintiff's employment reflected the *honest* belief that he falsified documents during the investigation process," (emphasis added), but admits that this alleged falsification was the stated reason for his termination. ECF 34 at 13 (citing ECF 33-3 ¶ 35; ECF 33-4 ¶ 27; ECF 33-5 ¶ 10; ECF 33-2 at 154:9-12, 212:22-25, 222-223:1-14); ECF 33-1 at 144:14-145:18 (Plaintiff notes that this stated reason was not documented until after his termination), 167:9-168:14 (documentation regarding termination was changed after the fact).

### H.  AS TO "Plaintiff's Claims of Alleged Discriminatory Behavior"

Plaintiff emphatically denies Defendant's assertion that only "[n]ow, and <u>not</u> while he was a GT employee, Plaintiff claims that he was discriminated against multiple times during his employment" (emphasis in original). ECF 34 at 13 (no internal citations provided); ECF 33-1 at 44:7-15; 66:6-22; 96:14-98:10; 99:6-102:19 (Jackson had accused Felger of Felger and White conspiring to confuse Jackson, so that he could be written up); 138:18-143:25.

For example, regarding Plaintiff's allegation "that his tools and chair would go missing," there were many witnesses, and Plaintiff had in fact informed James White. ECF 34 at 13 (citing ECF 33-1 at 174:1-13); ECF 33-1 at 172:12-176:15 ("I told James and he goes, […] you need to keep up with tools and let nobody steal them; it's just too bad […] they got them. And he would laugh, you know, right along with the rest of the employees in the maintenance department that I mentioned. And I would be asking guys, if y'all see my tools, would you kindly return them or

just lay them on my desk if you see them;" "I asked [my supervisors] and they wouldn't purchase the tools, but they would purchase tools for all the other maintenance guys").

Plaintiff denies that "Mr. White and Mr. Felger do not have any knowledge of Plaintiff complaining that any of his tools went missing during his employment at GT." ECF 34 at 13 n.14 (citing ECF 33-4 ¶ 31; ECF 33-6 ¶ 8); ECF 33-1 at 99:6-100:22; 172:12-176:15. Plaintiff denies Defendant's assertion that "Mr. Felger instructed Mr. White to remove all of the chairs in the workshop," due only to "general productivity concerns" which were "not specific to Plaintiff." ECF 34 at 13-14 (citing ECF 33-1 at 176:1-10; ECF 33-4 ¶ 32; ECF 33-6 ¶ 9; ECF 33-2 at 227:3-19); although everyone's chairs were taken four months later, initially, only Jackson's chair was taken. ECF 33-1 at 176:7-15 ("at the time, it was just my chair being taken and hidden. So I would have to stand up, couldn't find the chair a lot of times and I had to stand up and just do my work on the tablet or the computer"). Plaintiff denies that he "fail[ed] to connect how these alleged actions were in any way related to race, national origin, color, or retaliation." ECF 34 at 14 (citing ECF 33-2 at 19:1-23, 227-230:3-5); ECF 33-1 at 88:8-14; 96:14-98:21; 99:6-102:19; 103:4-105:7; 105:24-106:5; 149:8-150:18; 172:12-176:15; ECF 33-2 at 17:10-16; 60:7-61:23; 138:18-143:25 (termination notice issued shortly after Jackson reported discriminatory statue to Wade and LaVieri); 156:12-21.

Plaintiff admits "that James White made a comment to the effect that the State of Florida does not require minorities in the workplace," but disputes that Plaintiff's claim was "vague[]." ECF 34 at 14 (citing ECF 33-1 at 88:8-14; ECF 33-2 at 17:10-16, 60:7-18); ECF 33-1 at 88:8-20 (this statement implies intent to remove Jackson, who was the only minority in the department); ECF 33-2 at 60:7-61:23 (any vagueness is due to White's own ominous, intimidating statements, made without reference to a specific law).

Plaintiff admits that he "never provided details as to when the statement was made," beyond that it occurred during his employment, "or clarified what law he believes Mr. White was allegedly referring to," but notes that he asked White and others about said law, and that their failure to provide the law in questions proves intimidation. ECF 34 at 14 n.15 (no internal citations provided); ECF 33-2 at 60:7-61:23.

Plaintiff admits that "he did not report the comment to Ms. Wade," but notes that this was because White because White was a supervisor, and Jackson wanted to "not stoop to that level and just prayed about the situation and just moved forward." ECF 34 at 14 (citing ECF 33-2 at 61-62:25-2); ECF 33-1 at 149:8-151:2.

Plaintiff admits that Mr. White testified denying that "he ever made such a statement," but denies that such a statement was never made. ECF 34 at 14 (citing ECF 33-6 ¶ 10); ECF 33-1 at 88:8-20; ECF 33-2 at 17:10-16; 60:7-61:23.  Plaintiff admits that "on September 5, 2023 (the day of his termination), he returned from break and found 'a toy man [statue] with a noose around his [n]eck' on his desk." ECF 34 at 14 (citing ECF 1 ¶ 32; ECF 33-1 at 138:18-23); ECF 33-1 at 138:18-143:25. Plaintiff disputes Defendant's characterization of the "'statue'" as a mere "carved wooden figurine of a fisherman holding a large fish." ECF 34 at 14 (citing ECF 33-3 ¶ 44; ECF 33-3 Ex. A); ECF 33-1 at 139:12-140:1; 141:1-10 ("it's a […] dark brown statue of a black man holding a noose in his arm"/"noose around its neck").

Although Plaintiff admits to acknowledging that "[t]he statue belonged to a former employee of GT who left it behind when he departed and had been around the shop as a desk decoration for years," Plaintiff notes that Defendant conveniently omits the fact which makes this material: that the statue depicted a Black man with a noose around its neck, and that it was placed on his desk. ECF 34 at 14 (citing ECF 33-3 ¶ 43; ECF 33-1 at 139:12-15; ECF 33-2 at 236:12-18);

ECF 33-1 at 139:12-140:1; 141:1-10. Plaintiff denies that "the Company has no knowledge of the statue having a noose around the figure's neck." ECF 34 at 14 (citing ECF 33-3 ¶ 44; ECF 33-3 Ex. A); ECF 33-1 at 140:2-143:25 (Jackson immediately took a picture of it and showed it to LaVieri, Wade, and the security cameras by the front office; moments later, he was terminated).

Notably, Plaintiff admits that "he reported the statue to Ms. Wade and Mr. LaVieri;" although he lacks knowledge or information sufficient to form a belief as to the truth of whether "neither have any memory of being shown the statue by Plaintiff," Plaintiff denies that neither "observed the statue with anything around its neck." ECF 34 at 14-15 (citing ECF 33-1 at 141:11-19; ECF 33-3 ¶ 42; ECF 33-5 ¶¶ 12, 13; ECF 33-2 at 44:7-8,[2] 205:14-16, 209:4-5, 215-216:21-2; ECF 33-3 Ex. A); ECF 33-1 at 140:2-143:25.

Plaintiff denies that "[d]uring his employment, Plaintiff never complained to Mr. Felger about discrimination, never reported any comments he felt were inappropriate, […] and never made any complaints about Mr. White or any other GT employee." ECF 34 at 15 (citing ECF 33-1 at 102:20-23; ECF 33-4 ¶ 30; ECF 33-2 at 158:9-12, 169:12-25); ECF 33-1 at 44:7-15; 66:6-22; 96:14-98:10; 99:6-100:22 (Jackson had accused Felger of Felger and White conspiring to confuse Jackson, so that he could be written up); 100:23-102:19; 99:6-100:22; 138:18-143:25; 149:8-150:18.

Plaintiff denies that he "never reported anything that Mr. Felger believed needed to be reported to Human Resources." ECF 34 at 15 (citing ECF 33-1 at 102:20-23; ECF 33-4 ¶ 30; ECF 33-2 at 158:9-12, 169:12-25); ECF 33-1 at 100:23-102:19.

---

[2] Defendant itself provides evidence proving that Plaintiff reported statue to Wade and LaVieri.

Plaintiff denies that, "other than the brief reference in Plaintiff's rebuttal, Plaintiff never complained about discrimination to Ms. Wade." ECF 34 at 15 (citing ECF 33-1 at 93-94:19-6, 106:10-13; ECF 33-3 ¶¶ 40, 41); ECF 33-1 at 100:23-102:19.

Plaintiff denies that "Plaintiff never complained to Mr. LaVieri or Mr. White about any other employees, and never made complaints about discrimination or retaliation." ECF 34 at 15 (citing ECF 33-1 at 102:20-23; ECF 33-5 ¶ 11; ECF 33-6 ¶ 7; ECF 33-2 at 215:10-20, 216:7-13); ECF 33-1 at 44:7-15; 66:6-22; 96:14-98:10; 99:6-100:22; 100:23-102:19; 99:6-100:22; 138:18-143:25; 149:8-150:18.

Plaintiff admits to testifying, "when asked if he believed any individuals were treated better than himself because they were a different race, […] 'No. We was treated equal. Everybody got treated fair, you know, as far as performing work,'" but notes that Plaintiff had misunderstood the question as asking whether he believed individuals *should* be treated differently based on race. ECF 34 at 15 (citing ECF 33-1 at 155:11-16); ECF 33-1 at 155:11-22 (implied by Plaintiff's going on to defend himself/explain "I would tell everybody in the plant, when you need something. I was the type of gentleman that would pat somebody on their back and say, hey, great job, no matter what their situation, what they were going through or what they're going through at home. A little kindness goes a long ways when somebody needs it"); 146:11-147:8 (other minorities had been fired soon after being hired).

Plaintiff admits to testifying, "[w]hen asked if anyone was treated better because they were of a different national origin, […] "not to my knowledge." ECF 34 at 15-16 (citing ECF 33-1 at 156:6-11); ECF 33-1 at 155:11-22; 146:11-147:8; 151:20-153:10 (Jackson is Black mixed with Columbian, and people at GT – including Felger, Wade, White, and LaVieri – knew this).

**I.  AS TO "Plaintiff Cannot Establish Retaliation"**

Plaintiff disputes Defendant's characterization of his response(s) to "how he believes GT retaliated against him" as him being "unable to provide a concrete answer." ECF 34 at 16 (no internal citations provided); rather, Jackson provided several theories of retaliation. ECF 33-1 at 96:9-97:16; ECF 33-15; 33-16; 33-30 (Jackson was terminated soon after providing a rebuttal to HR accusing their performance warning notice as being discriminatory); 138:18-143:25 (termination notice issued almost immediately after Jackson reported discriminatory statue to Wade and LaVieri).

Plaintiff admits that, "[w]hen asked why he believed GT targeted him specifically, […] that 'I was trying to find out – I was able to produce the documents and the work orders that I had later on going forward when they actually said that I didn't have any documentation of work orders at all during the time I was terminated,'" but notes that Defendant omits Plaintiff's further explanation that the work orders eventually came to light after his termination, and that the delay was due to a glitch. ECF 34 at 16 (citing ECF 33-1 at 158:10-20); ECF 33-1 at 158:21-159:7. Plaintiff admits to "believ[ing] that the work orders discussed above (ECF 33-18 through 33-29) 'magically appeared' in the system after he was terminated," but disputes Defendant's claim "that [this] shows retaliation;" while this evidences that Plaintiff did not violate Company policy and was discriminated, Plaintiff's theory of retaliation is found from his termination shortly after reports of discrimination in rebuttal and in presenting the statue. ECF 34 at 16 (citing ECF 33-1 at 159:4-7); ECF 33-1 at 96:9-97:16; 138:18-143:25; ECF 33-15; 33-16; 33-30. Plaintiff denies Defendant's assertion that "[a]t no point has Plaintiff alleged that he was retaliated against for reporting or complaining of any discriminatory behavior, or any similar occurrence." ECF 34 at 16 (citing, *e.g.*, ECF 33-1); ECF 33-1 at 96:9-97:16; 138:18-143:25; ECF 33-15; 33-16; 33-30.

**J.   AS TO "Plaintiff's Misconduct Results in the Decision to Terminate Plaintiff's Employment"**

Plaintiff denies that "Plaintiff never complained to [Wade, Felger, and LaVieri] about discriminatory behavior, never reported any inappropriate comments, and never made complaints about other GT employees, other than the one complaint raised in the rebuttal submitted to Ms. Wade on August 25, 2023." ECF 34 at 16-17 (citing ECF 33-3 ¶¶ 40-42; ECF 33-4 ¶ 30; ECF 33-5 ¶¶ 11, 12; ECF 33-2 at 204:9-17, 158:9-12, 169:12-25, 215:10-20, 216:7-13); ECF 33-1 at 44:7-15; 66:6-22; 96:14-98:10; 99:6-100:22; 100:23-102:19; 149:8-150:18; 138:18-143:25. Plaintiff notes that any such incidents that he did not report were due to a desire to keep the peace and focus on his job. ECF 33-1 at 150:19-151:2.

Plaintiff denies that "[n]either Ms. Wade, Mr. Felger, nor Mr. LaVieri came to the decision to terminate Plaintiff because of his race, national origin, or color," but disputes Defendant's implication that such a decision would have been made without pretext. ECF 34 at 17 (citing ECF 33-3 ¶ 47; ECF 33-4 ¶ 33; ECF 33-5 ¶ 15).

Plaintiff denies that "none of them even knew that Plaintiff's national origin was Colombian," and nonetheless objects to this statement as immaterial. ECF 34 at 17 (citing ECF 33-3 ¶ 48; ECF 33-4 ¶ 34; ECF 33-5 ¶ 16); ECF 33-1 at 151:20-153:10 (Jackson told people at GT he was part-Colombian, including Felger, White, Wade, and LaVieri).

Plaintiff admits that the stated reason for his termination was due to "violations of the Associate Conduct Policy by falsifying records during an investigation," but denies that he committed such violations, and that termination would have been "recommended for any employee committing the same infraction." ECF 34 at 17 (citing ECF 33-3 ¶ 47; ECF 33-4 ¶ 35; ECF 33-5 ¶ 15); ECF 33-1 at 103:4-105:7 (other employees did the same things as Jackson and worse, yet were not disciplined); 105:24-106:5 (Jackson can remember other employees on second shift and

26

day shift who did not enter work orders and were not disciplined); 167:9-168:14 (documentation regarding termination was changed after the fact).

## II.    LEGAL ARGUMENT

### A.  GT is Not Entitled to Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" See FindWhat Inv'r Group v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" White v. Sec. of Veterans Affairs, No. 25-11332, 2025 WL 3772267, at *3 (11th Cir. Dec. 31, 2025) (citing Anderson, 477 U.S. at 248).

"[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

"Rule 56(e) provides: […] [that] [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response […] must set forth specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 n. 3 (1986).

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." See ADR Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (internal citation omitted).

However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." See Anderson, 477 U.S. at 255; see also Tolan v. Cotton, 572 U.S. 650, 655-57 (2014).

Applying this standard, this Court should deny Defendant's motion on the grounds that there are numerous material genuine issues of fact, as set forth in more detail below.

## B. Plaintiff's Discrimination Claim Must Survive

"Absent direct evidence of an employer's discriminatory motive, a plaintiff may establish [his] case through circumstantial evidence, using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 … (1973)." See Selby v. Tyco Healthcare Group, L.P., 301 Fed. Appx. 908, 911 (11th Cir. 2008) (unpublished). "To prevail on a claim for discrimination under Title VII based on circumstantial evidence, [a plaintiff] must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." See Maynard v. Bd. of Regents of Div. of Universities of Fla. Dept. of Educ. ex rel. U. of S. Fla., 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell, 411 U.S. at 802).

While race, color, and national origin discrimination claims are different, the *prima facie* case analysis is the same for all three protected classes. See Gupta v. Walt Disney World Co., 256 Fed. Appx. 279, 282 (11th Cir. 2007). Moreover, "[w]hether a plaintiff can establish a *prima facie* case or not, he can still attempt to survive summary judgment by "present[ing] a convincing mosaic of circumstantial evidence" of discrimination […] Such circumstantial evidence can include that the employer's justification is pretextual." See Ismael v. Roundtree, 161 F.4th 752, 760 (11th Cir. 2025)).

The evidence adduced in discovery readily demonstrates that Plaintiff does in fact "present a convincing mosaic of discriminatory and retaliatory behavior," as discussed below.

In this case, Plaintiff easily establishes a *prima facie* case of discrimination.

First, Defendant does not contest that Plaintiff is a member of a protected class (Black, with a national origin mixed with Columbian).

Second, in proving Plaintiff is qualified for his position, Plaintiff adopts Defendant's representation that qualification, or lack thereof, may be inferred from an employer's enforcement of performance standards; particularly, that a Plaintiff must establish that he was meeting legitimate expectations at the time of termination. See Baker v. Sears, Roebuck & Co., 903 F.2d 1515, 1520 (11th Cir. 1990); Johnson v. Switch & Data Mgt. Co. LLC, No. 8:04-CV-1750-T-17MAP, 2005 WL 3053598, at *4 (M.D. Fla. Nov. 14, 2005), aff'd, 199 Fed. Appx. 834 (11th Cir. 2006) (unpublished).

However, Plaintiff respectfully submits that the evidence adduced in discovery shows that he *was* meeting GT's expectations. Any perceived discrepancies with his CMMS entries can be attributed to a combination of normal company-wide practice of non-contemporaneous timekeeping, as well as the ability of all employees to edit any CMMS entries.

Accordingly, the enforcement of the Associate Conduct Policy, via termination, against Plaintiff alone – despite Plaintiff's proven track record, notwithstanding the commonplace practice of other employees doing the same yet receiving no discipline, and shortly after Plaintiff had complained about discrimination arising out of the initial performance warning notice and by the racist statue – is itself evidence of discrimination, and cannot be taken as evidence that Plaintiff was not fulfilling the expectations of his job.

Third, Plaintiff easily fulfills the adverse employment action element, in that he was terminated.

Fourth, Plaintiff also establishes that his termination was motivated by his race and color in that his non-Black/mixed counterparts did not face discipline or termination for similar and worse conduct.

Defendant argues that Plaintiff has not identified any comparators; the record readily demonstrates otherwise. The very fact that only Plaintiff was terminated/disciplined for engaging in a common practice at GT proves that he was treated differently than all employees. ECF 33-1 at 103:4-105:7; 105:24-106:5. Plaintiff disputes Defendant's assertion that no other employees experienced computer issues on Saturday, August 19, 2023, because he and his colleague, Johnny Taylor were the *only* employees working that day. ECF 33-1 at 72:24-74:2. It is irrelevant whether GT issued its initial Performance Warning Notice due to a failure to enter work performed on Saturday, August 19, 2023 into the CMMS on time,[3] or because the CMMS did not show that he completed a full days' worth of work by the end of his shift on Tuesday, August 22, 2023; regardless, the issue raised was non-contemporaneous timekeeping.[4] Plaintiff further disputes that only Johnny Taylor is a valid comparator, as all maintenance department employees are. See Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1224 (11th Cir. 2019) ("a plaintiff must show that she and her comparators are 'similarly situated in all material respects'").

---

[3] The relevant inquiry would be whether any employee was similarly disciplined for such conduct on any date other than August 19, 2023. In limiting Defendant's analysis to a single day, there is an absence of evidence as to whether other employees engaged in such conduct and, to the extent they did, whether they were disciplined for it. In other words, Defendant casts a net too small in its analysis of this issue for purposes of determining the existence of comparators.

[4] Plaintiff further notes, again, the discriminatory intent evidenced by the issuance of said Performance Warning Notice – accusing him of only working one hour in seven hours on August 22nd – at 9:45 AM on the same day that he was provided the notice. ECF 33-1 at 87:13-25; ECF 33-15.

Notably, the three other employees who were terminated for similar alleged "falsification" – unbeknownst to Jackson – some of which were terminated *after Jackson* between July 2023 and December 2023; in other words, Jackson's termination incentivized GT to start enforcing this "policy," so that their discrimination would be less obvious. ECF 33-1 at, *generally*.  Moreover, Defendant's testimony is inadmissible because they did not provide any evidence as to *who* was terminated, and – to the extent that Wade has no firsthand knowledge or herself terminated these employees – constitutes inadmissible hearsay.

As such, Plaintiff's discrimination claim must survive summary judgment. At minimum, there remain genuine disputes of material fact which preclude the relief Defendant seeks, as a jury should determine whether Defendant's stated reasons for terminating Plaintiff were pretextual and whether the scant evidence they offer concerning other employees allegedly terminated for similar reasons is sufficient.

### C. Plaintiff's Retaliation Claim Must Survive

Plaintiff adopts the authorities Defendant cites to establish a retaliation claim; which provides that "a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." See Ward v. Troup Cnty. Sch. Dist., 856 Fed. Appx. 225, 229 (11th Cir. 2021); Walker v. Indian River Transp. Co., 741 Fed. Appx 740, 749 (11th Cir. 2018).

Plaintiff easily establishes a *prima facie* case of retaliation here.

First, with respect to the existence of a protected activity, as stated *supra*, Plaintiff disputes that he only made one complaint of discrimination to HR (via his rebuttal); rather, he had openly discussed feeling discriminated against on multiple occasions. ECF 33-1 at 44:7-15 (Felger was

Jackson's direct supervisor); 66:6-22 (concerns were to be discussed with HR and plant manager); 96:14-98:10 (Jackson spoke to Felger about the issue); 99:6-100:22 (Felger and White had conspired to discriminate against Jackson, implying awareness of their mutual intent); 100:23-102:19 (prior to rebuttal, "I spoke with her in certain situations when I could find the time that was right, when she wasn't busy and wasn't having any kind of issues"); 149:8-150:18 (White had made racist comments in front of others); 138:18-143:25 (Jackson reported statue to Wade and LaVieri and was terminated moments later). Plaintiff engaged in statutorily protected activity through this conduct. Defendant makes much of the fact that Plaintiff did not make multiple complaints of discrimination; the law does not require this. It only requires the existence of a single act of protected activity. That element has been met here, in that the rebuttal contains a complaint of discrimination; this one complaint satisfies the first element in the retaliation analysis.

Second, Plaintiff suffered an adverse employment action in the form of his termination, an element which is indisputable. Moreover, there was clear causal connection between Plaintiff's rebuttal complaining of discrimination and his near-instant termination thereafter, as the rebuttal was dated August 25, 2023 and his termination occurred on September 5, 2023, a mere eleven (11) days later. See Date Calculator; see also ECF 33-16; 33-30. In such circumstances, courts routinely find the third prong in the retaliation analysis met based on the short temporal proximity alone. See Jones v. Gulf Coast Health Care of Delaware, LLC, 854 F.3d 1261, 1271 (11th Cir. 2017) ("'Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection'") (internal citations omitted); Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (establishing that *seven weeks'* timeframe was "sufficiently proximate to create a causal nexus for purposes of establishing a *prima facie* case") (emphasis added).

Here, Plaintiff submits that the alleged "falsification" in his rebuttal does not constitute intervening behavior severing causation, because Plaintiff maintains that there was no such "falsification" or misconduct by Plaintiff in the first place, and a jury should determine whether it believes the Plaintiff's or Defendant's side of the story. ECF 33-1 at 119:4-120:9; 127:21-130:14; 132:1-133:12; 136:18-137:9; 161:18-163:10; 167:9-168:14.

In considering Defendant's argument, it seeks to become the judge, the jury, and executioner by claiming that Plaintiff lied in the face of his sworn testimony that he did not do so, and that other employees have made entries in the CMMS in a similar manner without being disciplined for same. This is the quintessential dispute of material fact which requires denial of Defendant's motion for summary judgment. Indeed, false or pretextual allegations of misconduct does *not* break the causation analysis in determining whether an employer had a legitimate, non-discriminatory reason for adverse employment action, especially where the employee makes, as Plaintiff does here, a sufficient showing that Defendant's proffered reason was pretextual. See Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1135-1136 (11th Cir. 2020).

### D. GT's Reasons for Terminating Plaintiff's Employment Were Pretextual

"To show pretext, [Plaintiff] must 'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Jones, 854 F.3d at 1274 (internal citations omitted).

Plaintiff may "establish pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. (internal citations omitted).

"'[A] reason is not pretext for [retaliation] 'unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.'' See Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006)). And to repeat, in determining whether the plaintiff has met her burden to show pretext, Plaintiff remains mindful that it is his burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, his employer would not have fired him. See Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1136 (11th Cir. 2020).  Critically, the selective enforcement of policies among similarly situated employees can support inference of pretext. See Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1276-1280 (11th Cir. 2008).

Further, Plaintiff disputes Defendant's claim that GT employees did not know of his national origin. ECF 33-1 at 151:20-153:10 (Jackson is Black mixed with Columbian, and people at GT – including Felger, Wade, White, and LaVieri – knew this).

Here, GT's stated reason for termination – that Jackson had falsified Company records – is demonstrably false. ECF 33-30. Any perceived falsification can be attributed to a combination of normal company practice of non-contemporaneous timekeeping, as well as the ability of others to edit others' CMMS entries. ECF 33-1 at 103:4-105:7; 105:24-106:5; 119:4-120:9; 127:21-130:14; 132:1-133:12; 136:18-137:9; 161:18-163:10; 167:9-168:14.

Accordingly, GT's stated reason for termination is both false, and retaliatory in nature. Given the evidence adduced in discovery establishing that Defendant's proffered reason for termination arose after he engaged in protected activity, a jury must weigh whether Defendant's proffered reason is legitimate and non-discriminatory.

**E.  In Any Event, Plaintiff Presents a Convincing Mosaic of Discrimination or Retaliation**

Plaintiff maintains that he has established a *prima facie* case for his claims, but adds that he has presented a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker" to the extent this Court is inclined to find that he has not. See Ismael, 161 F.4th at 760 (internal quotations omitted). Circumstantial evidence can be shown through "'(1) suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.'" See Ismael, 161 F.4th at 760 (internal citations omitted).

Plaintiff's claim of discrimination is more than conclusory. Here, there is suspicious timing (between Plaintiff's allegations of discrimination to decision-makers via his rebuttal, and his reporting the racist statue) and his termination. Plaintiff had worked for Defendant for years without incident.

Notwithstanding, concerningly ambiguous statements directly preceded his termination ("Their response [to the racist statue – moments before termination] was, don't worry about it. They're just joking, just take it and put it away and go back to work like nothing happened." ECF 33-1 at 142:19-21). Moreover, others in the maintenance department engaged in similar, even worse, conduct but they were not disciplined. ECF 33-1 at 103:4-105:7; 105:24-106:5. And, as set forth above, the employer's justification that Jackson had falsified Company records was pretextual. ECF 33-30.

The foregoing facts provide a sufficient mosaic of circumstantial evidence to find that discriminator and/or retaliation was afoot.  Accordingly, Defendant's motion for summary judgment must be denied on this ground, as well.

III.    **CONCLUSION**

For the foregoing reasons, and viewing the evidence in the light most favorable to Plaintiff, genuine disputes of material fact preclude summary judgment. Defendant has not met its burden under Rule 56, as the record contains sufficient evidence from which a reasonable jury could return a verdict in Plaintiff's favor. Accordingly, Defendant's Motion for Summary Judgment should be denied.

**WHEREFORE,** Plaintiff respectfully requests that this Court deny Defendant's motion for summary judgment.

## CERTIFICATE OF COMPLIANCE REGARDING WORD COUNT

Pursuant to Local Rules 56.1 and 7.1, the undersigned certifies that the memorandum of law section of this filing contains 11,690 words, according to the word-processing system used to prepare this memorandum. Plaintiff shall submit an application for leave to file excess pages in light of the complexity and number of facts relevant to determine the instant motion.

Dated: Jamaica, New York
　　　　March 5, 2026

Respectfully submitted,
**CONSUMER ATTORNEYS, PLLC**
*/s/ Emanuel Kataev, Esq.*
Emanuel Kataev, Esq.
6829 Main Street
Flushing, NY 11367-1305
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
ekataev@consumerattorneys.com

*Admitted pro hac vice*

David Pinkhasov, FL # 1040933
6829 Main Street
Flushing, NY 11367
(718) 701-4605 (office)
(718) 715-1750 (facsimile)
dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiff*
*Quennel Jackson*

**<u>VIA ECF</u>**
All counsel of record